## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

HUMANE SOCIETY OF THE UNITED STATES, *et al.*,
Plaintiffs-Appellees,

v.

S.M.R. JEWELL, *et al.*,
STATE OF WISCONSIN, *et al.*, and
U.S. SPORTSMEN'S ALLIANCE FOUNDATION, et al.,
Defendants-Appellants

———————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————

## STATUTORY AND REGULATORY ADDENDUM

———————————

JOHN C. CRUDEN
  *Assistant Attorney General*

*Of Counsel:*
BENJAMIN C. JESUP
SHARON PUDWILL
  *Office of the Solicitor*
  *U.S. Department of the Interior*
  *Washington, DC 20240*

DAVID C. SHILTON
ANDREA GELATT
MICHAEL R. EITEL
JOAN M. PEPIN
  *Environment and Natural*
  *Resources Div.*
  *U.S. Department of Justice*
  *P.O. Box 7415*
  *Washington, D.C. 20044*
  *(202) 305-4626*
  *joan.pepin@usdoj.gov*

# STATUTORY AND REGULATORY ADDENDUM
## TABLE OF CONTENTS

Endangered Species Act

Section 2, Congressional findings and declaration of purpose
and policy, 16 U.S.C. § 1531 .................................................... A1

Section 3, Definitions, 16 U.S.C. § 1532 ...................................... A2

Section 4, Determination of endangered species and threatened
species, 16 U.S.C. § 1533 ......................................................... A4

Pub. L. No. 93-205, 87 Stat. 884 (1973) (excerpt) ............................... A10

50 C.F.R. § 17.11(g) ................................................................... A13

50 C.F.R. § 402.02 ...................................................................... A15

*Reclassification of the Gray Wolf,* 43 Fed. Reg. 9607 (Mar. 9, 1978) .. A18

*Policy Regarding the Recognition of Distinct Vertebrate
Population Segments Under the Endangered Species
Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996) ......................................... A27

*Final Policy on Interpretation of the Phrase "Significant
Portion of Its Range" in the Endangered Species Act's
Definitions of "Endangered Species" and "Threatened
Species,"* 79 Fed. Reg. 37,578 (July 1, 2014) ............................... A31

## CHAPTER 34—RURAL ENVIRONMENTAL CONSERVATION PROGRAM

### §§1501 to 1508. Repealed. Pub. L. 104–127, title III, §336(d)(1), Apr. 4, 1996, 110 Stat. 1006

Section 1501, Pub. L. 91–524, title X, §1001, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 241; amended Pub. L. 93–125, §1(g)(i), Oct. 18, 1973, 87 Stat. 450; Pub. L. 99–198, title XIII, §1318(b)(2), Dec. 23, 1985, 99 Stat. 1531, related to establishment and purpose of program, contracting and purchasing authority of Secretary, and maintenance of continuing and stable supply of agricultural commodities and forest products.

Section 1502, Pub. L. 91–524, title X, §1002, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 242, required eligible landowners and operators to furnish plan of farming operations or land use to Secretary.

Section 1503, Pub. L. 91–524, title X, §1003, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 242; amended Pub. L. 93–125, §1(g)(i), Oct. 18, 1973, 87 Stat. 450, related to approved conservation plans as basis for contracts, duties under contracts, and termination or modification of contracts.

Section 1504, Pub. L. 91–524, title X, §1004, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 243, authorized furnishing of conservation materials to eligible owners and operators.

Section 1505, Pub. L. 91–524, title X, §1005, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 243; amended Pub. L. 95–113, title XV, §1509, Sept. 29, 1977, 91 Stat. 1022, authorized establishment of multiyear set-aside contracts.

Section 1506, Pub. L. 91–524, title X, §1006, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 244, authorized issuance of rules and regulations as well as limitations on total retired acreage.

Section 1507, Pub. L. 91–524, title X, §1007, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 244; amended Pub. L. 93–125, §1(g)(ii), Oct. 18, 1973, 87 Stat. 450, directed appointment of advisory boards to assist in development of programs under this chapter.

Section 1508, Pub. L. 91–524, title X, §1008, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 244, directed coordination with and utilization of Federal, State, and local services and facilities to carry out programs and plans.

### §1509. Repealed. Pub. L. 95–313, §16(a)(7), formerly §13(a)(7), July 1, 1978, 92 Stat. 374; renumbered §16(a)(7), Pub. L. 101–624, title XII, §1215(1), Nov. 28, 1990, 104 Stat. 3525

Section, Pub. L. 91–524, title X, §1009, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 245, set forth provisions relating to establishment, funding requirements, etc., for the forestry incentives program.

EFFECTIVE DATE OF REPEAL

Section repealed effective Oct. 1, 1978, see section 17 of Pub. L. 95–313, set out as an Effective Date note under section 2101 of this title.

### §1510. Repealed. Pub. L. 104–127, title III, §336(d)(1), Apr. 4, 1996, 110 Stat. 1006

Section, Pub. L. 91–524, title X, §1010, as added Pub. L. 93–86, §1(28), Aug. 10, 1973, 87 Stat. 245; amended Pub. L. 95–313, §16(a)(7), formerly §13(a)(7), July 1, 1978, 92 Stat. 374, renumbered §16(a)(7), Pub. L. 101–624, title XII, §1215(1), Nov. 28, 1990, 104 Stat. 3525, related to authorization of appropriations as well as construction and continuation of programs, contracts, and authorities.

## CHAPTER 35—ENDANGERED SPECIES

Sec.
1531. Congressional findings and declaration of purposes and policy.
1532. Definitions.
1533. Determination of endangered species and threatened species.
1534. Land acquisition.
1535. Cooperation with States.
1536. Interagency cooperation.
1537. International cooperation.
1537a. Convention implementation.
1538. Prohibited acts.
1539. Exceptions.
1540. Penalties and enforcement.
1541. Endangered plants.
1542. Authorization of appropriations.
1543. Construction with Marine Mammal Protection Act of 1972.
1544. Annual cost analysis by Fish and Wildlife Service.

### §1531. Congressional findings and declaration of purposes and policy

#### (a) Findings

The Congress finds and declares that—

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to—

(A) migratory bird treaties with Canada and Mexico;

(B) the Migratory and Endangered Bird Treaty with Japan;

(C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

(D) the International Convention for the Northwest Atlantic Fisheries;

(E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

(F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

(G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

#### (b) Purposes

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and

threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

**(c) Policy**

(1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

(2) It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

(Pub. L. 93–205, § 2, Dec. 28, 1973, 87 Stat. 884; Pub. L. 96–159, § 1, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, § 9(a), Oct. 13, 1982, 96 Stat. 1426; Pub. L. 100–478, title I, § 1013(a), Oct. 7, 1988, 102 Stat. 2315.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (b) and (c)(1), was in the original "this Act", meaning Pub. L. 93–205, Dec. 28, 1973, 81 Stat. 884, as amended, known as the "Endangered Species Act of 1973", which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out below and Tables.

AMENDMENTS

1988—Subsec. (a)(4)(G). Pub. L. 100–478 substituted "; and" for period at end.

1982—Subsec. (c). Pub. L. 97–304 designated existing provisions as par. (1) and added par. (2).

1979—Subsec. (a)(5). Pub. L. 96–159 substituted "wildlife, and plants" for "wildlife".

EFFECTIVE DATE

Pub. L. 93–205, § 16, Dec. 28, 1973, 87 Stat. 903, provided that: "This Act [enacting this chapter, amending sections 460l–1, 460l–9, 668dd, 715i, 715s, 1362, 1371, 1372, and 1402 of this title and section 136 of Title 7, Agriculture, repealing sections 668aa to 668cc–6 of this title, and enacting provisions set out as notes under this section] shall take effect on the date of its enactment [Dec. 28, 1973]."

SHORT TITLE OF 1982 AMENDMENT

Pub. L. 97–304, § 1, Oct. 13, 1982, 96 Stat. 1411, provided: "That this Act [amending this section and sections 1532, 1533, 1535, 1536, 1537a, 1538, 1539, 1540, and 1542 of this title and enacting provisions set out as notes under sections 1533, 1537a, and 1539 of this title] may be cited as the 'Endangered Species Act Amendments of 1982'."

SHORT TITLE OF 1978 AMENDMENT

Pub. L. 95–632, § 1, Nov. 10, 1978, 92 Stat. 3751, provided: "That this Act [amending sections 1532 to 1536, 1538 to 1540, and 1542 of this title] may be cited as the 'Endangered Species Act Amendments of 1978'."

SHORT TITLE

Pub. L. 93–205, § 1, Dec. 28, 1973, 87 Stat. 884, provided: "That this Act [enacting this chapter, amending sections 460l–1, 460l–9, 668dd, 715i, 715s, 1362, 1371, 1372, and 1402 of this title and section 136 of Title 7, Agriculture, repealing sections 668aa to 668cc–6 of this title, and enacting provisions set out as notes under this section] may be cited as the 'Endangered Species Act of 1973'."

RELATIONSHIP TO ENDANGERED SPECIES ACT OF 1973

Pub. L. 102–251, title III, § 305, Mar. 9, 1992, 106 Stat. 66, as amended by Pub. L. 104–208, div. A, title I, § 101(a)

[title II, § 211(b)], Sept. 30, 1996, 110 Stat. 3009, 3009–41, provided that: "The special areas defined in section 3(24) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1802(24)) shall be considered places that are subject to the jurisdiction of the United States for the purposes of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.)."

MINIMIZATION OF CONFLICTS WITH RECREATIONAL FISHERIES

For provision that all Federal agencies minimize conflicts between recreational fisheries and administration of this chapter, see Ex. Ord. No. 12962, § 4, June 7, 1995, 60 F.R. 30770, set out as a note under section 1801 of this title.

## § 1532. Definitions

For the purposes of this chapter—

(1) The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

(2) The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however*, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

(3) The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

(4) The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

(5)(A) The term "critical habitat" for a threatened or endangered species means—

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

(B) Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

(C) Except in those circumstances determined by the Secretary, critical habitat shall

not include the entire geographical area which can be occupied by the threatened or endangered species.

(6) The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

(7) The term "Federal agency" means any department, agency, or instrumentality of the United States.

(8) The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

(9) The term "foreign commerce" includes, among other things, any transaction—

(A) between persons within one foreign country;

(B) between persons in two or more foreign countries;

(C) between a person within the United States and a person in a foreign country; or

(D) between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

(10) The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

(11) Repealed. Pub. L. 97–304, § 4(b), Oct. 13, 1982, 96 Stat. 1420.

(12) The term "permit or license applicant" means, when used with respect to an action of a Federal agency for which exemption is sought under section 1536 of this title, any person whose application to such agency for a permit or license has been denied primarily because of the application of section 1536(a) of this title to such agency action.

(13) The term "person" means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

(14) The term "plant" means any member of the plant kingdom, including seeds, roots and other parts thereof.

(15) The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

(16) The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

(17) The term "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(18) The term "State agency" means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

(19) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(20) The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

(21) The term "United States", when used in a geographical context, includes all States.

(Pub. L. 93–205, § 3, Dec. 28, 1973, 87 Stat. 885; Pub. L. 94–359, § 5, July 12, 1976, 90 Stat. 913; Pub. L. 95–632, § 2, Nov. 10, 1978, 92 Stat. 3751; Pub. L. 96–159, § 2, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, § 4(b), Oct. 13, 1982, 96 Stat. 1420; Pub. L. 100–478, title I, § 1001, Oct. 7, 1988, 102 Stat. 2306.)

REFERENCES IN TEXT

Reorganization Plan Numbered 4 of 1970, referred to in par. (15), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

AMENDMENTS

1988—Par. (13). Pub. L. 100–478, § 1001(a), amended par. (13) generally. Prior to amendment, par. (13) read as follows: "The term 'person' means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government."

Par. (15). Pub. L. 100–478, § 1001(b), inserted "also" before "means the Secretary of Agriculture".

1982—Par. (11). Pub. L. 97–304 struck out par. (11) which defined "irresolvable conflict" as, with respect to any action authorized, funded, or carried out by a Federal agency, a set of circumstances under which, after consultation as required in section 1536(a) of this title, completion of such action would violate section 1536(a)(2) of this title.

1979—Par. (11). Pub. L. 96–159 substituted "action would violate section 1536(a)(2) of this title" for "action would (A) jeopardize the continued existence of an endangered or threatened species, or (B) result in the adverse modification or destruction of a critical habitat".

1978—Pars. (1) to (4). Pub. L. 95–632, § 2(1), (7), added par. (1) and redesignated former pars. (1) to (3) as (2) to (4), respectively. Former par. (4) redesignated (6).

Par. (5). Pub. L. 95–632, §2(2), (7), added par. (5). Former par. (5) redesignated (8).

Par. (6). Pub. L. 95–632, §2(7), redesignated former par. (4) as (6). Former par. (6) redesignated (9).

Par. (7). Pub. L. 95–632, §2(3), (7), added par. (7). Former par. (7) redesignated (10).

Pars. (8) to (10). Pub. L. 95–632, §2(7), redesignated former pars. (5) to (7) as (8) to (10), respectively. Former pars. (8) to (10) redesignated (13) to (15), respectively.

Pars. (11), (12). Pub. L. 95–632, §2(4), (7), added pars. (11) and (12). Former pars. (11) and (12) redesignated (16) and (17), respectively.

Pars. (13) to (15). Pub. L. 95–632, §2(7), redesignated former pars. (8) to (10) as (13) to (15), respectively. Former pars. (13) to (15) redesignated as (18) to (20), respectively.

Par. (16). Pub. L. 95–632, §2(5), (7), redesignated former par. (11) as (16) and substituted "and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature" for "and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature". Former par. (16) redesignated (21).

Par. (17). Pub. L. 95–632, §2(7), redesignated former par. (12) as (17).

Par. (18). Pub. L. 95–632, §2(6), (7), redesignated former par. (13) as (18) and substituted "fish, plant, or wildlife" for "fish or wildlife".

Pars. (19) to (21). Pub. L. 95–632, §2(7), redesignated pars. (14) to (16) as (19) to (21), respectively.

1976—Par. (1). Pub. L. 94–359 inserted ": *Provided, however,* That it does not include exhibition of commodities by museums or similar cultural or historical organizations." after "facilitating such buying and selling".

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## § 1533. Determination of endangered species and threatened species

### (a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

(A) in any case in which the Secretary of Commerce determines that such species should—

(i) be listed as an endangered species or a threatened species, or

(ii) be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior; who shall list such species in accordance with this section;

(B) in any case in which the Secretary of Commerce determines that such species should—

(i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C) the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3)(A) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—

(i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii) may, from time-to-time thereafter as appropriate, revise such designation.

(B)(i) The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

(ii) Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

(iii) Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

### (b) Basis for determinations

(1)(A) The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

(B) In carrying out this section, the Secretary shall give consideration to species which have been—

(i) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii) identified as in danger of extinction, or likely to become so within the foreseeable fu-

ture, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

(2) The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

(3)(A) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The petitioned action is warranted, but that—

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be

treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii) The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7[1] to prevent a significant risk to the well being of any such species.

(D)(i) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii) Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

(4) Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

(5) With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall—

(A) not less than 90 days before the effective date of the regulation—

(i) publish a general notice and the complete text of the proposed regulation in the Federal Register, and

(ii) give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county, or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

(B) insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

(C) give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

(D) publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

_____
[1] So in original. Probably should be paragraph "(7)".

(E) promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

(6)(A) Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register—

(i) if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either—

(I) a final regulation to implement such determination,

(II) a final regulation to implement such revision or a finding that such revision should not be made,

(III) notice that such one-year period is being extended under subparagraph (B)(i), or

(IV) notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

(ii) subject to subparagraph (C), if a designation of critical habitat is involved, either—

(I) a final regulation to implement such designation, or

(II) notice that such one-year period is being extended under such subparagraph.

(B)(i) If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

(ii) If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

(iii) If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

(C) A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that—

(i) it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

(ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(7) Neither paragraph (4), (5), or (6) of this subsection nor section 553 of title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if—

(A) at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

(B) in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8) The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

(c) Lists

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or

threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e) Similarity of appearance cases**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to section 4 if he finds that—

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f) Recovery plans**

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as ''recovery plans'') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5) Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g) Monitoring**

(1) The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c) of this section.

(2) The Secretary shall make prompt use of the authority under paragraph 7[2] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to—

---

[2] So in original. Probably should be paragraph ''(7)''.

(1) procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

(2) criteria for making the findings required under such subsection with respect to petitions;

(3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

(4) a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition**

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) of this section files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3) of this section, the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

(Pub. L. 93–205, § 4, Dec. 28, 1973, 87 Stat. 886; Pub. L. 94–359, § 1, July 12, 1976, 90 Stat. 911; Pub. L. 95–632, §§ 11, 13, Nov. 10, 1978, 92 Stat. 3764, 3766; Pub. L. 96–159, § 3, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, § 2(a), Oct. 13, 1982, 96 Stat. 1411; Pub. L. 100–478, title I, §§ 1002–1004, Oct. 7, 1988, 102 Stat. 2306, 2307; Pub. L. 108–136, div. A, title III, § 318, Nov. 24, 2003, 117 Stat. 1433.)

REFERENCES IN TEXT

Reorganization Plan Numbered 4 of 1970, referred to in subsec. (a)(2), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

The Federal Advisory Committee Act, referred to in subsec. (f)(2), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5.

AMENDMENTS

2003—Subsec. (a)(3). Pub. L. 108–136, § 318(a), designated existing provisions as subpar. (A), redesignated former subpars. (A) and (B) as cls. (i) and (ii), respectively, and added subpar. (B).

Subsec. (b)(2). Pub. L. 108–136, § 318(b), inserted "the impact on national security," after "the economic impact,".

1988—Subsec. (b)(3)(C)(iii). Pub. L. 100–478, § 1002(a), added subcl. (iii).

Subsec. (e). Pub. L. 100–478, § 1002(b), substituted "regulation of commerce or taking," for "regulation," in introductory provisions.

Subsec. (f). Pub. L. 100–478, § 1003, amended subsec. (f) generally. Prior to amendment, subsec. (f) read as follows: "The Secretary shall develop and implement plans (hereinafter in this subsection referred to as 're-

covery plans') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans (1) shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other developmental projects or other forms of economic activity, and (2) may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act."

Subsecs. (g) to (i). Pub. L. 100–478, § 1004, added subsec. (g) and redesignated former subsecs. (g) and (h) as (h) and (i), respectively.

1982—Subsec. (a)(1). Pub. L. 97–304, § 2(a)(1)(B), (D), inserted "promulgated in accordance with subsection (b) of this section" after "shall by regulation" in introductory provisions preceding subpar. (A), and struck out provision following subpar. (E), which directed the Secretary, at the time regulations were proposed, to specify any habitat of a species considered to be a critical habitat but that such specification of critical habitats not apply to species listed prior to Nov. 10, 1978.

Subsec. (a)(1)(A). Pub. L. 97–304, § 2(a)(1)(A), redesignated subpar. (1) as (A).

Subsec. (a)(1)(B). Pub. L. 97–304, § 2(a)(1)(A), (C), redesignated subpar. (2) as (B) and substituted "recreational," for "sporting,".

Subsec. (a)(1)(C) to (E). Pub. L. 97–304, § 2(a)(1)(A), redesignated subpars. (3), (4), and (5) as (C), (D), and (E), respectively.

Subsec. (a)(3). Pub. L. 97–304, § 2(a)(1)(E), added par. (3).

Subsec. (b). Pub. L. 97–304, § 2(a)(2), completely revised subsec. (b) by, among other changes, requiring the Secretary to base determinations regarding the listing or delisting of species "solely" on the basis of the best scientific and commercial data available, streamlining the listing process by reducing the time periods for rulemaking, consolidating public meetings and hearing requirements, and establishing virtually identical procedures for the listing and delisting of species and for the designation of critical habitat, and altering the evidentiary standard which petitioners must satisfy to warrant a status review of the species proposed for listing or delisting.

Subsec. (c)(1). Pub. L. 97–304, § 2(a)(3)(A), struck out ", and from time to time he may by regulation revise," after "Federal Register" and inserted provision directing the Secretary to revise from time to time each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

Subsec. (c)(2). Pub. L. 97–304, § 2(a)(3)(B), (C), redesignated par. (4) as (2). Former par. (2), directing the Secretary, within 90 days of the receipt of the petition of an interested person under section 553(e) of title 5, to conduct and publish in the Federal Register a review of the status of any listed or unlisted species proposed to be removed from or added to either of the lists published pursuant to paragraph (1) of this subsection, but only if he made and published a finding that such person had presented substantial evidence which in his judgment warranted such a review, was struck out.

Subsec. (c)(3). Pub. L. 97–304, § 2(a)(3)(B), struck out par. (3) which had provided that any list in effect on Dec. 27, 1973, of species of fish or wildlife determined by the Secretary of the Interior, pursuant to the Endangered Species Conservation Act of 1969, to be threatened with extinction be republished to conform to the classification for endangered species or threatened species, as the case might be, provided for in this chapter, but until such republication, any such species so listed was to be deemed an endangered species within the meaning of this chapter, and that the republication of

any species pursuant to this paragraph did not require public hearing or comment under section 553 of title 5.

Subsec. (c)(4). Pub. L. 97–304, §2(a)(3)(C), redesignated par. (4) as (2).

Subsec. (d). Pub. L. 97–304, §2(a)(4)(A), substituted "section 1535(c) of this title" for "section 1535(a) of this title".

Subsec. (f). Pub. L. 97–304, §2(a)(4)(B), (C), (D), redesignated subsec. (g) as (f) and substituted "recovery plans (1) shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other developmental projects or other forms of economic activity, and (2)" for "recovery plans,". Former subsec. (f), relating to the promulgation of regulations, was struck out.

Subsec. (g). Pub. L. 97–304, §2(a)(4)(C), (E), redesignated subsec. (h) as (g), substituted reference to subsection (b)(3) of this section for reference to subsection (c)(2) of this section in par. (1), substituted "under subsection (a)(1) of this section" for "for listing" in par. (3), and substituted "subsection (f) of this section" for "subsection (g) of this section" in par. (4). Former subsec. (g) redesignated (f).

Subsec. (h). Pub. L. 97–304, §2(a)(4)(C), (F), added subsec. (h) and redesignated former subsec. (h) as (g).

1979—Subsec. (b)(1). Pub. L. 96–159, §3(1), required the Secretary's determinations to be preceded with a review of the status of the species.

Subsec. (f)(2)(B)(i). Pub. L. 96–159, §3(2), required publication of summary of text rather than of the complete text of proposed regulation specifying any critical habitat and inclusion of a map of the proposed critical habitat.

Subsec. (f)(2)(B)(iv)(II). Pub. L. 96–159, §3(3), substituted "if requested within 15 days after the date on which the public meeting is conducted," for "if requested,".

Subsec. (f)(2)(C). Pub. L. 96–159, §3(4), (5), inserted in introductory text ", subsection (b)(4) of this section,"; and in cl. (ii), included reference to significant risk to wellbeing of any species of plants, inserted in item (II) reference to regulation applicable to resident species of plants, extended the statutory period to a "240-day period" from a "120-day period", and provided for withdrawal of an emergency regulation without substantial evidence to warrant it, respectively.

Subsec. (h). Pub. L. 96–159, §3(6), added subsec. (h).

1978—Subsec. (a)(1). Pub. L. 95–632, §11(1), inserted provision requiring the Secretary, at the time a regulation is proposed, to specify by regulation any habitat of the species involved which is considered a critical habitat providing the species was listed subsequent to Nov. 10, 1978.

Subsec. (b)(4). Pub. L. 95–632, §11(7), added par. (4).

Subsec. (c)(1). Pub. L. 95–632, §11(2), struck out "and shall" after "if any" and inserted ", and specify any critical habitat within such range" after "endangered or threatened".

Subsec. (c)(2). Pub. L. 95–632, §11(6), substituted "within 90 days of the receipt of" for "upon" and "conduct and publish in the Federal Register a review of the status of" for "conduct a review of" and inserted a provision requiring that the review and findings be made and published prior to initiation of any procedures under subsec. (b)(1) of this section.

Subsec. (c)(4). Pub. L. 95–632, §11(3), added par. (4).

Subsec. (f)(2)(A). Pub. L. 95–632, §11(4)(A), substituted "Except as provided in subparagraph (B), in" for "In".

Subsec. (f)(2)(B), (C). Pub. L. 95–632, §11(4)(B), (C), added subpar. (B), redesignated former subpar. (B) as (C), and as so redesignated, substituted "Neither subparagraph (A) or (B)" for "Neither subparagraph (A)".

Subsec. (f)(3). Pub. L. 95–632, §13, substituted "a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulations" for "a statement by the Secretary of the facts on which such regulation is based and the relationship of such facts to such regulation".

Subsec. (f)(4), (5). Pub. L. 95–632, §11(4)(D), added pars. (4) and (5).

Subsec. (g). Pub. L. 95–632, §11(5), added subsec. (g).

1976—Subsec. (f)(2)(B)(ii). Pub. L. 94–359 substituted "subsection (b)(1)(A)" for "subsection (b)(A), (B), and (C)".

EFFECTIVE DATE OF 1982 AMENDMENT

Pub. L. 97–304, §2(b), Oct. 13, 1982, 96 Stat. 1416, provided that:

"(1) Any petition filed under section 4(c)(2) of the Endangered Species Act of 1973 [subsec. (c)(2) of this section] (as in effect on the day before the date of the enactment of this Act [Oct. 13, 1982]) and any regulation proposed under section 4(f) of such Act of 1973 [subsec. (f) of this section] (as in effect on such day) that is pending on such date of enactment [Oct. 13, 1982] shall be treated as having been filed or proposed on such date of enactment under section 4(b) of such Act of 1973 [subsec. (b) of this section] (as amended by subsection (a)); and the procedural requirements specified in such section 4(b) [subsec. (b) of this section] (as so amended) regarding such petition or proposed regulation shall be deemed to be complied with to the extent that like requirements under such section 4 [this section] (as in effect before the date of the enactment of this Act) were complied with before such date of enactment.

"(2) Any regulation proposed after, or pending on, the date of the enactment of this Act [Oct. 13, 1982] to designate critical habitat for a species that was determined before such date of enactment to be endangered or threatened shall be subject to the procedures set forth in section 4 of such Act of 1973 [this section] (as amended by subsection (a)) for regulations proposing revisions to critical habitat instead of those for regulations proposing the designation of critical habitat.

"(3) Any list of endangered species or threatened species (as in effect under section 4(c) of such Act of 1973 [subsec. (c) of this section] on the day before the date of the enactment of this Act [Oct. 13, 1982]) shall remain in effect unless and until determinations regarding species and designations and revisions of critical habitats that require changes to such list are made in accordance with subsection (b)(5) of such Act of 1973 [subsec. (b)(5) of this section] (as added by subsection (a)).

"(4) Section 4(a)(3)(A) of such Act of 1973 [subsec. (a)(3)(A) of this section] (as added by subsection (a)) shall not apply with respect to any species which was listed as an endangered species or a threatened species before November 10, 1978."

ABOLITION OF HOUSE COMMITTEE ON MERCHANT MARINE AND FISHERIES

Committee on Merchant Marine and Fisheries of House of Representatives abolished and its jurisdiction transferred by House Resolution No. 6, One Hundred Fourth Congress, Jan. 4, 1995. Committee on Merchant Marine and Fisheries of House of Representatives treated as referring to Committee on Resources of House of Representatives in case of provisions relating to fisheries, wildlife, international fishing agreements, marine affairs (including coastal zone management) except for measures relating to oil and other pollution of navigable waters, or oceanography by section 1(b)(3) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Resources of House of Representatives changed to Committee on Natural Resources of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

## § 1534. Land acquisition

### (a) Implementation of conservation program; authorization of Secretary and Secretary of Agriculture

The Secretary, and the Secretary of Agriculture with respect to the National Forest Sys-

Public Law 93-205

December 28, 1973
[S. 1983]

AN ACT

To provide for the conservation of endangered and threatened species of fish, wildlife, and plants, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Endangered Species Act of 1973".

Endangered
Species Act of
1973.

## TABLE OF CONTENTS

Sec. 2. Findings, purposes, and policy.
Sec. 3. Definitions.
Sec. 4. Determination of endangered species and threatened species.
Sec. 5. Land acquisition.
Sec. 6. Cooperation with the States.
Sec. 7. Interagency cooperation.
Sec. 8. International cooperation.
Sec. 9. Prohibited acts.
Sec. 10. Exceptions.
Sec. 11. Penalties and enforcement.
Sec. 12. Endangered plants.
Sec. 13. Conforming amendments.
Sec. 14. Repealer.
Sec. 15. Authorization of appropriations.
Sec. 16. Effective date.
Sec. 17. Marine Mammal Protection Act of 1972.

### FINDINGS, PURPOSES, AND POLICY

SEC. 2. (a) FINDINGS.—The Congress finds and declares that—

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to—

(A) migratory bird treaties with Canada and Mexico;

(B) the Migratory and Endangered Bird Treaty with Japan;

56 Stat. 1354.

(C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

1 UST 477.

(D) the International Convention for the Northwest Atlantic Fisheries;

4 UST 380.

(E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

(F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

(G) other international agreements.

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the

Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish and wildlife.

(b) Purposes.—The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

(c) Policy.—It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act.

### DEFINITIONS

Sec. 3. For the purposes of this Act—

(1) The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling.

(2) The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

(3) The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

(4) The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this Act would present an overwhelming and overriding risk to man.

(5) The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

(6) The term "foreign commerce" includes, among other things, any transaction—

(A) between persons within one foreign country;

(B) between persons in two or more foreign countries;

(C) between a person within the United States and a person in a foreign country; or

(D) between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

(7) The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any

place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

(8) The term "person" means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government.

(9) The term "plant" means any member of the plant kingdom, including seeds, roots and other parts thereof.

84 Stat. 2090.
5 USC app. II.

(10) The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this Act and the Convention which pertain to the importation or exportation of terrestrial plants, the term means the Secretary of Agriculture.

(11) The term "species" includes any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature.

(12) The term "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(13) The term "State agency" means the State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish or wildlife resources within a State.

(14) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(15) The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

(16) The term "United States", when used in a geographical context, includes all States.

### DETERMINATION OF ENDANGERED SPECIES AND THREATENED SPECIES

SEC. 4. (a) GENERAL.—(1) The Secretary shall by regulation determine whether any species is an endangered species or a threatened species because of any of the following factors:

(1) the present or threatened destruction, modification, or curtailment of its habitat or range;

(2) overutilization for commercial, sporting, scientific, or educational purposes;

(3) disease or predation;

(4) the inadequacy of existing regulatory mechanisms; or

(5) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

(A) in any case in which the Secretary of Commerce determines that such species should—

(i) be listed as an endangered species or a threatened species, or

and 1018–0094. The Service may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number. We are collecting this information to provide information necessary to evaluate permit applications. We will use this information to review permit applications and make decisions, according to criteria established in various Federal wildlife conservation statutes and regulations, on the issuance, suspension, revocation, or denial of permits. You must respond to obtain or retain a permit. We estimate the public reporting burden for these reporting requirements to vary from 2 to 2½ hours per response, including time for reviewing instructions, gathering and maintaining data, and completing and reviewing the forms. Direct comments regarding the burden estimate or any other aspect of these reporting requirements to the Service Information Collection Control Officer, MS–222 ARLSQ, U.S. Fish and Wildlife Service, Washington, DC 20240, or the Office of Management and Budget, Paperwork Reduction Project (1018–0093/0094), Washington, DC 20603.

[63 FR 52635, Oct. 1, 1998. Redesignated at 72 FR 48446, Aug. 23, 2007]

## Subpart B—Lists

### §17.11  Endangered and threatened wildlife.

(a) The list in this section contains the names of all species of wildlife which have been determined by the Services to be Endangered or Threatened. It also contains the names of species of wildlife treated as Endangered or Threatened because they are sufficiently similar in appearance to Endangered or Threatened species (see §17.50 *et seq.*).

(b) The columns entitled "Common Name," "Scientific Name," and "Vertebrate Population Where Endangered or Threatened" define the species of wildlife within the meaning of the Act. Thus, differently classified geographic populations of the same vertebrate subspecies or species shall be identified by their differing geographic boundaries, even though the other two columns are identical. The term "Entire" means that all populations throughout the present range of a vertebrate species are listed. Although common names are included, they cannot be relied upon for identification of any specimen, since they may vary greatly in local usage. The Services shall use the most recently accepted scientific name. In cases in which confusion might arise, a synonym(s) will be provided in parentheses. The Services shall rely to the extent practicable on the *International Code of Zoological Nomenclature.*

(c) In the "Status" column the following symbols are used: "E" for Endangered, "T" for Threatened, and "E [or T] (S/A)" for similarity of appearance species.

(d) The other data in the list are nonregulatory in nature and are provided for the information of the reader. In the annual revision and compilation of this title, the following information may be amended without public notice: the spelling of species' names, historical range, footnotes, references to certain other applicable portions of this title, synonyms, and more current names. In any of these revised entries, neither the species, as defined in paragraph (b) of this section, nor its status may be changed without following the procedures of part 424 of this title.

(e) The "historic range" indicates the known general distribution of the species or subspecies as reported in the current scientific literature. The present distribution may be greatly reduced from this historic range. This column does not imply any limitation on the application of the prohibitions in the Act or implementing rules. Such prohibitions apply to all individuals of the species, wherever found.

(f)(1) A footnote to the FEDERAL REGISTER publication(s) listing or reclassifying a species is indicated under the column "When listed." Footnote numbers to §§17.11 and 17.12 are in the same numerical sequence, since plants and animals may be listed in the same FEDERAL REGISTER document. That document, at least since 1973, includes a statement indicating the basis for the listing, as well as the effective date(s) of said listing.

