THIS CASE HAS NOT BEEN SCHEDULED FOR ORAL ARGUMENT

No. 15-5041
(Consolidated with 15-5043, 15-5060, and 15-5061)

In the
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

HUMANE SOCIETY OF THE UNITED STATES, *et al.*,

   Plaintiffs-Appellees,

v.

S.M.R. JEWELL, *et al.*,
STATE OF WISCONSIN, *et al.*, and
U.S. SPORTSMEN'S ALLIANCE FOUNDATION, *et al.*,

   Defendants-Appellants.

Appeal from the United States District Court
For the District of Columbia

**BRIEF FOR DEFENDANTS-APPELLANTS
STATE OF MICHIGAN AND MICHIGAN DEPARTMENT OF
NATURAL RESOURCES**

Bill Schuette
Attorney General

Aaron D. Lindstrom
Solicitor General
Co-Counsel of Record

Nathan Gambill
Pamela J. Stevenson
Assistant Attorneys General
Co-Counsel of Record

Attorneys for State of Michigan
and Michigan Department of
Natural Resources - Appellants
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540

Dated: November 23, 2015

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 28(a)(1), counsel for Michigan certifies the following:

**A.     Parties and Amici**.  All parties, intervenors, and amici appearing before the district court and in this court are listed in the November 6, 2015 Opening Brief for the Federal Appellants.  The State of Michigan and Michigan Department of Natural Resources are jointly referred to as "Michigan" in this brief.

**B.     Rulings under Review**.  References to the rulings at issue appear in the November 6, 2015 Opening Brief for the Federal Appellants.

**C.     Related Cases**.  The November 6, 2015 Opening Brief for the Federal Appellants accurately explains the extent to which there is a related case.

/s/ Nathan Gambill
Nathan Gambill

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases ............................. i

Table of Contents ................................................................................. ii

Table of Authorities ............................................................................ iv

Glossary ............................................................................................. vi

Introduction ......................................................................................... 1

Jurisdictional Statement ...................................................................... 3

Statement of Issues Presented ............................................................. 4

Statutes and Regulations ..................................................................... 5

Statement of the Case .......................................................................... 7

Standard of Review .............................................................................. 8

Summary of Argument .......................................................................... 8

Argument ............................................................................................ 10

I.      The district court's opinion undermines the foundation of the
        Endangered Species Act. ........................................................... 10

        A.      The ESA depends on state cooperation. ............................ 12

        B.      The district court effectively eliminates a primary
                reason States cooperate with the ESA. .............................. 15

        C.      The district court's opinion denies Michigan the benefit
                of its bargain. .................................................................. 18

II.     The FWS correctly concluded that Michigan regulations
        would adequately preserve a viable wolf population. ................... 20

        A.      Michigan is a leader in wolf conservation. ........................ 21

B.  A regulated hunt does not put Michigan's wolf
    population at risk of becoming threatened or
    endangered. ...............................................................................29

Conclusion and Relief Requested...............................................................32

Certificate of Compliance .........................................................................34

Certificate of Service ................................................................................35

# TABLE OF AUTHORITIES

Page

**Cases**

*\*Hughes v. Oklahoma,*
441 U.S. 322 (1979)...................................................................12

*Nat'l Ass'n of Home Builders v. Babbitt,*
130 F.3d 1041 (D.C. Cir. 1997)................................................12

*\*New York v. United States,*
505 U.S. 144 (1992)...................................................................13

*Printz v. United States,*
521 U.S. 898 (1997)...................................................................13

**Statutes**

\*16 U.S.C. § 1531(a)(5) .......................................................12, 14

16 U.S.C. § 1531(b) ...................................................................15

16 U.S.C. § 1531(c)(1) ..............................................................13

\*16 U.S.C. § 1532(3) .................................................................15

16 U.S.C. § 1533(a)(1)(D)..........................................................20

16 U.S.C. § 1533(c)(2) ...............................................................16

16 U.S.C. § 1535(a) .................................................................5, 16

Mich. Comp. Laws § 324.40113a(2) ..........................................5

**Regulations**

76 Fed. Reg. 81666........................ 17, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30

Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY

AR ................................................................. Administrative Record

DPS ............................................................ Distinct Population Segment

ESA ............................................................... Endangered Species Act

FWS ......................................................... U.S. Fish and Wildlife Service