(2) The ''Special rules'' and ''Critical habitat'' columns provide a cross reference to other sections in parts 17, 222, 226, or 227. The ''Special rules'' column will also be used to cite the special rules that describe experimental populations and determine if they are essential or nonessential. Separate listing will be made for experimental populations, and the status column will include the following symbols: ''XE'' for an essential experimental population and ''XN'' for a nonessential experimental population. The term ''NA'' (not applicable) appearing in either of these two columns indicates that there are no special rules and/or critical habitat for that particular species. However, all other appropriate rules in parts 17, 217 through 227, and 402 still apply to that species. In addition, there may be other rules in this title that relate to such wildlife, e.g., port-of-entry requirements. It is not intended that the references in the ''Special rules'' column list all the regulations of the two Services which might apply to the species or to the regulations of other Federal agencies or State or local governments.

(g) The listing of a particular taxon includes all lower taxonomic units. For example, the genus *Hylobates* (gibbons) is listed as Endangered throughout its entire range (China, India, and SE Asia); consequently, all species, subspecies, and populations of that genus are considered listed as Endangered for the purposes of the Act. In 1978 (43 FR 6230–6233) the species *Haliaeetus leucocephalus* (bald eagle) was listed as Threatened in ''USA (WA, OR, MN, WI, MI)'' rather than its entire population; thus, all individuals of the bald eagle found in those five States are considered listed as Threatened for the purposes of the Act.

(h) The ''List of Endangered and Threatened Wildlife'' is provided below:

any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat. Section 7(a)(3) of the Act authorizes a prospective permit or license applicant to request the issuing Federal agency to enter into early consultation with the Service on a proposed action to determine whether such action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Section 7(a)(4) of the Act requires Federal agencies to confer with the Secretary on any action that is likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat. Section 7(b) of the Act requires the Secretary, after the conclusion of early or formal consultation, to issue a written statement setting forth the Secretary's opinion detailing how the agency action affects listed species or critical habitat Biological assessments are required under section 7(c) of the Act if listed species or critical habitat may be present in the area affected by any major construction activity as defined in §404.02. Section 7(d) of the Act prohibits Federal agencies and applicants from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. Section 7(e)–(o)(1) of the Act provide procedures for granting exemptions from the requirements of section 7(a)(2). Regulations governing the submission of exemption applications are found at 50 CFR part 451, and regulations governing the exemption process are found at 50 CFR parts 450, 452, and 453.

(b) The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) share responsibilities for administering the Act. The Lists of Endangered and Threatened Wildlife and Plants are found in 50 CFR 17.11 and 17.12 and the designated critical habitats are found in 50 CFR 17.95 and 17.96 and 50 CFR part 226. Endangered or threatened species under the jurisdiction of the NMFS are located in 50 CFR 222.23(a) and 227.4. If the subject species is cited in 50 CFR 222.23(a) or 227.4, the Federal agency shall contact the NMFS. For all other listed species the Federal Agency shall contact the FWS.

§402.02 **Definitions.**

*Act* means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 *et seq.*

*Action* means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;

(b) the promulgation of regulations;

(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

(d) actions directly or indirectly causing modifications to the land, water, or air.

*Action area* means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

*Applicant* refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

*Biological assessment* refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

*Biological opinion* is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

*Conference* is a process which involves informal discussions between a Federal agency and the Service under section

313

A15

7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

*Conservation recommendations* are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

*Critical habitat* refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

*Cumulative effects* are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

*Designated non-Federal representative* refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

*Destruction or adverse modification* means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

*Director* refers to the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration, or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out.

*Early consultation* is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

*Effects of the action* refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the antici-

pated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

*Formal consultation* is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

*Incidental take* refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

*Informal consultation* is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

*Listed species* means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11–17.12.

*Major construction activity* is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

*Preliminary biological opinion* refers to an opinion issued as a result of early consultation.

*Proposed critical habitat* means habitat proposed in the FEDERAL REGISTER to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

*Proposed species* means any species of fish, wildlife, or plant that is proposed in the FEDERAL REGISTER to be listed under section 4 of the Act.

*Reasonable and prudent alternatives* refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

*Reasonable and prudent measures* refer to those actions the Director believes necessary or appropriate to minimize the impacts, *i.e.*, amount or extent, of incidental take.

*Recovery* means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

*Service* means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

[51 FR 19957, June 3, 1986, as amended at 73 FR 76286, Dec 16, 2008; 74 FR 20422, May 4, 2009]

### § 402.03  Applicability.

Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.

[74 FR 20423, May 4, 2009]

### § 402.04  Counterpart regulations.

The consultation procedures set forth in this part may be superseded for a particular Federal agency by joint counterpart regulations among that agency, the Fish and Wildlife Service, and the National Marine Fisheries Service. Such counterpart regulations shall be published in the FEDERAL REGISTER in proposed form and shall be subject to public comment for at least 60 days before final rules are published.

### § 402.05  Emergencies.

(a) Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)–(d) of the Act. This provision applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc.

(b) Formal consultation shall be initiated as soon as practicable after the emergency is under control. The Federal agency shall submit information on the nature of the emergency action(s), the justification for the expedited consultation, and the impacts to endangered or threatened species and their habitats. The Service will evaluate such information and issue a biological opinion including the information and recommendations given during the emergency consultation.

### § 402.06  Coordination with other environmental reviews.

(a) Consultation, conference, and biological assessment procedures under section 7 may be consolidated with interagency cooperation procedures required by other statutes, such as the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 *et seq.*, implemented at 40 CFR Parts 1500–1508) or the Fish and Wildlife Coordination Act (FWCA) (16 U.S.C. 661 *et seq.*). Satisfying the requirements of these other statutes, however, does not in itself relieve a Federal agency of its obligations to comply with the procedures set forth in this part or the substantive requirements of section 7. The Service will attempt to provide a coordinated review and analysis of all environmental requirements.

(b) Where the consultation or conference has been consolidated with the interagency cooperation procedures required by other statutes such as NEPA

315

A17

ting depredations on domestic animals will be authorized, this take is intended to ameliorate present conflict between the wolf and human interests. Such conflict would hinder conservation efforts and thus work against the long-term welfare of the wolf. A legal take is considered the only practical means by which depredations can be handled and the current problems relieved.

DATE: This rule becomes effective on April 10, 1978.

FOR FURTHER INFORMATION CONTACT:

Mr. Keith M. Schreiner, Associate Director for Federal Assistance, Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240, 202-343-4646.

SUPPLEMENTARY INFORMATION: Background: The gray wolf formerly occurred in most of the conterminous United States and Mexico. Because of widespread habitat destruction and human persecution, the species now occupies only a small part of its original range in these regions. Four subspecies of the gray wolf have been listed as Endangered pursuant to the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq.: the Mexican wolf (*Canis lupus baileyi*), of Mexico and the southwestern United States; the northern Rocky Mountain wolf (*C. l. irremotus*), possibly still found in parts of Wyoming, Montana, and Idaho; the eastern timber wolf (*C. l. lycaon*), now restricted to the northern Great Lakes region; and the Texas gray wolf (*C. l. monstrabilis*) formerly of Texas and Mexico and now probably extinct. This listing arrangement has not been satisfactory because the taxonomy of wolves is out of date, wolves may wander outside of recognized subspecific boundaries, and some wolves from unlisted subspecies may occur in certain parts of the lower 48 States. In any case, the Service wishes to recognize that the entire species *Canis lupus* is Endangered or Threatened to the south of Canada, and considers that this matter can be handled most conveniently by listing only the species name.

This rulemaking also will clarify the status of wolves within the designated range of *C. l. irremotus* and *C. l. lycaon* in Canada. These two subspecies were originally listed as Endangered at a time when there were two separate lists of Endangered species, one for foreign wildlife and one for native wildlife. Both subspecies were added only to the latter list, as published in the FEDERAL REGISTER of January 4, 1974 (39 FR 1171–1176), and thus for legal purposes were considered to be Endangered only within the United States. Subsequently, the two lists were combined into one List of Endangered and Threatened Wildlife,

[4310–55]

**Title 50—Wildlife and Fisheries**

**CHAPTER I—UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR**

**PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS**

**Reclassification of the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in Michigan and Minnesota**

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

SUMMARY: The Service issues a final rulemaking which provides for the reclassification of the gray wolf in the United States and Mexico, and for the determination of critical habitat for species of gray wolf in Michigan and Minnesota. The reclassification is considered to accurately express the current status of the gray wolf, based solely on an evaluation of the best available biological data. The special regulations being established in Minnesota are deemed necessary and advisable to provide for the future wellbeing of the species. Although an increased legal take of wolves commit-

## RULES AND REGULATIONS

covering both native and foreign species, as published on July 14, 1977 (42 FR 36420-36431). Examination of this list may give the impression that *C. l. irremotus* and *C. l. lycaon* are considered Endangered over their entire ranges, including Canadian areas. This rulemaking clearly indicates that the gray wolf is listed everywhere to the south of the Canadian border, but nowhere to the north.

Most current interest in the gray wolf centers on the eastern timber wolf, especially in Minnesota. As delineated by recent systematic sources, the original range of the subspecies *C. l. lycaon* included most of the region from Georgia to Maine, and between the Atlantic and the Great Plains. At present, however, the only substantial gray wolf population remaining in this region is in northern Minnesota. There also is a group on Isle Royale in Lake Superior, and possibly a few scattered individuals in northern Michigan and Wisconsin.

The eastern timber wolf was listed as Endangered in 1967, at a time when no Threatened category had been established by Federal legislation. Over the last decade the wolf continued to survive in northern Minnesota, and it became apparent that the species was not in immediate danger of being extirpated in the State. Numbers have fluctuated, but seem to have increased in some areas, and there has been an overall increase in range. Some wolves have entered areas with relatively extensive human settlement and made depredations on domestic animals. Many people have expressed concern about such depredations, and about the possibility that wolves could be detrimental to some deer herds in Minnesota, which have been undergoing a general decline because of several factors including habitat deterioration.

In a letter dated October 4, 1974, the Minnesota Department of Natural Resources petitioned the Service to exclude Minnesota from the range over which the eastern timber wolf is considered Endangered. In response, the Service issued a notice of review in the FEDERAL REGISTER of November 21, 1974 (39 FR 40877). Extensive public comment was received on this notice, mainly opposition from persons who were concerned that removal of the wolf from Endangered status would subject the species to excessive killing by man. Some support for delisting the wolf came from persons who felt that the continued total protection of the Endangered classification would result in serious depredations by the wolf on livestock and game.

Further measures by the Service were withheld pending formulation of recommendations by the Eastern Timber Wolf Recovery Team. This team is one of many appointed by the Service to develop Recovery Plans for Endangered and Threatened species. On June 9, 1977 (42 FR 29527-29533), the Service issued a proposed rulemaking on the gray wolf; this final rulemaking does not differ substantially from the proposal.

### SUMMARY OF COMMENTS

In response to the proposed rulemaking of June 9, 1977, the Governments of the following States sent letters expressing support or no opposition: Arkansas, Georgia, Illinois, Louisiana, Maryland, Maine, Michigan, Montana, New Mexico, New York, Oklahoma, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin, and Wyoming. In addition, responses, but no comments, were received from the Governments of Alabama, California, Connecticut, Delaware, Florida, Missouri, and North Carolina.

The Governor of Minnesota stated that the wolf in Minnesota should be classified neither as Endangered nor Threatened. He indicated that the proposal did not give sufficient reason for maintaining the species as Threatened, and that the regulations would not allow for adequate control of depredating wolves. The Service recognizes that there is disagreement regarding the application of the Threatened category, but now considers that the rationale given in the proposal, and repeated below, does justify this classification. The Service also considers that the proposed control provisions are all that can be supported on the basis of currently available data. The situation, however, will be closely monitored, and any modifications that seem warranted will be proposed.

The Governor also made the following recommendations (assuming that the wolf was classified as Threatened in Minnesota): Critical Habitat should be restricted to the northeastern part of the State; zone 3 "should not be designated as a sanctuary", because much of it is peat bog and thus poor deer habitat, and because it is surrounded by livestock country; no taking of wolves should be allowed in zone 2; the boundaries of zones 1 and 2 should be expressed in simpler language so that citizens would know the location of the "sanctuary"; zones 4 and 5 should be combined into one zone; and reporting of the taking of depredating wolves should be done quarterly, rather than within 5 days. In response, the Service first wants to make it clear that neither the proposed nor final regulations use the term "sanctuary". The regulations actually will reduce the area of total protection for the wolf in Minnesota from the entire State to only zone 1 in the northeastern corner. In all other parts of the State, depredating wolves may be taken under the conditions set

forth in the regulations. The Critical Habitat zones being established are not the same as a "sanctuary", and apply only to actions of Federal agencies affecting habitat conditions. Except for zone 1, depredating wolves may be taken within Critical Habitat. The Service considers that both zones 2 and 3, as well as the area surrounding zone 3, should be open to such taking. The Critical Habitat boundaries were recommended by authorities who have many years of field experience with wolves in this region, and the Service thinks these boundaries, except for the slight modifications indicated, should be the same as proposed. The boundaries will apply only to evaluation of Federal actions, and have nothing to do with any restriction of the movement or activity of private citizens of State agencies. Although all the same regulations will apply to zones 4 and 5, at least for a while, the Service prefers to maintain them as separate zones for informational purposes. The Service also prefers to keep the reporting period to 5 days, because of the importance of closely monitoring the rate, location, and circumstances of the taking of wolves.

The Secretary of State of Minnesota sent a copy of a resolution passed by the State Legislature and approved by the Governor. The resolution called for complete declassification of the wolf in Minnesota, and cited the following reasons: the wolf population had reached carrying capacity in many areas and was expanding into areas "not heretofore inhabited"; hardship was resulting from wolf depredations; the State had adequate resources and authority to effectively manage the wolf; and the Legislature believed it best for the State to have exclusive control of its resident wolf population. Only the first of these reasons is relevant to the factors that may legally be considered in determining the classification of a species under the Endangered Species Act. And, while it is recognized that the wolf may recently have increased its range in Minnesota, it is not entirely correct to say that the involved areas were "not heretofore inhabited", because at one time the wolf occupied the entire State. It is also probable that the wolf population has reached carrying capacity in some parts of Minnesota, but these areas represent a comparatively small portion of the original range of the species, and population density alone will not assure long-term welfare. The depredation problem is being dealt with under this rulemaking.

Expressions of objection to the proposal also were received from a number of other parties in Minnesota, including the Beltrami County Board of Commissioners, the Itasca County

Board of Commissioners, the City of Littlefork, the City of International Falls, the Sheriff of Roseau County, and State Senator Bob Lessard. In addition, State Representative Irv Anderson sent a detailed statement commenting negatively on the proposal. Much of this statement is devoted to the background of the situation, and to comparison with other Federal activities. Mr. Anderson indicated even a Threatened classification was unjustifiable for the wolf in Minnesota, although he went on to mention a potential conflict between the species and economic development in one area, and to suggest the possibility of the wolf becoming Endangered because of human attitudes. In any event, the Service stands by its original reasoning, as repeated below, for considering the wolf to be a Threatened species in Minnesota. Mr. Anderson also stated that the proposed special regulations were inadequate, because taking of wolves would not be allowed until after depredations had occurred, and then only by government agents. In practice, however, most taking of problem wolves has always been done by trappers who respond to complaints. Under the rulemaking, both State and Federal agents would be available for such action. It might be added here, for the information of all parties who recommended total declassification or more liberal taking regulations in Minnesota, that the Service could not take such measures, even if it wanted to, without first making an entirely new proposal and allowing a new period of public comment.

The U.S. Forest Service supported the reclassification and Critical Habitat designation, but requested assurance that biological subspecies would continue to be maintained and dealt with as separate entities. The Fish and Wildlife Service can give this assurance. The Forest Service also made a number of management recommendations, which will be considered at appropriate times.

The National Park Service also favored continued recognition of the different wolf subspecies, and in general supported the proposal. The Park Service, however, recommended enlargement of the Critical Habitat designation in Minnesota to include all of Voyageurs National Park and some adjacent lands. Recent studies have indicated that several packs of wolves in the Park depend partly on habitat not included in the proposal. The Fish and Wildlife Service has decided to follow this recommendation, and the delineation of zones given below reflects the changes called for by the Park Service. Approximately 13 square miles in Voyageurs National Park, and about 13 square miles outside of the Park have been added to zone 1. A reduc-

tion of about eight square miles in the size of zone 2 also has been made, based on new information provided by the Region 3 Office of the Fish and Wildlife Service, in Twin Cities, Minn.

Representative Abner J. Mikva of Illinois opposed the proposal, stating that the wolf should continue to be listed as Endangered in Minnesota, and that the Service should not give in to pressure for reclassification from a small interest group. The Service, however, does not consider that it is giving in, but rather that an accurate classification and proper regulations are being established.

The Defenders of Wildlife sent a detailed statement on the proposal, which it said was endorsed by three other conservation organizations: Fund for Animals, The Humane Society of the United States, and Let Live. Most of the statement consisted of various recommendations, which the Service will consider, but which are not directly related to preparation of this rulemaking. In addition, the statement expressed opposition to the separation of the wolf in Minnesota as a species for legal purposes, and warned that such a measure might set a precedent for pressure to make exceptions for other species in particular political areas. The Service understands this point, but, in the case of the wolf, considers that there is adequate legal basis for the rulemaking in section 3(11) of the Endangered Species Act; and sufficient biological basis in the long-established and striking difference between the status of the wolf in Minnesota and all other areas south of the Canadian border.

The Environmental Defense Fund "cautiously" supported the proposal, but issued a number of warnings of possible problems, which the Service will consider. The Service does strongly disagree with the contention that the reclassification proposal was based primarily on pressure from agricultural and political interests, rather than biological factors. The Service considers that the status of the wolf in Minnesota is accurately expressed by a Threatened classification, and that had this category been available in 1967 the eastern timber wolf probably would have been so listed. Also, the special regulations allowing some take of depredating wolves should not be viewed as a vindication of past illegal killing. These regulations express recognition of the need to deal with an active current problem. The Service will enforce these regulations to the limit of its ability, and will not tolerate any taking of wolves beyond that authorized.

The Fur and Trapping Ethics organization indicated opposition to reclassification in Minnesota, and suggested that instead of allowing the take of depredating wolves by special regula-

tion, the Service should permit such take under the provisions of section 10(a) of the Endangered Species Act. That section authorizes the issuance of permits to do anything otherwise prohibited by the Act, in order to enhance the survival of an Endangered species. Since the take of a few depredating wolves might moderate antagonism toward the entire species, it could be argued that such measures would enhance the survival of the species. The Service, however, considers a Threatened classification to be biologically justifiable in Minnesota, and under this classification a special regulation can be applied.

The Help Our Wolves Live organization made a number of recommendations, some of which were already expressed in the proposal. This group suggested that only Federal trappers be allowed to take depredating wolves in Minnesota, but at present the Service sees no justification for prohibiting participation by personnel of the Minnesota Department of Natural Resources.

The following organizations within the Monitor Consortium expressed opposition to reclassification in Minnesota: The International Primate Protection League; Fund for Animals, Inc.; Let Live; Audubon Naturalist Society of the Central Atlantic States; Committee for the Preservation of the Tule Elk; International Fund for Animal Welfare—U.S.A.; American Littoral Society; American Littoral Society, Chesapeake Chapter; Environmental Policy Center; Society for Animal Protective Legislation; Washington Humane Society; and Friends of the Earth. These organizations thought that the Minnesota wolf population should not be separated from that of the rest of the lower United States, but should be viewed as a tiny and Endangered remnant of a former wide-ranging species. The Service can understand this position, but considers that no matter how the Minnesota population is viewed, it, by itself, is more properly classified as Threatened. These respondents also suggested that by allowing take of depredating wolves, the Service would be giving in to poachers who are killing wolves illegally. Such is not the case; the take is being authorized because it is the most practical means of dealing with a current problem, and will not be detrimental to the overall Minnesota wolf population. Another comment was that the Critical Habitat designation should be larger, but the Service considers that the proposed zones, as based on the recommendations of experienced field personnel, are all that can be justified by presently available data.

The National Audubon Society and the National Wildlife Federation supported the proposed rulemaking, but

both suggested that wording of proposed § 17.40(d)(2)(B)(4) be revised to make it clear that wolves would be taken only in response to specific, documented or confirmed cases of depredation. The Service considers that present language, authorizing take only by Government agents, and requiring that all taking be reported, is sufficient to provide all legal assurances that are necessary.

The National Parks and Conservation Association recommended that taking of depredating wolves be allowed only in zones 4 and 5 of Minnesota, and not in zones 2 and 3. Any take in the latter two zones, however, would be very limited, since little domestic stock is present, and the Service considers that such taking would have a negligible effect on wolf populations. This Association also indicated that the reclassification was based mainly on social factors, and could not be justified by biological data. The Service disagrees; the reclassification will reflect the actual biological status of the wolf in Minnesota.

The New York Zoological Society and the Zoological Society of San Diego expressed concern that the Endangered classification of all wolves in the lower 48 States (except Minnesota) would apply to any individual of the species *Canis lupus*, even to those in zoos. This rulemaking, however, like most rulemakings of this kind, will apply only to wild animals and to captives originating in the wild population that is being listed. Captive wolves would not be affected, unless their origin was within the wild population found to the south of the Canadian border.

The North American Wolf Society supported the reclassification of the wolf in Minnesota and the designation of Critical Habitat, but questioned the elimination of subspecific differentiation in listings, suggesting that such elimination could jeopardize efforts to locate and maintain stocks of the various subspecies. The Service, however, can offer the firmest assurance that it will continue to recognize valid biological subspecies for purposes of its research and conservation programs.

The Safari Club International supported the Endangered classification for all wolves south of Canada, except in Minnesota, but opposed any listing, regulations, or Critical Habitat designation in Minnesota. It was stated that the Service rejected the recommendations of the Eastern Timber Wolf Recovery Team, but actually most recommendations were accepted, and the Team's advice will continue to be carefully considered in the future. The Safari Club suggested that any wolf which wandered into the United States from Canada, and which was not from a currently listed subspecies, should not be considered Endangered.

It is the intention of the Service, however, to list any naturally present wolf to the south of Canada (except Minnesota) as Endangered.

The Sierra Club indicated opposition to reclassification in Minnesota, and made a number of comments along the same lines as some of those already covered above. The Sierra Club also recommended revision of proposed § 17.40(d)(2)(i)(a) to prevent abuse of the provision, but the proposed wording actually is identical to that covering Endangered species in existing 50 CFR § 17.21(c)(2). In addition, the statement was made that control programs in zone 4 could break pack structure, allow hybridization with coyotes, and thus jeopardize the overall wolf population. Actually, however, the wolf in Minnesota was taken intensively for many years prior to protection, and no specimen was ever collected that suggested the occurrence of hybridization.

The Wilderness Society also opposed the reclassification, again mostly on the basis of the same points discussed above. The Society suggested a number of management alternatives to taking of depredating wolves, which the Service will consider, but which can not be used as immediate solutions to the problem at hand. In answer to questions asked, it is likely that taking will include the use of steel traps and may be done by agents specially hired for the purpose, but the live-capture and transfer of wolves certainly will remain a viable option.

In addition to the above, the following organizations supported the proposed rulemaking: Minnesota Conservation Federation, North American Wildlife Park Foundation, Tahoma Audubon Society, and Wildlife Management Institute. The following other organizations opposed the proposal: Interior Wildlife Association of Alaska, Littlefork Gun Club, Minnesota Chapter of the Safari Club International, National Association for Humane Legislation, Texas Committee on Natural Resources, United Animal Defender, and Wildlife Unlimited.

In addition to the above, there was a heavy response to the proposal from private citizens. A breakdown of the responses shows the following approximate figures: 637 persons sent individual comments, and 380 signed petitions in support of maintaining the Endangered classification of the wolf in Minnesota; 84 persons sent individual comments, 28 signed petitions, and 214 signed form letters supporting total declassification in Minnesota; 99 persons sent individual comments, and 214 signed form letters expressing opposition to what they termed a "sanctuary" in Minnesota; 129 persons signed a form letter suggesting that the proposed depredation control measures were inadequate; 7 persons sent

comments supporting the proposal; and 9 persons sent information without actually expressing a viewpoint. Practically all of the views expressed in these comments by citizens have been covered above in the discussion of comments by organizations and governmental bodies.

## SUMMARY OF FACTORS AFFECTING THE SPECIES

As defined in section 3 of the Act, the term "species" includes any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature. For purposes of this rulemaking, the gray wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one "species", and the gray wolf group in Minnesota is being considered as another "species".

Section 4(a) of the Act states that the Secretary of the Interior may determine a "species" to be Endangered or Threatened because of any of five factors. These factors, and their application to the gray wolf in Minnesota, and to the gray wolf in the other 48 conterminous States of the United States and in Mexico, are listed below.

1. *The present or threatened destruction, modification, or curtailment of its habitat or range.*—The gray wolf once had a range that included most of Mexico and the 48 conterminous States of the United States. The species now occurs in only a small fraction of this range, and is very rare in most places where it does exist. Perhaps fewer than 200 wolves survive in Mexico, and these are widely scattered and subject to intensive human pressure. In the southwestern United States the wolf probably is present only as an occasional wanderer near the Mexican border. In the northwestern United States the wolf is restricted mainly to remote parts of the Rocky Mountains, though some individuals may wander from this region, or from Canada, into other areas. In the eastern half of the United States the gray wolf has been totally eliminated by man, except in the upper Great Lakes region. Here, there is a group on Isle Royale, and possibly a few in northern Michigan and Wisconsin. The only major population of the gray wolf remaining anywhere in the 48 conterminous States is in northern Minnesota. This population, while small compared to the original numbers and range of the gray wolf in the lower 48 States, has not itself undergone a significant decline since about 1900. Indeed, within the last decade there appears to have been a numerical increase in some areas, and an overall range increase. The relatively remote primary habitat of the population,

which is composed in large part of protected public lands, along with the continuity of the population with other populations in Canada, has contributed to the survival of the wolf in Minnesota. There appear to be no serious problems that could result in the immediate extirpation of the species in this area, and thus the population would not seem to be Endangered as defined by the Act. On the other hand, the Minnesota population does represent the last significant element of a species that once occupied a vastly larger range in the lower 48 States, and long-term trends may be working against the wolf. To quote the Recovery Plan, "Future circumstances are unpredictable and those that now exist could change drastically. For example, widespread industrialization, mineral exploitation, and general development could threaten much of the wolf's remaining range, making regulation increasingly significant to the populations left. Additional roads, railroads, power lines, mines and tourist facilities could further carve up much of northern Minnesota. This would disrupt the natural repopulation of depleted areas by wolves and promote higher human densities which would compete with wolves for their wild prey." Moreover, in recent years there has been a decline in deer, the main prey species, in parts of the primary range of the wolf. This decline has resulted primarily from forest maturation and severe winter weather. Wolf numbers have declined accordingly in some of these areas. In contrast, wolves have increased in their peripheral range where they are more likely to come into conflict with human interests and thus stimulate action against them. These various problems would seem to warrant the maintenance of a Threatened classification for the wolf in Minnesota.

2. *Overutilization for commercial, sporting, scientific, or educational purposes.*—Direct killing by man, including large-scale commercial and sport taking, has been the major direct factor in the decline of wolves in the conterminous United States and Mexico. Wolves still are regularly shot, especially when they appear in settled areas that are not part of their regular range. Illegal killing is a problem in Minnesota and other areas where the wolf still occurs.

3. *Disease or predation.*—Not applicable.

4. *The inadequacy of existing regulatory mechanisms.*—There still are some places in the lower 48 States, such as Washington and North Dakota, where wolves may occur and where they are not under Federal protection. Moreover, because of the confusing taxonomy of wolf subspecies, and because wolves may wander across recognized subspecific boundaries, dif-

ficult law enforcement problems may arise. In Minnesota, wolves are totally protected under the Act, but this total protection may actually be working against the species. By prohibiting the killing of wolves, even those that may be attacking livestock and pets, current regulations may be creating an adverse public attitude toward the whole species.

5. *Other natural or manmade factors affecting its continued existence.*— None in addition to those discussed above.

### INTERAGENCY COOPERATION

Section 7 of the Endangered Species Act of 1973 requires Federal agencies, and only Federal agencies, to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of Endangered or Threatened species, or adversely affect the Critical Habitat of such species. The Recovery Team has described zones 1, 2, and 3 in Minnesota, and Isle Royale National Park, Michigan, as "critical areas" of the wolf. These areas provide the space for normal growth and movement of established pack units and would supply sufficient food and cover for the assured survival of the species. The Service considers that these areas qualify as Critical Habitat, pursuant to Section 7, and that Federal agencies should evaluate their actions affecting these areas relative to the welfare of the wolf.

### EFFECTS OF THE RULEMAKING

With respect to the gray wolf in the 48 conterminous States of the United States, except Minnesota, and in Mexico, all prohibitions of section 9(a)(1) of the Act, as implemented by 50 CFR 17.21 will apply. These prohibitions, in part, will make it illegal for any person subject to the jurisdiction of the United States to take, import or export, ship in interstate commerce in the course of a commercial activity, or sell or offer for sale in interstate or foreign commerce this species. It also will be illegal to possess, sell, deliver, carry, transport, or ship any such wildlife which was illegally taken. Certain exceptions apply to agents of the Service and State conservation agencies. Permits for scientific purposes or for the enhancement of propagation or survival are available in accordance with 50 CFR 17.22. Economic hardship permits are available under 50 CFR 17.23. For practical purposes these measures already are in effect since nearly all wolves that regularly occur in the region in question are currently listed as Endangered. The rulemaking will extend Endangered status to those few wolves that may be in the region that are not already listed, and would simplify law enforcement and conservation measures.

With respect to the gray wolf in Minnesota, which is listed as Threatened, a special rule is promulgated which applies provisions similar to those of 50 CFR 17.31, and an additional provision for depredation control. The prohibitions of 50 CFR 17.31 are essentially the same as those for Endangered species, except that "any employee or agent of the Service, of the National Marine Fisheries Service, or of a State conservation agency which is operating under a Cooperative Agreement with the Service or with the National Marine Fisheries Service, in accordance with Section 6(c) of the Act, who is designated by his agency for such purposes, may, when acting in the course of his official duties, take any threatened wildlife to carry out scientific research or conservation programs." In accordance with 50 CFR 17.32, permits for Threatened wildlife are available for scientific purposes, enhancement of propagation or survival, economic hardship, zoological exhibitions, educational purposes, or special purposes consistent with the purposes of the Act.

The provisions for predator control state that wolves may be taken by authorized Federal or State employees in zones 2, 3, 4, and 5, if such wolves commit significant depredations on lawfully present domestic animals. Few, if any, of these wolves will be taken in zones 2 and 3 which have practically no livestock, and nearly all will be taken in zone 4. Essentially then, the wolf population in zones 1, 2, and 3 will not be affected by the depredation control activity. The population in zone 4 might be held below biological potential, but would continue to exist in reasonable numbers. The control of depredating wolves in zone 4 will reduce conflicts with human interests and should create a more favorable public attitude that would be of overall benefit to the wolf.

The effects of Critical Habitat determination involve Federal agencies. In accordance with section 7 of the Act, such agencies, and only such agencies, are required to insure that actions authorized, funded, or carried out by them do not adversely affect the Critical Habitat of Endangered or Threatened species. The designation of Critical habitat for the gray wolf in Minnesota, as delineated below, points out areas where this responsibility will apply. This will not automatically prohibit any particular actions, and it is likely that many kinds of Federal actions involving the areas in question would not be expected to be detrimental to the wolf. For more information, please consult the "Guidelines to Assist Federal Agencies in Complying with Section 7 of the Endangered Species Act of 1973," as prepared by the Fish and Wildlife Service and National Marine Fisheries Service.

# RULES AND REGULATIONS

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment has been prepared in conjunction with this rulemaking. It is on file in the Service's Office of Endangered Species, 1612 K Street NW., Washington, D.C. 20240, and may be examined during regular business hours. The assessment is the basis for a decision that the determinations of this rulemaking are not major Federal actions which would significantly affect the quality of the human environment within the meaning of section 102(2)(C) of the National Environmental Policy Act of 1969.

The primary author of this rulemaking is Ronald M. Nowak, Office of Endangered Species, U.S. Fish and Wildlife Service (202/343-7814).

## REGULATIONS PROMULGATION

Accordingly, Part 17, Subparts B, D, and I, Title 50 of the Code of Federal Regulations, are amended as set forth below.

1. Section 17.11 is amended by deleting the Mexican wolf (*Canis lupus baileyi*), northern Rocky Mountain wolf (*Canis lupus irremotus*), eastern timber wolf (*Canis lupus lycaon*), and Texas gray wolf (*Canis lupus monstrabilis*) from the List of Endangered and Threatened Wildlife and Plants, and by adding the gray wolf (*Canis lupus*) to the List as indicated below:

§ 17.11 Endangered and threatened wildlife.

| Species | | | Range | | | | |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | Population | Known distribution | Portion of range where threatened or endangered | Status | When listed | Special rules |
| **Mammals:** | | | | | | | |
| Wolf, gray | *Canis lupus* | United States (48 conterminous States, other than Minnesota), Mexico. | Arizona, Idaho, Michigan, Montana, New Mexico, North Dakota, Oregon, Texas, Washington, Wisconsin, Wyoming, Mexico. | Entire | E | 1, 6, 13, 15, 35 | N/A. |
| Do | do | Minnesota | Northern Minnesota | Entire | T | 35 | 17.40(d). |

2. Section 17.40 is amended by adding the following paragraph (d):

§ 17.40 Special rules—mammals.

* * * * *

(d) Gray wolf (*Canis lupus*) in Minnesota.—(1) *Zones.* For purposes of these regulations, the State of Minnesota is divided into the following five zones.