UP .............................................................. Michigan's Upper Peninsula

WGL .......................................................... Western Great Lakes

## INTRODUCTION

By spiriting away the Service's (FWS) ability to delist recovered populations of a listed species, the district court's interpretation of the Endangered Species Act (ESA) indefinitely transfers jurisdiction over Michigan's wolves to the federal government. This result threatens the very foundation of the ESA: federal-state cooperation. Michigan has invested an enormous amount of resources into the management and recovery of Michigan wolves on the expectation that it would regain exclusive jurisdiction over wolves once they recovered. That expectation is built directly into the ESA – it is the end ESA's means are designed to accomplish. Now the district court has thrown a wrench into Congress's design, which robs Michigan of the benefit of its bargain and places an unnecessary burden on FWS's resources.

Michigan values and is committed to conserving its thriving wolf population. There is no reason why it should have to endure an indefinite invasion of its sovereignty simply because wolves are unlikely to recover in other states. The district court erroneously ruled that the FWS failed to explain how Michigan's regulatory mechanisms will adequately protect its wolf population.

The November 6, 2015 Opening Brief for the Federal Appellants capably establishes the framework of this appeal and corrects the district court's mistaken interpretation of both the ESA and the administrative record.  To be as concise as possible and avoid repeating statements already made by the FWS, Michigan focuses on the errors in the district court's opinion from Michigan's unique perspective.  Wolves have recovered in Michigan with Michigan's indispensable assistance, and the state is fully committed and able to maintain a viable wolf population.

# JURISDICTIONAL STATEMENT

Michigan agrees with the jurisdictional statement in the

November 6, 2015 Opening Brief for the Federal Appellants.

## STATEMENT OF ISSUES PRESENTED

Michigan agrees with the statement of the issues in the November 6, 2015 Opening Brief for the Federal Appellants.

# STATUTES AND REGULATIONS

Except for the following, all applicable statutes, etc., are contained in the Addendum filed with the November 6, 2015 Opening Brief for the Federal Appellants:

## 16 U.S.C. § 1535(a)

**(a)** Generally

In carrying out the program authorized by this chapter, the Secretary shall cooperate to the maximum extent practicable with the States. Such cooperation shall include consultation with the States concerned before acquiring any land or water, or interest therein, for the purpose of conserving any endangered species or threatened species.

## Mich. Comp. Laws § 324.40113a(2)

**(2)** The natural resources commission has the exclusive authority to regulate the taking of game as defined in section 401031 in this state. The natural resources commission shall, to the greatest extent practicable, utilize principles of sound scientific management in making decisions regarding the taking of game. The natural resources commission may take testimony from department personnel, independent experts, and others, and review scientific literature and data, among other sources, in support of its duty to use principles of sound scientific management. Issuance of orders by the natural resources commission regarding the taking of game shall be made following a public meeting and an opportunity for public input . . . .

**76 Fed. Reg. 81666**

The final rule at issue, titled *Endangered and Threatened Wildlife and Plants; Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, exceeds 40 pages so it is filed separately in an addendum as required by D.C. Circuit Rule 28(a)(5).

## STATEMENT OF THE CASE

Michigan agrees with the thorough statement of the case in the November 6, 2015 Opening Brief for the Federal Appellants.

## STANDARD OF REVIEW

Michigan agrees that the standard of review identified in the November 6, 2015 Opening Brief for the Federal Appellants is correct and applies to each of the issues presented, and Michigan will not repeat the description of the standard of review here.

## SUMMARY OF ARGUMENT

By denying the U.S. Fish and Wildlife Service the flexibility to treat distinct segments of a species' population distinctly, the district court's opinion transfers jurisdiction over Michigan wolves to the federal government indefinitely because the district court's interpretation requires wolves in other states to recover before Michigan's wolves can be delisted. This result is the opposite of what Congress intended and hampers the delicate federal-state cooperation upon which the success of the Endangered Species Act almost entirely relies.

Congress cannot force Michigan to cooperatively administer the ESA, but Michigan has voluntarily done so in regards to wolves for many years based on both the federal and state expectation that Michigan wolves would return to Michigan's exclusive jurisdiction once recovered. The district court's opinion, contrary to the text, structure, and purpose of the ESA, upends this expectation and threatens the future success of the ESA.