ZONE 1—4,488 SQUARE MILES

Beginning at the point of intersection of United States and Canadian boundaries in Section 22, Township 71 North, Range 22 West, in Rainy Lake, then proceeding along the west side of Sections 22, 27, and 34 in said Township and Sections 3, 10, 15, 22, 27 and 34 in Township 70 North, Range 22 West and Sections 3 and 10 in Township 69 North, Range 22 West; then east along the south boundaries of Sections 10, 11, and 12 in said Township; then south along the Koochiching and St. Louis counties line to Highway 53; thence southeasterly along State Highway 53 to the junction with County Route 765; thence easterly along County Route 765 to the junction with Kabetogama Lake in Ash River Bay; thence along the south boundary of Section 33 in Township 69 North, Range 19 West, to the junction with the Moose River; thence southeasterly along the Moose River to Moose Lake; thence along the western shore of Moose Lake to the river between Moose Lake and Long Lake; thence along the said river to Long Lake; thence along the east shore of Long Lake to the drainage on the southeast side of Long Lake in NE¼, Section 18, Township 67 North, Range 18 West; thence along the said drainage southeasterly and subsequently northeasterly to Marion Lake, the drainage being in Section 17 and 18, Township 67 North, Range 18 West; thence along the west shoreline of Marion Lake proceeding southeasterly to the Moose Creek; thence along Moose Creek to Flap Creek; thence southeasterly along Flap Creek to the Vermilion River; thence southerly along the Vermilion River to Vermilion Lake; thence along the Superior National Forest boundary in a southeasterly direction through Vermilion Lake passing these points: Oak Narrows, Muskrat Channel, South of Pine Island, to Hoodo Point and the junction with County Route 697; thence southeasterly on County Route 697 to the junction with State Highway 169; thence easterly along State Highway 169 to the junction with State Highway 1; thence easterly along State Highway 1 to the junction with the Erie Railroad tracks at Murphy City; thence easterly along the Erie Railroad tracks to the junction with Lake Superior at Taconite Harbor; thence northeasterly along the North Shore of Lake Superior to the Canadian Border; thence westerly along the Canadian Border to the point of beginning in Rainy Lake.

ZONE 2—1,856 SQUARE MILES

Beginning at the intersection of the Erie Mining Co. Railroad and State Highway 1 (Murphy City); thence southeasterly on State Highway 1 to the junction with County Road 4; thence southwesterly on County Road 4 to the State Snowmobile Trail (formerly the Alger-Smith Railroad); thence southwesterly to the intersection of the Old Railroad Grade and Reserve Mining Co. Railroad in Section 33 of Township 56 North, Range 9 West; thence northwesterly along the Railroad to Forest Road 107; thence westerly along Forest Road 107 to Forest Road 203; thence westerly along Forest Road 203 to the junction with County Route 2; thence in a northerly direction on County Route 2 to the junction with Forest Road 122; thence in a westerly direction along Forest Road 122 to the junction with the Duluth, Missable and Iron Range Railroad; thence in a southwesterly direction along the said railroad tracks to the junction with County Route 14; thence in a northwesterly direction along County Route 14 to the junction with County Route 55; thence in a westerly direction along County Route 55 to the junction with County Route 44; thence in a southerly direction along County Route 44 to the junction with County Route 266; thence in a southeasterly direction along County Route 266 and subsequently in a westerly direction to the junction with County Road 44; thence in a northerly direction on County Road 44 to the junction with Township Road 2815; thence westerly along Township Road 2815 to Alden Lake; thence northwesterly across Alden Lake to the inlet of the Cloquet River; thence northerly along the Cloquet River to the junction with Carrol Trail-State Forestry Road; thence west along the Carrol Trail to the junction with County Route 4 and County Route 49; thence west along County Route 49 to the junction with the Duluth, Winnipeg and Pacific Railroad; thence in a northerly direction along said Railroad to the junction with the Whiteface River; thence in a northeasterly direction along the Whiteface River to the Whiteface Reservoir; thence along the western shore of the Whiteface Reservoir to the junction with County Route 340; thence north along County Route 340 to the junction with County Route 16; thence east along County Route 16 to the junction with County Route 346; thence in a northerly direction along County Route 346 to the junction with County Route 569; thence along County Route 569 to the junction with County Route 565; thence in a westerly direction along County Route 565 to the junction with County Route 110; thence in a westerly direction along County Route 110 to the junction with County Route 100; thence in a north and subsequent west direction along County Route 100 to the junction with State Highway 135; thence in a northerly di-

rection along State Highway 135 to the junction with State Highway 169 at Tower; thence in an easterly direction along the southern boundary of Zone 1 to the point of beginning of Zone 2 at the junction of the Erie Railroad Tracks and State Highway 1.

### ZONE 3—3,501 SQUARE MILES

Beginning at the junction of State Highway 11 and State Highway 65; thence southeasterly along State Highway 65 to the junction with State Highway 1; thence westerly along State Highway 1 to the junction with State Highway 72; thence north along State Highway 72 to the junction with an un-numbered township road beginning in the northeast corner of Section 25, Township 155 North, Range 31 West; thence westerly along the said road for approximately seven (7) miles to the junction with SFR 95; thence westerly along SFR 95 and continuing west through the southern boundary of Sections 36 through 31, Township 155 North, Range 33 West, through Sections 36 through 31, Township 155 North, Range 34 West, through Sections 36 through 31, Township 155 North, Range 35 West, through Sections 36 and 35, Township 155 North, Range 36 West to the junction with State Highway 89, thence northwesterly along State Highway 89 to the junction with County Route 44; thence northerly along County Route 44 to the junction with County Route 704; thence northerly along County 704 to the junction with SFR 49;

thence northerly along SFR 49 to the junction with SFR 57; thence easterly along SFR 57 to the junction with SFR 63; thence south along SFR 63 to the junction with SFR 70; thence easterly along SFR 70 to the junction with County Route 87; thence easterly along County Route 87 to the junction with County Route 1; thence south along County Route 1 to the junction with County Route 16; thence easterly along County Route 16 to the junction with State Highway 72; thence south on State Highway 72 to the junction with a gravel road (un-numbered County District Road) on the north side of Section 31, Township 158 North, Range 30 West; thence east on said District Road to the junction with SFR 62; thence easterly on SFR 62 to the junction with SFR 175; thence south on SFR 175 to the junction with County Route 101; thence easterly on County Route 101 to the junction with County Route 11; thence easterly on County Route 11 to the junction with State Highway 11; thence easterly on State Highway 11 to the junction with State Highway 65, the point of beginning.

### ZONE 4—20,883 SQUARE MILES

Excluding Zones 1, 2 and 3, all that part of Minnesota north and east of a line beginning on State Trunk Highway 48 at the eastern boundary of the state; thence westerly along Highway 48 to Interstate Highway 35; thence northerly on I-35 to State Highway 23, thence west one-half mile on

Highway 23 to State Trunk Highway 18; thence westerly along Highway 18 to State Trunk Highway 65, thence northerly on Highway 65 to State Trunk Highway 210; thence westerly along Highway 210 to State Trunk Highway 6; thence northerly on State Trunk Highway 6 to Emily; thence westerly along County State Aid Highway (CSAH) 1, Crow Wing County, to CSAH 2, Cass County; thence westerly along CSAH 2 to Pine River; thence northwesterly along State Trunk Highway 371 to Backus; thence westerly along State Trunk Highway 87 to U.S. Highway 71; thence northerly along U.S. 71 to State Trunk Highway 200; thence northwesterly along Highway 200, to County State Aid Highway (CSAH) 2, Clearwater County; thence northerly along CSAH 2 to Shevlin; thence along U.S. Highway 2 to Bagley; thence northerly along State Trunk Highway 92 to Gully; thence northerly along CSAH 2, Polk County, to CSAH 27, Pennington County; thence along CSAH 27 to State Trunk Highway 1; thence easterly on Highway 1 to CSAH 28, Pennington County; thence northerly along CSAH 28 to CSAH 54, Marshall County, thence northerly along CSAH 54 to Grygla; thence west and northerly along Highway 89 to Roseau; thence northerly along State Truck Highway 310 to the Canadian border.

### ZONE 5—54,603 SQUARE MILES

All that part of Minnesota south and west of the line described as the south and west border of Zone 4.



REGULATORY ZONES FOR GRAY WOLF IN MINNESOTA

(ZONES 1, 2, and 3 are CRITICAL HABITAT)

Zone Sizes (square miles)

Zone 1: 4,488
Zone 2: 1,856
Zone 3: 3,501
Zone 4: 20,883
Zone 5: 54,603

(2) *Prohibitions.* The following prohibitions apply to the gray wolf in Minnesota.

(i) *Taking.* Except as provided in this paragraph (d)(2)(i) of this section, no person may take a gray wolf in Minnesota.

(A) Any person may take a gray wolf in Minnesota in defense of his own life or the lives of others.

(B) Any employee or agent of the Service, any other Federal land management agency, or the Minnesota Department of Natural Resources, who is designated by his agency for such purposes, may, when acting in the course of his official duties, take a gray wolf in Minnesota without a permit if such action is necessary to:

(1) Aid a sick, injured, or orphaned specimen; or

(2) Dispose of a dead specimen; or

(3) Salvage a dead specimen which may be useful for scientific study.

(4) Furthermore, such designated employees or agents of the Service or the Minnesota Department of Natural Resources may take a gray wolf without a permit in Minnesota if such action is necessary to remove from zone 2, 3, 4, or 5, as delineated in paragraph (d)(3)(1) of this section, a gray wolf committing significant depredations on lawfully present domestic animals, but only if the taking is done in a humane manner.

(C) Any taking pursuant to paragraph (d)(2)(i) (A) and (B) of this section must be reported in writing to the

United States Fish and Wildlife Service, Division of Law Enforcement, P.O. Box 19183, Washington, D.C. 20036, within 5 days. The specimen may only be retained, disposed of, or salvaged in accordance with directions from the Service.

(D) Any employee or agent of the Service or the Minnesota Department of Natural Resources when operating under a Cooperative Agreement with the Service in accordance with section 6(c) of the Act, who is designated by his agency for such purposes, may, when acting in the course of his official duties, take a gray wolf in Minnesota to carry out scientific research or conservation programs.

(ii) *Unlawfully taken wolves.* No person may possess, sell, deliver, carry, transport, or ship, by any means whatsoever, a gray wolf taken unlawfully in Minnesota.

(iii) *Import or export.* Except as may be authorized by a permit issued under authority of § 17.32, no person may import or export any Minnesota gray wolf.

(iv) *Commercial transactions.* Except as may be authorized by a permit issued under § 17.32, no person may deliver, receive, carry, transport, ship, sell, or offer to sell in interstate or foreign commerce, by any means whatsoever, and in the course of a commercial activity, any Minnesota gray wolf.

(3) *Permits.* All permits available under § 17.32 (General Permits—

Threatened wildlife) are available with regard to the gray wolf in Minnesota. All the terms and provisions of § 17.32 apply to such permits issued under the authority of this paragraph (d)(3).

3. Section 17.95 is amended by adding the following Critical Habitat description after the Critical Habitat description for the Morro Bay kangaroo rat.

§ 17.95  Critical habitat—fish and wildlife.

(a) Mammals.

*     *     *     *     *

. Gray Wolf

(*Canis lupus*)

Michigan. Isle Royale National Park.

Minnesota. Areas of land, water, and airspace in Beltrami, Cook, Itasca, Koochiching, Lake, Lake of the Woods, Roseau, and St. Louis Counties, with boundaries (4th and 5th Principal meridians) identical to those of zones 1, 2, and 3, as delineated in 50 CFR 17.40(d)(1).

NOTE.—The Service has determined that this document does not contain a major action requiring preparation of an Economic Impact Statement under Executive Order 11949 and OMB Circular A-107.

Dated: March 3, 1978.

LYNN A. GREENWALT,
*Director, Fish and
Wildlife Service.*

[FR Doc. 78-6192 Filed 3-8-78; 8:45 am]

INT: 2646-78

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act

**AGENCIES:** Fish and Wildlife Service, Interior; National Marine Fisheries Service, NOAA, Commerce.

**ACTION:** Notice of policy.

**SUMMARY:** The Fish and Wildlife Service and the National Marine Fisheries Service (Services) have adopted a policy to clarify their interpretation of the phrase "distinct population segment of any species of vertebrate fish or wildlife" for the purposes of listing, delisting, and reclassifying species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et. seq.*) (Act).

**ADDRESSES:** The complete record pertaining to this action is available for inspection, by appointment, during normal business hours at the Division of Endangered Species, U.S. Fish and Wildlife Service, in Room 452, Arlington Square Building, 4401 North Fairfax Drive, Arlington, Virginia.

**FOR FURTHER INFORMATION CONTACT:** E. LaVerne Smith, Chief, Division of Endangered Species, U.S. Fish and Wildlife Service at the above address (703/358–2171), or Russell Bellmer, Chief, Endangered Species Division, National Marine Fisheries Service, 1335 East-West Highway, Silver Spring, Maryland 20910 (301/713–1401).

**SUPPLEMENTARY INFORMATION:**

### Background

The Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et. seq.*). (Act) requires the Secretary of the Interior or the Secretary of Commerce (depending on jurisdiction) to determine whether species are endangered or threatened. In defining "species," the Act as originally passed included, "* * * any species of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." In 1978, the Act was amended so that the definition read "* * * any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which

interbreeds when mature." This change restricted application of this portion of the definition to vertebrates. The authority to list a "species" is thus not restricted to species as recognized in formal taxonomic terms, but extends to subspecies, and for vertebrate taxa, to distinct population segments (DPS's).

Because the Secretary must "* * * determine whether any species is an endangered species or a threatened species" (section 4(a)(1)), it is important that the term "distinct population segment" be interpreted in a clear and consistent fashion. Furthermore, Congress has instructed the Secretary to exercise this authority with regard to DPS's "* * * sparingly and only when the biological evidence indicates that such action is warranted." (Senate Report 151, 96th Congress, 1st Session). The Services have used this authority relatively rarely; of over 300 native vertebrate species listed under the Act, only about 30 are given separate status as DPS's.

It is important in light of the Act's requirement to use the best available scientific information in determining the status of species that this interpretation follows sound biological principles. Any interpretation adopted should also be aimed at carrying out the purposes of the Act (i.e., "* * * to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section" (section 2(b)).

Available scientific information provides little specific enlightenment in interpreting the phrase "distinct population segment." This term is not commonly used in scientific discourse, although "population" is an important term in a variety of contexts. For instance, a population may be circumscribed by a set of experimental conditions, or it may approximate an ideal natural group of organisms with approximately equal breeding opportunities among its members, or it may refer to a loosely bounded, regionally distributed collection of organisms. In all cases, the organisms in a population are members of a single species or lesser taxon.

The National Marine Fisheries Service (NMFS) has developed a Policy on the Definition of Species under the Endangered Species Act (56 FR 58612–58618; November 20, 1991). The policy applies only to species of salmonids

native to the Pacific. Under this policy, a stock of Pacific salmon is considered a DPS if it represents an evolutionarily significant unit (ESU) of a biological species. A stock must satisfy two criteria to be considered an ESU:

(1) It must be substantially reproductively isolated from other conspecific population units; and

(2) It must represent an important component in the evolutionary legacy of the species.

This document adopts an interpretation of the term "distinct population segment" for the purposes of listing, delisting, and reclassifying vertebrates by the U.S. Fish and Wildlife Service (FWS) and NMFS. The Services believe that the NMFS policy, as described above, on Pacific salmon is consistent with the policy outlined in this notice. The NMFS policy is a detailed extension of this joint policy. Consequently, NMFS will continue to exercise its policy with respect to Pacific salmonids

The Services' draft policy on this subject was published on December 21, 1994 (59 FR 65885) and public comment was invited. After review of comments and further consideration, the Services adopt the policy as issued in draft form.

### Summary of Comments and Recommendations

The Services received 31 letters from individuals and organizations commenting on the draft policy. In addition, since publication of the draft policy, the National Academy of Sciences, National Research Council (NRC), has published a report titled "Science and the Endangered Species Act," prepared by a committee appointed by the Academy at the request of several members of Congress. This report in part examines the definition of "species" under the Act, and endorses the recognition of scientifically identified evolutionary units for conservation purposes. It discusses the recognition of DPS's in terms of "distinctiveness," which is consistent with the concept of "discreteness" as presented in the draft policy except that it would not recognize an international political boundary to delimit a DPS. The committee noted that: "Although there can be good policy reasons for such delineations, there are not sound scientific reasons to delineate species only in accordance with political boundaries." The Services agree that the inclusion of international boundaries in determining whether a population segment is discrete is sometimes undertaken as a matter of policy rather than science. Although the committee

expressed the belief that application of a distinctiveness test (analogous to the standard of discreteness in the policy) would adequately carry out the congressional instruction that the authority to address DPS's be exercised sparingly, the Services continue to believe that a judgement regarding the significance of any unit found to be discrete is necessary to comply with congressional intent.

Respondents presented a wide range of opinion regarding the recognition of DPS's. Some argued that the draft policy would be too restrictive and make it difficult or impossible to protect important elements of biodiversity; others maintained that the draft was not restrictive enough and would allow the Services to extend protection to entities never intended to be eligible for protection under the Act. A few respondents questioned the need for any policy framework and advocated case-by-case determinations of the eligibility of entities for listing under the DPS provision. The Services continue to believe that the Act will be best administered if there is a general policy framework governing the recognition of DPS's that can be disseminated and understood by the affected public.

Several respondents questioned the relationship of the draft policy to the NMFS policy regarding salmonids. The Services believe that the NMFS policy for salmonids is consistent with the general policy outlined in this notice, although the salmonid policy is formulated specifically to address the biology of this group. Several respondents also questioned the use of qualifying words such as "significant" or "markedly" in the policy. The Services intended these words to have their commonly understood senses. At the time any distinct population is recognized or not recognized the reasons for which it is believed to satisfy or not satisfy the conditions of the policy will be fully explained.

Several respondents maintained that a policy of this nature required adoption under rulemaking procedures of the Administrative Procedure Act. The Services disagree, and continue to regard the policy as non-regulatory in nature. Specific recommendations advanced by respondents are paraphrased and responded to below.

*Only Full Species are Genetically Distinct From one Another, and Listing Should Only be Extended to These Genetically Distinct Entities.*

Restricting listings to full taxonomic species would render the Act's definition of species, which explicitly includes subspecies and DPS's of vertebrates, superfluous. Clearly, the Act is intended to authorize listing of some entities that are not accorded the taxonomic rank of species, and the Services are obliged to interpret this authority in a clear and reasonable manner.

*The Services Should Focus on Genetic Distinctness in Recognizing a Distinct Population Segment. Conversely, Some Respondents Believed There Should be No Requirement That a DPS be Genetically Differentiated or Recognizable for it to be Protected Under the Act*

There appears to be a diversity of understanding regarding the purposes of the Act, with some individuals viewing it as directed almost exclusively toward the conservation of unique genetic resources while other individuals emphasize its stated intention of conserving ecosystems. This diversity of viewpoints is reflected in comments addressing the role to be played by genetic information in the draft policy. The Services understand the Act to support interrelated goals of conserving genetic resources and maintaining natural systems and biodiversity over a representative portion of their historic occurrence. The draft policy was intended to recognize both these intentions, but without focusing on either to the exclusion of the other. Thus, evidence of genetic distinctness or of the presence of genetically determined traits may be important in recognizing some DPS's, but the draft policy was not intended to always specifically require this kind of evidence in order for a DPS to be recognized. The ESU policy of NMFS also does not require genetic data before an ESU can be identified. Thus in determining whether the test for discreteness has been met under the policy, the Services allow but do not require genetic evidence to be used. At least one respondent evidently understood the draft policy to require that genetic distinctness be demonstrated before a DPS could be recognized, and criticized the draft on that basis. As explained above, this was never intended.

*The Elements Describing Reasons for Considering a Population Segment Significant Should be Laid Out Comprehensively, Rather Than Presented as an Open-Ended Set of Examples as in the Draft Policy*

The Services appreciate the need to make a policy on this subject as complete and comprehensive as possible, but continue to believe that it is not possible to describe in advance all the potential attributes that could be considered to support a conclusion that a particular population segment is "significant" in terms of the policy. When a distinct population is accepted or rejected for review pursuant to a petition or proposed for listing or delisting, the Services intend to explain in detail why it is considered to satisfy both the discreteness and significance tests of the policy.

*In Assessing the Significance of a Potential Distinct Population Segment, the Services Should Focus on its Importance to the Status of the Species to Which it Belongs. Alternatively, the Services Should Emphasize the Importance of a Potential DPS to the Environment in Which it Occurs*

Despite its orientation toward conservation of ecosystems, the Services do not believe the Act provides authority to recognize a potential DPS as significant on the basis of the importance of its role in the ecosystem in which it occurs. In addition, it may be assumed that most, if not all, populations play roles of some significance in the environments to which they are native, so that this importance might not afford a meaningful way to differentiate among populations. On the other hand, populations commonly differ in their importance to the overall welfare of the species they represent, and it is this importance that the policy attempts to reflect in the consideration of significance.

*International Boundaries are not Appropriate in Determining That a Population is Discrete in the Draft Policy; Political Boundaries Other Than Those Between Nations may be Appropriate in Some Cases to Delimit DPS's*

The Services recognize that the use of international boundaries as a measure of discreteness may introduce an artificial and non-biological element to the recognition of DPS's. Nevertheless, it appears to be reasonable for national legislation, which has its principal effects on a national scale, to recognize units delimited by international boundaries when these coincide with differences in the management, status, or exploitation of a species. Recognition of international boundaries in this way is also consistent with practice under the Convention on International Trade in Endangered Species of Wild Fauna and Flora, which is implemented in the United States by the Act. Recognition of other political boundaries, such as State lines within the United States, would appear to lead to the recognition of

entities that are primarily of conservation interest at the State and local level, and inappropriate as a focus for a national program. The Services recognize, as suggested in some comments, that infra-national political boundaries offer opportunities to provide incentives for the favorable management of species if they were used as a basis for recognizing discrete entities for delisting or for exclusion from a listing. Particularly when applied to the delisting or reclassification of a relatively widespread species for which a recovery program is being successfully carried out in some States, recognition of State boundaries would offer attractive possibilities. Nevertheless, the Act provides no basis for applying different standards for delisting than those adopted for listing. If the Services do not consider entities for listing that are not primarily of conservation interest at a national level, they must also refrain from delisting or reclassifying units at this level.

*Complete Reproductive Isolation Should be Required as a Prerequisite to the Recognition of a Distinct Population Segment*

The Services do not consider it appropriate to require absolute reproductive isolation as a prerequisite to recognizing a distinct population segment. This would be an impracticably stringent standard, and one that would not be satisfied even by some recognized species that are known to sustain a low frequency of interbreeding with related species.

The Services Should Emphasize Congress' Instruction to use Their Authority to Dddress DPS's "Sparingly"

The Services believe that application of the policy framework announced in this document will lead to consistent and sparing exercise of the authority to address DPS's, in accord with congressional instruction.

*The Occurrence of a Population Segment in an Unusual Setting Should not be Used as Evidence for its Significance*

The Services continue to believe that occurrence in an unusual ecological setting is potentially an indication that a population segment represents a significant resource of the kind sought to be conserved by the Act. In any actual case of a DPS recognized in part on this basis, the Services will describe in detail the nature of this significance when accepting a petition or proposing a rule.

*The Authority to Address DPS's Should be Extended to Plant and Invertebrate Species*

The Services recognize the inconsistency of allowing only vertebrate species to be addressed at the level of DPS's, and the findings of the NRC committee also noted that such recognition would be appropriate for other species. Nevertheless, the Act is perfectly clear and unambiguous in limiting this authority. This policy acknowledges the specific limitations imposed by the Act on the definition of "species."

*The Services Should Stress Uniqueness and Irreplaceability of Ecological Functions in Recognizing DPS's*

The Services consider the Act to be directed at maintenance of species and populations as elements of natural diversity. Consequently, the principal significance to be considered in a potential DPS will be the significance to the taxon to which it belongs. The respondent appears to be recommending that the Services consider the significance of a potential DPS to the community or ecosystem in which it occurs and the likelihood of another species filling its niche if it should be extirpated from a particular portion of its range. These are important considerations in general for the maintenance of healthy ecosystems, and they often coincide with conservation programs supported by the Act. Nevertheless, the Act is not intended to establish a comprehensive biodiversity conservation program, and it would be improper for the Services to recognize a potential DPS as significant and afford it the Act's substantive protections solely or primarily on these grounds.

*Congress did not Intend to Require That DPS's be Discrete. In a Similar Vein, Congress did not Require That a Potential DPS be Significant to be Considered Under the Act*

With regard to the discreteness standard, the Services believe that logic demands a distinct population recognized under the Act be circumscribed in some way that distinguishes it from other representatives of its species. The standard established for discreteness is simply an attempt to allow an entity given DPS status under the Act to be adequately defined and described. If some level of discreteness were not required, it is difficult to imagine how the Act could be effectively administered or enforced. At the same time, the standard adopted does not require absolute separation of a DPS

from other members of its species, because this can rarely be demonstrated in nature for any population of organisms. The standard adopted is believed to allow entities recognized under the Act to be identified without requiring an unreasonably rigid test for distinctness. The requirement that a DPS be significant is intended to carry out the expressed congressional intent that this authority be exercised sparingly as well as to concentrate conservation efforts undertaken under the Act on avoiding important losses of genetic diversity.

*A Population Should Only be Required to be Discrete or Significant, but not Both, to be Recognized as a Distinct Population Segment*

The measures of discreteness and significance serve decidedly different purposes in the policy, as explained above. The Services believe that both are necessary for a policy that is workable and that carries out congressional intent. The interests of conserving genetic diversity would not be well served by efforts directed at either well-defined but insignificant units or entities believed to be significant but around which boundaries cannot be recognized.

*Requiring That a DPS be Discrete Effectively Prevents the Loss of Such a Segment From Resulting in a Gap in the Distribution of a Species. Essentially, if Distinct Populations are Entirely Separate, the Loss of One Has Little Significance to the Others*

If the standard for discreteness were very rigid or absolute, this could very well be true. However, the standard adopted allows for some limited interchange among population segments considered to be discrete, so that loss of an interstitial population could well have consequences for gene flow and demographic stability of a species as a whole. On the other hand, not only population segments whose loss would produce a gap in the range of a species can be recognized as significant, so that a nearly or completely isolated population segment could well be judged significant on other grounds and recognized as a distinct population segment.

*The Services Lack Authority to Address DPS's of Subspecies*

The Services maintain that the authority to address DPS's extends to species in which subspecies are recognized, since anything included in the taxon of lower rank is also included in the higher ranking taxon.

The following principles will guide the Services' listing, delisting and reclassification of DPS's of vertebrate species. Any proposed or final rule affecting status determination for a DPS would clearly analyze the action in light of these guiding principles.

**Policy**

Three elements are considered in a decision regarding the status of a possible DPS as endangered or threatened under the Act. These are applied similarly for addition to the lists of endangered and threatened wildlife and plants, reclassification, and removal from the lists:

1. Discreteness of the population segment in relation to the remainder of the species to which it belongs;

2. The significance of the population segment to the species to which it belongs; and

3. The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

*Discreteness:* A population segment of a vertebrate species may be considered discrete if it satisfies either one of the following conditions:

1. It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

2. It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

*Significance:* If a population segment is considered discrete under one or more of the above conditions, its biological and ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that the authority to list DPS's be used "* * * sparingly" while encouraging the conservation of genetic diversity. In carrying out this examination, the Services will consider available

scientific evidence of the discrete population segment's importance to the taxon to which it belongs. This consideration may include, but is not limited to, the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon,

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

Because precise circumstances are likely to vary considerably from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment.

*Status:* If a population segment is discrete and significant (i.e., it is a distinct population segment) its evaluation for endangered or threatened status will be based on the Act's definitions of those terms and a review of the factors enumerated in section 4(a). It may be appropriate to assign different classifications to different DPS's of the same vertebrate taxon.

*Relationship to Other Activities*

The Fish and Wildlife Service's Listing and Recovery Priority Guidelines (48 FR 43098; September 21, 1983) generally afford DPS's the same consideration as subspecies, but when a subspecies and a DPS have the same numerical priority, the subspecies receives higher priority for listing. The Services will continue to generally accord subspecies higher priority than DPS's.

Any DPS of a vertebrate taxon that was listed prior to implementation of this policy will be reevaluated on a case-by-case basis as recommendations are made to change the listing status for that distinct population segment. The appropriate application of the policy will also be considered in the 5-year

reviews of the status of listed species required by section 4(c)(2) of the Act.

*Effects of Policy*

This guides the evaluation of distinct vertebrate population segments for the purposes of listing, delisting and reclassifying under the Act. The only direct effect of the policy is to accept or reject population segments for these purposes. More uniform treatment of DPS's will allow the Services, various other government agencies, private individuals and organizations, and other interested or concerned parties to better judge and concentrate their efforts toward the conservation of biological resources at risk of extinction.

Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range. This may allow protection and recovery of declining organisms in a more timely and less costly manner, and on a smaller scale than the more costly and extensive efforts that might be needed to recover an entire species or subspecies. The Services' ability to address local issues (without the need to list, recover, and consult rangewide) will result in a more effective program.

Author/Editor: The editors of this policy are Dr. John J. Fay of the Fish and Wildlife Service's Division of Endangered Species, 452 ARLSQ, Washington, DC 20240 (703/358–2105) and Marta Nammack of the National Marine Fisheries Service's Endangered Species Division, 1335 East-West Highway, Silver Spring, Maryland 20910 (301/713–2322).

**Authority:** The authority for this action is the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

Dated: February 1, 1996.

**John G. Rogers,**
*Acting Director, Fish and Wildlife Service.*

Dated: February 1, 1996.

**Nancy Foster,**
*Deputy Assistant Administrator for Fisheries, National Marine Fisheries Service.*

[FR Doc. 96–2639 Filed 2–6–96; 8:45 am]
**BILLING CODE 3510–22–P**

A30



# FEDERAL REGISTER

Vol. 79          Tuesday,

No. 126         July 1, 2014

Part VIII

## Department of the Interior

Fish and Wildlife Service

50 CFR Chapter I

## Department of Commerce

National Oceanic and Atmospheric Administration

50 CFR Chapter II
Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species"; Final Rule

# DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Chapter I**

# DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Chapter II**

**[Docket No. FWS–R9–ES–2011–0031; FXES11130900000C6–145–FF09E42000; DOC Docket No. 110131072–4385–02]**

**RIN 1018–AX49; 0648–BA78**

**Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species"**

**AGENCIES:** Fish and Wildlife Service, Interior; National Marine Fisheries Service, NOAA, Commerce.

**ACTION:** Notice of final policy.

**SUMMARY:** We, the United States Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively, the Services), announce a policy to provide our interpretation of the phrase "significant portion of its range" in the Endangered Species Act's (Act's) definitions of "endangered species" and "threatened species." The purpose of this final policy is to provide an interpretation and application of "significant portion of its range" that reflects a permissible reading of the law and minimizes undesirable policy outcomes, while fulfilling the conservation purposes of the Act. This final policy provides a consistent standard for interpretation of the phrase and its role in listing determinations.

**DATES:** This policy is effective on July 31, 2014.

**ADDRESSES:** This final policy is available on the Internet at *http://www.regulations.gov* at Docket Number FWS–R9–ES–2011–0031. Comments and materials received, as well as supporting documentation used in the preparation of this policy, are also available at the same location on the Internet.

**FOR FURTHER INFORMATION CONTACT:** Gina Shultz, U.S. Fish and Wildlife Service, Ecological Services Program, 4401 North Fairfax Drive, Room 420, Arlington, VA 22203; telephone 703–358–2171; facsimile 703–358–1735; or Marta Nammack, National Marine Fisheries Service, Office of Protected Resources,

1315 East-West Highway, Silver Spring, MD 20910; telephone 301–427–8469; facsimile 301–713–0376. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Introduction
II. Changes from the Draft Policy
III. Policy Explanation
   *A. Purpose*
   *B. The First Component: Consequences of a Species Being in Danger of Extinction or Likely to Become So Throughout a Significant Portion of Its Range (SPR)*
   *C. Second Component: The Definition of "Significant" as it Relates to SPR*
   1. Circumstances under which a portion can be "significant"
   2. Biological basis for "significant"
   3. The threshold for "significant"
   *D. Range and Historical Range*
   *E. Relationship of SPR to the Act's Distinct Population Segment (DPS) Authority*
   *F. Procedure for Implementing the Policy*
IV. Summary of Comments and Responses
   *A. The Policy is Not Needed, Needs Additional Process, or Legislation is Required*
   *B. The SPR Language Provides an Independent Basis for Listing*
   *C. Apply Protections to Entire Species if Listed Because it is Endangered or Threatened Throughout an SPR*
   *D. The Biological Basis for "Significant"*
   *E. The Threshold for "Significant"*
   *F. Quantitative Approaches or Rebuttable Presumptions to Determine Whether a Portion is "Significant"*
   *G. Range and Historical Range*
   *H. Relationship with DPS Authority*
   *I. Whether a Species Can Be Both Threatened Throughout All of Its Range and Endangered Throughout an SPR*
   *J. Use of Best Available Science, Appropriate Analyses, Correct Conclusions*
   *K. Implementation in Listing Determinations*
   *L. Effects on Implementation of Other Portions of the Act*
   *M. Procedural Requirements and Compliance with Laws*
V. Policy
VI. Effects of Policy
   *A. Designation of Critical Habitat*
   *B. Rules Promulgated Under Section 4(d) of the Act*
   *C. Recovery Planning and Implementation*
   *D. Sections 7, 9, and 10 of the Act*
VII. Required Determinations
   *A. Regulatory Planning and Review (E.O.s 12866 and 13563)*
   *B. Regulatory Flexibility Act*
   *C. Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.)*
   *D. Takings (E.O. 12630)*
   *E. Federalism (E.O. 13132)*
   F. Civil Justice Reform (E.O. 12988)
   G. Government-to-Government Relationship with Tribes
   H. Paperwork Reduction Act
   I. National Environmental Policy Act
   J. Energy Supply, Distribution or Use (E.O. 13211)

## I. Introduction

On December 9, 2011, the Services published a notice of a draft policy in the **Federal Register** (76 FR 76987) regarding the interpretation and application of the phrase "significant portion of its range" (SPR) as it occurs in the Act's definitions of "endangered species" and "threatened species." The Act defines the term "endangered species" to mean any species which is in danger of extinction throughout all or a significant portion of its range and the term "threatened species" to mean any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. In the December 9, 2011, **Federal Register** notice, we provided the background for our draft policy in terms of the statute, legislative history, and case law. We also explained different aspects of the draft policy and discussed various alternatives for interpreting the phrase "significant portion of its range," including defining "significant." Finally, we discussed the effects the draft policy would have with respect to implementation of other sections of the Act.