Michigan is fully committed to protecting the wolf population within its borders, as shown, among other things, by its long history of wolf conservation efforts that predate federal efforts. The FWS carefully reviewed Michigan's regulatory mechanisms and correctly determined that they are sufficient to ensure that wolves in Michigan will not be at risk of becoming endangered – even if Michigan allows regulated wolf hunts in the future. The district court's ruling to the contrary disregards expert opinion, misunderstands wildlife management, and relies on the district court's own speculation.

# ARGUMENT

## I. The district court's opinion undermines the foundation of the Endangered Species Act.

The district court held that the FWS cannot use its authority to address distinct segments of a species' population in order delist a segment of an already-listed species. (Op. 66-67) (holding that "the creation or initial designation of a [Distinct Population Segment] operates as a one-way ratchet" the FWS can use only to *list* distinct populations, not *delist* distinct populations that are already listed.)

Under the district court's interpretation of the Endangered Species Act, the Michigan segment of the Minnesota wolf population – which is part of what the FWS refers to as the Western Great Lakes population – must remain endangered unless the wolves in states outside of the Western Great Lakes also recover. At a minimum, however, wolves need "large tracts of land with low human densities," and sufficient amounts of "wild prey" such as "ungulates and beaver" in order to thrive. AR 5. The wolves also must have support from the general public. AR 57. ("The FWS is certain that any reintroduction scheme will fail unless the majority of the local human population is desirous of such action . . . .") As a result, wolves simply cannot recover

10

in most states outside of the Western Great Lakes.  *See* AR 57-58 (explaining that reintroduction of wolves in many areas where they had been extirpated is not possible).

Since gray wolves will never recover in most states, the result of the district court's opinion is that gray wolves in Michigan must permanently remain on the federal endangered species list – regardless of how healthy and numerous the Michigan segment of the Minnesota population is.

The FWS's brief demonstrates how the district court's opinion misinterprets the FWS's Distinct Population Segment (DPS) policy, misunderstands the distinctive nature of the Minnesota population of gray wolves, and – most importantly – contradicts the text, purpose, and history of the Endangered Species Act.  Michigan will further explain how the opinion undermines the foundation of the ESA and, ultimately, pulls the rug out from under Congress, the federal executive, and the states – but especially out from under the states.

## A. The ESA depends on state cooperation.

Congress found that state cooperation was "key" to accomplishing the ESA's purposes.  16 U.S.C. § 1531(a)(5).  This is true both as a legal and a practical matter.

As a legal matter, when ratifying the Constitution, the states did not delegate their sovereign control over the wildlife within their boundaries to the federal government.  The Supreme Court considers "the States' interest in conservation and protection of wild animals" to be the equivalent of the states' police power "interests in protecting the health and safety of their citizens." *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).  The Court "has long recognized" the states' "substantial interest in preserving and regulating the exploitation of the fish and game and other natural resources within its boundaries for the benefit of its citizens." *Id*. at 341-341 (J. Rehnquist, dissenting) (citations omitted).  While in narrow circumstances Congress can assert federal jurisdiction over wildlife using its state-delegated Constitutional authority, such as its Commerce Clause power, *see Hughes,* general authority over the nation's wildlife remains with the states. *See also Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041 (D.C. Cir. 1997)

(Congress's authority to assert jurisdiction over state wildlife stems primarily from the Commerce Clause).

Also as a legal matter, Congress cannot "impress the state executive into its service." *Printz v. United States*, 521 U.S. 898, 907 (1997). That is, when it comes to implementing a federal policy, "States are not mere political subdivisions of the United States." *New York v. United States*, 505 U.S. 144, 188 (1992). While Congress can require "all *Federal* departments and agencies" to "seek to conserve endangered species and threatened species" and "utilize their authorities in furtherance of the purposes" of the ESA, 16 U.S.C. § 1531(c)(1) (emphasis added), it cannot require the states to do the same. *New York v. United States*, 505 U.S. 144, 188 (1992) ("The Federal Government may not compel the States to enact or administer a federal regulatory program.").

Congress recognized this limitation on its authority when it found that the only way to obtain the state cooperation that is "key" to the success of the ESA is to "encourage" it "through Federal financial assistance and a system of incentives." 16 U.S.C. § 1531(a)(5). In other words, Congress can only persuade, not require, the states to implement the ESA.