We intend this final policy to be legally binding. It sets forth the Services' interpretation of "significant portion of its range" and its place in the statutory framework of the Act. In this final policy, we focus our discussion on changes to the draft policy based on comments we received during the comment period. For background on the statutory, legislative history, and case law relevant to this policy, as well as alternatives we considered for interpreting the phrase "significant portion of its range" and defining "significant," we refer the reader to our draft policy and the environmental assessment of the policy, which is available at *http://www.regulations.gov* under Docket No. FWS–R9–ES–2011–0031.

## II. Changes From the Draft Policy

This final policy differs from our draft policy in one substantive respect and three editorial respects. Here we summarize those changes. They are explained in greater detail in section III. First, we modified the definition of "significant." The definition in the draft policy was: "A portion of the range of a species is 'significant' if its contribution to the viability of the species is so important that, without that portion, the species would be in

danger of extinction.'' The definition in this final policy reads:

A portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range.

We explain in detail why we revised the definition of ''significant'' in section III.C. In brief, the revised definition will:

1. Remove problems associated with allowing a species to qualify as both threatened throughout its range and endangered throughout an SPR. The change to the first part of the definition ensures that only one legal status is assigned to the species: If a species is endangered or threatened throughout its range, no portions of its range can qualify as ''significant.'' We made this change in response to numerous comments, which raised two issues. First, commenters were concerned that a species simultaneously meeting the definitions of an ''endangered species'' and a ''threatened species'' would be extremely confusing. Second, some commenters thought that it was inappropriate to protect the entire range of a species as endangered if the species, viewed rangewide, met the definition of a ''threatened species.'' This change eliminates these concerns.

2. Lower and simplify the threshold for ''significant.'' Because we have changed ''the species would be in danger of extinction'' to ''the species would be in danger of extinction, or likely to become so in the foreseeable future,'' a portion of the range of a species would be significant if the species would, without that portion, be either endangered *or* threatened. Many commenters requested this change, and we concluded that the change is appropriate in combination with the other change we made to the definition of ''significant.'' A lower threshold will further the conservation purposes of the statute and more clearly avoid the appearance of similarity to the ''clarification'' approach. (The clarification approach was rejected by the Ninth Circuit, as discussed in the draft policy [76 FR 76987, p. 76991, section II.A].) Using this standard, we may list a few more species with important populations that are facing substantial threats. Nonetheless, this relaxed threshold is still relatively high. As discussed in the draft policy (76 FR 76987, p. 76995), this is desirable because we have concluded that, if a species is endangered or threatened in a significant portion of its range, it is

protected throughout all of its range. Thus, we conclude that listings dependent on an SPR determination still will be infrequent.

Second, we made a nonsubstantive change to the first section of the policy, regarding the consequences of a species being endangered or threatened throughout an SPR. The second paragraph of the draft policy stated (emphasis added):

If a species is found to be endangered or threatened in only a significant portion of its range, the entire species is listed as endangered or threatened, respectively, and the Act's protections apply *across the species' entire range.*

In the final policy, we replaced ''across the species' entire range'' with ''to all individuals of the species wherever found.'' This does not reflect a change in the intended meaning of the language but instead simply clarifies how protections will apply. As we explain in section III.D., the protections apply to the species itself, not the ''range'' in which it is found. Further, this change aligns our interpretation with our regulations at 50 CFR 17.11(e) and 17.12(e) that state that once a species is determined to be an endangered species or threatened species, the protections of the Act apply ''to all individuals of the species, wherever found.''

Third, we made a nonsubstantive change to the last section of the policy, reconciling the SPR and Distinct Population Segment (DPS) authorities. In the draft policy, this paragraph read (emphasis added):

If the species *is not endangered or threatened throughout all of its range, but it* is endangered or threatened within a significant portion of its range, and the population in that significant portion is a valid DPS, we will list the DPS rather than the entire taxonomic species or subspecies.

In the final policy, we have deleted the language in italics as redundant. It is no longer necessary to specify this as a prerequisite for when this provision will operate, in light of the revised definition of ''significant.'' Under the final policy, it will be a prerequisite to *any* SPR analysis that the Services first find that the species is neither endangered nor threatened throughout all of its range. Thus, the edit to this paragraph does not represent a change in meaning, but merely harmonizes the language in this paragraph with the previously described edit.

Fourth, we substituted ''throughout'' for ''in'' or ''within'' in several places to track the statutory language (''throughout . . . a significant portion of its range'') more closely.

## III. Policy Explanation

### A. Purpose

The purpose of this policy is to develop a joint interpretation of ''significant portion of its range'' to reduce inconsistencies in applying the phrase and to improve effective and efficient implementation of the Act. The Services need to ensure that the policy is consistent with the plain language and mandates of the Act, is consistent with case law, provides clarity as to both the meaning and consequences of the SPR phrase so that the Services will be accorded deference when they apply the interpretation in making status determinations, and furthers the conservation purposes of the Act.

The relevant statutory provisions together create a variety of tensions and ambiguities, so there is no single best interpretation. Here, we adopt a reasonable interpretation of these statutory provisions. We conclude that (1) if a species is found to be endangered or threatened throughout a significant portion of its range, the entire species is listed as endangered or threatened, respectively, and the Act's protections apply to all individuals of the species wherever found; (2) a portion of the range of a species is ''significant'' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range; (3) the range of a species is considered to be the general geographical area within which that species can be found at the time FWS or NMFS makes any particular status determination; and (4) if a vertebrate species is endangered or threatened throughout an SPR, and the population in that significant portion is a valid DPS, we will list the DPS rather than the entire taxonomic species or subspecies.

As discussed in the draft policy (76 FR 76987, pp. 76988–76990) and in more detail in the Department of the Interior (DOI) (2010) and FWS and NMFS SPR Working Group (2010), the role of the SPR language in the context of the entire statutory scheme is not clear from the text itself or the legislative history. However, the Ninth Circuit's ruling in *Defenders of Wildlife* v. *Norton,* 258 F.3d 1136 (9th Cir. 2001) (*Defenders (Lizard)*), indicates that, with respect to the statutory language ''throughout all or a significant portion of its range,'' we should give the words on either side of the ''or'' operational

meaning (see *Defenders (Lizard)* 258 F.3d at 1141–42). We agree, and we have therefore developed a policy that gives operational effect to the SPR language instead of treating it as merely a clarification of the "throughout all" language. Thus, under our policy, a species will be able to qualify as an "endangered species" in two different situations: (1) If it is in danger of extinction throughout all of its range, or (2) if it is in danger of extinction throughout a significant portion of its range. The same is true for "threatened species."

This policy addresses two separate, but interrelated, components to giving the phrase "a significant portion of its range" operational meaning. First, we establish the consequence of a species being endangered or threatened throughout an SPR. Second, we define "significant," thereby providing a standard for determining when a portion of a species' range constitutes an SPR, and thus when that consequence may be triggered. (We address the consequences issue first because the Services have greater discretion in defining "significant," and those consequences play an important role in the Services' decision as to how to exercise that discretion.) We address each of these components in turn.

We note that throughout this policy when discussing SPR and "portion of the range" and similar phrases, we are referring to the members of the species within that portion of the range. As explained further below, when analyzing portions of ranges we consider the contribution of the individuals in that portion to the viability of the species in determining whether a portion is significant, and we consider the status of the species in that portion. Thus, when we refer to "portion of its range," we mean the individuals of the species that occupy that portion. However, for the sake of readability, in this policy we sometimes refer to "a portion of the range" or similar phrases as a short hand for the "members of the species in that portion of its range."

### B. The First Component: Consequences of a Species Being in Danger of Extinction or Likely To Become So Throughout a Significant Portion of Its Range (SPR)

Given that we have determined that a species may be an "endangered species" or "threatened species" if it is in danger of extinction (endangered) or likely to become so (threatened) throughout an SPR but not throughout all of its range, we considered what consequences under the Act flow from such a

determination. In particular, we considered two alternative interpretations: individuals of a species that are endangered or threatened throughout an SPR are protected wherever found, or individuals of a species that are endangered or threatened throughout an SPR are protected only in that SPR. The legal opinion issued by the Solicitor of the DOI in 2007 (referred to as the "M-Opinion") (DOI 2007) took the latter view (for additional discussion of the M-Opinion, see our draft policy (76 FR 76987, p. 76990)). We conclude that the former view is the best interpretation of the Act. As we explained in the draft policy (76 FR 76987, pp. 76991–76993), the statutory text and the most relevant case law strongly support our conclusion, while the purposes of the Act, the legislative history, and past agency practice are of little help in answering this question. (We acknowledge that one of the district court opinions we discussed was vacated after we published the draft policy: *Defenders of Wildlife* v. *Salazar,* 729 F. Supp. 2d 1207 (D. Mont. 2010), *vacated,* 2012 U.S. App. Lexis 26769 (9th Cir. Nov. 7, 2012). That opinion was vacated, however, not on the merits, but solely because the pending appeal of the opinion became moot due to intervening congressional action. Thus, to the extent that this policy is informed by the reasoning of the district court opinion, it is because we have concluded that that reasoning is valid notwithstanding the opinion's vacatur for technical reasons.)

In addition, we note that our revised definition of "significant" bolsters our conclusion in the draft policy that our interpretation does not render irrelevant the "all" language in the definitions of "endangered species" and "threatened species" (76 FR 76987, p. 76992). As discussed in our draft policy, the "all" language retains independent meaning via the practical way in which the Services actually determine the status of a species. Our revised definition of "significant" further reinforces the "all" language by essentially stipulating that a portion can be significant only if we first find that the species is not currently endangered or threatened throughout all of its range. Thus, the "all" language will retain independent meaning and play an important role in status determinations.

### C. Second Component: The Definition of "Significant" as It Relates to SPR

Having concluded that the phrase "significant portion of its range" provides an independent basis for listing and protecting the entire species,

we next turn to defining "significant" to establish a standard for when such an independent basis for listing exists. As we explained in our draft policy, we have broad discretion to interpret "significant," particularly in the context of creating a policy related to SPR after notice and comment, as we have done here (see 76 FR 76987, p. 76993). In this final policy, we determine that a portion of the range of a species is "significant" if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range. Our definition of "significant" addresses three questions: (1) Under what circumstances can a portion be significant? (2) what information is relevant to determining whether a portion is significant? and (3) what is the threshold or level of importance required for a portion to be significant?

### 1. Circumstances Under Which a Portion Can Be "Significant"

As discussed in our draft policy (76 FR 76987, p. 76992), we have concluded that we must give both the "all" language and the SPR phrase operational effect. In other words, there must be some circumstances in which each provision results in listing species. The Act, however, does not specify the relationship between the two provisions. Based in part on public comments on our draft policy, we now conclude that a portion of the range of a species can be "significant" only if the species is not currently endangered or threatened throughout all of its range.

We reach this conclusion for both textual and practical reasons. With regard to the text of the Act, we note that Congress placed the "all" language before the SPR phrase in the definitions of "endangered species" and "threatened species." This suggests that Congress intended that an analysis based on consideration of the entire range should receive primary focus, and thus that the agencies should do an SPR analysis as an alternative to a rangewide analysis only if necessary. Under this reading, the Services should first consider whether listing is appropriate based on a rangewide analysis and proceed to conduct an SPR analysis if (and only if) a species does not qualify for listing according to the "all" language.

A practical consideration, as made clear by numerous commenters, is that interpreting the definitions of an

"endangered species" and a "threatened species" in a way that a species could meet both definitions simultaneously (i.e., threatened throughout all of its range and endangered throughout a significant portion of its range) would be extremely confusing to the public. Limiting significance to circumstances in which the species is not currently endangered or threatened throughout all of its range eliminates that concern. A related benefit of limiting the applicability of the SPR language is to reduce the circumstances in which additional legal determinations are necessary. This will allow us to more efficiently use our limited resources to undertake additional actions required in administering the Act to further its conservation purposes.

As noted below (section VI. Effects of Policy) and in the draft policy (76 FR 77003), we conclude that finding that a species is an endangered species or a threatened species based on its status in an SPR will occur only under a limited set of circumstances and will be relatively uncommon. Under the draft policy, finding that a species is threatened throughout its range and also endangered in a significant portion of its range is only one of the possible circumstances (of that already limited set) that would have led to finding that a species is endangered or threatened in an SPR, and thus would have been relatively uncommon even within that set of limited circumstances. Moreover, in no circumstance should the interpretation in this final policy lead to a reduction in protections that the Secretaries deem to be necessary and advisable, as the Secretaries have the authority under section 4(d) to apply the full protections of the Act to threatened species.

2. Biological Basis for "significant"

As we explained in our draft policy (76 FR 76987, p. 76994), we conclude that a definition of "significant" that is biologically based best conforms to the purposes of the Act, is consistent with judicial interpretations, and best ensures species' conservation. This policy's definition emphasizes the biological importance of the portion of the range to the conservation of the species as the measure for determining whether the portion is "significant." For that reason, it describes the threshold for "significant" in terms of an increase in the risk of extinction for the species. We evaluate biological significance based on the principles of conservation biology using the concepts of redundancy, resiliency, and representation (the three Rs) (Schaffer and Stein 2000). These concepts also

can be expressed in terms of the four viability characteristics used more commonly by NMFS: abundance, spatial distribution, productivity, and diversity of the species.

3. The Threshold for "significant"

As discussed in our draft policy (76 FR 76987, p. 76995) and below, we conclude that the threshold for "significant" should be high enough to avoid dilution of conservation efforts and unnecessary restrictions that may result from listing a species based on its status throughout an SPR, but not so high as to make it indistinguishable from the "clarification interpretation" in the M–Opinion (the clarification approach was rejected by the Ninth Circuit, as discussed in the draft policy). After considering comments received on the draft policy, we have lowered the threshold for "significant" somewhat by incorporating the concept of being likely to become in danger of extinction in the foreseeable future (the threatened standard) along with the standard for endangered in the definition of "significant." Use of the somewhat lowered threshold furthers the conservation purposes of the statute and more clearly avoids the appearance of similarity to the "clarification" approach while striking a balance between too high and too low a threshold. At the same time, use of the endangered and threatened standards in the definition of "significant" minimizes the introduction of complicating new concepts into the status-determination process.

Use of Endangered and Threatened Standards: We used the endangered and threatened standards from the Act to define the threshold for "significant" because they are well-understood concepts that are directly linked to the conservation status of the species, and are within the expertise of the Services. Lowering the threshold further, beyond the endangered and threatened standards, would require that we define new standards that would complicate the understanding, and analysis, of how or whether a species meets the definitions of the Act. We also considered using another well-known standard—the definition of significance in the DPS policy—as a threshold for "significant" in this policy. We rejected this option, however, because it would result in all DPSs being SPRs, rendering the DPS language in the Act meaningless. We concluded that the threshold for significance must be higher than that in the DPS policy in order to avoid this outcome.

Lower Threshold Furthers the Conservation Purposes of the Act: The

threshold for "significant" in our draft policy furthered the conservation purposes of the Act by adding an independent basis for listing. In other words, under the draft policy we would consider not only whether a species is endangered or threatened throughout its range, but also whether it is endangered or threatened throughout an SPR. This final policy retains the additional, independent basis for listing and, by lowering the threshold for "significant" to incorporate the threatened standard, may slightly increase (compared to the draft policy) the number of species we consider for listing. In other words, the lower threshold for "significant" in this final policy will further the conservation purposes of the statute beyond that already embodied in the draft policy because it will enable us to provide protection under the Act to species with important populations facing significant threats that we might not have otherwise listed.

Lower Threshold is More Clearly Distinguishable from the "Clarification Interpretation": Although this final policy's definition establishes a threshold for "significant" that is relatively high, lowering it somewhat from what we described in the draft policy will make it clearer that we are giving the phrase "a significant portion of its range" independent meaning. Specifically, we have not set the threshold as high as it was under the interpretation presented by FWS in the Defenders (Lizard) litigation (termed the "clarification interpretation" in the M-Opinion). As discussed in the draft policy (76 FR 76987, p. 76989), under that interpretation, the portion of the range must be so important that current imperilment there would mean that the species would be currently imperiled everywhere. Under this final policy, the portion of the range need not rise to such an exceptionally high level of biological significance. (Note that if the species is imperiled in a portion that rises to the high level of biological significance required under the clarification interpretation, then we should conclude that the species is in fact imperiled throughout all of its range—and we need not conduct an SPR analysis.) Rather, under this final policy we ask whether the species would be in danger of extinction or likely to become so in the foreseeable future without that portion, i.e., if the members of that portion were not just currently imperiled, but already completely extirpated.

Unlike the clarification interpretation at issue in Defenders (Lizard), this final policy does not, by definition, limit the SPR phrase to situations in which it is

unnecessary. The clarification interpretation defined "significant" in such a way that a portion of a species' range could be significant only if the current status of the species throughout its range were endangered or threatened (in particular, as a result of the endangered or threatened status of the species throughout that portion of its range). But if the current status of the species throughout its range is endangered or threatened, then the species could be listed even without the SPR phrase. Thus, that definition of "significant" inherently made the statutory SPR phrase unnecessary and redundant. In contrast, the definition in this policy does not render the statutory phrase redundant. In fact, this policy's definition of "significant" itself makes it clear that a portion can only be significant if the species is not currently endangered or threatened throughout all of its range. Moreover, a portion of a species' range is significant when the species would be in danger of extinction or likely to become so in the foreseeable future rangewide if the species were extirpated in that portion, but that will not be the case at the time of the analysis because, by definition, an SPR is a portion of the current range of the species, and therefore the species cannot yet be extirpated there. In other words, this policy's definition leaves room for listing a species that is not currently imperiled throughout all of its range.

Two examples illustrate the difference between the policy's definition and the clarification interpretation. First, a species might face severe threats only in the portions of the range it uses in one part of its life cycle (Portion A). Because the species cannot complete its life cycle without Portion A, threats in Portion A affect all individuals of the species even if other portions of the species' range are free of direct threats. In other words, if the species is endangered in Portion A, it is in fact endangered throughout all of its range. Portion A would be an SPR under the clarification interpretation. Under this policy's interpretation, we would still list this species, but its listing would be based on its status throughout all of its range rather than its status throughout a significant portion of its range. We would not go further to consider the status in any potentially significant portion of its range.

In contrast, another species may have two main populations. The first of those populations (found in Portion Y) currently faces only moderate threats, but that population occurs in an area that is so small or homogeneous that a stochastic (*i.e.,* random, unpredictable,

due to chance) event could devastate that entire area and the population inhabiting it. Therefore, if it were the only population, the species would be so vulnerable to stochastic events that it would be in danger of extinction. (With two main populations, it is unlikely that both would be affected by the same stochastic event. The severity of the threats posed by the stochastic event would therefore be smaller because there could be exchange between the populations following the stochastic event—and this exchange could help to stabilize the population that has suffered declines.) Thus, without the portion of the range currently occupied by the second population (Portion X), the species would be in danger of extinction. But, as long as Portion X contained an extant population, the resiliency and redundancy of the two portions combined would be sufficient that the species would not be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, even in the face of severe threats to Portion X. Under these facts, Portion X would not be an SPR according to the clarification interpretation. Under this final policy, we first determine whether the species is endangered or threatened throughout all of its range and, if so, list the species accordingly. If the species is not endangered or threatened throughout all of its range, then we look further to determine whether it is endangered or threatened throughout a significant portion of its range. Under these facts, and in contrast to the clarification interpretation, Portion X would be an SPR under this policy because the species would not currently be endangered or threatened throughout all of its range, but the hypothetical loss of Portion X would cause the species to become endangered. Therefore, we would need to consider whether the species was endangered or threatened in Portion X, and, if so, we would list the species.

More broadly, and as a logical corollary to the reasoning of *Defenders (Lizard),* any interpretation of the definitions of "endangered species" and "threatened species" must afford practical meaning to each part of the statutory language. Thus, an interpretation must not render irrelevant any of the four discrete bases, or categories, for listing set forth in the plain language of the statute (that a species is: endangered throughout all of its range; threatened throughout all of its range; endangered throughout a significant portion of its range; or threatened throughout a significant

portion of its range). This policy's threshold for determining biological significance will give meaning to all four discrete bases for listing. Under our interpretation, there is at least one set of facts that falls uniquely within each of the four bases (without simultaneously fitting the standard of another basis).

Lower Threshold Is Still High Enough to Be Compatible with Listing the Species Throughout its Range: Given that the consequence of finding a species to be endangered or threatened throughout an SPR is listing the species throughout its entire range, it is important not to use a threshold for "significant" that is too low (*e.g.,* the threshold described by the definition of significance in the DPS policy, or that a portion of the range is "significant" if its loss would result in any increase in the species' extinction risk, even a negligible one). Although we recognize that most portions of a species' range contribute at least incrementally to a species' viability, use of such a low threshold would require us to impose restrictions and expend conservation resources disproportionately to conservation benefit; listing would be rangewide, even if a portion of only minor conservation importance to the species is imperiled. In such a situation, a proportion of limited conservation resources would be diverted away from the conservation of species most vulnerable to extinction and used for species that might arguably better fit a lesser standard if viewed solely across their ranges. The threshold defined in this policy strikes a balance between being high enough to avoid these negative consequences, and low enough to give the SPR phrase independent meaning.

Application of the Threshold: Under this policy, after having determined that the species is neither endangered nor threatened throughout all of its range, we will determine if a portion of a species' range is significant. To do so, we will ask whether, without that portion, the three Rs of the species—or the four viability characteristics used more commonly by NMFS—would be so impaired that the species would have an increased vulnerability to threats to the point that the overall species would be in danger of extinction (*i.e.,* would be "endangered") or likely to become so in the foreseeable future (*i.e.,* would be "threatened"). If so, then the portion in question is significant, and we will undertake an analysis of the threats to the species in that portion to determine if the species is endangered or threatened there. That analysis evaluates current and anticipated threats facing the species in that portion

now and into the foreseeable future, the impacts these threats are expected to have, and the species' anticipated responses to those impacts. If, on the other hand, the answer is negative, that is the end of the inquiry—the portion in question is not significant and the species does not qualify for listing.

There are a number of circumstances in which we might determine that a portion of the range of a species is "significant." For example, the population in the remainder of the species' range without the population in the SPR might not be large enough to be resilient to environmental catastrophes or random variations in environmental conditions. Or, if the viability of the species depends on the productivity of the population in the SPR, the population in the remainder of the range might not be able to maintain a high-enough growth rate to persist in the face of threats without that portion. Further, without the population in the SPR, the spatial structure of the entire species could be disrupted, resulting in fragmentation that could preclude individuals from moving from degraded habitat to better habitat. If habitat loss is extensive, especially in core areas, remaining populations become isolated and fragmented, and demographic and population-dynamic processes within the species can be disrupted to the extent that the entire species is at higher risk of extinction (*e.g.,* Waples *et al.* 2007), such that those remaining populations might then warrant listing. Finally, if the population in the SPR contains important elements of genetic diversity, without that population the remaining population may not be genetically diverse enough to allow for adaptations to changing environmental conditions. Diversity is generally thought to buffer a species against environmental fluctuations in the short term and to provide evolutionary resilience to meet future environmental changes (*e.g.,* Hilborn *et al.* 2003).

### D. Range and Historical Range

When considering an interpretation of the SPR phrase, we must also consider the meaning of the term "range." The term is not defined in the Act. Indeed, it is used only six times, two of which are in the SPR phrases of the definitions of "endangered species" and "threatened species." None of these uses sheds much light on precisely what Congress meant by the term "range." The context in which Congress used the term is, however, instructive. In the Act, "range" is used as a conceptual and analytical tool related to (1) identifying endangered and threatened species under section 4, and (2) identifying

areas appropriate for the establishment of experimental populations. In contrast, the concept of "range" plays no direct role in implementation of the key operative provisions of the Act that protect species that we determine are endangered or threatened. (We note that it would be possible to interpret the use of "range" in section 4(c)(1) of the Act in isolation to control the scope of the operative protections under the Act. However, as discussed in our draft policy (76 FR 76987, pp. 76991–76992, section II.B.), the interpretation of section 4(c)(1) that best harmonizes the various parts of the Act and relevant case law is to treat section 4(c)(1) as an informational rather than a substantive provision.)

Once we determine that a species is an "endangered species" or "threatened species," the protections of the Act are applied to the species itself, not the "range" in which it is found.[1] For example, sections 7 and 9 of the Act contain no reference to "range" and their provisions are applied to the species or individuals of the species, rather than a specified "range." In other words, as explicitly acknowledged in the regulations governing the Lists of Endangered and Threatened Wildlife and Plants, the protections of the Act are applied "to all individuals of the species, wherever found" (50 CFR 17.11(e), 17.12(e)). As long as a species is listed, these protections apply to all populations and individuals of the species regardless of how that species' range changes over time (whether the

[1] We note that for species listed as DPSs, because individuals in a distinct population segment are most often not morphologically or visually distinct from other members of their taxonomic species or subspecies, the population ("species" as defined by the Act) is often defined geographically. This geographic description (except in the case of international boundaries) is intended to define the "species" by indicating the area within which it is highly likely that individuals are members of the listed DPS rather than members of other populations of the same taxonomic species or subspecies. It may include areas that are generally not occupied by the species but where an individual of the species, if found, is most likely a member of the DPS. Geographic descriptions are meant to aid in identification of individuals of the listed entity rather than limit protections. In other words, the geographic description can define the species. It is often true that individuals of the taxonomic species or subspecies found outside the geographic area defining the listed DPS are considered to belong to other populations of the species (unless identity can be established by other means) and are thus not protected. Within the area defining the species, all members are assumed to belong to the DPS and protections of the Act apply to "all individuals of the species." It is important to note that, while the geographic description of some listed DPSs (*e.g.,* Pacific salmon) do not explicitly state that the boundaries of the DPS include the marine range of the DPS, individuals of these DPSs are protected wherever they go (to the extent that they can be identified).

range contracts due to continuing threats or expands as a result of recovery efforts). The protections can be modified only through rules promulgated under sections 4(d) and 10(j) of the Act, or completely removed through delisting and removal of the species from the List of Endangered and Threatened Wildlife or the List of Endangered and Threatened Plants.

Thus, the term "range" is relevant to whether the Act protects a species, but not how that species is protected. Having concluded that the term "range" is used primarily in determining whether a species qualifies as an endangered species or threatened species, we must still consider its meaning in that context. The Services interpret the term "range" to be the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, even if not used on a regular basis. We consider the "current" range of the species to be the range occupied by the species at the time the Services make a determination under section 4 of the Act.

We reach this conclusion based on the text of the Act. As defined in the Act, a species is endangered only if it "is in danger of extinction" throughout all or a significant portion of its range. The phrase "is in danger" denotes a present-tense condition of being at risk of a current or future undesired event. Hence, to say a species "is in danger" in an area where it no longer exists—*i.e.,* in its historical range where it has been extirpated—is inconsistent with common usage. Thus, "range" must mean "current range," not "historical range."

Some have questioned whether lost historical range may constitute a significant portion of the range of a species, such that the Services must list the species rangewide because of the extirpation in that portion of the historical range. We already take into account in our determinations the effects that loss of historical range may have on the current and future viability of the species. We conclude that this consideration is sufficient to account for the effects of loss of historical range when evaluating the current status of the species, and a specific consideration of whether lost historical range constitutes a significant portion of the range is not necessary. In other words, we do not base a determination to list a species on the status (extirpated) of the species in lost historical range. We base this conclusion on the present tense language of the Act and on the fact that considering the status of the species in its current range is in fact applying

the test required by our SPR definition as explained below.

Given our definition of SPR, we will arrive at the appropriate status conclusion by considering the effects of loss of historical range on the current status of the species even though we do not explicitly consider whether lost historical range is itself an SPR. In other words, considering the status of the species in its current range is in fact applying exactly the test envisioned by our definition of SPR, with the difference that the scenario is actual rather than hypothetical. Under this policy's definition, we consider whether, under a hypothetical scenario, a species would be endangered or threatened without the portion in question. When we consider the status of a species in its current range, we are considering whether, without that portion (*i.e.*, lost historical range) the species is endangered or threatened. If lost historical range had indeed been an SPR prior to its loss, then, with the loss having occurred, the species should currently be endangered or threatened in its remaining current range. When considering the status of a species that has lost historical range, the scenario is no longer hypothetical but actual, and the status of the remaining portion is no longer hypothetical but is determined by examining the species in its current range. Thus, we conclude that the appropriate focus of our analysis is the status of the species in its current range.

While we conclude that it is not necessary to separately consider whether lost historical range is an SPR, evaluating the effects of lost historical range on the viability of the species is an important component of evaluating the current status of the species. Past range reduction can stem from habitat destruction or degradation, or from factors that cause displacement of the species from an area they once occupied. Range reduction may result in reduced numbers of individuals and populations, changes in available resources and carrying capacity, changes in demographic characteristics (survival, reproductive rate, metapopulation structure, etc.), and changes in genetic diversity and gene flow, which in turn can increase a species' vulnerability to a wide variety of threats, including habitat loss. In other words, past range reduction can reduce the redundancy, resiliency, and representation of a species in its remaining range. Additionally, factors other than habitat loss may become important as a species loses its range, and these factors that result from past range reduction are evaluated as current or future threats. For example, a species

with a reduced range is at greater risk of all or most of its populations being affected by a catastrophic event such as a hurricane or fire. We collectively evaluate all the current and potential threats to a species, including those that result from past loss of historical range. For example, the loss of historical range may have resulted in a species for which distribution and abundance is restricted, gene flow is inhibited, or population redundancy is reduced to such a level that the entity is now vulnerable to extinction or likely to become so within the foreseeable future throughout all or a significant portion of its current range. The effect of loss of historical range on the viability of the species could prompt us to list a species because the loss of historical range has contributed to its present status as endangered or threatened throughout all or a significant portion of its range. In such a case, we do not list a species because it is endangered or threatened in its lost historical range, but rather because it is endangered or threatened throughout all or a significant portion of its current range because that loss of historical range is so substantial that it undermines the viability of the species as it exists today. Conversely, a species suffering a similar loss of historical range would not be listed if viability of the remaining individuals was not compromised to the point of endangering or threatening the species. (We also note that a species that has not experienced any loss of historical range may still be vulnerable to a wide variety of threats and in fact meet the definition of an "endangered species" or a "threatened species." Thus, loss of historical range is not necessarily determinative of a species' status, but must be considered in the context of all factors affecting a species.)

In addition to considering the effects that loss of historical range has had on the current and future viability of the species, we must also consider the causes of that loss of historical range. If the causes of the loss are still continuing, then that loss is also relevant as evidence of the effects of an ongoing threat. Loss of historical range for which causes are not known or well understood may be evidence of the existence of threats to the remaining range.

In implementing listing determinations (including reclassifications and delistings), the Services use the best scientific and commercial data available, including data on the species' current range, regardless of the point in time at which we examine the status of the species (12-month listing finding,

reclassification, proposed listing or delisting rule, 5-year review, and so forth). For example, if we are petitioned to reclassify an already listed species, we examine the status of the species in the range it currently occupies, not the range it occupied at the time of listing. As explained above, examining the current status of the species in its current range in no way constrains or limits use and application of the tools of the Act to only the species' current range. Protections of the Act (except as modified through sections 10(j) and 4(d) of the Act) apply "to all individuals of the species, wherever found" (50 CFR 17.11(e) and 50 CFR 17.12(e)), even if the range of the species changes over time. In fact, reducing a species' vulnerability to threats and ultimately to extinction often requires recovering the species in some or all of its lost historical range. Indeed, the Act's definitions of "conserve" and "critical habitat," and the provisions of section 10(j) of the Act, all indicate that Congress specifically contemplated that recovering species in lost historical range may be needed to bring a species to the point that it no longer needs the protections of the Act. Thus, examining a species' status in its current range does not set the bar for recovery; rather, it is simply the approach that the Act requires us to apply when we examine a species' current and future vulnerability to extinction.