State cooperation is also "key" to the ESA's purposes as a practical matter because, as the FWS puts it: "FWS does not have the resources to do it all on its own." (Opening Br. for Fed. Appellants, p. 49.) There is no way the FWS's staff could, acting alone, successfully administer the ESA nationwide.

Ultimately, without state cooperation, the "key" to fulfilling the ESA's purposes could not be activated and the ESA's potential would remain unachieved.

**B.    The district court effectively eliminates a primary reason States cooperate with the ESA.**

As the Department of the Interior Solicitor's opinion indicates, one of the incentives for states that is built into the ESA's "system of incentives" is the fact that the federal detour into state wildlife management is temporary.  AR 506-507.  The temporary nature of the ESA's provisions is most clearly demonstrated by the way Congress defined the word "conserve."  Two of the ESA's fundamental purposes are to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be *conserved*," and "provide a program for the *conservation* of such endangered species and threatened species."  16 U.S.C. § 1531(b) (emphasis added).  The meaning of "conserve" is "to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter *are no longer necessary*."  16 U.S.C. § 1532(3) (emphasis added).

Therefore, once threatened and endangered species are no longer threatened or endangered, the federal role in their management expires.  And the primary purpose of the ESA is to reach a point when the federal role expires – that is what it means to "conserve" an endangered species.  This helps explain why Congress imposed a

standing obligation on the Secretary of the Interior to routinely "review" the existing list of threatened and endangered species and determine whether any species on the list should be "removed from the list." 16 U.S.C. § 1533(c)(2). It also explains why the Secretary must "cooperate to the maximum extent practicable with the States." 16 U.S.C. § 1535(a). States need to be ready to re-shoulder the full burden of wildlife management once the temporary federal role has expired.

It stands to reason that Michigan would not have invested so much of its own time and money into wolf conservation if wolves in Michigan were to be indefinitely managed by the federal government – which is the result required by the district court's holding in this case. If Michigan did not expect to recover full jurisdiction over gray wolves once Michigan's wolf population recovered, there would have been no reason for Michigan to develop its exhaustively-prepared wolf management plans discussed below, fund academic research on wolves, or spend its limited funding on enforcement. Michigan could have referred members of the public whose livestock were killed by wolves to the FWS to complete the necessary investigations, and used its valuable

staff time to manage animals over which Michigan actually had jurisdiction.

To be clear, Michigan highly values wolves. They are "an integral part of the natural resources of the State and have improved the natural functioning of Michigan ecosystems." AR 417. But that does not mean Michigan would continue to heavily invest its own resources into the recovery and management of wolves within its borders if they were, indefinitely, under federal jurisdiction.

For example, Isle Royale National Park is located in Michigan and has wolves. But Michigan has not attempted to address either wolf recovery or management in Isle Royale because "the wolf population is fully protected by the National Park Service." (Addendum A46.) If the district court's ruling stands and Michigan wolves are transferred to federal jurisdiction indefinitely like the wolves in Isle Royale, Michigan would have little incentive to continue its active role in managing all other Michigan wolves.

## C. The district court's opinion denies Michigan the benefit of its bargain.

As explained above, the success of the ESA depends on federal-state cooperation. Congress does not have the authority to force the States to cooperate, and the Federal government does not have the resources to successfully implement the ESA on its own. So part of the way the States are persuaded to cooperate with and invest in the implementation of the ESA is the assurance that the Federal intervention in State wildlife management is only temporary. AR 506-508.

Michigan was persuaded. And up to this point Michigan and the FWS have acted with the expectation that Michigan would reacquire jurisdiction over Michigan wolves once they recovered. *See*, *e.g.*, AR 5 (the goal of FWS's recovery plan was to delist the wolf, or end federal jurisdiction over wolves in Michigan); AR 403-408 (as the wolf reached its recovery goals, Michigan spent many years exhaustively planning how to manage wolves once they were returned to Michigan's jurisdiction). There is no question that the Michigan segment of the Minnesota population has long since satisfied – by leaps and bounds –

its recovery criteria, as the FWS already explains in its brief. (Opening Br. for Fed. Appellants, pp. 14-16.)