We acknowledge that the Ninth Circuit Court of Appeals has held that FWS must consider whether lost historical range is a significant portion of a species' range (*Defenders (Lizard)*, 258 F.3d at 1145) ("where . . . it is on the record apparent that the area in which the lizard is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range'"). This appears to have been based at least in part on a misunderstanding of FWS's position, which the Ninth Circuit Court interpreted as a denial of the relevance of lost historical range (see *Tucson Herpetological Society* v. *Salazar*, 566 F.3d 870, 876 (9th Cir. 2009) ("On appeal, the Secretary clings to his argument that lost historical habitat is largely irrelevant to the recovery of the species, and thus the [Act] does not require him to consider it.")). As explained above, the fact that historical range has been lost can be highly relevant to the conservation status of the species in its current range. The Services also consider historical range during recovery planning. For the

reasons described above, however, we respectfully disagree with this holding of the Ninth Circuit, and conclude that the status of lost historical range should not be separately evaluated; ultimately, it is the conservation status of the then-current range at the time of the listing determination in question that must be evaluated (see *Ctr. for Biological Diversity* v. *Norton,* 411 F. Supp. 2d 1271 (D.N.M. 2005), *vacated by* No. 06–2049 (10th Cir. May 14, 2007); *Ctr. for Biological Diversity* v. *U.S. Fish & Wildlife Serv.,* 2007 U.S. Dist. LEXIS 16175 (D. Colo. Mar. 7, 2007), *vacated by* No. 07–1203 (10th Cir, Oct. 22, 2007)). Thus, if a species "is expected to survive [in an area] much smaller than its historical range," we undertake an analysis different from that apparently contemplated by the Ninth Circuit. In fact, two different analyses may be required. First, if the species has already been extirpated in some areas, the Services must determine whether the loss of those areas makes the species endangered or threatened throughout all of its current range. Second, if the species is not endangered or threatened throughout its current range, but there are areas in its current range in which the species has *not* been extirpated, but is in danger of extirpation (or is likely to become so in the foreseeable future),

the Services must determine whether those areas constitute a significant portion of its range, and, if so, list the species in its entirety.

*E. Relationship of SPR to the Act's Distinct Population Segment (DPS) Authority*

As we explained in our draft policy (76 FR 76987, p. 76998), the definition of "significant" for the purpose of SPR analysis differs from the definition of "significant" found in our DPS policy and used for DPS analysis. We expect, based on our experience in applying the DPS policy, that the differences between the two standards, the specific circumstance described by the definition of "significant portion of its range," and the high bar this policy sets will seldom result in situations in which the population within an SPR for a taxonomic species or subspecies might also constitute a DPS. In those rare circumstances, under this policy we will consider the DPS to be the proper entity for listing. Please refer to our draft policy for a discussion of various issues we considered in choosing an appropriate relationship between the SPR language and the Act's DPS authority, including: (1) The differing definitions of "significant" in each context; (2) the overlap between SPR and DPS analyses; and (3) the portions

of the species to protect when a DPS also constitutes an SPR. This final policy includes what we conclude is the most reasonable approach.

*F. Procedure for Implementing the Policy*

This policy will be applied to all status determinations, including analyses for the purposes of making listing, delisting, and reclassification determinations. The procedure for conducting analyses of whether any portion is an SPR is similar, regardless of the type of status determination we are making. The first step in our analysis of the status of a species is to determine its status throughout all of its range. If we determine that the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, we will list the species as endangered (or threatened) and no SPR analysis will be required. If the species is neither endangered nor threatened throughout all of its range, we will determine whether the species is endangered or threatened throughout a significant portion of its range. If it is, we will list the species as endangered or threatened, respectively; if it is not, we will conclude that listing the species is not warranted. (Figure 1)



Figure 1. Analysis steps

If we conclude a species is neither endangered nor threatened throughout all of its range, we must examine whether it is endangered or threatened throughout a portion of its range. When we conduct an SPR analysis, we will first identify any portions of the species' range that warrant further consideration. The range of a species can theoretically be divided into portions in an infinite number of ways. However, there is no purpose to analyzing portions of the range that are not reasonably likely to be significant and endangered or threatened. To identify only those portions that warrant further consideration, we will determine whether there is substantial information indicating that (1) the portions may be significant and (2) the species may be in danger of extinction in those portions or likely to become so within the foreseeable future. We emphasize that answering these questions in the affirmative is not a determination that the species is endangered or threatened throughout a significant portion of its range—rather, it is a step in determining whether a more detailed analysis of the issue is required. In practice, a key part of this analysis will be whether the threats are geographically concentrated in some way. If the threats to the species are affecting it uniformly throughout its range, no portion is likely to warrant further consideration. Moreover, if any concentration of threats apply only to portions of the range that clearly do not meet the biologically based definition of "significant" (*i.e.,* the loss of that portion clearly would not be expected to increase the vulnerability to extinction of the entire species), those portions will not warrant further consideration. (Figure 2)



Figure 2. Identifying and analyzing portions

If we have identified any portions that may be both (1) significant and (2) endangered or threatened, we will engage in a more detailed analysis to determine whether these standards are indeed met. As discussed above, to determine whether a portion of the range of a species is significant, we consider whether, under a hypothetical scenario, the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction or likely to become so in the foreseeable future throughout all of its range. This analysis will consider the contribution of that portion to the viability of the species based on principles of conservation biology. Contribution would be evaluated using the concepts of redundancy, resiliency, and representation. (These concepts can similarly be expressed in terms of abundance, spatial distribution, productivity, and diversity.)

To determine whether a species is endangered or threatened throughout a portion of its range, we will use the same standards and methodology that we use to determine if a species is endangered or threatened. The identification of an SPR does not create a presumption, prejudgment, or other determination as to whether the species in that identified SPR is endangered or

threatened. We must go through a separate analysis to determine whether the species is endangered or threatened in the SPR. Depending on the biology of the species, its range, and the threats it faces, it may be more efficient to address the ''significant'' question first, or the status question first. Thus, if we determine that a portion of the range is not ''significant,'' we will not need to determine whether the species is endangered or threatened there; if we determine that the species is not endangered or threatened in a portion of its range, we will not need to determine if that portion was ''significant.''

## IV. Summary of Comments and Responses

The notice announcing our draft policy (76 FR 76987) requested written comments and information from the public. That notice established a 60-day comment period ending February 7, 2012. We received several requests to extend the public comment period and subsequently published a notice (77 FR 6138) that extended the comment period an additional 30 days, from February 7, 2012, through March 8, 2012.

During the public comment period, we received approximately 42,000 comments, of which approximately 41,500 were form letters and approximately 100 were duplicate submissions. We received comments

from State and local governments, tribes, commercial and trade organizations, conservation organizations, nongovernmental organizations, private citizens, and others. The range of comments varied from those that provided statements of support or opposition to the draft policy with no additional explanatory information, to those that provided extensive comments and information (supporting or opposing the draft policy or specific aspects of the policy) and suggestions for revisions. Some comments were strictly editorial and included suggested specific line edits or word usage, which we addressed as appropriate in this document.

All substantive information provided during the comment period has been considered in this final policy and, where appropriate, has been incorporated directly into this final policy or is addressed below. Comments received were grouped into general issues specifically relating to the draft policy, and are presented below along with our responses to these comments.

### A. The Policy Is Not Needed, Needs Additional Process, or Legislation Is Required

*Comment (1):* The Services should amend the Act to exclude the phrase ''throughout a significant portion of its range.''

*Response:* Amendments to the Act are outside the scope of this policy. Only Congress has the authority to amend the Act.

*Comment (2):* One commenter stated that the internal review process did not involve enough pragmatic review.

*Response:* We disagree. A team of experienced, informed staff within both Services spent many hours reviewing the statutory language, legislative history, and case law relating to SPR. The team looked at every practical option of how to address SPR before developing the draft policy, including detailed discussion of pragmatic considerations. The team's recommendations were reviewed more broadly by practitioners and officials at both agencies. These reviews took pragmatic considerations into account. Nonetheless, the Services' ultimate decision is also constrained by legal considerations, as detailed above and in the draft policy—implementation of the statutory language that is ''pragmatic'' but likely to be rejected by the courts as inconsistent with the statute is not truly pragmatic.

*Comment (3):* Several commenters, including the Association of Fish and Wildlife Agencies (AFWA), stated that the draft policy needs significant work and that it is neither necessary nor timely for finalizing at this time. They urged it be given no further consideration until a determination of need and timeliness is concluded. Another commenter stated there is no compelling need to advance a revised definition at this time because the Services have acknowledged that the SPR definition would be only sparingly used.

*Response:* The SPR phrase is integral to the Act's definitions of ''endangered species'' and ''threatened species,'' terms that are relevant to all listing determinations. We have not previously provided a joint interpretation of the phrase. In part as a result, we have faced an increasing amount of litigation related to our application of the phrase. Therefore, we have determined that we need to promulgate a binding interpretation of the SPR phrase. This policy will allow us to more efficiently and consistently carry out our responsibilities under section 4 of the Act and reduce litigation. Although we anticipate that the policy will affect the outcome of only relatively few determinations, the policy itself will be relevant to numerous determinations.

*Comment (4):* Several commenters recommended that we refer the draft SPR policy to a panel comprised of representatives nominated by scientific, professional, and conservation societies

as the Act advises the Services to do in section 4(b)(5)(C) with regard to listing decisions.

*Response:* As the commenters acknowledge, section 4(b)(5)(C) of the Act applies only to particular determinations under section 4(a); it does not apply to generic policies and rules promulgated by the Services to guide implementation of the Act. In any case, section 4(b)(5)(C) simply states that we should give notice of a proposed regulation to such professional scientific organizations as the Secretary deems appropriate. We notified professional scientific organizations of our draft policy and accepted public comments from those organizations, as well as all other interested parties, during the public comment period.

*Comment (5):* AFWA, the Hawaii Department of Land and Natural Resources, the Florida Fish and Wildlife Conservation Commission, and the Washington Department of Fish and Wildlife recommended that the draft policy be referred to the Joint Federal/State Task Force on Endangered Species Act Policy (JTF) for review.

*Response:* The Services acknowledged the special and unique relationship between the States, FWS, and NMFS through the formation of the JTF in 2011. However, we had substantially formulated the draft SPR policy (the culmination of a multi-year effort on the parts of the Services, DOI, and DOC) prior to the formation of the JTF. While formulating the draft policy predated the JTF, we nevertheless briefed the JTF on development of the draft SPR policy prior to its publication, and through the JTF and AFWA, we hosted webinars in 2011 and 2012 with State fish and wildlife agencies during the public comment period to inform the States and provide opportunities for feedback. The open comment period provided an additional opportunity for the States to comment. We have considered and addressed comments we received from the States in the development of this final policy. In light of our ongoing need to have established guidance on this important policy matter to guide our listing determinations, and in the absence of discrete concerns raised by the States that have not already been thoroughly considered, we have determined that the most appropriate course of action is to proceed with finalizing this policy. We will continue to coordinate with the States on application of this policy as needed.

*Comment (6):* The Arizona Game and Fish Department questioned whether this policy is necessary in the absence of ''thorough development and review of alternatives conducted by the affected

parties.'' They further suggested that a task force should develop and analyze alternatives and present them to the public for comment.

*Response:* The draft policy presented a detailed discussion of alternatives. The notice-and-comment opportunity provided on the draft policy allowed for adequate development and review of alternatives by affected parties.

*B. The SPR Language Provides an Independent Basis for Listing*

*Comment (7):* Most commenters who addressed this topic agreed that the SPR language provides an independent basis for listing. One commenter asserted that this interpretation is more consistent with both the statutory language and the spirit of the Act, and will help facilitate resource adaptation and provide the protections of the Act to more species that need it.

*Response:* We appreciate the commenters' feedback.

*Comment (8):* The Wisconsin Department of Natural Resources stated that interpreting the SPR language as providing an independent basis for listing may not be appropriate, and suggested (without further explanation) that other alternatives, such as equating the SPR language with the ''distinct population segment'' language, may be more appropriate, understandable, and simpler to implement and defend.

*Response:* As indicated in the draft policy (76 FR 76987, pp. 76997–76999), we considered a number of other alternatives, including equating the SPR language with the DPS language. For the reasons described there and elsewhere in this final policy, we have determined that interpreting the SPR language to provide an independent basis for listing is the most appropriate interpretation; the Wisconsin Department of Natural Resources comments presented no analysis that rebutted this conclusion.

*Comment (9):* One commenter thought that separate analyses with respect to significant portions of the range would create an arbitrary process that is difficult to understand and explain. The commenter recommended that the Services return to a simpler definition and stated that Congress intended species should be listed when threats reach a large-enough portion of the range to affect the entire species.

*Response:* This appears to be an argument in favor of the clarification interpretation, which FWS had unsuccessfully advanced in the litigation that culminated in the Ninth Circuit's *Defenders (Lizard)* decision. As discussed in the draft policy (76 FR 76987, pp. 76989–76990) and elsewhere in this final policy, that interpretation

has been rejected by most courts, and we have accepted those judicial determinations as correctly interpreting the statute's language.

*C. Apply Protections to Entire Species if Listed Because It Is Endangered or Threatened Throughout an SPR*

Comments on the topic of whether to list the whole species or instead apply protections only to a portion of the range were split almost entirely by group affiliation: Environmental groups asserted that this result was required by the Act and will increase the likelihood that the species will be conserved and restored; the regulated community and States asserted that either the Act requires the opposite result, or that it is unwise policy to interpret the Act in this way. Responses to more specific comments follow.

*Comment (10):* One commenter, while admitting that the Act and relevant case law prohibits listing distinctions below the subspecies or DPS level, argued that the definition of "species" governs only the taxonomic level of what can be listed, not *where* a "species" can be listed.

*Response:* We disagree. The Act's limitation of listing solely "species" would have no meaning if we interpreted the Act to allow "species" to be listed or protected only in certain places.

*Comment (11):* Numerous commenters opposed to this interpretation pointed to section 4(c)(1) of the Act for support, with at least one arguing that we have misinterpreted the district court's decision in *Defenders of Wildlife* v. *Salazar.* They argued that the language about specifying "with respect to each species over what portion of its range it is threatened or endangered" means that a species can be listed and protected in only a portion of its range. They further argued that the interpretation in the draft policy writes this language out of the statute. One commenter claims that the Services' treatment of section 4(c)(1) is "without authority or even reasoning."

*Response:* As we indicated in the draft policy, it is a challenge to harmonize the various relevant provisions of the Act. However, we have concluded that section 4(c)(1) of the Act is a bookkeeping provision, and should not be interpreted to change the otherwise plain meaning of the operative and definitional provisions of the Act. The type of information to be conveyed may include, for example, whether the species was listed on the basis that it is endangered or threatened in a portion of its range, and if so, which portion. This does not render the

"portion of its range" language in section 4(c)(1) meaningless, as such information can, for example, help focus recovery efforts. Moreover, even if it would have been reasonable to interpret the 1972 bill as using the SPR language to authorize listings of significant portions of the ranges of species (as opposed to entire "species"), the final language of the 1973 Act moved the SPR language to the definitions of "endangered species" and "threatened species," and added the precursor to the DPS language to address the issue of listings of less than a species or subspecies. This revised structure simply cannot support the interpretation preferred by these commenters, notwithstanding the fact that the 1973 Act carried over the language in section 4(c)(1) referring to "portion of its range." Finally, despite the claim about lack of authority and reasoning, the draft policy cited relevant case law and provided the Services' reasoning (see 76 FR 76991–76992). No commenter advanced a clear or persuasive explanation of their view that our interpretation of any of these sources or case law is in error.

*Comment (12):* One commenter asserted that the draft policy was inconsistent with the requirement of section 4(b)(1) that listing determinations take into account State and local governmental efforts to protect species.

*Response:* We disagree. Under this policy, those protection efforts still will be considered. Those efforts are, of course, relevant to the rangewide analysis, but they are also highly relevant to both the questions of significance of a portion of a range, and the status of the species throughout that portion. For example, the Services would consider whether local governmental protections in the portion at issue prevented the species from being endangered or threatened throughout that portion, and whether local governmental protections in the remainder of the range would make the population throughout the remainder sufficiently robust that the portion of the range at issue cannot meet the standard for being a "significant portion."

*Comment (13):* One commenter asserted that our interpretation rendered meaningless the "all" language in the definitions of "endangered species" and "threatened species."

*Response:* We directly addressed this argument in the draft policy, noting that (1) the argument fails to take into account the fact that the Services as a practical matter consider a species' status throughout its range first, and (2)

the relevant cases have rejected it (76 FR 76987, p. 76992). Also, as discussed above, the revised definition of "significant" in this final policy accords particular weight to the "all" language because it prescribes that the rangewide analysis be done first.

*Comment (14):* Several commenters agreed with the Services' conclusion that the SPR language provides an independent basis for listing, but asserted that adherence to that principle required listing something other than the entire species when the species is endangered or threatened in an SPR. They did not explain the basis for this assertion.

*Response:* We disagree. There is nothing inherently inconsistent with the SPR language providing an independent basis for listing and the result being listing the entire species. In other words, the SPR language provides an independent basis for listing the entire species; there are some circumstances covered by each basis that are not covered by the other. We discussed our reasons for choosing this interpretation in detail in the draft policy (76 FR 76987, pp. 76991–76993 and 76999–77000).

*Comment (15):* Several commenters argued that it is contradictory for us to determine that a species does not warrant listing rangewide, and then to list it rangewide because it is endangered or threatened in an SPR.

*Response:* Determining that a species is not in danger of extinction throughout all of its range is not the same thing as determining that there is an absence of risk to the species. The species still may face a sufficient level of risk in portions of its range to warrant listing rangewide. This policy concludes that, under the properly construed definitions of the Act, a species that is in danger of extinction throughout an SPR does warrant listing rangewide, because it meets the definition of an "endangered species."

*Comment (16):* Two commenters sought to analogize to the Act's provisions for designation of critical habitat as a basis for urging the Services not to apply protections throughout a species' range. Specifically, they pointed to the Act's provisions dividing potential critical habitat into areas occupied at the time of listing and areas not occupied, and requiring that unoccupied areas be included only if the areas themselves are found "essential for the conservation of the species," as well as the proclamation that critical habitat generally shall not include the entire geographical area which can be occupied by the species

(see 16 U.S.C. 1532(5)). These provisions, they suggested, evince congressional recognition that it is possible and sometimes necessary to limit protections for listed species to only certain areas throughout their ranges. They urge the Services to conclude from this structure that Congress would similarly intend for the Services to have the ability to tailor the effect of a listing.

*Response:* While it is true that Congress specifically provided that critical habitat need not be coextensive with the entire geographical area where a species can exist (except in circumstances where the Secretary determines that it should), 16 U.S.C. 1532(5)(C), Congress did not include such specific direction in the provisions governing listings. Nor does Congress' recognition that critical habitat need not cover the full range of a species imply that the geographic parameters of a listing also should be flexible; listing provides the fundamental level of protection to the species, whereas critical habitat's direct legal effect is limited to application of the destruction or adverse modification standard to Federal agency actions through section 7 of the Act. It is also important to note that the SPR analysis is not based on the physical and biological features of the area and is not designed to protect the area. Rather, it is based on an assessment of the biological importance of the members of the species in an area to the overall listed entity.

*Comment (17):* One commenter asserted that the import of the 1978 and 1979 amendments to the Act and the wolf and Gunnison's prairie dog district court opinions was that the Act does not allow listing of something "smaller" than a DPS—doing so would render the DPS language superfluous. The commenter suggested, however, that the Services could still limit a listing to an SPR if that SPR was "larger" than the range occupied by a DPS.

*Response:* The SPR and DPS authorities are distinct: DPSs do not have to be a particular size, and therefore we cannot mathematically compare the size of an SPR to that of a DPS. As discussed elsewhere, however, if the population within the SPR qualifies as a valid DPS, we will list the DPS, rather than the entire "species" of which the SPR is a part.

*Comment (18):* Several commenters, including the Idaho Office of Species Conservation, questioned the propriety of the Services relying on two district court opinions (*Defenders of Wildlife* v. *Salazar,* 729 F. Supp. 2d 1207 (D. Mont. 2010), *vacated,* 2012 U.S. App. Lexis 26769 (9th Cir. Nov. 7, 2012), and

*WildEarth Guardians* v. *Salazar,* 2010 U.S. Dist. Lexis 105253 (D. Ariz. Sept. 30, 2010)), rather than two circuit court opinions (*Defenders of Wildlife* v. *Norton,* 258 F.3d 1136 (9th Cir. 2001), and *Roosevelt Campobello Intl. Park Comm'n* v. *U.S. Env't'l Protection Agency,* 684 F.2d 1041 (1st Cir. 1982)). Idaho specifically asserted that, although the Services referred to *Defenders of Wildlife* v. *Norton* as the seminal case, we did not discuss that case's analysis of the legislative history, which Idaho further asserted supports protecting species only in portions of their ranges. Commenters also criticized the reasoning of the district court decisions. Several commenters, including Idaho, suggested reinstating the M-Opinion at least until an appeals court has directly addressed the issue.

*Response:* As discussed in the draft policy (76 FR 76987, p. 76990) the district court opinions represent the most recent and detailed judicial analyses of the precise point at issue. We find the reasoning of these cases to be persuasive. In contrast, the language in the circuit court opinions that lends some support to the commenters' position (that the Secretaries have the authority to list or protect species in only a portion of their range) is dicta and appears to be based in part on a misunderstanding of the basis for some of FWS' earlier listings. We conclude that both the First and Ninth Circuits would likely adopt conclusions consistent with the district court opinions, were the issue now directly presented to them. The Department of the Interior has withdrawn and no longer supports the reasoning of the M-Opinion. For this reason, we think it would be wasteful, inefficient, and unwise to pursue further litigation in support of this aspect of the M-Opinion.

*Comment (19):* One commenter suggested that two additional district court cases support this aspect of the draft policy: *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation,* 794 F. Supp. 2d 65, 96 n.38 (D.D.C. 2011), and *Center for Native Ecosystems* v. *Salazar,* 795 F. Supp. 2d 1236, 1240 (D. Colo. 2011).

*Response:* We agree, but because these cases cite the cases we discussed without additional analysis, we focused on the other cases.

*Comment (20):* Several commenters argued that the legislative history clearly supports interpreting the Act to allow the Services to list just a portion of the range of a species. Other commenters pointed to legislative history that supports the contrary position. The Idaho Office of Species Conservation criticized the draft policy

for not sufficiently analyzing the legislative history.

*Response:* As discussed in the draft policy (76 FR 76987, p. 76989) and FWS (2011), aspects of the legislative history support different conclusions. And although there is some legislative history that suggests that Congress intended to give the Secretaries discretion to list less than full biological species, it is unclear how that intention relates to the various statutory provisions (*e.g.,* the definition of "species" versus the definitions of "endangered species" and "threatened species") and to the restructuring of the operative provisions and definitions between the 1972 Nixon Administration bill and the 1973 Act as passed. Ultimately, we concluded that it would not be necessary or particularly helpful to the public to include in the draft policy itself a detailed written analysis of the legislative history, but we have made the summary available for public review.

*Comment (21):* Several commenters asserted that FWS has a historical practice of protecting only portions of the range of species, citing the examples listed in *Defenders of Wildlife* v. *Norton,* 258 F.3d 1136 (9th Cir. 2001); the Idaho Office of Species Conservation asserted that the draft policy completely ignored this history. One commenter further stated that if the authority for these listings was not section 4(c)(1) (with respect to SPRs) of the Act, the Services must explain what statutory basis other than section 4(c)(1) of the Act authorized the partial protections provided in those examples.

*Response:* Contrary to Idaho's assertion, we directly referred to the examples listed in *Defenders* in explaining that the draft policy did not conflict with established agency practice. The draft policy concluded that those listings could also be explained as relying on the authority of the DPS language in the definition of "species" or the precursor to that language (76 FR 76987, pp. 76992–76993). The draft policy (76 FR 76987, p. 76988) also explained that prior to and in the years following the issuance of the DPS Policy (61 FR 4722, February 7, 1996) the Services had generally understood (although not expressly articulated) that, given the Act's definition of "species," the only way to list less than a taxonomic species or subspecies was as a DPS. For example, on April 28, 1976, FWS listed the U.S. population of a subspecies of the Bahama swallowtail butterfly (41 FR 17736). When the Act was amended in 1978 to limit population listings only to vertebrates, the Service removed the

population because it did not qualify as a "species" under the revised definition (49 FR 34501, August 31, 1984). Thus, past practice FWS did not believe the Act allowed listing units below taxonomic species or subspecies, except (after 1978) in the case of vertebrate DPSs.

*Comment (22):* Several commenters, including several States, argued against a one-size-fits-all approach, noting that various provisions of the Act provide the Services with flexibility. They noted that the flexibility provided by allowing the listing of a species in a portion of its range (with the remainder unlisted) would also recognize the States' role in managing fish and wildlife populations within their borders, and would provide an incentive for States to conserve imperiled species. In contrast, the approach in the draft policy was described by one commenter as "heavy handed" and likely to generate increased animosity towards the Act. Another commenter suggested that being endangered or threatened throughout an SPR should result in a rangewide listing only if protective actions anywhere in the range would reduce the threat of extinction in the SPR, an assumption that may not be valid in all cases.

*Response:* Although we agree that in a number of areas Congress provided the Services with administrative flexibility, that flexibility derives from particular statutory language. As discussed in the draft policy, here the better reading of the relevant statutory language (and the only one permissible under prevailing case law, as discussed previously) is that Congress did not intend to allow partial listing of "species." Regarding providing an incentive to States to conserve imperiled species, we recognize that in some circumstances allowing protection only in certain portions of the range would provide a stronger incentive to States. However, under this policy States will have an incentive to conserve species, as State conservation efforts are relevant to both listing and delisting determinations under section 4(b)(1) of the Act.

*Comment (23):* One commenter suggested that, taken to its logical conclusion, the draft policy would mean that any time a species is endangered or threatened "in some isolated area," it could be listed throughout its current range. The Florida Fish and Wildlife Conservation Commission expressed concern that listing would be required even if a species is "thriving and well managed in some portion of its range." Other States expressed similar concerns, particularly the Alaska Department of Fish and Game given its isolation from the contiguous 48 States.

*Response:* A species would only be listed because of its status throughout an "isolated area" if that area was "significant" (*i.e.,* the contribution of the members of the species in that portion of its range to the viability of the species was so important that, without that portion, the species would be in danger of extinction or likely to become so within the foreseeable future). In that unlikely circumstance, listing the species throughout its range is appropriate and consistent with the statutory language. Similarly, if a species is "thriving and well managed" in some portion of its range, in most circumstances the other parts of its range would not be "significant" as defined in this policy, and would be listed, if at all, only under our authority to list DPSs.

*Comment (24):* Several commenters, including the Hawaii Department of Land and Natural Resources, suggested that listing only the endangered or threatened portions of the range of a species would allow the Services to focus their limited resources where they can be most effective in furthering the purposes of the Act, and that listing rangewide would be inequitable to stakeholders in the remainder of the range.

*Response:* Although we acknowledge that focusing conservation efforts on the most imperiled portions of a species range is one of the benefits of interpreting the Act to allow for listings of portions of ranges, there are also benefits of the contrary interpretation (76 FR 76987, pp. 76991–76993). Moreover, as discussed elsewhere (76 FR 76987, p. 76992), we have concluded that requiring rangewide listings is the best way of harmonizing the various provisions of the Act. And, as also discussed elsewhere (76 FR 76987, p. 77004), we will use what discretion is available to us to focus conservation efforts on the areas where those efforts are most likely to lead to recovery of the species.

*Comment (25):* One commenter stated that interpreting the Act to tie the hands of the Secretary to impose protections that apply no additional benefit is indefensible.

*Response:* We disagree that rangewide listing will provide no additional benefit. We recognize that, in most cases, the key to recovery of a species listed because it is endangered or threatened throughout a significant portion of its range will be to reduce the threats in that portion, so that it is no longer endangered or threatened there. But, in some cases, protections throughout all of the range may lead to recovery. This may occur if the conservation status of the members in the remainder of the range is improved such that the endangered or threatened portion of the range loses its significance. For instance, the resiliency and redundancy of the remainder of the range may be increased through conservation actions to the point that the endangered or threatened portion of the range's relative contribution to the viability of the species is reduced, and the status of the species in the remainder of the range is not dependent on the portion of the range in which the species is endangered or threatened. In other words, the remainder of the range may become secure enough that it would not qualify as endangered (or threatened) even in the absence of the portion of the range that was endangered or threatened at the time of listing.

*Comment (26):* One commenter agreed that the issue is a difficult one, and expressed no opinion as to the right interpretation. The commenter did suggest that listing the species rangewide would be consistent with the "precautionary principle" and scientific principles of conservation biology, but recognized that rangewide listing "will likely result in unintended consequences that may be contrary to congressional intent . . . and may result in [Act] being applied to protect populations where those protections are not needed." The commenter, however, expressed the opinion that the Services should not even attempt to answer this question in a policy defining "significant," as doing so injects considerations of economic and regulatory consequences in conflict with the mandate of section 4(b) of the Act that listing decisions be based solely on the best scientific and commercial data available. Therefore, the commenter suggested removing this section of the draft policy.

*Response:* Section 4(b)(1) of the Act requires the Services to "make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available." Section 4(a)(1) governs individual listing determinations. The commenter failed to recognize that defining "significant" is not itself a listing decision; rather, it is an interpretive exercise with legal, policy, and biological components. In other words, the policy is not a "determination[] required by subsection (a)(1)," and therefore section 4(b)(1) does not by its own terms apply to the policy. In resolving ambiguities in the Act and providing guidance for its

implementation, it is lawful and completely appropriate for the Services to consider a wide variety of factors.

*Comment (27):* One commenter suggested that if the final policy also concluded that an entire species must be listed if endangered or threatened throughout an SPR, then that authority should be used sparingly.

*Response:* We agree that rangewide listings should not be made lightly, and as discussed in the draft policy (76 FR 76987, p. 76995) and above in the II. Changes from the Draft Policy section, part of our reasoning for adopting the relatively high standard of this final policy for the definition of "significant" is to avoid unnecessary regulatory burdens. However, we have a duty to apply the Act's definitions in the context of the best available scientific and commercial information in each case and must not hesitate to use the authority where appropriate.

*Comment (28):* One commenter suggested that when a species is endangered or threatened throughout an SPR outside of the United States, that the U.S. population should not be included in the listing.

*Response:* As the commenter pointed out, the draft policy is silent as to the effect of jurisdictional boundaries on the operation of the SPR language. There is, however, a good reason for this: Section 4 of the Act makes no reference to any different treatment of species found outside of the United States. Rather, it only specifies notification requirements to foreign governments, and clarifies that the conservation efforts of those governments should be considered in making listing determinations. That said, as indicated in the draft policy (76 FR 76987, p. 77003) and elsewhere here, if an SPR that warrants listing also qualifies as a DPS, we will list the DPS, including those with boundaries that correspond with international boundaries.

*Comment (29):* One group of commenters opposed application of the policy to foreign species. The commenters asserted that the conservation considerations for foreign species are very different than those for domestic species. The commenters were particularly concerned that rangewide listing resulting from application of the draft policy would interfere with sport-hunting programs in countries that manage a species well, and provided several existing examples of FWS providing a species with different listing statuses in different countries. The commenters also asserted that the DPS concept is not an adequate safeguard to prevent that interference. One commenter stated that the Services

should issue a separate policy for foreign species to take into account foreign programs and practices and congressional language not to list areas that do not themselves warrant being listed.

*Response:* We disagree. The standards for listing are the same for domestic and foreign species, although the nature of the data to be analyzed can differ. Moreover, as discussed in the draft policy, our policy stipulates that if an endangered or threatened SPR of a species also qualifies as a DPS, we will list the DPS rather than the entire taxonomic species or subspecies. This treatment is consistent with the commenters' examples and maintains the full flexibility of the DPS authority to apply differing statuses across the range of a vertebrate taxon comprising multiple DPSs, including those that qualify as DPSs based on different management across international boundaries. Thus, our SPR policy honors congressional intent that suggests we should apply differing statuses for species across international boundaries if there are differences in management.

*Comment (30):* Colorado Parks and Wildlife commented that it would be unreasonable to list the Gunnison's prairie dog rangewide if the prairie portion of its range does not warrant listing itself, and if adequate mechanisms do not exist for the recovery of the montane population, which is subject to much greater threats.

*Response:* On November 14, 2013, FWS published (78 FR 68660) a not-warranted finding for Gunnison's prairie dog consistent with application of the principles laid out in this policy.

### D. The Biological Basis for "Significant"

*Comment (31):* Most commenters, including the Wisconsin Department of Natural Resources and Idaho Office of Species Conservation, supported the biological basis for the definition of "significant." One noted that a percentage-of-range test departs from the biological conservation of listed species and the "best science" features of the Act, and moves away from the areas of expertise of Service biologists. Another thought size of the portion would be most straightforward, but acknowledged that size will not always be directly related to biological/conservation importance, which matters most when trying to conserve endangered and threatened species.

*Response:* We appreciate the commenters' constructive feedback.

*Comment (32):* Several commenters supported the biological basis for the definition of "significant," but

questioned how the Services will make these determinations. For example, the Nevada Department of Wildlife questioned whether decisions based on an analysis of biological significance (based on the principles of conservation biology using the concepts of representation, resiliency, and redundancy (the three Rs)) can be articulated and supported in a manner that will be able to withstand challenges. The Idaho Department of Fish and Game found it difficult to imagine the multitude of potential analyses of different geographically based configurations of how much of the taxonomic species' range is required to meet the threshold of "significance." The Hawaii Department of Land and Natural Resources was concerned that the biological basis may be too subjective to another commenter how a species with a metapopulation structure throughout all of its extant range would be affected by the proposed interpretation.

*Response:* Although these determinations are necessarily subjective to some degree, we will make them based on the best available scientific and commercial data. Our expertise and experience uniquely qualify us to make these sorts of determinations. The biologically based definition of "significant" requires the same types of analyses that we already conduct, and we are confident that we can apply this standard in a manner that will be able to withstand challenges. With regard to the concern about the multitude of potential analyses that would be required, we acknowledged this in the draft policy, and explained how our process for considering SPRs would address that concern (76 FR 76987, p. 77002). The process we outlined is appropriate for species with a metapopulation structure throughout all of its extant range, since a metapopulation is a group of spatially separated populations of the same species that interact at some level. One or more of these populations can constitute an SPR.

*Comment (33):* Several commenters supported the biological basis of the definition of "significant," but asked how we will determine that the threats in a portion are so "significant" as to warrant a listing determination based on an SPR.