Now the district court has rejected the FWS's attempt to conform its designation of the Minnesota wolf population to the scientific reality of the population's numbers and range. And the district court has, instead, conditioned the delisting of wolves in Michigan on the occurrence of a virtually impossible event: the recovery not only of the Minnesota population, but the recovery of wolf populations in other states outside the Western Great Lakes region. The result of the district court's ruling is the indefinite federal protection of a healthy and distinct population of wolves. This bait-and-switch result contradicts the ESA's text, undermines the fundamental purposes of the ESA, and frustrates a heretofore successful federal-state partnership. Michigan is fully capable of managing the wolves within its boundaries, and should not be impeded by the fact that it would be virtually impossible for wolves to recover in other states.

## II. The FWS correctly concluded that Michigan regulations would adequately preserve a viable wolf population.

One of the criteria the FWS was required to consider when it evaluated whether the Minnesota population of wolves should remain on the endangered species list was the extent to which "existing regulatory mechanisms" would protect the wolves if federal protection were lifted. 16 U.S.C. § 1533(a)(1)(D). The FWS examined state, tribal, and federal regulatory mechanisms in great detail, and concluded that they "are adequate to control threats to wolves in the WGL DPS." (Addendum A37–A53.)

The district court ruled, however, that the record did not support the FWS's conclusion. (Op. 103-107.) Specifically, the court held that "the arbitrariness of the agency's conclusion is further demonstrated by the Final Rule's inadequate consideration of those state management plans and the effect of such plans on the threats to the western Great Lakes DPS." (Op. 102-103.)

The FWS's brief already explains why the district court was wrong.  (Opening Br. for Fed. Appellants, pp. 78-84.)  Below, Michigan elaborates on its history of wolf management and explains why Michigan's Wolf Management Plan, which anticipates the possibility of regulated takings, does not jeopardize a viable Michigan wolf population.

## A.    Michigan is a leader in wolf conservation.

Michigan protected wolves under state law in 1965 before the ESA even existed.  AR 11; AR 96.  Michigan led the nation's first effort to reintroduce wolves into historical wolf habitat in 1974.  (Addendum A47.)  And Michigan has made "repeated written commitments to ensure the continued viability of a Michigan wolf population." *Id*.   For this reason, the FWS considers Michigan to be "an innovative leader in wolf recovery efforts." *Id*.

By 1973, there were only six wolves in Michigan's entire Upper Peninsula (UP).  AR 96.  But in that same year, the Minnesota population began to move south into Wisconsin.  And as wolves gradually moved east from Minnesota and Wisconsin into the UP, and south from Canada, the wolf population in the UP began to climb.

AR 97; (Addendum A14.)  Through the mid-nineties, the population

grew steeply.  In 1991 there were 17 wolves in the UP, and by 1997

there were 112.[1]  AR 97.

Michigan acted accordingly, and formed a multi-agency recovery

team staffed by officials from Michigan's Department of Natural

Resources, the Great Lakes Indian Fish and Wildlife Commission, the

U.S. Forest Service, the National Park Service, and the U.S. Fish and

Wildlife Service.  AR 81.  Recognizing that "public acceptance and

support are essential for the long-term survival of a viable wolf

population in Michigan," the team conducted a detailed public interest

survey and held 15 public meetings throughout the state to gather

information and include the public in the formation of a wolf policy.  AR

101-104.

---

[1] When the FWS delisted gray wolves under the final rule more than a decade later at the end of 2011, there were 687 wolves in the UP. (Addendum A12.)

By December 15, 1997, the Michigan Gray Wolf Recovery and Management Plan was approved.  The plan "demonstrate[d] Michigan's intent . . . to protect the wolf from adverse effects that could lead to a need for its relisting as a threatened or endangered species."  AR 90.  And the plan played an important role in helping Michigan wolves to reach the federal recovery goal.  AR 403.

The federal recovery goal for a population within 100 miles of the Minnesota population was that the population must have at least 100 wolves in the late-winter for five consecutive years.  (Addendum A11.)  In 1998, the FWS confirmed that Michigan's wolves were within 100 miles of the Minnesota population.  And by 2000, the Michigan segment of the Minnesota population had achieved the FWS's recovery goal.[2]  AR 414.

_____

[2] Michigan's wolves, alone, reached the recovery goal by at least 2000.  The Michigan-Wisconsin population combined reached the recovery goal by the late winter 1993-1994.  (Addendum A15.)