*Response:* The commenters' question goes to the second step of the SPR analysis, which asks whether a species is endangered or threatened throughout an SPR. We will make these determinations in the same way we determine whether any species is endangered or threatened. The only

difference in these determinations is that they will be made with reference to the members in a smaller portion of the species' range. We do not ask whether the threats acting on the portion are "significant," but whether they cause the species to be either in danger of extinction or likely to become so within the foreseeable future throughout that portion.

*Comment (34):* One commenter suggested that we include the more detailed language about the three Rs and four viability criteria (abundance, spatial distribution, productivity, and diversity) in the definition itself, instead of only in the preamble, to ensure that the definition is more specific and less open to interpretation and debate. Otherwise, "in danger of extinction" will be difficult to apply consistently.

*Response:* We disagree. A succinct policy statement is beneficial both to the Services and the public, and additional guidance is available by referring to the preamble. If we determine that it would be helpful to do so in the future, the Services may develop internal guidance that would include such details to help their biologists implement the policy.

*Comment (35):* One commenter was concerned about the emphasis placed on the term "viability" because this term is not defined.

*Response:* We use the term to describe conservation biology principles, as it is a common term in the field of conservation biology. "Viability" is the ability of a population to persist and avoid extinction. The viability of a population will increase or decrease in response to changes in the rates of birth (or germination), death, immigration, and emigration of individuals.

*Comment (36):* One commenter wondered how the Services will determine what will constitute a significant portion of the range for plants with disjunct distributions. What criteria will we use (genetic data, population viability analysis (PVA), population modeling, or other methods)? The commenter was concerned that genetic diversity may be lost if the "significance" of a portion of a plant species' range or genetic diversity or both across its range is not adequately investigated and understood. The commenter also opined that climate change (changing precipitation patterns and temperature regimes) may increase the significance of populations located at the extremes of a species' range because those populations may make disproportionately high contributions to the total adaptive capacity of species.

*Response:* All of these considerations are subsumed within our evaluation of the three Rs and four viability criteria.

In evaluating the status of species, the Services encounter species with a wide range of life histories, circumstances, and varying levels of data quality and quantity. Because of this, it is not possible to lay out a single set of specific criteria in this policy. Analyses will necessarily be species-specific and will rely on the best scientific and commercial data available for that species. However, as explained in the draft policy (76 FR 76987, p. 76994), the framework of the three Rs and four viability criteria include considerations such as spatial distribution, abundance, and genetic diversity. Where we have quantitative data, we may be able to use PVAs or population modeling. In less data-rich situations, we will use qualitative methods. In the response to *Comment 84* below, we provide an example of the application of this framework to the Queen Charlotte goshawk. In that analysis, we specifically considered geographic barriers and genetic diversity in our evaluation of whether portions of the species' range could be "significant."

*Comment (37):* A few commenters, including the Alaska Department of Fish and Game, recommended changing the definition of significant to read, "A portion is 'significant' in the context of the Act's 'significant portion of its range' phrase if its contribution to the viability of the species is so important that, without the individuals in that portion, the species would be in danger of extinction." The commenters suggested that this would eliminate confusion that could arise from the fact that "range" usually refers to a geographic area rather than the individuals in that area.

*Response:* The commenters are correct that our determinations are made with reference to the biological organisms, not the geographic area. Therefore, we changed the definition of "significance" to clarify that "that portion" refers to members of the species in the portion of the range.

*Comment (38):* Two commenters suggested the following modification to our definition of "significant": "In implementing the assessment of a portion of a range's contribution to the viability of a species, the Services shall identify and explain those physical attributes and biological elements that are present in the species' occupied range and are so integral to the life cycle of the species that they make a unique and irreplaceable contribution to the species' ability to survive."

*Response:* The biologically based definition in our draft policy refers to the biological organisms, not the geographic area. Regardless, the

biological principles that we will consider when evaluating whether a portion's contribution to the viability of a species is so important that, without the members in that portion, the species would be in danger of extinction or likely to become so within the foreseeable future already incorporate the concepts suggested by these commenters because it is impossible to separate these habitat concepts from the species' needs. These concepts will be reflected in the viability of the species.

*Comment (39):* A number of commenters argued in favor of using other factors (*e.g.,* size, esthetic, ecological, educational, recreational, cultural, U.S. presence) to define "significant" instead of applying a purely biological/conservation approach. For example, South Dakota Game, Fish and Parks suggested that we include both the options of conservation value and size for defining "significant," and another commenter stated that percentage of range and percentage of population should be required components of a science-based SPR analysis throughout all ecotypes within the species' current and historical range. Other commenters preferred that we base our approach on the "Values of the Act" so that we can retain broad discretion to determine that a particular portion of a species' range should be deemed significant based on the specific national "values" set forth in the Act itself.

*Response:* We considered these factors as well as other factors when we were developing the draft policy (76 FR 76987, pp. 77000–77002). However, we concluded that a biological/ conservation importance approach would result in us applying protections and resources to portions that are biologically important and in need of conservation, consistent with the purposes of the Act. An approach that is based on biological importance necessarily includes consideration of factors such as size of the population, spatial distribution across ecotypes, etc. Such a biological approach is most appropriate because the Act focuses on protecting species, and to protect species requires that we assess whether they are biologically viable. The commenters did not present a clear explanation or rationale for why or how non-biologically based factors would be better than a biological/conservation approach.

*Comment (40):* The Kalispel Tribe of Indians suggested a hybrid approach, incorporating both the biological/ conservation importance and the values identified in section 2 of the Act. Under this approach, if a portion is

"significant" for biological or conservation reasons, the portion would be a "significant portion of [the species'] range"; if not, the Services would, in consultation with the affected Tribe, look to whether that portion is "significant" because of the values articulated by the Act (*e.g.*, cultural, historical, educational). If the portion is important because of any of these values, it would then be "significant."

*Response:* All of the reasons we gave in the draft policy (and in response to *Comment (39)*, above) for not applying a values approach (76 FR 76987, p. 77001) apply as well to the hybrid approach suggested by the Kalispel Tribe. Therefore, we concluded that the biological/conservation approach should be used alone in determining whether a portion of the range of a species is significant.

*Comment (41):* One commenter suggested that a variety of factors should be used to determine the significance of a portion of the range of a species, including whether that portion supports unique habitats or adaptations for the species, and whether its loss would result in a significant gap in the species' range.

*Response:* Unique adaptations are incorporated in the three Rs or four viability criteria. Since the Act is a species-focused law (rather than ecosystem-focused), incorporating the concept of "unique habitats" is not appropriate unless the species' presence in that habitat contributes to its resilience. Evaluating whether the loss of the portion would result in the species being endangered or threatened already captures the commenter's suggestion of evaluating whether its loss would result in a significant gap in the species' range. We deliberately chose not to use the phrase, "significant gap in the species' range" because that is a factor in the DPS Policy, and "significant" in the SPR phrase is not the same as "significant" in the DPS Policy.

*Comment (42):* Several commenters recommended that we incorporate ecosystem principles into our definition of "significant." For example, one commenter recommended rewording the definition of "significant" so that when the loss of a portion of a species' range would result in the extirpation of that species from a defined ecoregion or ecosystem unit, then that portion is significant to the species and the species must be protected under the Act. The commenter further argues that an ecosystem-unit assessment provides for a meaningful distinction between the concept of endangered throughout an SPR and threatened throughout an SPR.

Another commenter recommended that we revise the draft policy by defining the word "significant" in a way that recognizes the ecological significance of various parts of a species' range to the species and the ecosystem, does not diminish the species' resilience or potential to adapt in response to rapidly changing environmental conditions, and does not rule out the possibility that areas that do not now constitute good habitat might become so as a consequence of the same processes that are causing the loss or degradation of presently occupied areas. As an example, this commenter suggested that the loss of a large whale population from an ecosystem (*i.e.*, Gulf of Alaska, Bering Sea, or Sea of Okhotsk) would be significant at the species and ecosystem level, and therefore, this loss could be considered a loss from an SPR. Similarly, this commenter argued that portions of a species' range that are important for supporting vital functions such as reproduction, feeding, and refuge from predators could reasonably be considered SPRs. This commenter emphasized the importance of preserving the populations' capacity to adapt to changing environmental conditions by not allowing a population to decline as a result of human impacts throughout an SPR.

*Response:* We explained our rationale for choosing a biologically based definition of "significant" in detail in the draft policy (76 FR 76987, pp. 76993–76994 and 77001). A biologically based definition best conforms to the purposes of the Act, is consistent with judicial interpretations, and best ensures species' conservation. While one of the purposes of the Act is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, the Act provides for protecting listed species and their critical habitat, not ecosystems. Therefore, we declined to reword our draft policy to incorporate ecoregions or ecosystem units, although we note that extirpation of a species from an ecoregion or ecosystem unit can be a relevant consideration under the policy, even if not dispositive. With regard to the comment that an ecosystem-unit assessment provides for a meaningful distinction between the concept of endangered throughout an SPR and threatened throughout an SPR, the commenter did not explain how this would be provided, and, therefore, we cannot offer a response. When determining whether a species is endangered or threatened, we recognize the ecological significance of various

parts of its range to the species and the ecosystem, and consider its resilience or potential to adapt in response to rapidly changing environmental conditions; there is no need to revise the draft policy to recognize this. In response to this commenter's recommendation that we consider the possibility for low-quality areas to become good habitat, nothing in our policy precludes us from considering the dynamic ecological and evolutionary processes that lead to these changes in habitat quality when determining whether a portion of the range of a species is significant.

*Comment (43):* One commenter stated that the draft policy equates "significant" only with "biological viability" when it should be focusing on viability and geographic representation. Another commenter stated that "significant" should be defined to include a geographic component that is related to but not subsumed by viability, citing Congressional Report No. 93–412, historical application of the Act, and peer-reviewed assessments (Vucetich *et al.* 2006 and Carroll *et al.* 2010) to support its claim. Another commenter notes that species cannot be effectively protected without protecting the habitats and ecosystems on which they depend and without considering the species' integral ecological processes; this commenter supported the use of the conservation-biology principles of resilience, representation, and redundancy, but believed that our focus on species viability as the sole criterion for listing contradicts these three principles. As an example, this commenter argued that misinformed and harmful "mitigation" for a proposed groundwater-pumping-and-exportation project would be allowed under the species-viability focus in our proposed approach.

*Response:* As we discussed in the draft policy, we consider the conservation-biology principles (three Rs or four viability criteria) when evaluating whether a portion is significant (76 FR 76987, p. 76994). Consideration of these principles necessitates an evaluation of geographic representation as all of the three Rs (resilience, representation, and redundancy) and the spatial distribution criterion (one of the four viability criteria) include geographic components. While one of the Act's purposes is to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, the actual, operational provisions of the Act are explicitly species-focused and do not specifically provide for protection of ecosystems (though critical habitat designation

offers some protection). However, the species' integral ecological processes are considered in any evaluation of the status of a species. With regard to the comment expressing concern about harmful "mitigation" resulting from our draft policy, the commenter did not explain the connection between this concern and our draft policy. However, we disagree that there would be any harmful mitigation as a result of implementing the policy

*E. The Threshold for "Significant"*

*Comment (44):* A number of commenters supported a lower bar that would include "threatened." Arguments offered in favor of this include: (1) A recommendation to apply the precautionary principle and protect species before they become endangered (when it is too late) and species recovery becomes more costly; and (2) concern that the draft definition does not provide a meaningful distinction between when a species is endangered throughout an SPR and when a species is endangered throughout all its range (citing *Defenders (Lizard)*).

*Response:* Although we disagree with the assertion that the precautionary principle should be applied to listing determinations under section 4 of the Act (*see CBD* v. *Lubchenco,* 758 F. Supp. 2d 945, 955 (N.D. Cal. 2010)), as discussed above, this final policy adopts the standard suggested by these commenters. See section II. Changes from the Draft Policy, above.

*Comment (45):* Two commenters stated that the threshold in the draft policy was too high and would result in decreased protections for species with important populations that are facing significant threats. They expressed concern that many populations important to the redundancy, resiliency, and representation within the species will not warrant protection. The commenters proposed that a population be considered "significant" if its loss would "meaningfully compromise" redundancy, resiliency, or representation for the species as a whole. They suggested that this would ensure that all species are represented by multiple viable populations distributed across the range of variation of that species including geographic, ecological, and genetic variation. Another commenter agreed that the threshold was too high, and asserted that the Services are giving economic impacts of listing species too much emphasis and not giving conservation success enough emphasis.

*Response:* We agree that the threshold should be lower than in the draft policy to ensure that species with important

populations that are facing significant threats receive protection under the Act, but we do not believe "meaningfully compromise the redundancy, resiliency, or representation for the species as a whole" is an appropriate and clear standard. In addition to its ambiguity, the recommended threshold would appear to set an inappropriately low standard for "significant" given the effect of finding that a species is endangered or threatened throughout an SPR, *i.e.,* rangewide listing. For the reasons discussed above, we have lowered the threshold for "significance," but we decline to adopt this recommendation. We do not agree with the commenter who asserted that we are giving economic impacts of listing species too much emphasis and not giving conservation success enough emphasis. We developed our policy by examining the Act, its legislative history, and case law, and the result is a policy that balances the need to give full meaning to both "throughout all of its range" and "throughout a significant portion of its range" while affording appropriate protections to species.

*Comment (46):* Many commenters, including the Idaho Department of Fish and Game, Alaska Department of Fish and Game, Wisconsin Department of Natural Resources, and Hawaii Department of Land and Natural Resources supported the high threshold for "significant" in the draft policy. A few argued that introducing the consideration of whether a species is "likely to become endangered" as part of identifying a "significant portion" would confuse the purpose of the identification of an SPR. Another stated that the use of the endangered standard would provide a more straightforward approach for determining if a species' range is "significant" because it would avoid adding the temporal element of the threatened standard. The commenter also suggested that use of a higher standard lessens the risk of unnecessary species listings that would result in application of the Act's protections across the species' range.

*Response:* We do not think introducing the consideration of whether a species would meet or exceed the standard for threatened as part of the threshold for "significant" confuses the purpose of the identification of an SPR. Determining whether a portion is "significant" is a separate exercise from determining whether the members of the species in that portion meet the status test of "endangered" or "threatened." The inquiry assumes that all members in that portion are extirpated, without reference to a particular point in time. Regarding use

of the threatened standard in the definition of "significant," in our draft policy we also concluded that the use of the endangered standard was more straight-forward. However, for the reasons discussed in sections II. and III.C.3., above, we now conclude that it is more appropriate to include the threatened standard along with the endangered standard in the definition of "significant," and have done so in this final policy.

*F. Quantitative Approaches or Rebuttable Presumptions To Determine Whether a Portion is "Significant"*

*Comment (47):* One commenter asked us to rescind the draft policy and instead adopt one that considers the plain meaning of significance of the range in terms of the majority of the range as measured in quantitative or numerical terms. However, most commenters, including the Wisconsin Department of Natural Resources, Hawaii Department of Land and Natural Resources, and Alaska Department of Fish and Game, agreed with us that a quantitative approach or rebuttable presumption should not be used for determining whether a portion of a species' range is significant. Many commenters noted that a single metric, percentage, or other quantitative measure should not be used to establish a presumption for identifying an SPR. Instead, they suggested that we must draw upon those myriad factors specific to the species and the portion of the range at issue to determine whether that portion meets the threshold for identification and review under the SPR inquiry.

One commenter added that, based on research indicating variation in habitat quality and productivity at the scale of the species' range, percentage of range or population is an unreliable indicator of biological or conservation significance. Therefore, a rebuttable presumption would be either overly strict in many instances, would somehow result in "shifting to the public" an assessment the Services are better equipped to make, or would be generally under-protective. Another thought using percentage of range or habitat as the threshold for "significant" is appealing because it is more tangible and objective, but admitted that it is likely to be impossible to develop size-based criteria that will work for all possible scenarios. Another pointed out that a predetermined percentage of the species' overall range should not be used to define "significant"; significant reduction in a species' range, particularly when coupled with reduced abundance, could be a sufficient basis

for listing even if that portion fails to meet some predetermined percentage of the species' range.

Two other commenters noted that the use of size (either of a population or a range) as a rebuttable presumption would provide a quantitative measure that could be easier to apply as a first cut, but acknowledge that it could ultimately complicate the issue rather than streamline the process because it would not take into account species-specific characteristics, and determining what is necessary to rebut the presumption would be problematic. They concluded that the use of the size approach, and necessary size-threshold determination, would be arbitrary and likely impossible to apply in a consistent or systematic manner. They agreed with us that percentage of range or population as a rebuttable presumption would be inconsistent with case law (the Ninth Circuit has already rejected the argument that a specific percentage loss of habitat should automatically qualify a species for listing (*Defenders (Lizard),* 258 F.3d at 1143–44)).

*Response:* In view of the comments received and the complications identified in the draft policy, we have concluded that it is not feasible to implement a purely quantitative approach. The Services specifically contemplated the possibility of using a quantitative threshold for "significant" when we considered using size as a basis for determining significance. We specifically rejected using size because a single quantitative threshold would be unlikely to be applicable to the widely varying life histories, habitats, and needs of the species for which we conduct status reviews. We also specifically requested comment on the possibility of developing a specific quantitative threshold for significance that could be used as a rebuttable presumption to streamline and simplify our analyses and provide for greater transparency (a rebuttable presumption would provide a standard quantifiable threshold for significance that would be applied unless certain assumptions or conditions are not met). Most commenters who addressed this issue replied that developing quantitative thresholds (even as a rebuttable presumption) would not be feasible or useful or would be unnecessarily complicated given the variety of circumstances, species life histories, and variability in the types of data that would be available to the Services. We agree.

## G. Range and Historical Range

*Comment (48):* Many commenters appeared to believe the policy would limit protections of a species to only the range occupied at the time of listing. Other commenters recommended we explain that "range" is not a regulatory concept.

*Response:* The Services noted in the draft policy that our interpretation of the term "range" does not limit application of the tools and protections of the Act (76 FR 76987, pp. 76997 and 77003–77004). However, in this final policy, we have further clarified that the term "range" is relevant to whether the Act protects a species, but not how that species is protected. We note that the protections of the Act are applied "to all individuals of the species, wherever found," the phrasing used in 50 CFR 17.11(e) and 17.12(e).

*Comment (49):* Many commenters believe that the policy would result in the Services giving no consideration of loss of historical range or reasons for its loss in our listing determinations. Several commenters believed that defining range as current range would result in a "shifting baseline." Commenters assumed that we would establish the current range as the baseline for comparison of a species' status without consideration of historical information to provide context to interpret the species' current status.

*Response:* As explained in the draft policy (76 FR 76987, pp. 76996–77007), loss of historical range, its impact on the current and future viability of the species, and its causes are important considerations in determining a species' status. While the definition of "range" establishes that the question of whether a species is endangered or threatened is a forward-looking inquiry, nothing in the policy suggests that current range would be used as the baseline against which to measure whether a species is endangered or threatened. In fact, because asking whether a species is currently in danger of extinction or likely to become so is a forward-looking exercise, there is no specific "baseline" of comparison. As we explain above in section III.D., a species' current and future status is informed by past trends and events and the Services agree that information regarding historical range cannot be ignored. We have further clarified the importance and relevance of evaluating the effects of loss of historical range on the current and future viability of a species.

*Comment (50):* Many commenters supported the Services' interpretation of range as current range and noted

additional support in other provisions of the Act and other case law for the policy's interpretation that "range" must mean current range.

*Response:* We appreciate the commenters' supportive feedback.

*Comment (51):* One commenter suggested the Services more clearly make a distinction between the roles of SPR and consideration of lost historical range. Further, the commenter recommended that the Services explain that SPR concerns the biological significance of a portion of currently occupied range, while loss of historical range is a factor in determining whether a species is currently viable.

*Response:* We have added further explanation of the roles and relationships of SPR and lost historical range in determining the status of a species.

*Comment (52):* Many commenters believe that defining "range" as the current range accepts that lost historical range is unrecoverable and that it would limit options going forward for recovery. Some have suggested that defining "range" as current range would exclude from conservation and protection efforts any areas from which a species has been extirpated.

*Response:* We explained in the draft policy (76 FR 76987, p. 76997) and in section III.D., above, that examining a species' status in its current range in no way constrains or limits use and application of the tools of the Act to the current range of the species. Such tools include, but are not limited to, designation of critical habitat outside areas occupied by the species at the time it is listed; protection, restoration and management of habitat to allow for natural range expansion; improvement in population growth rates to allow for natural expansion; and translocation and reintroduction to areas outside the current range of the species (*e.g.,* California condor, black-footed ferret, peregrine falcon). We specifically note that recovering a species in some or all of its historical range may be necessary, and that the language of the Act indicates Congress specifically contemplated this necessity. However, we have added further explanation that the term "range" is a conceptual and analytical tool related to identifying threatened and endangered species and plays no direct role in implementing the Act to protect and recover species.

*Comment (53):* Some commenters asked how range would be determined for listing determinations and status reviews. Some commenters requested we explain how the Services would address specific scenarios, such as species with disjunct populations,

recently restored populations, captive populations, or species found only in captivity.

*Response:* The available information on current and historical ranges varies widely among species. For example, we may have very detailed information for some species and more limited data for others. Similarly, we may have detailed information in some portions of a species' range and very limited data in others. There is no single method for defining a species' range that can be used for all species and all situations. We describe the range, both current and historical, based on the best scientific and commercial data available. We note that range is described in our findings and status reviews for the purposes of conducting analyses of the species' status. As explained in section III.D., above, description of a species' range does not limit where protections of the Act apply, as the protections apply to the species itself. The same would be true for a species with disjunct populations. Similarly, protections of the Act would be extended to newly restored populations, as the protections of the Act are applied to the species itself, not the "range." We note that with regard to considering whether newly restored populations constitute an SPR, we would consider such populations to be part of the range of the species for purposes of any status reviews because "range" is defined as the current range of the species at the time of the determination (not the range defined at listing or another previous determination). Whether or not a newly restored population would be considered an SPR would depend on its contribution to the conservation of the species. As for any other portion of a species' range, we would consider its contribution to the resiliency, redundancy, and representation of the species (such considerations could include the size of the newly restored population, its likelihood of persistence, or its contribution to the genetic diversity of the species). With regard to species found in captivity, the Services consider a captive population to have no "range" separate from that of the species to which it belongs (captive populations cannot be considered an SPR). Captive members have the same legal status as the species as a whole. In situations where all members of the species in the wild are gone, either because they are extirpated or because, as a last resort, the remaining wild members are captured and moved into captivity, the species remains listed as endangered or threatened until the species can be reintroduced and recovered in the wild. Our reasoning regarding the status of captive populations is further detailed at 78 FR 33790 (June 5, 2013).

## H. Relationship With DPS Authority

*Comment (54):* One commenter asserted that the draft policy conflates the identification of the relevant "species" with the determination of whether it is an "endangered species" or a "threatened species." According to the commenter, the fact that a population could be protected either because a DPS is endangered or threatened throughout all of its range or because a biological species is endangered or threatened throughout a significant portion of its range does not mean that either provision is superfluous. Moreover, the commenter asserted that Congress's adoption of the DPS concept in 1978 did not alter the SPR phrase or otherwise change its meaning.

*Response:* We agree that the identification of the "species" and the determination of whether it is endangered or threatened are two different steps. Once we determine that a species meets the definition of an "endangered species" or a "threatened species," the operative provisions of the Act do not provide that protections only apply with respect to some members of the species (absent, for example, an applicable rule under section 4(d) or section 10(j) of the Act that modifies those protections). As we discussed in the draft policy, a species that is in danger of extinction throughout a significant portion of its range is an "endangered species." Take of an "endangered species" (not just of an endangered species where it is endangered) is prohibited by section 9 of the Act. Moreover, we did not assert that interpreting the Act to allow protections solely in an SPR would make the DPS language redundant. We merely asserted that doing so "creates unnecessary tension between the SPR language and the DPS language" (76 FR 76987, p. 76991). Also, we did not argue that the addition of the DPS language in the 1978 amendments to the Act changed the meaning of the SPR language. The commenter's preferred interpretation would also have created unnecessary tension with the 1973 definition of "species."

*Comment (55):* Many commenters, including the Florida Fish and Wildlife Conservation Commission, agreed that the draft policy struck a reasonable balance between the DPS policy and the statutory SPR language. The Wisconsin Department of Natural Resources appeared to agree that endangered or threatened DPSs that also qualify as SPRs should not be the basis for listing the entire taxonomic species of which it is a part. Otherwise, the agency suggested, the result could be "unintended listings of DPSs" (which we take to mean the portions of the range outside the SPR/DPS); the remainder of the range presumably is one or more DPSs, for which independent listing determinations should be made.

*Response:* We appreciate the constructive feedback of the commenters.

*Comment (56):* A number of commenters recommended that the Services reevaluate the DPS policy. In particular, several commenters, including the Wisconsin Department of Natural Resources, suggested that the DPS policy be revised to allow DPS boundaries to be defined by State borders, or by ecoregion or ecosystem unit boundaries, without requiring that DPSs be disjunct from one another. The Alaska Department of Fish and Game suggested that the Services clarify that, for purposes of the DPS policy, Alaska is separated from the contiguous 48 States by international boundaries. One commenter suggested distinguishing DPS analysis from SPR analysis by relaxing or eliminating the significance requirement of the DPS policy. Another commenter suggested adding a fifth criterion for significance to the DPS policy (geographic representation in an ecosystem unit), and another suggested that any reevaluation of the DPS policy should include a notice-and-comment process for formulating a more rational approach to reconciling the SPR and DPS language.

*Response:* Revision of the DPS policy is outside the scope of the current effort. This policy does, however, describe the relationship between the DPS language and the SPR language in the Act.

*Comment (57):* One commenter asserted that giving "significant" different meaning in the SPR and DPS contexts runs afoul of Supreme Court precedent that statutory terms that normally be given the same meaning throughout a statute.

*Response:* We disagree. "Significant" is *not* a statutory term in the DPS context—"significant" is used in the DPS policy, not in the statute. The case law cited by the commenter is simply not applicable.

*Comment (58):* Several commenters asserted that despite our explanation to the contrary, the draft policy defines "significant" in the exact same way as the DPS policy because both refer to the concept of importance. They argued that this has the effect of rendering the DPS

language moot and illegally amending the Act.

*Response:* We disagree. The fact that the concept of significance in the draft policy and the DPS policy both relate to importance (as opposed to, for example, statistical significance) does not mean that the terms are defined identically. As explained in great detail in the draft policy, the draft policy sets a much higher and more specific bar than the DPS policy (76 FR 76987, pp. 76998–76999). In other words, although both relate to importance, under the draft policy a portion of the range must be much *more* important to be "significant" than a population must be to be significant to the taxon as a whole under the DPS policy. This remains true under the revised definition of "significant" in this final policy.

*Comment 59:* One commenter suggested that we will not be able to list a DPS rather than the entire species if an endangered or threatened DPS occupies an SPR of the species, because the policy requiring rangewide listing will be binding.

*Response:* We disagree. The policy expressly provides that where a DPS overlaps with an SPR only the DPS will be listed.

*Comment 60:* Several commenters suggested that we should list a species rangewide even if there is a valid DPS that could be listed instead. Two of these commenters cited the disparity between the treatment of vertebrates and invertebrates if the draft policy is followed, with the paradoxical result that a similarly situated invertebrate could receive *more* protection than a vertebrate, in contravention of congressional intent. Another suggested that because DPS and SPR inquiries encompass different kinds of characteristics, they should be assessed independently.

*Response:* As discussed in the draft policy (76 FR 76987, pp. 76988–76989), it is very difficult to harmonize the various provisions of the Act and the goals that Congress intended to pursue. We conclude that the position taken in this policy strikes the best balance and appropriately reconciles these two distinct authorities.

*Comment 61:* One commenter asserted that the draft policy did not provide an adequate rationale for listing only the DPS where its range is coextensive with an SPR of the taxon to which it belongs. The commenter argued that the rationale given is undermined by the fact that section 4(d) of the Act allows the Service to tailor restrictions for threatened species. Also, the commenter suggested that, for domestic species, DPSs are unlikely to

correspond to political boundaries in the absence of international borders.

*Response:* As we discussed in the draft policy (76 FR 76987, pp. 76998–76999), DPSs will not often correspond to SPRs, but we determined that the policy should explain what happens if they do because the Act does not indicate how these two distinct authorities should interact with one another. Rules promulgated under section 4(d) of the Act are not adequate to address the problem, as section 4(d) does not apply to endangered species.

*Comment 62:* Several commenters, including the Alaska Department of Fish and Game, stated that the draft policy should be modified to require the Services to determine whether a proposed SPR is encompassed by a DPS.

*Response:* As discussed in the draft policy, we generally will identify, as a matter of practice, relevant DPSs before considering SPRs, although in some circumstances a different order or scope of analysis may be more appropriate. To preserve flexibility, we find there would be no benefit to expressly requiring this in the policy.

*Comment 63:* One commenter expressed concern that the draft policy's discussion of DPSs would lead the Services "to conduct a review that is out of order"—apparently considering the proper order to be to identify the "species" first, and then apply the definitions of "endangered species" and "threatened species" to the species.

*Response:* As we stated in the draft policy, we agree that we will usually identify the species to be analyzed first. In fact, in our draft policy, our treatment of DPSs that are also SPRs helps justify conducting the analysis in this order, without a need to reexamine endangered or threatened DPSs to determine whether they also constitute SPRs. Under the draft policy, no change in the listing would result from that additional analysis, so there would be no need for the Services to conduct it.

*Comment 64:* Several commenters asserted that an SPR inquiry should not be used in evaluating whether a DPS warrants listing. In other words, those commenters think that a DPS should not be listed because it is endangered or threatened throughout a significant portion of its range. Another commenter took the opposite position, and suggested that we clarify this fact.

*Response:* As stated in the draft policy, the same logic applies to DPSs that applies to taxonomic species and subspecies (76 FR 76987, p. 76998). Natural operation of the language of the statute leads to the conclusion that any "species," including a DPS, can be an "endangered species" because it is "in

danger of extinction throughout . . . a significant portion of its range."

*Comment 65:* The Wisconsin Department of Natural Resources suggested defining SPR and DPS as the same where there is substantial overlap to allow for more effective, efficient, and practical application of listing and delisting efforts.

*Response:* Although they use the same word, the DPS Policy and the SPR language have different purposes: The DPS policy helps define what counts as a "species," and the SPR language helps determine whether a species is endangered or threatened. Therefore, it is reasonable for "significant" to have different meanings in those different contexts. Moreover, as discussed above and in the draft policy (76 FR 76987, p. 76995), given the effect of finding a species to be endangered or threatened in a significant portion of its range, it is appropriate for "significant" in that context to be a demanding standard. The definition of "significant" used in the DPS Policy, although appropriate in that context, would, applied in the SPR context, be too low a standard, and result in the listing of many species with little long-term risk of extinction, diluting the conservation efforts of the Services, and imposing costs with relatively little conservation benefit. Finally, defining "significant" the same way in both contexts would tend to make the DPS language of the Act irrelevant, as DPSs of a species would always constitute SPRs of that species.

*Comment 66:* Two commenters thought that the discussion of the relationship between DPSs and SPRs was confusing and should include examples or case studies. One commenter specifically suggested the Services need to provide spatial diagrams to explain the relationship of SPR to DPS.

*Response:* There is no static relationship between these concepts, and not every species will have both an SPR and a DPS. Beyond the general framework that we have laid out, the relationship between DPSs and SPRs is highly fact-specific; we do not see the value of providing additional examples or case studies. Also, as "significance" is defined differently for SPR versus DPS, these concepts are not in tension.

*Comment 67:* One commenter noted that the draft policy's discussion was unclear as to whether the Services would give any consideration to the status of the species as a whole if a DPS warrants listing. The commenter pointed to a number of current examples in which a DPS is listed as endangered, and the species of which it is a part is listed as threatened.

*Response:* We generally look at taxonomic species and subspecies before considering DPSs, and we will always consider whether a species is in danger of extinction (or likely to become so in the foreseeable future) throughout all of its range before we engage in an SPR analysis (76 FR 76987, p. 77002). In addition, our revised definition of "significant" will preclude existence of an SPR if the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range. Nothing in this policy will change how the Services conduct the analysis of "species" throughout their ranges. When a taxonomic species or subspecies is endangered in one DPS, and threatened throughout the rest of its range, the Services will continue to make separate listing determinations for the two (or more) populations, and list those populations accordingly.

*Comment (68):* One commenter suggested that we add a discussion of the relationship of the SPR language and NMFS' evolutionary significant unit (ESU) policy.

*Response:* ESUs identified under NMFS' ESU policy (56 FR 58612, November 20, 1991) are DPSs, and for the purposes of this policy will be treated as DPSs.

*Comment (69):* Montana Fish, Wildlife & Parks asserted that the Services already list populations as DPSs even though they do not meet the criteria of the DPS policy, and expressed concern that the Services not use the DPS policy to list populations that are not SPRs.

*Response:* We disagree with Montana's assertion; the Services rigorously apply the DPS criteria, and list DPSs sparingly, as suggested by Congress (Senate Report 151, 96th Congress, 1st Session). Moreover, the fact that a DPS may be imperiled in a portion of its range that is not significant will not provide a basis for listing the DPS.

### I. Whether a Species Can Be Both Threatened Throughout All of Its Range and Endangered Throughout an SPR

*Comment (70):* Many commenters, including the Wisconsin Department of Natural Resources, South Dakota Game, Fish and Parks, and Idaho Department of Fish and Game, stated that, where the Act would allow either an endangered or a threatened listing, the Services should favor the more flexible threatened listing. They asserted that the part of the draft policy supporting an endangered listing in those circumstances is undesirable over-regulation that would produce needless economic dislocation. They suggested

that the Services embrace the flexibility of tailoring "take" rules and reducing regulatory burdens with respect to threatened species, in response to a Presidential Order (E.O. 13563 to promote economic growth, innovation, competitiveness, and job creation), a Supreme Court ruling, and congressional intent. The New Mexico Department of Game & Fish was concerned that the many different analyses we would need to do under the draft policy would affect the Services' Act-mandated deadlines for responses to petitions and other potential listing actions.