Anticipating the wolf's return to Michigan's exclusive jurisdiction, Michigan appointed a committee in 2001 to review the 1997 recovery plan. (Addendum A46.) The committee concluded that Michigan's strategy needed to emphasize not only recovery, which was the focus of the 1997 plan, but also to emphasize management. *Id.* And Michigan began a comprehensive review of the "best available biological and social science relevant to wolves, wolf-related issues, and wolf management options in Michigan." AR 407.

As Michigan reviewed the available science, it also convened meetings with state and federal officials, held 10 public meetings throughout the state, hosted a public comment period, coordinated nine focus-group meetings, and completed direct-mail public attitude surveys. AR 404-407. Michigan repeatedly reached out to the public because, just as Michigan concluded in the 1997 plan, "[p]ublic support is critical for the long-term viability of a wolf population." AR 419.

By 2006, Michigan had not only gathered significant input from the public, but had also completed a paper titled *Review of Social and Biological Science Relevant to Wolf Management in Michigan* that, as the title indicates, gathered the relevant science on Michigan wolves into one place.  AR 406-407.

At that point, Michigan convened the Michigan Wolf Management Roundtable to "help it develop a plan that is acceptable to a wide range of stakeholder interests."  AR 407.  The Roundtable was made up of 20 entities, including the Michigan Humane Society, that represented a wide spectrum of Michigan's interest in wolves, such as "environmental and ecological interests, hunting and trapping interests, livestock-producer interests, public-safety interests, tourism and resource-development interests, tribes, and wolf protection interests."  *Id.* Through a series of meetings and "intense negotiations," the Roundtable produced a report titled *Recommended Guiding Principles for Wolf Management in Michigan.*  *Id.*

Relying on the information and recommendations gathered over the course of the previous years, Michigan began drafting the plan near the end of 2006. AR 408. And by August 2007, Michigan released a draft plan to the public for comment. Nearly 1,500 comments were submitted. *Id.* Michigan reviewed the comments, revised the draft plan, and the final version, titled the Michigan Wolf Management Plan (Plan), was approved by the Michigan Department of Natural Resources on July 10, 2008. AR 397.

The Plan's wolf management goals are to (1) maintain a viable wolf population above a threatened or endangered level; (2) facilitate wolf-related benefits; (3) minimize wolf-related conflicts; and (4) ensure that management is science-based and socially acceptable. AR 403. The FWS carefully reviewed the Plan and concluded that it "will provide adequate regulatory mechanisms for Michigan wolves." (Addendum A47.)

In particular, the FWS "strongly support[s]" the fact that even though Michigan's population is within 100 miles of the Minnesota population and, therefore, likely connected to it genetically, Michigan "has chosen to manage [its] wolves as though they are an isolated population." (Addendum A46.)  That means Michigan has committed to maintaining a viable population "regardless of the future fate of wolves in Wisconsin or Ontario." *Id.*

Importantly, Michigan commits to maintaining a population of at least 200 wolves, but does not set that figure as an upper limit.  This is because 200 wolves is likely not enough to "provide all of the ecological and social benefits valued by the public."  AR 436.  Additionally, setting an upper limit could create pressure to allow the taking of more wolves than necessary to manage wolf-related conflicts, and impede Michigan's ability to respond to new scientific data.

The Plan leaves open the possibility of a public wolf hunt to control wolf-related conflicts in the event non-lethal control measures fail to resolve the conflicts.  AR 457-458.  The FWS considers Michigan's approach to lethal conflict resolution to be "conservative, in that they commit to nonlethal depredation management whenever possible,

oppose preventative wolf removal where problems have not yet

occurred, encourage incentives for best management practices that

decrease wolf-livestock conflicts without impacting wolves, and support

closely monitored and enforced take by landowners of wolves 'in the act

of livestock depredation' or under limited permits if depredation is

confirmed and nonlethal methods are determined to be ineffective."

(Addendum A48.)

      The Plan also leaves open the possibility of a public wolf harvest

for purely recreational purposes.  But this is the one issue about which

the Roundtable could not reach a consensus.  AR 459.  For this reason,

the Plan commits Michigan to continue monitoring the issue, and only

recommend a recreational public wolf hunt to the Michigan Natural

Resources Commission – which has the exclusive authority in Michigan

to regulate the taking of game animals, Mich. Comp. Laws

§ 324.40113a(2) – "[i]f biologically defensible, legally feasible, and

supported by the public."[3]  AR 460.