*Response:* Although we do not necessarily agree with all of the rationale provided by these commenters, for the reasons described above, we agree with their conclusion, and thus the final policy defines "significant" such that a portion cannot be significant if the species already warrants listing throughout all of its range. Therefore, as this policy is applied, there will be no circumstance in which a species is threatened throughout all of its range and endangered throughout an SPR (see section II., above).

*Comment (71):* A commenter noted that the most efficient use of limited Service resources is to focus first on the entire species, and to use the SPR concept only secondarily and sparingly. Under that approach, once the Services find that a species is threatened throughout its range, the species should be listed as threatened, and an SPR-based endangered listing should not be considered further.

*Response:* We agree with the commenter and have changed the policy in part in response to this comment.

*Comment (72):* Some commenters expressed concern about a species being both threatened throughout its range and endangered throughout an SPR because it would be confusing to have two statuses for the same species.

*Response:* We have changed the definition of "a significant portion of its range" to avoid the confusion of a species potentially qualifying both as threatened throughout its range and endangered throughout an SPR.

*Comment (73):* One commenter suggested that, when a species is found to be endangered throughout an SPR, the species should be listed as endangered only in that portion of its range and threatened in the remainder of its range. This would allow more flexibility to issue a rule under section 4(d) of the Act for the species where it is only threatened. Other commenters, including the Hawaii Department of Land and Natural Resources, suggested

that we apply protections according to the degree of threat in different portions of a species' range. Two commenters believed it is fine to protect a species as endangered if it is threatened throughout all of its range but endangered throughout an SPR, but protective efforts should be focused on the portion of the range where threats are greatest.

*Response:* For reasons set out above and in the preamble of the draft policy (76 FR 76987), we cannot list an entity smaller than a species (*i.e.,* species, subspecies, or DPS). Once a species is listed as endangered, it is listed as endangered wherever found, and all of the Act's section 9 prohibitions apply. We cannot apply different listing statuses to the same species in different portions of its range (except to the extent that those portions of the range correspond to subspecies or DPSs, *i.e.,* are in fact different "species"). That said, with the revisions incorporated into this final policy, a species that in fact warrants listing as threatened because of its status throughout all of its range will, by definition, not contain any endangered SPRs.

### J. Use of Best Available Science, Appropriate Analyses, Correct Conclusions

*Comment (74):* Several commenters stated that we should revise the draft SPR policy's current heavy and litigation-inviting reliance on the principles and concepts of conservation biology in determining biological significance. Conservation biology is a philosophy and pseudoscience.

*Response:* The Act requires that we use the best available science in making listing determinations. The principles and concepts of conservation biology are commonly accepted throughout the scientific community, and make up part of the best available science relevant to listing determinations. We always consider relevant and available species-specific evidence as well.

*Comment (75):* One commenter stated that the basis for the draft policy is flawed in that it fails to consider the full array of scholarly research, economic information, and legal considerations related to the issues and effects of various policy choices legitimately before the Secretary.

*Response:* We did consider the best scientific information available as well as recent judicial opinions relating to SPR. We considered a wide variety of policy options and the pros and cons of each. This final policy reflects the Services' expert judgment as to the best way to interpret and apply "significant portion of its range" as that phrase

appears in the Act. The commenter did not offer any specific constructive suggestions that we have not already considered.

### K. Implementation in Listing Determinations

*Comment (76):* Some commenters requested we clarify when SPR analyses would be required. Several commenters requested we clarify how SPRs will be identified, what criteria will be used to identify SPRs, and whether threats will always be used to identify SPRs.

*Response:* When making a determination according to section 4(a)(1) of the Act, the Services must always interpret and apply the definitions of "endangered species" and "threatened species," including the SPR language. We must always ensure that we are fully considering all the parts of these definitions. We explain how and when an SPR analysis will be conducted under the approach adopted in this policy in section III.F., above. No analysis of SPR is required when we find a species to be either endangered or threatened throughout all of its range. Where the rangewide analysis does not lead to a determination that the species is endangered or threatened, an SPR analysis is required. However, the level of detail of analysis necessary will vary according to the specific species and data under consideration. In general, a more detailed SPR analysis would likely be needed to fully address and consider all parts of the definitions when the kinds and levels of threats vary across a species' range. This is more likely to occur for species with large ranges than for narrow endemics with a very small range. Narrow endemics are likely to experience the same kinds and levels of threats in all parts of their ranges, and thus, no portion would likely have an increased level of threats and thus a different status. Essentially, we would conduct a "screening" analysis to determine whether additional analysis is needed. As a matter of definition, the SPR does not always have to be identified according to threats. In practice, a portion is most likely to be identified if there is a concentration of threats that could indicate the individuals in that portion may be endangered or threatened. The Services would then ask whether the portion also may be significant. If we determine that the portion is not significant (*e.g.,* if it were an extremely small area), we would not analyze it further. The Services may also identify a portion for further consideration based on biological characteristics, such as population structure or spatial distribution, that indicate a portion may

be of particular biological importance (*i.e.,* it may be significant). However, if we determine that the portion is not endangered or threatened there (*e.g.,* if threats were not acting on the species in that area), we would not analyze it further.

*Comment (77):* One commenter suggested that we clarify that the identification of an SPR does not create a presumption, prejudgment, or other determination as to whether the species in that identified SPR warrants protection under the Act as either endangered or threatened.

*Response:* As we stated in the draft policy (76 FR 76987, pp. 76994, 77002), the determination of whether a portion of the range of a species is significant is completely separate from the determination of whether a species is endangered or threatened throughout a significant portion. We have added some language to this document to make this even clearer.

*Comment (78):* Montana Fish, Wildlife & Parks asked whether certain species will be treated as exceptions to this policy.

*Response:* We plan to apply this policy consistently to all species, unless we need to do otherwise to comply with a court order.

*Comment (79):* Some commenters expressed concern that adopting the SPR Policy will require the Services to undertake additional analyses that could affect timelines for completing determinations or otherwise affect the Services' resources. Some commenters asked for clarification of when detailed analysis of SPRs is needed. Some expressed concern that the Services will have to devote scarce resources to ensure consistency in interpretation.

*Response:* As explained above (section III.F.), the policy outlines a stepwise process to ensure that we engage in the level of analysis that is appropriate for the particular species. This process will not only ensure that the Services are not expending resources on unnecessarily detailed analyses, but also promote a consistent approach to conducting the analyses. We cannot predict every possible scenario we will encounter and must necessarily leave room for best professional judgment based on specific circumstances, but a consistent interpretation and stepwise analytical process will promote a consistent approach.

*Comment (80):* Several commenters requested we clarify that identifying the species, as defined by the Act, would be the first step in the process of making a listing determination. Some seemed concerned that the Services might

instead identify potential SPRs and then broadly ask what entity (species, subspecies, or DPS) of which it may be a part.

*Response:* We have clarified in the policy explanation that the Services first determine what entity meets the definition of "species."

*Comment (81):* Some commenters suggested that the Services should develop quantitative tools and standards for measuring contribution to the viability of the species to ensure objective and unbiased SPR analysis. (We addressed the similar but distinct issue of whether to incorporate a quantitative threshold or rebuttable presumption as part of the definition of "significant" in response to *Comment (47),* above.)

*Response:* Our policy applies a conceptual framework that identifies the relationship a portion must have to the conservation of the species as a whole rather than a specific quantitative approach such as a numerical threshold. As with any listing determination, analyses applying this framework may use quantitative methods if data are available and allow for applying appropriate methodologies. However, quantitative data and methodologies are not required if the data available do not allow for quantitative analyses. Section 4(b)(1)(A) of the Act requires us to make determinations based on the best scientific and commercial data available. Thus, we must make determinations as to whether species are endangered species, threatened species, or neither, regardless of whether the data allow for quantitative analyses. In other words, we cannot defer making a determination where we lack the ideal kinds and quantity of data. Our policy accommodates the wide variety of situations and types of data available.

*Comment (82):* Several commenters requested that the Services provide more detail on how the policy will be implemented. Requests included providing more detail on what kinds of data will be used to determine whether a portion is significant (genetic data, PVAs, modeling, etc.), as well as how a variety of specific circumstances will be addressed and evaluated.

*Response:* The Services must use and base our determinations on the best scientific and commercial data available. We also must interpret and apply the definitions of "endangered species" and "threatened species," including the SPR phrase, in all our determinations, regardless of the kind and quality of the data or the specific circumstances. However, the same kinds of information that have always been useful in determining a species' status

may be relevant to evaluating the relative contribution of a portion of its range to the viability of a species. The kinds of data include, but are not limited to, species biology and life history, genetic data, population-viability analyses, species distribution and abundance data, population and metapopulation structure, threats and species response to threats, etc. While particular kinds of data (and especially detailed, up-to-date data and information) may be most useful, we are required to apply the definitions of ''endangered species'' and ''threatened species'' regardless of the kind, quantity, or quality of the data available. We cannot predict every possible circumstance or scenario we will encounter. This policy, therefore, lays out a broad, conceptual framework that will allow the Services to evaluate a wide variety of circumstances. The Services have made numerous determinations prior to this policy as to whether a species meets the definitions of ''endangered species'' or ''threatened species.'' These determinations span a wide variety of species and circumstances, as well as a wide variety in the types, amount, and quality of data and information available. We expect to encounter the same variety in the future and will continue to apply our expertise to base our determinations on the best scientific and commercial data available.

*Comment (83):* The Arizona Game and Fish Department suggested that the policy, if approved, should ''more thoroughly describe how it would be applied during . . . application of the Policy on the Evaluation of Conservation Efforts (PECE) criteria.''

*Response:* Nothing in the SPR policy affects application of PECE or related considerations. Of course, the status of a species throughout an SPR can be affected by conservation efforts, as can its status throughout all of its range.

*Comment (84):* Several commenters requested we provide examples for real species.

*Response:* The Services have continued to publish numerous determinations in which we apply the definitions of ''endangered species'' and ''threatened species,'' including, as appropriate, the SPR language in those definitions. These include 12-month findings on petitions to list, reclassify, and delist species, as well as proposed and final rules to list, reclassify, and delist species. The Services have been applying an approach that is similar to this policy on a case-by-case basis since circumstances warrant giving some consideration to whether the species is endangered or threatened throughout an

SPR. While the definitions applied on a case-by-case basis prior to this final policy may differ slightly from this final policy's definition of SPR, our recent determinations generally illustrate how we would apply the analysis framework laid out in this policy. We provide examples below.

*Example 1:* FWS was petitioned to list Van Rossem's gull-billed tern (a subspecies of gull-billed tern) and conducted a status review to determine whether listing was warranted. In our 12-month finding (76 FR 58650, September 21, 2011), FWS determined that this species was not endangered or threatened throughout all of its range. We next examined the question of whether the species might be endangered throughout a significant portion of its range. We identified two portions of the species' breeding range that may have a greater concentration of threats because of reductions in water levels that could increase nest predation and make the locations less suitable as nesting habitat. We next examined the question of whether these portions could be SPRs by examining their contribution to the resiliency, redundancy, and representation of the species. We determined that these two nesting locations were not unique or biologically different from other nesting locations. We also concluded that, even if these sites were to be abandoned in the future, it is likely that the Van Rossem's gull-billed tern would move and nest elsewhere because the species displays low nest-site fidelity. Additionally, existing and potential nesting locations are distributed along a 2,250-km (1,400-mi) stretch of the species' range, such that the two locations, either individually or combined, would not constitute a significant portion of the total breeding range. We therefore concluded that these two nesting areas were not SPRs because their contribution to the viability of the species is not so important that the species would be in danger of extinction without those portions. In this example, we identified portions based on a concentration of threats but determined the portions were not SPRs and therefore did not further examine the status of the species in those portions.

*Example 2:* On November 4, 2013, NMFS published a final rule removing the eastern distinct population segment of the Steller sea lion from the List of Endangered and Threatened Wildlife (78 FR 66139). After considering the status of the DPS throughout all of its range, NMFS next considered whether any portions of the DPS qualified as SPRs. NMFS identified as a potential

SPR the southern portion of the range in California because of previously identified concerns over performance of rookeries in this portion. While this portion of the range has poorer performance compared to the rest of the DPS, data indicate that this portion is not in decline, nor does its poorer performance appear to be affecting the recovery of the DPS elsewhere. In other words, it does not appear to be endangered or threatened in that portion, and its contribution to the viability of the DPS is not so important, that without it, the DPS would be in danger of extinction now or in the foreseeable future. NMFS also identified the California Current Ecoregion as a potential SPR. Trend and threat information for this portion indicate that this portion is not in danger of extinction or likely to become so. Because NMFS determined that the California portion was not significant, and neither the California portion nor the California Current Ecoregion portion was endangered or threatened, NMFS did not evaluate them further. NMFS then concluded that the DPS no longer meets the definitions of an endangered species or threatened species. This example illustrates the process of identifying portions. The first portion was identified by considering information that could indicate the species could be endangered or threatened there (poor performance of rookeries). The second portion was identified by considering information that could indicate that the area is important to the conservation of the species (an ecoregion). This example also illustrates that we treat DPSs in the same manner as species and subspecies when applying the SPR language in our status determinations.

*Comment (85):* Several commenters suggested that visual aids such as charts or diagrams would be helpful in illustrating how the policy will be implemented.

*Response:* See Figures 1 and 2 in section III.F., above.

*Comment (86):* One commenter suggested the Services should provide an opportunity for public comment on the potential characterization of any portion of the range as ''significant'' for a particular species prior to the Services making any listing or status-related determination for the SPR. Specifically, the commenter suggested the Services include in their policies and procedures a requirement to publish a notice in the **Federal Register** prior to initiating a status review (*i.e.,* at the 90-day finding stage on a petition or prior to conducting the annual candidate notice of review) and prior to any proposed

listing of a species as endangered or threatened on the basis of an SPR. At a minimum, the commenter further suggested that this advance public notice should include mapping, identification of factors considered, identification of all studies and information to be considered, and an explanation as to any proposed basis for the identification of an SPR.

*Response:* The commenter's suggestion is not consistent with the requirements of the Act and is not necessary or feasible. The statute does not require the Services to engage in a rulemaking process to arrive at a 90-day or a 12-month finding on a listing petition. The statute generally requires an initial determination on a petition within 90 days of receipt, and a 12-month finding (along with any proposal to list) within one year of receipt, following a status review. Even if the Services were required to conduct rulemaking-style activities as part of the review of a petition, the requirement of relatively quick turnaround and relatively low ''may be warranted'' standard at the 90-day stage would make it wholly infeasible to try to seek public comment on the identification of an SPR prior to the Services completing their analysis and announcing their decision to commence a status review. In any event, an SPR analysis is a part of the overall analysis of whether a species is endangered or threatened under the Act, and no need is served by pre-publishing separate findings prior to our overall finding. Of course, if the Services determine that any portion of the range is both significant and either endangered or threatened and propose to list a species based on this (or to reclassify or delist), we will publish a proposed listing rule upon which the public will have an opportunity to comment. At that time the public can review and respond to the explanation of the basis developed by the agency and submit additional relevant information to be considered in development of a final listing rule.

*Comment (87):* The commenter further suggested that the Services should revise their regulations governing the petition process to prescribe strict requirements for the petitioner to provide information specifying and documenting an SPR. The commenter also recommended that we modify our petition regulations to specify that the Services will do SPR analyses only when specifically petitioned to do so and that failure to submit the requisite level of information will result in the petition being construed to request listing on a rangewide basis. Other commenters

requested we clarify whether petitioners will be required to identify SPRs or whether the Services will identify them.

*Response:* Modifying our petition regulations is outside of the scope of this policy. However, we agree that, if petitioners intend that the Services should base their analysis on an SPR, the petitioners should include as much information as they have about any potential area of special importance so the Services can determine whether the area may qualify as an SPR. Such petitions should include substantial information to indicate that a particular portion may be both significant and in danger of extinction or likely to become so. We have emphasized that, unless there is evidence to suggest both prongs are met, the Services need not conduct a detailed SPR analysis. However, the Services conclude that it is not necessary to more specifically prescribe the showing that needs to be made in a particular petition, as the Services must evaluate each petition in context to determine if the standard of section 4(b)(3)(A) of the Act (whether the petition ''presents substantial scientific or commercial information indicating that the petitioned action may be warranted'') is met. In any case, we conclude that it is preferable to retain the discretion to address SPR issues in petitions as needed in the context of particular circumstances, rather than create a binding rule. At the initial review stage (*i.e.,* development of a 90-day finding), the standard the Services must apply is whether the petition presents substantial information indicating that the petitioned action may be warranted. At the 12-month finding stage, the Services have a responsibility to interpret and apply the Act's definitions, including (if a species is found to be neither endangered nor threatened rangewide) the SPR language, regardless whether a petition specifically identifies any SPRs. Thus, we will identify any SPRs as necessary and based on the best scientific and commercial data available.

*Comment (88):* Some commenters suggested that the policy should more clearly articulate that determining whether a species is endangered or threatened in a SPR requires two separate tests and both must be met: that the portion is ''significant,'' and that the species is endangered or threatened throughout that portion.

*Response:* We have clarified this further in section III.F., above.

*Comment (89):* Several commenters inquired as to the continuing relevance or functioning of an SPR, such as how a spatial area to be ''designated'' as an SPR will be identified and defined, how

SPRs will be defined and mapped, and whether areas that qualify as SPRs would be subject to periodic review.

*Response:* To the extent commenters believe the Services will map or ''designate'' SPRs as entities or boundaries formalized in regulations, they misunderstand the purpose of our interpretation of the SPR language. Under this policy, the SPR phrase and its interpretation is used solely to determine whether a species is an endangered species or threatened species, pursuant to the definitions in the Act and the requirements of section 4(a)(1) of the Act. Once we determine that a species is an endangered species or threatened species, the SPR language has no direct effect on implementation of the Act. If a species is an endangered species or threatened species because of its status throughout an SPR, the entire species is listed and the Act's protections are applied to the entire species, not just to the SPR. The process of listing a species does not ''designate an SPR'' for the species. Once a species is listed, there is no formal relevance of the SPR. Of course, consistent with current practice, the identification of a concentration of threats in a certain portion of its range may be relevant in a variety of contexts, such as identifying actions needed for recovery, formulating rules under section 4(d) of the Act, and analyzing proposed actions under section 7 of the Act. In other words, the SPR language is an analysis tool, not an entity or a designation, and it does not directly result in regulations or requirements specific to the SPR, but may inform development of other measures as discussed above. In fact, once a species is listed, periodic review of the species' status (through 5-year reviews or petitions, reclassifications, or delistings) will be conducted as for any species, and the SPR interpretation will be applied independent of previous findings. As a species' status changes over time, we expect that what constitutes an SPR for the species may also change (for instance, if new populations are established, portions of the range previously identified as SPRs may contribute relatively less to the viability of the species in the remainder of the range) and therefore will require new analyses as the species progresses toward recovery. Threats may also change over time and alter the basis for listing a species or alter its status. For example, if new threats are identified that affect the species throughout its range, it may warrant listing because it is now threatened or endangered throughout all of its range and no longer just in a significant portion of its range.

Some examples may be useful. Example 1: A species that has few populations may be listed because it was threatened throughout most populations, and those populations constituted an SPR (without those populations, the remaining populations would be endangered or threatened— even though with those populations extant, the species is not threatened or endangered throughout all of its range). Recovery efforts reestablished several populations, and the species recolonized and expanded into unoccupied habitat in additional areas. The populations that were originally considered an SPR now make up a much smaller percentage of the total number of populations and their loss would no longer result in the remaining populations (that are more widespread) being likely to be in danger of extinction in the foreseeable future. Under this scenario, the original SPR is no longer an SPR because of the increased number of populations and expanded species' range. The species might then be proposed for delisting even though the threats in what had been an SPR have not abated.

Example 2: A species is threatened throughout an SPR, and the species is therefore listed as threatened. For this species, threats from development and land-use activities are acting primarily in the SPR. Over time, new threats emerge (a new invasive plant is altering habitat and outcompeting the species' primary host plant) that affect the species throughout its entire range. We determine during a new status review that the species is threatened throughout all of its range. The status throughout the range is determinative, because an SPR is relevant only where a species is neither endangered nor threatened throughout its range. Therefore, it is no longer necessary to examine the original SPR or any other potential SPR. The species remains listed as threatened, but now on a different basis.

Comment (90): Several commenters, including the Arizona Game and Fish Department and Montana Fish, Wildlife & Parks, requested we clarify how the policy would be applied to already-listed species and in delisting species. Some recognized that we said that "listing" really meant all determinations under section 4(a)(1) of the Act but still believed more explanation would be useful.

Response: The interpretation of SPR in this policy applies to all future determinations made under section 4(a)(1) of the Act. Section 4(a)(1) requires that we determine whether any species meets the definitions of an "endangered species" or "threatened species." This same process applies to all status determinations regardless of whether we are evaluating a potential listing, or a reclassification or delisting of an already-listed species. We will begin with first assessing the status of a species throughout all of its range. If the species is neither endangered nor threatened throughout its range, then we will assess whether any portions require further examination, and if so, ask whether the species is endangered or threatened throughout an SPR. For example, if we are petitioned to delist a species, we would first evaluate the status of the species rangewide. If we determine that the species is neither endangered nor threatened throughout all of its range, we would then examine the question of whether it might remain endangered or threatened throughout any SPRs. This is identical to the process we undertake in considering whether a species should be listed.

Comment (91): Some commenters, including Montana Fish, Wildlife & Parks, suggested that a species listed on the basis of an analysis in an SPR must be considered for delisting once recovered in the SPR that led to listing.

Response: We agree that significant improvement in the species' status in the SPR would be relevant and important to considering the species' listing status, but cannot agree with any suggestion that the species should automatically be delisted in that situation. Once the species is listed, the same standards and processes apply to reviewing the listing regardless of whether the listing was based on status throughout an SPR. Thus, it is not correct to think of a portion of the range as being "recovered"; the status of the species (and by extension whether the species is "recovered") is assessed at the level of the listed entity. While we might generally expect it to be the case that a species would no longer qualify for the protections of the Act once it is no longer facing significant threats in the area analyzed as an SPR at the time of listing, there could be situations where the status of the originally examined portion of the range improves, but where other portions have become less stable (see Example 2 in our response to Comment (89), above). Since the result of listing the species after an SPR evaluation is a rangewide listing, we would need to consider whether the best available data at the time indicated that the species had become endangered or threatened throughout any other SPRs or had become endangered or threatened overall prior to proposing to delist.

Comment (92): Several commenters, including Montana Fish, Wildlife & Parks, asked if we could delist a species if it was recovered throughout a significant portion of its range regardless of the basis for the original listing.

Response: As we noted in the response to the previous comment, determining whether a species is "recovered" is in reality considering whether the species still meets the definitions of "endangered species" or "threatened species." In evaluating whether a species should be delisted due to recovery, we do not ask whether a species is recovered throughout an SPR; the concept of "recovery" (like listing itself) is applicable only at the level of the species. We begin by asking whether the species is an "endangered species" or "threatened species" rangewide using the same process as explained above. We could determine that a species is neither endangered nor threatened throughout all of its range under two circumstances: (1) Threats throughout the range of the species have been sufficiently ameliorated and all populations of the species are secure; or (2) some threats to the species have been ameliorated and the species is secure in a portion of its range. (In other words, a species cannot be endangered or threatened throughout all of its range if it is secure in a portion of its range; however, it still could be endangered or threatened in another portion of its range.) If we examine the status of a listed species rangewide and determine it is neither endangered nor threatened throughout all of its range, we would then ask whether it is endangered or threatened throughout an SPR. Under the first scenario, we would likely not identify any portion for further SPR analysis since no area is likely to be endangered or threatened (i.e., no remaining unaddressed threats). Under the second scenario, we would consider whether the remaining threats cause the species to be endangered or threatened throughout an SPR. We may find that some areas of the species' range still experience threats, but these areas are not SPRs. In that case, we would conclude the species does not meet the definition of an "endangered species" or "threatened species," and we would propose to delist the species.

Comment (93): Several commenters suggested that the draft policy would exacerbate the problem of the "virtually irreversible nature" of listings, and suggested returning to the position taken in the M-Opinion. The Wisconsin Department of Natural Resources also opined that the draft policy's interpretation may make it more

difficult for species to be delisted and their management turned over to the States.

*Response:* The Services disagree. As discussed in section VI. Effects of Policy, the Services anticipate there would be relatively few circumstances in which the SPR language would change the outcome of a listing or delisting determination. Furthermore, some delistings have occurred since the Services have begun to apply an analysis consistent with the one adopted here. For example, since the M-Opinion was withdrawn in May of 2011, the Services have delisted, due to recovery, the Tennessee purple coneflower (76 FR 46632, August 3, 2011), Lake Erie watersnake (76 FR 50680, August 16, 2011), Concho watersnake (76 FR 66780, October 27, 2011), Magazine Mountain shagreen (78 FR 28513, May 15, 2013), Morelet's crocodile (77 FR 30820, May 23, 2012), and eastern DPS of Steller sea lion (78 FR 66139, November 4, 2013). A number of other species have been proposed to be delisted.

*Comment (94):* The Arizona Game and Fish Department suggested the Services should discuss the impact of this policy on the monitoring of species following their removal from the Lists of Endangered and Threatened Wildlife and Plants.

*Response:* This final policy will affect only future listing determinations (including delistings and reclassifications). We do not anticipate changing existing monitoring plans as a result of this policy. Moreover, the process and standards for future post-delisting monitoring will not change. We will still direct monitoring resources first to those areas where the species had previously experienced significant adverse impacts. Those areas will be identified in the delisting rule. Of course, if monitoring of a delisted species leads us to conclude that a species again warrants listing, including because of threats in an SPR, we may initiate a new listing process for that species.

*Comment (95):* The Arizona Game and Fish Department suggested that all previous listing determinations made under the now withdrawn M-Opinion must be reexamined. The agency appeared to be concerned that we may convert any existing listings to rangewide listings.

*Response:* During the time the M-Opinion was in effect (2007–2011), FWS made a number of listing determinations, some of which resulted in listings and some of which ended in negative findings on listing petitions. Most of these listings were based on information about the status of the species throughout its range; only a handful turned on consideration of the species' status throughout an SPR. Only two final listing rules based on consideration of status throughout an SPR resulted from application of the M-Opinion (concerning Northern Rocky Mountain wolves (74 FR 15123, April 2, 2009) and Preble's meadow jumping mouse (73 FR 39790, July 10, 2008)), and both of these have been modified or nullified for different reasons and thus are not subject to revision as the commenter suggests.

We do not intend to reexamine every listing determination that was made while the M-Opinion was in effect. Regulations and policies are generally presumed to have prospective (forward-looking) impact only. Further, consistent with the presumption of regularity of agency decisions, all listing determinations are presumed consistent with the then-existing guidance. Of course, anyone may petition us to reconsider any listing determination if there is a basis to think the result would be different under this final policy. It is unlikely, though, that a species that was found not to qualify for listing during the time in which the M-Opinion was in effect would be found to meet the standards of this policy.

## L. Effects on Implementation of Other Portions of the Act

*Comment (96):* Some commenters urged the Services to ensure that, in applying the policy, we use all available tools to limit application of the statutory protections for "endangered species" and "threatened species" only to those members of the species in the SPR that is the basis for a listing determination. Montana Fish, Wildlife & Parks, for example, suggested that there needs to be more emphasis on utilizing available tools under the Act in a creative manner to provide regulatory relief and other incentives in areas where a species is doing well and a commitment to work with regulated entities to provide regulatory relief.

*Response:* The Services are committed to working with stakeholders to develop innovative ways to further species protection consistent with the statute. As we explained in the preamble to the draft policy (76 FR 76987), the Services intend to use the flexibilities of the statute to tailor protections to those members of the species most at risk whenever possible. Where the statute permits flexibility, the Services will use it to promote conservation without causing unnecessary burdens that provide no benefit to the species. However, because the Act requires us to list and manage entire species, subspecies, or DPSs, the Services may not always be free to craft ideal solutions that would satisfy all stakeholders. The purposes of the Act go beyond just recognizing where a species has already become imperiled. The ultimate goal is to bring species to the point where the protections are no longer needed, which means managing the listed entity to bring the health of the entity as a whole to that point. In some cases protecting members outside the SPR may be necessary or important to this overall goal.

*Comment (97):* Several commenters (including the Florida Fish and Wildlife Conservation Commission and Montana Fish, Wildlife & Parks) requested that the Services revise the text of the draft policy itself to include additional detail from the discussion in the preamble as to the tools and methods that would be used to minimize unintended consequences and avoid over-regulation, with reference to several specific sections of the Act. Other commenters requested we develop additional guidance to explain how the Services plan to use available tools to increase the efficiency of section 7 consultations for species listed on the basis of status throughout an SPR. Some commenters, including the Idaho Office of Species Conservation, suggested that we failed to give adequate consideration to the burdens that will be caused by the policy, particularly in relation to section 7 consultations and permitting under section 10 of the Act.

*Response:* The role of the language in the actual policy statement is to concisely set out the fundamental principles that constitute the Services' interpretation of the key phrase "significant portion of its range." While we have provided discussion of issues regarding the need for flexibility in applying other portions of the Act above, we find it unnecessary to expand the policy statement itself to discuss these ancillary issues. Further, we have adequately considered any additional regulatory burdens that might result from this policy. We specifically considered this issue in developing this policy and in setting the threshold for SPRs. The Services expect that the policy is unlikely to lead to many new listings on the basis of an SPR, suggesting that it would not be a wise use of agency resources to develop detailed guidance at this time. As explained in section VI. Effects of Policy, where threats vary across the range of a species, we may use methods such as programmatic consultations, low-effect HCPs, or other methods to streamline consultation and permitting

procedures for areas where the species is relatively more secure or the effects of the action are small. We expect these same analyses and procedures to be applicable regardless of whether a species is listed because of its status throughout an SPR or throughout all of its range. It does not appear that developing guidance in detail for species listed on the basis of their status throughout an SPR would be a valuable use of our resources because all consultations are driven by highly fact-specific considerations. If these issues in practice arise more frequently or pose more difficulty than expected at this time, the Services will consider developing further guidance for agency staff.

*Comment (98):* Some commenters requested that the Services expressly limit designations of critical habitat for species listed on the basis of SPR to avoid undue impacts to projects that would have effects outside the SPR. Some suggested that the Services should adopt a "high threshold" or "rebuttable presumption" that would limit a designation of critical habitat to the area within the SPR that was the basis for listing the species. Appearing to key off of the distinction in the statutory definition between "occupied" and "unoccupied" habitat, these commenters suggested that a designation of critical habitat should first focus on the physical and biological features (or primary constituent elements) inside the SPR and should include areas outside the SPR only upon a finding that the area inside the SPR would not satisfy the purposes of critical habitat designation.

*Response:* All provisions governing designations of critical habitat, including the definition in section 3(5) of the Act, must be applied for species listed on the basis of an SPR analysis in the same manner as for any other listed species. Thus, since a listing based on an SPR analysis is of the entire listed entity, not just the members in the SPR, it would be incorrect to apply the provisions governing habitat occupied at the time of listing to only the areas within the SPR and ignore other areas where members of the listed entity are present. Also, it would not be appropriate to categorically or presumptively foreclose designation of areas outside the SPR, as we discussed in the preamble to the draft policy (76 FR 76987, pp. 77003–77004.). In light of the strong conservation purpose of critical habitat and the definition of "conservation" as meaning all tools useful to bring a species to the point where the protections of the Act are no longer needed, we must consider the role all suitable habitat can play in supporting species' recovery. However, while we cannot agree that areas outside the SPR should be disqualified from the scope of areas that may meet the definition of "critical habitat," we note that the impacts analysis and discretionary exclusions process of section 4(b)(2) of the Act are key mechanisms for tailoring designations to the areas where conservation benefits are greatest and not outweighed by other impacts. As we have indicated, we would expect the Secretary to consider using his or her discretion to tailor designations where threats are present in only a portion of the range.

*Comment (99):* Some commenters suggested that section 4(c)(1) of the Act provides a basis upon which to limit the scope of critical habitat designations to the areas within an SPR. They argued that the text of section 4(c)(1) should be interpreted as a substantive grant of authority to the Services to tailor a critical habitat designation to those areas within the SPR.

*Response:* Section 4(c)(1) of the Act simply has no substantive bearing on the scope of critical habitat designations. As we have explained, we adopt the view of the courts that have recently held that section 4(c)(1) is meant to serve an informational purpose rather than substantively constraining the scope of either listings or, by extension, critical habitat designations. Further, even if section 4(c)(1) had substantive meaning, the commenters appear to misread the last clause of section 4(c)(1), which does not refer to "such portion" but refers to "such range."

*Comment (100):* One commenter asked that the Services confirm they will exclude under section 4(b)(2) of the Act those areas where benefits of exclusion outweigh benefits of inclusion, except where exclusion would result in extinction of the species. (Another commenter acknowledged that section 4(b)(2) "enables" the Services to exclude areas rather than requires them.) Another suggested that there could never be a circumstance where failure to include an area could result in extinction of the species (which is the only circumstance in which section 4(b)(2) prohibits excluding a specific area) and that the net benefits analysis will likely always lean in favor of exclusion.

*Response:* We agree, as we have indicated in our draft policy (76 FR 76987, p. 77003) and in our response to *Comment (98),* that our authority to exclude areas from critical habitat designations may be an important tool in tailoring protections for a species listed because of its status throughout an SPR. However, it is important to understand that the application of the authority to exclude areas under section 4(b)(2) of the Act is discretionary rather than mandatory. While the Secretary must "consider" economic and other relevant impacts prior to designating, he or she is not required to undertake a particular method of analysis and is not required to weigh benefits of exclusion against benefits of inclusion. Exclusions under section 4(b)(2) are always discretionary (see *Building Industry Association (BIA)* v. *DOC,* No. C 11–4118 PJH, 2012 WL 6002511, *5–7 (N.D. Cal. Nov. 30, 2012) (green sturgeon)).