---

[3] The 2015 update to the Michigan Wolf Management Plan amended
this language to say "biologically sustainable, legally feasible, and
socially responsible."  Updated Plan, p. 60.
http://www.michigan.gov/documents/dnr/wolf_management_plan_49256
8_7.pdf, accessed November 18, 2015.

**B.    A regulated hunt does not put Michigan's wolf population at risk of becoming threatened or endangered.**

The FWS's brief explains how the district court conflated individual wolves with a wolf population, and why the court was wrong to reject the FWS's expert conclusion that human-caused mortality within the states' regulatory framework will not put the Western Great Lakes population of wolves at risk.  (Opening Br. for Fed. Appellants, pp. 65-78.)

By way of additional detail, between 2003 and 2009, Michigan and federal officials killed 41 depredating wolves, and "there was no evidence of resulting adverse impacts to the maintenance of a viable wolf population in the UP."  (Addendum A47-A48.)  Public wolf hunts in places where wolves were not endangered, such as Alaska and Canada, have removed as much as 28% of a wolf population without destabilizing the population.  AR 459.  In some cases, the population even increased.  *Id.* This is in part because, as the FWS explains, wolves have such a "high reproductive potential."  (Addendum A36.)  So much so that the Western Great Lakes populations "have continued to

increase in both numbers and range" in spite of both legal and illegal "human-caused mortalities." *Id*.

The district court's one-sentence conclusion that the FWS acted arbitrarily and capriciously because it did not adequately consider "state management plans" is perplexing. (Op. 103.) It is difficult to imagine how the FWS could have more thoroughly examined Michigan's Plan and more adequately explained how the Plan does not pose a threat to the viability of Michigan's wolf population. The FWS examined each relevant aspect of the Plan, and concluded that Michigan's "history of leadership in wolf recovery and its repeated written commitments to ensure the continued viability of a Michigan wolf population above a level that would trigger State or Federal listing as threatened or endangered further reinforces that the [Plan] will provide adequate regulatory mechanisms for Michigan wolves." (Addendum A46.)

The district court's apparent assumption that any authorized taking of any wolf is an existential threat to the wolf's population betrays a fundamental misunderstanding of wildlife management, and shows a surprising disregard for the opinion of the many experts who agree that the Western Great Lakes population should be delisted. The FWS correctly determined that Michigan will carefully protect its wolf population, and the district court identified nothing to the contrary to supports its conclusory ruling.

## CONCLUSION AND RELIEF REQUESTED

The district court's ruling is contrary to the text, purpose, and structure of the ESA. As it a result, it pulls a rug out from under the federal-state arrangement that Congress carefully designed. There is no reason Michigan should have to endure an indefinite invasion of its sovereignty simply because wolves are not going to recover in other states.

Accordingly, Michigan requests that this Court reverse the district court's ruling and reinstate the final rule removing wolves in Michigan from the federal endangered species list.

Respectfully submitted,

Bill Schuette
Attorney General

Aaron D. Lindstrom
Solicitor General
Co-Counsel of Record

/s/ Nathan Gambill
Nathan Gambill
Pamela J. Stevenson
Assistant Attorneys General
Co-Counsel of Record
Attorneys for State of Michigan
and Michigan Department of
Natural Resources - Appellants

Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
gambilln@michigan.gov
stevensonp@michigan.gov

Dated:  November 23, 2015

**CERTIFICATE OF COMPLIANCE**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitations of this
Court's July 29, 2015 order, which authorized the State Appellants to
file a brief not to exceed 7,000 words.  There are a total of 4,315 words,
excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because this brief has been prepared in a proportionally spaced
typeface using Word 2010 in 14 point Century Schoolbook.

/s/ Nathan Gambill
Assistant Attorney General
Co-Counsel of Record
Attorney for State of Michigan
and Michigan Department of
Natural Resources - Appellants
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
gambilln@michigan.gov

# CERTIFICATE OF SERVICE

I certify that on November 23, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

/s/ Nathan Gambill
Assistant Attorney General
Co-Counsel of Record
Attorney for State of Michigan
and Michigan Department of
Natural Resources - Appellants
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
gambilln@michigan.gov