*Comment (101):* One commenter suggested that the Services should include a statement of intent to limit critical habitat designations to areas within the SPR in any new policy regarding application of section 4(b)(2) and perhaps in the handbook.

*Response:* We clarified above (*e.g.,* response to *Comment (100)*) the role of section 4(b)(2) of the Act in appropriately tailoring critical habitat designations. At this time we do not see a need to separately address these issues through other policies or documents not within the scope of the policy being adopted. If in practice there are more listings on the basis of SPR than we currently expect, such that these issues arise frequently or otherwise need further clarification, we may consider promulgating additional guidance.

*Comment (102):* One commenter suggested that a February 28, 2012, Presidential Memorandum addressing FWS' designation of critical habitat for the northern spotted owl directed the Services to exclude private lands from all critical habitat designations.

*Response:* The commenter misconstrues the scope and effect of the cited memorandum. In any event, these issues are beyond the scope of the present policy, which is focused on the interpretation of the "significant portion of its range" language in the definitions of "endangered species" and "threatened species." We have separately amended the regulations governing the designation of critical habitat (50 CFR 424.19) to respond to the memorandum (78 FR 53058, August 28, 2013).

*Comment (103):* Several commenters (including the Alaska Department of Fish and Game and Southern Nevada Water Authority) expressed concerns about how this policy was intended to influence the conduct of interagency consultation under section 7(a)(2) of the Act. Some appear to believe that the Services intend to categorically consider any action that would have an adverse

effect on members in an SPR to be likely to jeopardize the listed species' continued existence. For example, the Alaska Department of Fish and Game suggested the Services need to explain, "whether a jeopardy determination would differ if the proposed project affected species outside the SPR as opposed to within the SPR. It also does not address whether the Services would be more likely to make a 'no jeopardy' finding if a project is conducted outside of the SPR with no direct impact on the individuals within the SPR."

*Response:* We must make determinations under section 7(a)(2) of the Act based on a review of the best available scientific and commercial data assessed at the level of the entire listed entity (species/subspecies/DPS). It has always been the case that impacts to particularly sensitive or critical members of the listed entity may be found to appreciably reduce the likelihood of survival or recovery of the entire species, such as if those members are a critical breeding population. This is very fact-specific. This policy does not establish a presumption that a proposed Federal action that would adversely affect the members in an SPR will automatically result in a jeopardy determination under section 7(a)(2). Nor does this policy suggest that impacts to members that are not located within the SPR will automatically be found not likely to jeopardize the species. We will analyze each situation on its own facts.

*Comment (104):* The Alaska Department of Fish and Game suggested that one of the methods available to the Services to streamline consultation would be to use section 4(d) rules at the listing stage to tailor protections, and requested the Services to explain how the draft policy would influence issuance of section 4(d) rules.

*Response:* As discussed further in the section of this document discussing rules issued under section 4(d) of the Act (see section VI.B., below), we agree that the ability to issue section 4(d) rules to tailor protections for threatened species may be particularly important for species listed on the basis of an SPR analysis. Thus, where appropriate, we will consider whether certain activities in certain areas can be exempted from the take prohibition of section 9 of the Act even where those prohibitions are generally being applied for that species. However, section 7(a)(2) creates independent obligations on Federal agencies to avoid authorizing, funding, or carrying out actions that would be likely to appreciably reduce the likelihood of survival or recovery of listed species or to destroy or adversely modify their critical habitat. Thus, even

where the Services have tailored take protections for threatened species, this would not relieve Federal agencies of their consultation obligations.

*Comment (105):* One commenter seemed to question whether NMFS or FWS would engage in "consultation" with foreign countries in the event that a species is listed rangewide even though only a portion of its range (and perhaps only insignificant portions) falls within the United States, its territories, or its Exclusive Economic Zone (EEZ). The commenter further suggested that the lack of ability to apply protections outside the United States should influence how the Services apply this policy in reaching listing determinations.

*Response:* Section 7(a)(2) of the Act does not apply to foreign governments, so we do not engage in "consultations" with foreign nations in the sense that that term is used in connection with section 7. However, we inform affected countries of potential listings and seek information in return. We also provide some technical assistance after listing when requested and feasible. In any event, our limited ability to regulate the species outside of the United States does not factor into either the development of this policy or individual listing determinations. Listing determinations must be based solely on the best available scientific and commercial data after taking into account certain factors as specified in section 4 of the Act. Our authority to list species worldwide has been an acknowledged feature of the Act and its precursors, without regard to our limited ability to apply the protections of the Act outside of the United States, its territories, its EEZ, and on the high seas. This final SPR policy will in no way affect the current framework.

*Comment (106):* Some commenters (including the Governor of Wyoming and Alaska Department of Fish and Game) suggest that the Services should choose to list species as threatened whenever possible, instead of basing a listing on an endangered status inside an SPR, so that the Services may take advantage of the ability to promulgate rules under section 4(d) of the Act.

*Response:* We have revised the definition of "significant" in this final policy. Under the new definition, it will not be possible for a species to be simultaneously classified as threatened throughout its range and endangered throughout an SPR. Thus, the commenters' suggestion is no longer relevant. Of course, where a species is listed as threatened, each agency will continue its practice of considering whether a rule promulgated under

section 4(d) of the Act would be appropriate.

*Comment (107):* At least one commenter suggested that the Services should clarify in the final policy that section 4(d) has two distinct provisions, and that rules under the first requires a "necessary and advisable" finding, while rules under the second (determining whether to apply the take prohibitions) do not.

*Response:* While we acknowledge that this has been recognized by courts as a permissible reading of section 4(d) of the Act, most recently in the polar bear litigation, it is beyond the scope of the SPR policy to construe section 4(d) at this level of detail (see *In Re Polar Bear Endangered Species Act Listing And § 4(D) Rule Litigation*, 818 F.Supp.2d 214, 228 (D.D.C. 2011)).

*Comment (108):* The Governor of Wyoming stated that the Act's "policy reform needs to address implementing laws particularly prone to litigation."

*Response:* This policy is an attempt to address an issue that has frequently led to litigation. It is beyond the scope of the current effort to comprehensively address other areas of the Act that could benefit from reform.

*Comment (109):* The Arizona Game and Fish Department suggests that the policy, if approved, should "more thoroughly describe how it would be applied during development of Recovery Plans."

*Response:* As discussed in section III.F., above, we reiterate that we anticipate recovery planning to focus first on ameliorating threats in the SPR. This is consistent with current practice—our traditional and reasonable approach, even for species not listed on the basis of an SPR, has been to focus on the areas where members face greatest peril. However, members of the species outside the SPR should not be ignored in planning for overall species conservation and recovery.

*Comment (110):* One commenter suggested the agencies need to explain how implementation of the SPR policy can be harmonized with the candidate-review process and the process to implement FWS' settlements with WildEarth Guardians and the Center for Biological Diversity.

*Response:* In reviewing whether a species is a candidate (or should be removed from the candidate list), FWS considers the same definitions of "endangered species" and "threatened species," including the SPR phrase, as we would for a proposed listing determination or any other status review. As candidate species are reviewed for either proposed listing or for removal from the candidate list as a

result of conservation actions or changed status, FWS will apply the definitions of "endangered species" and "threatened species" using the same process we have outlined in section III.F., above. If FWS determines a candidate species is not currently endangered or threatened throughout all of its range, we will consider whether there are any portions that may be both (1) significant and (2) endangered or threatened. If the species is endangered or threatened throughout an SPR, it would remain a candidate or be proposed for listing. If it is not currently endangered or threatened throughout all of its range and it is also not endangered or threatened throughout any SPR, then FWS would remove the species from the candidate list. This process will apply to all FWS determinations, regardless of any settlement agreements to complete such determinations—settlement agreements require that we make a determination by a date certain, but do not alter the standards the Services must apply to those determinations.

*Comment (111):* One commenter suggested that FWS should give SPR candidates a low priority under its listing priority guidelines, and that the Services should make greater use of their authority to make warranted-but-precluded findings.

*Response:* FWS follows the current listing priority guidance (48 FR 43098, September 21, 1983) for assigning priorities to listing actions in order to make the most appropriate use of the limited resources available to implement the Act. The priority of a species depends on the magnitude of threats, the imminence of threats, and the taxonomic distinctness of the species (monotypic genus, species, or subspecies or DPS). Under this system, FWS assigns a ranking to a candidate species at the level of the entity considered for listing (species, subspecies, or DPS). FWS will apply this system to any species that is a candidate because of its endangered or threatened status throughout an SPR. Because the entity that would be listed is the entire species (not just the SPR), FWS will determine the ranking with respect to the species as a whole. In other words, FWS will consider the magnitude and imminence of threats to the entire species, not just the SPR. It is likely that a species that is a candidate because it is endangered or threatened throughout an SPR will not be experiencing the same level of threats throughout its range, or will not be experiencing threats that are currently acting on the entire range of the species. Thus, such a candidate may be ranked relatively lowly based on magnitude

and imminence of threats. In other words, the current system, while not explicitly addressing ranking of a species that is a candidate because it is endangered or threatened throughout an SPR, allows for considering differences in the magnitude and imminence of threats that are likely to occur between species that are endangered or threatened throughout all their range and species that are endangered or threatened throughout an SPR.

We noted that NMFS' definition of "candidate species" differs from that of FWS, and therefore the language above applies only to FWS. NMFS' candidate species are those petitioned species that are actively being considered for listing as endangered or threatened under the Act, as well as those species for which NMFS has initiated a status review that it has announced in the **Federal Register** (69 FR 19975, April 15, 2004; 71 FR 61022, October 17, 2006).

With regard to our authority to make warranted-but-precluded findings, the Services can only make those findings to the extent that prioritization of proposals and available resources allow, and expeditious progress on adding to and removing species from the Lists of Endangered and Threatened Wildlife and Plants can be demonstrated. To the extent that a species that is a FWS candidate because it is endangered or threatened throughout an SPR will tend to have lower priority rankings than other species, it may be more likely that FWS would make a warranted-but-precluding finding for it.

## M. Procedural Requirements and Compliance With Laws

*Comment (112):* Several commenters stated that the SPR policy is a major Federal action and, as such, the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) requires the preparation of an environmental impact statement.

*Response:* We conducted an environment assessment, which concluded with a finding of no significant impact (FONSI). Under NEPA, an environmental impact statement is not required. See the discussion of NEPA under VII. Required Determinations, below, and in the FONSI.

*Comment (113):* Several commenters stated that the required determinations (explaining compliance with various procedural requirements imposed by statutes and executive orders) in the **Federal Register** notice announcing the draft policy were inadequate.

*Response:* We disagree. Specific criticisms are addressed individually below.

*Comment (114):* One commenter suggested that the policy was contrary to Executive Order 13563.

*Response:* We disagree. This is not a circumstance in which the Secretaries have complete discretion delegated by Congress as to the scope or substance of regulation. Here, we have determined that the most defensible legal interpretation of the Act is the one set forth in this policy. Nothing in the Executive Order suggests that agencies should take legally unsound positions to reduce regulation.

*Comment (115):* One commenter stated that we misrepresented the effect of the policy on small entities. The commenter asserted that the policy will expand listings and require small businesses to get incidental take permits. The commenter further argued that the Services have no basis for asserting that they are the only entities affected by the draft policy. Similar comments were made with respect to State and Tribal governments, and local governments bear the burden of section 7 consultation on public works projects that may affect listed species. Another commenter stated that the draft policy would have resulted in gray wolves remaining listed in Montana and Wyoming, which would have placed unreasonable burdens on small businesses.

*Response:* The discussion of small-business impacts in the draft policy did not assert that no small businesses would be affected; rather, it concluded that no small businesses would be directly regulated. The draft policy went on to explain that we predict that few small entities, including governments, will even be affected because the policy is likely to result in only a small number of additional listings (even when compared to no implementation of the SPR language at all, which is not a legally sound option). As discussed below in section VII.B., a regulatory flexibility analysis is only required if a Federal action directly regulates small entities. The Services' current understanding is that this position is supported by existing case law regarding the certification requirements under the Regulatory Flexibility Act (RFA), the Small Business Regulatory Enforcement Fairness Act (SBREFA), and SBA's handbook, "A guide for Government Agencies: How To Comply With the Regulatory Flexibility Act (2003). However, it is the current practice of the Services to assess, to the extent practicable, these potential impacts if sufficient data are available, whether or not this analysis is believed by the Services to be strictly required by the RFA. In addition, we noted

elsewhere in the draft policy that where a species is listed as threatened, the take prohibitions may be tailored under section 4(d) of the Act so as not to apply throughout its range. Finally, contrary to the assertion of one commenter, if the draft policy had been applied to the Northern Rocky Mountain DPS of gray wolves in 2009, it is not clear what the result would have been. In any case, that point is moot due to subsequent congressional action.

*Comment (116):* One commenter asserted our conclusion that the draft policy would not have significant takings implications is incorrect. According to the commenter, the examples of delta smelt, northern spotted owl, and others demonstrate that the policy would present a barrier to all reasonable and beneficial use of private property affected by listings that result from the policy.

*Response:* We stand by our analysis in the draft policy. We are unaware of any court having found that a listing under the Act imposes a taking under the Fifth Amendment of the Constitution. Therefore, even to the extent that this policy leads to the listing of a species that would not otherwise be listed, this policy will not cause a taking under the Fifth Amendment. See our statement below under section VII.D.

*Comment (117):* One commenter asserted that we misstated the draft policy's federalism implications and that the policy would turn the Act into a massive land-use and zoning program administered by the Federal Government, obviating State authority. Another commenter asserted that our federalism conclusions are incorrect because listing determinations have great impacts on States and local communities, and the policy will create a disincentive on proactive State conservation.

*Response:* We disagree. In some circumstances, listing determinations can have impacts on States and local communities, but, as discussed elsewhere, we predict that relatively few listing decisions will turn on application of this policy, so this policy is likely only in rare circumstances to have impacts on States and local communities. In any case, as we stated in the draft policy, any impacts would not be "substantial, direct effects," the threshold under Executive Order 13132 (Federalism). Moreover, in no case does the Act, with or without this policy, supplant State authority to regulate land use or zoning.

*Comment (118):* One commenter asserted that we misstate the policy's effect on energy supplies, distribution, or use, and cited the example of

proposed energy regulations adopted by Bureau of Land Management in anticipation of protection of the greater sage-grouse.

*Response:* We disagree. Although listing species under the Act can indirectly affect energy, as discussed elsewhere, we predict that relatively few listing decisions will turn on application of this policy. See our statement below under section VII.J.

*Comment (119):* One commenter suggested that we add a discussion of how we will incorporate the Information Quality Act (IQA; Pub. L. 106–554) and presidential directives into the process for evaluating species under the SPR policy.

*Response:* The Services, in accordance with our July 1, 1994, peer review policy (59 FR 34270) and the Office of Management and Budget's December 16, 2004, Final Information Quality Bulletin for Peer Review, solicit independent scientific review of the information and analyses contained in our proposed listing determinations under the Act. This review usually occurs concurrently with the public comment period for the proposed action. Peer review would include consideration of the adequacy of the data relied on, the analyses, and the conclusions drawn, including any analyses of potential SPRs. In addition to conducting peer review where appropriate, the Services conduct pre-dissemination review of information to ensure compliance with applicable Information Quality Act guidelines. The Services will follow the same procedures and policies for peer review of influential scientific documents and other supporting information for all listing determinations, including those that may be based on a species' status throughout an SPR. This SPR policy does not alter those procedures and the Services are committed to conducting peer review and pre-dissemination review for all determinations as part of the process of ensuring our decisions are based on the best scientific and commercial data available.

*Comment (120):* Colorado Parks and Wildlife asserted that the draft policy is inconsistent with the 1994 Interagency Cooperative Policy Regarding the Role of State Agencies in Endangered Species Act Activities (59 FR 34274, July 1, 1994).

*Response:* The 1994 policy referred to by the commenter provides guidance on how we will involve the States in prelisting, listing, section 7 consultation, habitat conservation planning, and recovery. The 1994 policy requires us to utilize the expertise and solicit information from the States, and

to provide notification to the States regarding particular prelisting and listing actions. This final SPR policy is not a particular prelisting or listing action. Nonetheless, the SPR policy will apply to those actions, and we will continue to implement the 1994 policy by notifying the States of those actions. Additionally, as noted in our response to *Comment (5),* we have been in close contact with the Joint Task Force concerning this issue.

*Comment (121):* One commenter asserted that we must complete a comprehensive evaluation of the costs that will be caused by the draft policy, including consideration of small businesses.

*Response:* We completed all required analyses; see section VII. Required Determinations, below.

*Comment (122):* Several commenters asserted that we should be engaged in Administrative Procedure Act (APA; 5 U.S.C. chapter 5, subchapter II) legislative rulemaking (or "full notice and comment rulemaking"), not adopting a "policy." They further commented that the policy will have the effect of modifying the existing regulations, and requires a revision of the Code of Federal Regulations.

*Response:* Labeling a document a "policy" or choosing not to include it in the Code of Federal Regulations is not inconsistent with APA rulemaking. In fact, in promulgating this policy, the Services have purposefully used the processes required for APA rules, including public notice of and opportunity for comment on the draft policy, even if they may not have been required, in order to ensure full compliance with the APA. Moreover, the Services have indicated that we intend to be bound by the policy. Thus, the Services are effectively treating this policy as an APA rulemaking. We note that several of these comments recommended "formal" APA rulemaking. As "formal rulemaking" is a technical term for a rare, trial-like proceeding required by statutes that require rules to be made "on the record after opportunity for an agency hearing," 5 U.S.C. 553(c), we assume that these were references to "informal rulemaking" under 5 U.S.C. 553 (commonly referred to as notice-and-comment rulemaking).

*Comment (123):* One commenter asserted that the draft policy is inconsistent with 50 CFR 424.10, which states that the Secretary may list species "only in accordance with the procedures of [part 424]" and stated that listing a species like the western snowy plover (currently listed as a threatened species) as an endangered species if

FWS determines that it is endangered throughout a significant portion of its range would violate the express provisions of 50 CFR 424.10.

*Response:* Nothing in the policy is inconsistent with the current regulations, as the current regulations do not elaborate on the statutory definitions of "endangered species" and threatened species," and, in particular, are silent as to the meaning or application of "significant portion of its range." The policy merely clarifies how we will implement the statute under the current regulations. Therefore, no revision to the regulations is necessary. In any case, under the final policy, we could not determine that a species that is threatened throughout all of its range, like the western snowy plover, is endangered throughout an SPR.

## V. Policy

Consequences of a species being endangered or threatened throughout a significant portion of its range:

The phrase "significant portion of its range" in the Act's definitions of "endangered species" and "threatened species" provides an independent basis for listing. Thus, there are two situations (or factual bases) under which a species would qualify for listing: a species may be endangered or threatened throughout all of its range or a species may be endangered or threatened throughout only a significant portion of its range.

If a species is found to be endangered or threatened throughout only a significant portion of its range, the entire species is listed as endangered or threatened, respectively, and the Act's protections apply to all individuals of the species wherever found.

*Significant:* A portion of the range of a species is "significant" if the species is not currently endangered or threatened throughout its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range.

*Range:* The range of a species is considered to be the general geographical area within which that species can be found at the time FWS or NMFS makes any particular status determination. This range includes those areas used throughout all or part of the species' life cycle, even if they are not used regularly (*e.g.,* seasonal habitats). Lost historical range is relevant to the analysis of the status of the species, but it cannot constitute a significant portion of a species' range.

*Reconciling SPR with DPS authority:* If the species is endangered or

threatened throughout a significant portion of its range, and the population in that significant portion is a valid DPS, we will list the DPS rather than the entire taxonomic species or subspecies.

## VI. Effects of Policy

This policy's interpretation of the "significant portion of its range" language in the Act's definitions of "endangered species" and "threatened species" provides a standard for determining whether a species meets the definitions of "endangered species" or "threatened species." The only direct effect of the policy will be to classify as "significant" (or not) portions of the range of a species under consideration for listing, delisting, or reclassification. More uniform application of the Act's definitions of "endangered species" and "threatened species" will allow the Services, various other government agencies, private individuals and organizations, and other interested or concerned parties to better judge and concentrate their efforts toward the conservation of biological resources vulnerable to extinction.

Application of the policy may result in the Services listing and protecting, throughout their ranges, species that previously we either would not have listed or would have listed in only portions of their ranges. However, this result will occur only under a limited set of circumstances. Under most circumstances, we anticipate that the outcomes of our status determinations with or without the policy will be the same. This comparison is true for both the period prior to the M-Opinion, and the period during which FWS implemented the M-Opinion. The primary difference when compared to the M-Opinion is that a species will be listed throughout all of its range under this policy. Another key difference is that, in implementing the M-Opinion on a case-by-case basis, FWS generally interpreted "significant" as having a relatively lower threshold (a portion only had to meaningfully contribute to the viability of the whole species). FWS's experience with implementing the M-Opinion suggests that listings based on application of this policy will be relatively uncommon. During the time that the M-Opinion was in effect, between March 2007 and May 2011, FWS determined that a species should be listed based on its status throughout a significant portion of its range only five times. Under this policy, in those instances where we list a species because of its status throughout a significant portion of its range, protections will be applied throughout the species' range, rather than just in the

portion. This outcome is a permissible interpretation of the statute, and it reflects the policy views of the Departments of the Interior and Commerce.

Listing a species when it is endangered or threatened throughout a "significant portion of its range" before it is endangered or threatened throughout all its range may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs throughout the entire range of the species. This may allow protection and recovery of declining organisms in a more timely and less costly manner, and on a smaller scale than the more costly and extensive efforts that might be needed to recover a species that has reached a point that it has become endangered or threatened throughout all its range.

Once we determine that a species is endangered or threatened, the provisions of the Act are applied in a straightforward manner, regardless of whether the species was listed because it is endangered or threatened throughout all its range or only throughout a significant portion of its range.

### A. Designation of Critical Habitat

If a species is listed because it is endangered or threatened throughout a significant portion of its range, the Services will designate critical habitat for the species (within areas under the jurisdiction of the United States) to the maximum extent prudent and determinable. We will use the same process for designating critical habitat for species regardless of whether they are listed because they are endangered or threatened throughout a significant portion of their range or because they are endangered or threatened throughout all of their range. In either circumstance, we will designate all areas that meet the definition of "critical habitat" (unless excluded pursuant to section 4(b)(2) of the Act). "Critical habitat" includes certain "specific areas within the geographical area occupied by the species, at the time it is listed" and certain "specific areas outside the geographic area occupied by the species at the time it is listed" (16 U.S.C. 1532(5)(A)). Thus, critical habitat designations may include areas within the SPR, areas outside the SPR occupied by the species, and areas that are both outside the SPR and outside the area occupied by the species at the time of listing, as appropriate. If a species is listed, however, as a result of threats throughout a significant portion of its range, the designation of critical habitat

may tend to focus on that portion of its range. For example, with respect to portions of the range of the species not facing relevant threats, the Secretary may find that the benefits of excluding an area from designation outweigh the benefits of specifying the area as critical habitat, which may lead to an exclusion under section 4(b)(2) of the Act.

### B. Rules Promulgated Under Section 4(d) of the Act

Determining that a species is threatened throughout a significant portion of its range will result in the threatened status being applied to the entire range of the species. When a species is listed as threatened, section 4(d) of the Act allows us to issue regulations "necessary and advisable to provide for the conservation" of the species. This provision allows us to tailor regulations to the needs of the species. When a species is listed as threatened because of its status throughout an SPR, we will consider the development of a section 4(d) rule to provide regulatory flexibility and to ensure that we apply the prohibitions of the Act where appropriate.

### C. Recovery Planning and Implementation

Regardless of whether a species is listed because it is endangered or threatened throughout all of its range, or because it is endangered or threatened throughout only a significant portion of its range, the goal of recovery planning and implementation is to bring the species to the point at which it no longer needs the protections of the Act. Recovery plans must, to the maximum extent practicable, include site-specific management actions and measurable, objective criteria for determining the point at which the species no longer meets the definition of an "endangered species" or a "threatened species" (see 16 U.S.C. 1533(f)(1)(B). In other words, the recovery plan predicts that when those measurable, objective criteria are met, the species would not be likely to become an endangered species in the foreseeable future either throughout all of its range or throughout a significant portion of its range. As with recovery planning and implementation for species that are endangered or threatened throughout all of their ranges, a variety of actions may be necessary to recover species that are endangered or threatened throughout an SPR. Recovery actions should focus on removing threats to the species, and are thus likely to be focused on those areas where threats have been identified. However, recovery efforts are not constrained to just the significant

portion of the range throughout which the species was originally determined to be endangered or threatened, and may include recovery actions outside the SPR, or even outside the current range of the species. For example, reintroducing a species to parts of its historical range outside the SPR may increase the species' redundancy and resiliency such that the SPR no longer meets the policy's standard for "significant" (i.e., loss of the species in the SPR would no longer cause the remainder to become endangered or threatened).

### D. Sections 7, 9, and 10 of the Act

Regardless of whether a species is listed because it is endangered or threatened throughout all of its range, or because it is endangered or threatened throughout only a significant portion of its range, the provisions of the Act apply to the entire species. A Federal agency is required to consult with FWS or NMFS under the jeopardy standard of section 7 of the Act if its actions may affect an endangered or threatened species anywhere in its range. Jeopardy analyses will be conducted at the scale of the species as a whole. Where threats vary across the range of a species, we may streamline consultation processes in areas where the species is more secure. We note that threats, population trends, and relative importance to recovery commonly vary across the range for many species, especially as recovery efforts progress. The Services routinely account for this variation in our consultations. We expect to apply the same approach for species listed because they are endangered or threatened throughout only significant portions of their ranges. Similarly, analyses for issuing permits and exemptions under section 10 of the Act will apply throughout the species' range, and we will use our expertise to streamline the processes and apply the appropriate level of protection for the areas under consideration. In the same way, even if a species is listed because it is endangered or threatened throughout a significant portion of its range, the prohibitions under section 9 of the Act will apply throughout the species' range for endangered species, and as established by rules promulgated pursuant to section 4(d) of the Act for species listed as threatened.

### VII. Required Determinations

#### A. Regulatory Planning and Review (E.O.s 12866 and 13563)

Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of

Management and Budget will review all significant regulations. OIRA has determined that this policy is significant.

Executive Order 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this policy in a manner consistent with these requirements.

#### B. Regulatory Flexibility Act

Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996; 5 U.S.C. 601 et seq.), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare, and make available for public comment, a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of an agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a rule will not have a significant economic impact on a substantial number of small entities. We are certifying that this policy will not have a significant economic effect on a substantial number of small entities. The following discussion explains our rationale.

This policy establishes binding requirements for NMFS and FWS in making listing determinations under the Endangered Species Act. NMFS and FWS will apply this policy in determining whether a species meets the Act's definitions of "endangered species" or "threatened species." However, based on agency experience, we predict application of this policy will affect our determinations in only a limited number of circumstances,

resulting in only a small number of additional species listed under the Act and application of the Act's protective regulations. Moreover, a regulatory flexibility analysis is only required if a Federal action directly regulates small entities; it is not sufficient that the action merely affects a small entity in some indirect manner. The Services' current understanding is that this position is supported by existing case law regarding the certification requirements under the Regulatory Flexibility Act (RFA), the Small Business Regulatory Enforcement Fairness Act (SBREFA), and SBA's handbook, "A guide for Government Agencies: How To Comply With the Regulatory Flexibility Act (2003). However, it is the current practice of the Services to assess, to the extent practicable, these potential impacts if sufficient data are available, whether or not this analysis is believed by the Services to be strictly required by the RFA.

We cannot reasonably predict those species for which we will receive petitions to list, delist, or reclassify, or whether a species' specific circumstances would result in us listing a species based on its status throughout an SPR. We, therefore, cannot predict which entities (other than the Services) could even potentially be affected, much less directly regulated, by listing a species as endangered or threatened based on its status throughout an SPR or the extent of those potential impacts. Nonetheless, and given the reasons discussed in this document under section VI. Effects of Policy and our experience implementing the Act, we expect that few, if any, entities would be indirectly affected in any way, and none would be directly regulated.

Moreover, NMFS and FWS are the only entities that are bound, and therefore directly regulated, by this policy, and they are not small entities under the Regulatory Flexibility Act. As discussed above, no other entities are directly regulated by this policy. Therefore, this policy will not have a significant economic effect on a substantial number of small entities.

### C. Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.)

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 *et seq.*):

On the basis of information contained in the *B. Regulatory Flexibility Act* section, above, this policy will not "significantly or uniquely" affect small governments. We have determined and certify pursuant to the Unfunded Mandates Reform Act, 2 U.S.C. 1502,

that this policy will not impose a cost of $100 million or more in any given year on local or State governments or private entities. A Small Government Agency Plan is not required. As explained above, small governments will not be affected because the policy would not place additional requirements on any city, county, or other local municipalities.

This policy will not produce a Federal mandate on State, local, or tribal governments or the private sector of $100 million or greater in any year; that is, it is not a "significant regulatory action"' under the Unfunded Mandates Reform Act. This policy imposes no obligations on State, local, or tribal governments.

### D. Takings (E.O. 12630)

In accordance with Executive Order 12630, this policy will not have significant takings implications. This policy will not pertain to "taking" of private property interests, nor does it directly affect private property. A takings implication assessment is not required because this policy (1) will not effectively compel a property owner to suffer a physical invasion of property and (2) will not deny all economically beneficial or productive use of the land or aquatic resources. This policy will substantially advance a legitimate government interest (conservation and recovery of endangered and threatened species) and will not present a barrier to all reasonable and expected beneficial use of private property.

### E. Federalism (E.O. 13132)

In accordance with Executive Order 13132, we have considered whether this policy will have significant Federalism effects and have determined that a federalism summary impact statement is not required. This policy pertains only to determinations to list, delist, or reclassify species under section 4 of the Act, and will not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government.

### F. Civil Justice Reform (E.O. 12988)

This policy does not unduly burden the judicial system and meets the applicable standards provided in sections 3(a) and 3(b)(2) of the Executive Order 12988. This policy clarifies how the Services will make determinations to list, delist, and reclassify species under section 4 of the Act.

### G. Government-to-Government Relationship With Tribes

In accordance with the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments'' (59 FR 22951, May 4, 1994), Executive Order 13175, the Department of the Interior Manual Chapter 512 DM 2, and the Department of Commerce *American Indian and Alaska Native Policy* (March 30, 1995), we have considered possible effects on federally recognized Indian tribes and have determined that there are no potential adverse effects of issuing this policy. As noted above, we cannot reasonably predict those species for which we will receive petitions to list, delist, or reclassify, or whether a species' specific circumstances would result in us listing a species based on its status throughout an SPR. We, therefore, cannot predict which entities, including federally recognized Indian tribes, will be affected by listing a species as endangered or threatened based on its status throughout an SPR or the extent of those impacts. Given our experience implementing the Act, we predict that few if any entities, including tribes, will be affected. However, the Act requires that we give notice of and seek comment on any proposal to list, delist, or reclassify any species prior to making a final decision. Our proposed rules to list, delist, or reclassify species indicate the types of activities that may be affected by resulting regulatory requirements of the Act. Any potentially affected federally recognized Indian tribes would be notified of a proposed determination and given the opportunity to review and comment on the proposed rules.

### H. Paperwork Reduction Act

This policy does not contain any new collections of information that require approval by Office of Management and Budget (OMB) under the Paperwork Reduction Act. This policy will not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

### I. National Environmental Policy Act

We have analyzed this policy in accordance with the criteria of the National Environmental Policy Act (NEPA), the Department of the Interior Manual (318 DM 2.2(g) and 6.3(D)), and National Oceanic and Atmospheric

Administration (NOAA) Administrative Order 216–6, and prepared an environmental assessment documenting our analysis. The environmental assessment presents the purpose of and need for this SPR policy, the proposed action and alternatives, and an evaluation of the effects of the alternatives under the requirements of NEPA, as implemented by the Council on Environmental Quality regulations (40 CFR 1500 *et seq.*) and according to the Department of the Interior's NEPA procedures. In our analysis of the probable environmental impacts of this SPR policy on the human environment, we have determined that there will be no significant impacts or effects caused by this SPR policy. The environmental assessment, as well as the finding of no significant impact (FONSI), is available for public inspection at *http://www.regulations.gov* at Docket No. FWS–R9–ES–2011–0031.

*J. Energy Supply, Distribution or Use (E.O. 13211)*

Executive Order 13211 requires agencies to prepare Statements of Energy Effects when undertaking actions that significantly affect energy supply, distribution, and use. This policy is not expected to affect energy supplies, distribution, and use. Therefore, this action is a not a significant energy action, and no Statement of Energy Effects is required.

**References Cited**

A complete list of all references cited in this document is available on the Internet at *http://www.regulations.gov* under Docket Number FWS–R9–ES–2011–0031 or upon request from the Ecological Services Program, U.S. Fish and Wildlife Service (see **FOR FURTHER INFORMATION CONTACT**).

**Authors**

The primary authors of this policy are the staff members of the Ecological Services Program, U.S. Fish and Wildlife Service, 4401 N. Fairfax Drive, Arlington, VA 22203, and the National Marine Fisheries Service's Endangered Species Division, 1335 East-West Highway, Silver Spring, MD 20910.

**Authority**

We are taking this action under the authority of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

Dated: June 18, 2014.

**Dan Ashe,**

*Director, U.S. Fish and Wildlife Service.*

Dated: June 19, 2014.

**Samuel D. Rauch III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

[FR Doc. 2014–15216 Filed 6–27–14; 11:15 am]

**BILLING CODE 4310–55–P**