**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 15-5060 consolidated with 15-5041, 15-5043, 15-5061

————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

HUMANE SOCIETY OF THE
UNITED STATES, et al.,

    Plaintiffs-Appellees,

  v.

SALLY JEWELL, SECRETARY
OF THE INTERIOR, et al.,
U.S. SPORTSMEN'S ALLIANCE
FOUNDATION, et al., and
STATE OF WISCONSIN, et al.,

    Defendants-Appellants.

**On Appeal from the U.S. District Court for the District of
Columbia No. 1:13-cv-00186-BAH (Hon. Beryl A. Howell)**

**OPENING BRIEF FOR THE STATE OF WISCONSIN AND
WISCONSIN DEPARTMENT OF NATURAL RESOURCES**

BRAD D. SCHIMEL
Attorney General

JENNIFER L. VANDERMEUSE
Assistant Attorney General
State Bar #1070979

DANIEL P. LENNINGTON
Assistant Attorney General
State Bar #1088694

THOMAS J. DAWSON
Assistant Attorney General
State Bar #1016134

Attorneys for the Wisconsin Appellants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7741 (JLV)
(608) 267-8901 (DPL)
(608) 266-8987 (TJD)
(608) 267-2223 (Fax)
*vandermeusejl@doj.state.wi.us*
*lenningtondl@doj.state.wi.us*
*dawsontj@doj.state.wi.us*

**CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

A.    <u>Parties and Amici</u>. The plaintiffs-appellees are the Humane Society of the United States, Born Free USA, Help our Wolves Live, and Friends of Animals and Their Environment. The defendants-appellants are Sally Jewell, Secretary of the U.S. Department of the Interior; the U.S. Department of the Interior; and the U.S. Fish and Wildlife Service (the "Federal Appellants"). Though styled appellees in the caption of appeal No. 15-5041, the Federal Appellants have also appealed from the adverse judgment of the District Court in consolidated appeal No. 15-5043. The State of Wisconsin and the Wisconsin Department of Natural Resources ("Wisconsin" or the "Wisconsin Appellants"), though styled appellees in the caption of appeal No. 15-5041, are intervenor-defendants and are appellants in consolidated appeal No. 15-5060. The State of Michigan and the Michigan Department of Natural Resources are intervenor-defendants and are appellants in consolidated appeal No. 15-5061. The U.S. Sportsmen's Alliance

Foundation, National Rifle Association of America, Wisconsin Bear Hunters Association, Michigan United Conservation Clubs, Wisconsin Bowhunters Association, Upper Peninsula Bear Houndsmen Association, Michigan Hunting Dog Federation, Rocky Mountain Elk Foundation, and the Safari Club International are intervenor-defendants and are the appellants in the lead appeal, No. 15-5041. The State of Minnesota is participating as amicus curiae in support of the appellants.

B. <u>Rulings Under Review</u>. References to the rulings at issue appear in the Brief for the Federal Appellants, filed November 6, 2015.

C. <u>Related Cases</u>. This case has not been before this or any other court as defined by D.C. Circuit Local Rule 28(a)(1)(C). The Wisconsin Appellants do not believe there are any other related cases pending, as D.C. Circuit Local Rule 28(a)(1)(C) defines that phrase. The pending case of *Defenders of Wildlife v. Jewell*, D.C. Cir. No. 5300, D.D.C. No. 12-1833 (Hon. Amy Berman Jackson), involves some of the same parties and some of the same issues.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................i

TABLE OF CONTENTS ..........................................................iii

TABLE OF AUTHORITIES ...................................................... v

GLOSSARY .....................................................................viii

INTRODUCTION................................................................. 1

STATEMENT OF JURISDICTION ........................................ 3

STATEMENT OF THE ISSUES........................................... 3

PERTINENT STATUTES AND REGULATIONS .................... 4

STATEMENT OF THE CASE .............................................. 4

SUMMARY OF ARGUMENT ............................................... 4

ARGUMENT .................................................................... 5

    I.    Standard of review. .............................................. 5

    II.    The ESA authorizes FWS to identify and delist the Western Great Lakes DPS............................... 8

    III.    The record supports FWS's conclusion that the Western Great Lakes DPS is neither threatened nor endangered........................................................ 9

        A.    The statutory phrase "significant portion of its range" means the wolves' current range. ............... 10

B.    FWS adequately explained its findings regarding disease, human-caused mortality, and state regulatory mechanisms. ....................................................... 13

    1.    FWS adequately explained why disease and human-caused mortality do not threaten the Western Great Lakes DPS. ........................................... 14

    2.    FWS sufficiently explained why the Western Great Lakes state regulatory mechanisms were adequate. ............................................... 15

IV.    Vacatur is not the appropriate remedy. ................. 18

A.    Assuming the Final Rule's deficiencies amounted at most to an insufficiency of explanation, remand is the proper remedy. ............... 19

B.    The disruptive consequences weigh heavily against vacatur. ........................................... 21

    1.    The lethal control and wolf harvest aspects of Wisconsin's wolf management program did not harm Wisconsin's wolf population. ................................ 21

    2.    Vacating the Final Rule resulted in regulatory disruption and harm to the state of Wisconsin. ........................................ 24

CONCLUSION ...................................................... 26

# TABLE OF AUTHORITIES

## CASES CITED

Page

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................. 19

*Allina Health Servs. v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) .......................................................... 19

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki,*
  709 F.3d 29 (D.C. Cir. 2013) ................................................................ 7

*Am. Trucking Ass'ns, Inc. v.*
  *Fed. Motor Carrier Safety Admin.,*
  724 F.3d 243 (D.C. Cir. 2013) .............................................................. 6

*Am. Wildlands v. Kempthorne,*
  530 F.3d 991 (D.C. Cir. 2008) .............................................................. 5

*Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,*
  838 F.2d 1258 (D.C. Cir. 1988) ........................................................... 6

*Chevron U.S.A., Inc. v.*
  *Nat. Res. Defense Council, Inc.,*
  467 U.S. 837 (1984) ............................................................. 2, 3, 4, 7, 8

*City of Arlington, Tex. v.*
  *Fed. Commc'n Comm'n,*
  133 S. Ct. 1863 (2013) ......................................................... 7, 9, 12, 13

*Defs. of Wildlife v. Jewell,*
  68 F. Supp. 3d 193 (D.D.C. 2014) ...................................................... 16

*Envt'l Def. Fund, Inc. v. Costle,*
  657 F.2d 275 (D.C. Cir. 1981) ........................................................... 6-7

***Authorities upon which we chiefly rely are marked with asterisks.***

*Ethyl Corp. v. Envtl. Prot. Agency,*
   541 F.2d 1 (D.C. Cir. 1976) ..................................................6

*Heartland Reg'l Med. Ctr. v. Sebelius,*
   566 F.3d 193 (D.C. Cir. 2009) .............................................20

*In re Polar Bear Endangered Species Act Listing,*
   709 F.3d 1 (D.C. Cir. 2013) ..................................................6

*Mayo Found. for Med. Educ. & Research v. United States,*
   562 U.S. 44 (2011) ..................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.*
   *v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ..................................................................6

*Pharm. Research & Mfrs. of Am. v.*
   *U.S. Dep't of Health & Human Servs.,*
   43 F. Supp. 3d 28 (D.D.C. 2014) .......................................22

## STATUTES CITED

5 U.S.C. § 551, et seq. ..............................................................2

5 U.S.C. § 702 ..........................................................................3

5 U.S.C. § 704 ..........................................................................3

5 U.S.C. § 706(2) ................................................................18-19

5 U.S.C. § 706(2)(A) ................................................................6

16 U.S.C § 1531(b) .................................................................12

16 U.S.C. § 1532(6) ........................................................9, 10, 11

16 U.S.C. § 1532(20) ......................................................9, 10, 11

16 U.S.C. § 1533(a) .................................................................13

16 U.S.C. § 1533(a)(1)..................................................................9, 13

16 U.S.C. § 1540(g) ........................................................................3

28 U.S.C. § 1291 ............................................................................3

28 U.S.C. § 1331 ............................................................................3

## RULES CITED

Fed. R. App. P. 28(i) .......................................................................4

Fed. R. App. P. 4(a)(1)(B) ..............................................................3

Fed. R. App. P. 4(a)(3) ...................................................................3

# GLOSSARY

APA .............................................................. Administrative Procedure Act

DNR .................................. (Wisconsin) Department of Natural Resources

DPS ............................................................. Distinct Population Segment

ESA ...................................................................... Endangered Species Act

FWS .......................................................... U.S. Fish and Wildlife Service

# INTRODUCTION

The recovery of the Western Great Lakes gray wolf has been a complete success, thanks to the management efforts of the U.S. Fish and Wildlife Service (FWS), Wisconsin and other Great Lakes states, and private conservation groups. In Wisconsin alone, the population of gray wolves increased from 34 in 1990 to between 815 and 880 in 2012—well above federal and state recovery goals.

As a result, FWS took steps to revise the Great Lakes wolf's status under the Endangered Species Act. In 2011, FWS published a final rule that renamed this population the Western Great Lakes Distinct Population Segment ("Western Great Lakes DPS") and removed it from the List of Endangered and Threatened Wildlife. 76 Fed. Reg. 81,665 (Dec. 28, 2011) (the "Final Rule"). The Final Rule was grounded in both law and fact. It was the product of a thorough evaluation of public comments, peer reviews, and the best available scientific and commercial data.

After the Final Rule went into effect, Wisconsin revised its wolf management program to allow for depredation (lethal) control of wolves in certain limited and carefully defined situations. Wisconsin also

implemented a controlled season harvest. The Final Rule allowed Wisconsin to manage its wolf population in a manner that reduced losses from depredation, or wolf attacks on domestic animals, while also ensuring the wolf species was not placed at risk.

On December 19, 2014, the district court vacated the Final Rule. This had the effect of relisting the gray wolves in the Western Great Lakes DPS, and management of Wisconsin's wolf population shifted back to the federal government. Wisconsin was no longer able to use lethal control to protect citizens' livestock from wolf attacks, and Wisconsin taxpayers once again assumed a greater financial burden in compensating people for depredation losses.

While the harm to states like Wisconsin is real, this appeal, at its core, is about the true purpose of the ESA, and whether FWS's actions were consistent with the ESA's text and purpose. This case is also about the role of the district court, and the proper scope of review under the deferential standards stated in *Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837 (1984), and the Administrative Procedure Act (APA), 5 U.S.C. § 551, et seq. Based on those standards, the Final

Rule should be upheld in its entirety, and the district court's decision should be reversed.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction over this action, 28 U.S.C. § 1331, which the plaintiffs brought under the citizen-suit provision of the Endangered Species Act (ESA), 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. §§ 702, 704. In a final order dated December 19, 2014, the district court granted summary judgment for the plaintiffs. The Federal Appellants filed a timely notice of appeal on February 13, 2015. Fed. R. App. P. 4(a)(1)(B). The Wisconsin Appellants timely filed their notice of appeal on February 26, 2015, within the 14-day window allowed under Fed. R. App. P. 4(a)(3). Two other notices of appeal were timely filed by various intervenor-defendants. Fed. R. App. P. 4(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

(1)   Given the highly deferential standards of review under the APA and *Chevron* did the district court err in holding that the Final Rule, based on FWS's interpretation of the ESA, was not a proper exercise of FWS authority?

(2)    Did the district court err in holding that FWS's decision to delist the Western Great Lakes DPS was insufficiently explained and contrary evidence before the agency?

(3)    In light of the forgoing, was vacating the Final Rule proper?

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and regulations were produced in an addendum to the Federal Appellants' brief, filed November 6, 2015, and in an addendum to the brief for State of Michigan and the Michigan Department of Natural Resources, filed November 23, 2015.

## STATEMENT OF THE CASE

Wisconsin is in agreement with the Federal Appellants regarding the factual background, procedural history, and legal standards that direct this case. (Fed. Appellant's Br. 5-32); Fed. R. App. P. 28(i).

## SUMMARY OF ARGUMENT

The Final Rule fully complies with the ESA. The ESA unambiguously permits FWS to delist recovered populations of the gray wolf. But even assuming the ESA is ambiguous on this point, FWS's interpretation is reasonable and entitled to *Chevron* deference. Moreover, FWS's conclusion that the Western Great Lakes DPS is not

endangered or threatened was amply supported by the record. FWS's findings were thoroughly explained in the Final Rule, and demonstrate a rational connection between the record evidence and FWS's decision to remove ESA protections from the Western Great Lakes DPS. The district court erred in substituting its own interpretation of the evidence for FWS's interpretation.

In light of the district court's errors, vacating the Final Rule is improper. The Final Rule was a valid exercise of FWS authority and was supported by the evidence in the record; therefore, it should be upheld in its entirety. But at most, any deficiency in the Final Rule amounts to a need for further explanation. The disruptive consequences of vacatur and the harm to states like Wisconsin, which were responsibly managing their wolf populations, weigh heavily against vacating the Final Rule.

## ARGUMENT

### I.    Standard of review.

The APA governs this Court's review of the Final Rule. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008). This Court reviews the administrative action directly, according no

particular deference to the district court's judgment. *In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 8 (D.C. Cir. 2013).

The standard of review under the APA "is a highly deferential one. It presumes agency action to be valid." *Ethyl Corp. v. Envtl. Prot. Agency*, 541 F.2d 1, 34 (D.C. Cir. 1976). Thus, the Final Rule may be set aside only if FWS's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review is narrow, and the reviewing court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When an agency has acted in an area in which it has special expertise, the court must be particularly deferential to its determinations. *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988). A reviewing court is to look only for a rational connection between the facts found and the choice made. *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 249 (D.C. Cir. 2013). This standard "mandates judicial affirmance if a rational basis for the agency's decision is presented, even

though [a court] might otherwise disagree." *Envt'l Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted).

The two-step process set out in *Chevron* applies to claims that an agency has acted in excess of its statutory authority. *See Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). At the first step of the *Chevron* inquiry, a court must "ask whether Congress has 'directly addressed the precise question at issue.'" *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011) (quotation omitted). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. Fed. Commc'n Comm'n,* 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842-43).

If the statute is silent or ambiguous with respect to the specific issue, the analysis shifts to *Chevron* step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843). "Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency." *Id.*

## II.  The ESA authorizes FWS to identify and delist the Western Great Lakes DPS.

Wisconsin agrees with the Federal Appellants that FWS had statutory authority to delist the Western Great Lakes DPS. The reasoning need not be repeated here. (Fed. Appellants' Br. 39-65.) The ESA unambiguously permits FWS to delist recovered wolf populations like the Western Great Lakes DPS.[1] (*Id.* at 39-42.) But even if the ESA was ambiguous on that point, FWS's interpretation that it may identify and delist a distinct population segment was reasonable. (*Id.* at 42-59.) This interpretation of the ESA was explained in the Final Rule as well as a memorandum opinion of the Solicitor for the Department of the Interior. (*Id.* at 37-38; AR491-509.) Because FWS's interpretation is consistent with the ESA's text, legislative history, and policy objectives, it is entitled to *Chevron* deference.

---

[1]FWS ultimately determined, based on its expert assessment of all available scientific information on wolf taxonomy, that the wolf population in the Western Great Lakes DPS consists of gray wolves. (76FR81688.) Contrary to the district court's assertion, this determination was not "fatal" to the Final Rule. (Op. 89.) FWS may revise the 1978 listing of this gray wolf population to reflect its territorial expansion and its recovered status, and to bring that 1978 listing into compliance with the subsequently-promulgated statutory language and DPS policy. (Fed. Appellants' Br. 59-65.)

The job of the courts is not to engage in public policymaking "by prescribing the meaning of ambiguous statutory commands." *City of Arlington*, 133 S. Ct. at 1873. Rather, questions, about how best to construe an ambiguous term in light of competing policy interests belong to the agencies that administer the statutes. *Id*. The district court erred by substituting its own interpretation of the ESA for FWS's reasonable interpretation.

## III. The record supports FWS's conclusion that the Western Great Lakes DPS is neither threatened nor endangered.

After a thorough analysis of the evidence and the criteria required by the ESA, FWS concluded that the Western Great Lakes wolf population is no longer endangered or threatened throughout all or a significant portion of its range. (76FR81688-723); *see also* 16 U.S.C. §§ 1532(6), (20), 1533(a)(1). FWS's conclusion was supported by FWS experts, state biologists, and peer reviewers. (76FR81681, 81688-723; AR11652-54; AR11709-13; AR12769-71.)

Yet, without citing any record evidence to the contrary, the district court overturned FWS's expert findings and conclusions. The district court held that FWS's conclusion was arbitrary and capricious because FWS "neglect[ed] to explain why the portion of the historical range no

longer occupied by the gray wolf in the western Great Lakes DPS is no longer a significant portion of the species' range." (Op. 100.) The district court also held that the record does not support, or FWS failed to explain, its conclusions that these wolves are no longer threatened in light of disease, human-caused mortality, or inadequate regulatory mechanisms. (*Id.* at 100-07.) These holdings were in error.

### A. The statutory phrase "significant portion of its range" means the wolves' current range.

When deciding whether to delist a species, FWS must determine whether the species "is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), or whether it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). In the Final Rule, FWS analyzed all territory in the Western Great Lakes DPS and reasonably concluded that the gray wolf population is not endangered or threatened throughout all or a significant portion of its range. (76FR81689-93, 81722-23; Fed. Appellants' Br. 65-74.)

Contrary to the district court's assertion, the phrase "significant portion of its range" means the wolves' current range, not their

historical range. (Fed. Appellants' Br. 67-74.) Nothing in the ESA's text indicates that "significant portion of its range" includes the wolves' historical range. (*Id.* at 69-71); *see also* 16 U.S.C. § 1532(6), (20). The relevant statutes are written in present tense, and as the Federal Appellants point out, "to say a species 'is in danger' in an area where it no longer exists . . . is inconsistent with common usage." (*Id.* at 69.) "Significant portion of its range" unambiguously means the wolves' current range.

Even assuming the phrase is ambiguous, FWS set forth a reasonable interpretation in the Final Rule. (76FR81722.) FWS likewise set forth its interpretation in a legally binding opinion. (Fed. Appellants' Add. 31; Fed. Appellants' Br. 69-70.) FWS's construction of the statute is entitled to *Chevron* deference. Based on its reasonable interpretation of the statute, FWS properly found that the Western Great Lakes DPS is not endangered or threatened in all or a significant portion of its range. (Fed. Appellants' Br. 73-74.) The agency need not further explain why lost historical territory is not a significant portion of the Great Lakes wolves' range.

While the district court suggests that "significant portion of its range" should include the wolves' historical range, such a reading is inconsistent with the ESA's purpose. It would mean that Western Great Lakes wolves would need to recover in Chicago, Milwaukee, Green Bay, and other urban areas where they were historically present before they could be delisted. This creates an impossible standard, and is in direct conflict with the ESA's core purpose to list animal populations only if the existence of the species is endangered or threatened by the listed factors. 16 U.S.C § 1531(b) (purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such endangered species and threatened species"). The ESA's purpose is not to protect individual wolves or restore wolves to areas where they lived hundreds of years ago—it is to prevent species from becoming extinct.

Regardless, a reviewing court may not "mak[e] public policy" by substituting its reading of the ESA if FWS's interpretation is reasonable. *City of Arlington*, 133 S. Ct. at 1873. Rather, the "archetypal *Chevron* questions, about how best to construe an

ambiguous term in light of competing policy interests" belong to the "agencies that administer the statutes." *Id.* The agency's interpretation of "significant portion of its range" is a permissible construction of the statute. Therefore, it must be given controlling weight. *Id.* at 1878.

## B. FWS adequately explained its findings regarding disease, human-caused mortality, and state regulatory mechanisms.

Decisions to delist a species are based on the five criteria set forth in Section 4(a) of the ESA, 16 U.S.C. § 1533(a). That section directs FWS to

> determine whether any species is an endangered species or a threatened species because of any of the following factors:
>
> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). The Final Rule analyzes these factors in detail to explain why the Western Great Lakes wolves are not

endangered or threatened in all or a significant portion of their range. (76FR81688-723; Fed. Appellants' Br. 74-84.) Yet the district court held that the record does not support, or FWS failed to explain, FWS's conclusions that these wolves are no longer threatened in light of disease, human-caused mortality, or inadequate regulatory mechanisms. (Op.100-07.) The district court is incorrect.

1. **FWS adequately explained why disease and human-caused mortality do not threaten the Western Great Lakes DPS.**

The Final Rule contains a thorough analysis of disease and predation threats to wolves, as well as a detailed discussion of human-caused wolf mortality. (76FR81694-701; Fed. Appellants' Br. 74-78.) Based on this analysis, FWS reasonably concluded that neither disease nor human-caused mortality renders the Western Great Lakes DPS an endangered or threatened species. *Id*. Among other things, the agency noted that Wisconsin, Minnesota, and Michigan all had disease-monitoring components to their wolf management plans, (76FR81698), and had all committed to regulate human-caused mortality to keep the wolf population well above federal recovery goals. (76FR81700.)

The district court rejected these conclusions because FWS allegedly failed to address how the factors of disease and human-caused mortality could "interact with each other." (Op. 102.) Wisconsin agrees with and adopts the Federal Appellants' response to this assertion. (Fed. Appellants' Br. 74-78.)

The district court also found the agency's conclusions arbitrary due to FWS improperly "minimizing concern" of human-caused mortality in light of state management plans. (Op.102-03.) This holding was based on flawed logic regarding the adequacy of state regulatory mechanisms, as explained below.

### 2. FWS sufficiently explained why the Western Great Lakes state regulatory mechanisms were adequate.

As the district court acknowledged, FWS thoroughly analyzed the wolf management plans of Minnesota (76FR81701-05), Wisconsin[2] (76FR81705-10), and Michigan (76FR81710-13), the three states containing the wolf packs of the Western Great Lakes DPS. (Op. 103.)

---

[2]The district court did not dispute the Final Rule's conclusion that Wisconsin's regulatory mechanisms adequately protect the gray wolf. (Op. 103.) FWS's conclusions about Wisconsin's regulatory mechanisms were correct and thoroughly explained, and are therefore entitled to deference. (76FR81705-10; AR00153-286; *see also* Wis. Mem. in Opp'n to Pl's Mot. for Summ. J. and Corrected Wis. Mem. in Opp'n to Pl's Mot. for Summ. J., Dist. Ct. Dkts. 29 and Attachs. 1-6; 35.)

The only deficiency the court identified was in Minnesota's Wolf Management Plan, which allegedly allowed "virtually unregulated killing" of wolves in Zone B, the south-southwest portion of the state containing the Twin Cities metropolitan area. (Op.105-07; 76FR81702.)

Wisconsin agrees with the Federal Appellants regarding the adequacy of Minnesota's Wolf Management Plan. (Fed. Appellants' Br. 80-84.) In addition, the district court improperly compared the Minnesota wolf management program to Wyoming's wolf management program. (Op. 105 (citing *Defs. of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014)).) In *Defs. of Wildlife*, the court noted that parts of Wyoming allow for unregulated wolf harvest. 68 F. Supp. 3d at 217. In contrast, as FWS observed in the Final Rule, Minnesota allowed landowners in Zone B to shoot wolves if citizens needed to protect their livestock, pets, or other domestic animals on their land. (76FR81704.) Thus, even setting aside the point that wolves need not be reestablished in Minnesota's Zone B because Zone B "is not suitable for wolves," (76FR81704), Zone B does not permit unlimited killing.

The Final Rule also discussed the regulatory mechanisms in the six peripheral states of the Western Great Lakes DPS, in which wolves

sometimes roam but do not live or breed. (Fed. Appellants' Br. 79.)
While wolf protections in these states are less comprehensive than the
three Great Lakes states containing the core wolf population, FWS
reasonably concluded that it would not harm the Western Great Lakes
wolf population as a whole. (*Id.* at 78-84.) The district court disagreed,
asserting that the "virtual absence of any regulations to protect the
species in the other six states . . . renders the agency's finding on this
factor contrary to the evidence in the record." (Op. 103.)

The district court's holding is in error. (Fed. Appellants' Br. 78-84.)
As explained in the Final Rule, the peripheral states do not have
established wolf populations and are unlikely to develop them in the
future:

> [W]olves currently occupy the vast majority of the suitable
> habitat in the WGL DPS, and that habitat is adequately
> protected for the foreseeable future. Unoccupied areas that
> have the characteristics of suitable habitat exist in small
> and fragmented parcels are not likely to develop viable wolf
> populations. Threats to those habitat areas will not
> adversely impact the recovered wolf metapopulation in the
> DPS.

(76FR81692; *see also* 76FR81688-92.) Based on its scientific expertise
and examination of the evidence, FWS found it highly unlikely that the
peripheral states will develop viable wolf populations. It is therefore

unsurprising that these states do not currently have robust wolf management programs. It was reasonable for FWS to conclude that the regulatory schemes in the peripheral states will not adversely impact the wolf population in the Western Great Lakes DPS.

The agency, not the court, is best equipped to draw conclusions regarding the evidence set forth in the administrative record. Based on the evidence and its agency expertise, FWS set forth thorough findings and reasonable conclusions that the Western Great Lakes wolf population is no longer endangered or threatened. The evidence supports the agency's conclusions, and therefore, they must be affirmed.

## IV. Vacatur is not the appropriate remedy.

The Final Rule should be upheld in its entirety because it was a valid exercise of FWS authority and was supported by the evidence in the record. Alternatively, even assuming the Final Rule cannot be upheld in its current form, the disruptive consequences of vacatur and the harm to states like Wisconsin, which were responsibly managing their wolf populations, weigh heavily against vacating the Final Rule.

When a court finds that an agency action is flawed, the APA normally requires a court to "hold unlawful and set aside [the] agency

action, findings, and conclusions." 5 U.S.C. § 706(2). However, this Court allows remedies short of complete vacatur under certain circumstances. *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). The decision to vacate depends on two factors: (1) the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and (2) the likely "disruptive consequences" of vacatur. *Id.* at 150–51; *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).

The district court held that vacatur was the proper remedy because the Final Rule fell outside FWS's statutory authority under the ESA, and the disruptive consequences of repeated shifts between State and Federal management did not outweigh the Final Rule's "serious substantive errors." (Op. 109-10.) The district court is wrong.

## A. Assuming the Final Rule's deficiencies amounted at most to an insufficiency of explanation, remand is the proper remedy.

The district court's finding that the first factor favored vacatur was based on its incorrect conclusion that FWS lacked statutory authority to issue the Final Rule. Given the errors on which its assessment of the

first factor was based, this was not a proper basis to vacate the Final Rule. *See* Sec. II, *supra*.

Aside from its holding that the Final Rule was not a valid exercise of FWS authority, the other deficiencies found by the district court amounted to an insufficiency in explanation, which led the court in some instances to find FWS's conclusions arbitrary and capricious under the APA. (*See* Op. 93 (stating FWS failed to adequately explain four bases for its conclusion that the Great Lakes wolves are no longer endangered or threatened); *see also id.* at 93-107.) If this Court finds that only further explanation is needed, then remand, not vacatur, is the proper remedy.[3] *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied-Signal* counsels remand without vacatur."). No one disputes that the

---

[3]The defendants and intervenor-defendants asked the district court to allow bifurcated briefing so the parties could address the remedy based on the nature of the error found by the court, should any error be found. (Fed. Defs.' Position in Favor of Bifurcated Briefing, Dist. Ct. Dkt. 46; *see also* Dist. Ct. Dkts. 48-50.) As the federal defendants explained, the scope of the remand depends on nature of the error. (Dist. Ct. Dkt. 46:3-5.) The district court did not allow bifurcated briefing on the remedy issue. (Op. 110.)

Western Great Lakes wolves have recovered well above federal recovery goals. (76FR81675; Fed. Appellants' Br. 14-15.) FWS will undoubtedly be able to justify its actions on remand. (Fed. Appellants' Br. 65-84.)

## B. The disruptive consequences weigh heavily against vacatur.

The district court did not give appropriate weight to the second *Allied-Signal* factor, the disruptive consequences of vacatur. Vacating the Final Rule resulted in unwarranted disruptions to states like Wisconsin, who were responsibly managing their wolf populations both before and after the Final Rule was issued.

### 1. The lethal control and wolf harvest aspects of Wisconsin's wolf management program did not harm Wisconsin's wolf population.

Wisconsin's wolf management program has always balanced the need to protect domestic animals from wolf predation against the need to ensure the wolf population remains above state and federal recovery goals. (76FR81705-10.) This did not change after the Final Rule went into effect.

When Wisconsin wolves were removed from the endangered and threatened species list, Wisconsin allowed for lethal control in limited situations, such as in response to

livestock mortalities. (76FR81708); *see also* Wisconsin DNR Wolf Monitoring Report 15 April Through 14 April 2015, at 4-5, *available at* http://dnr.wi.gov/topic/Wildlifehabitat/wolf/documents/PostDelistMonitor2015.pdf (last visited November 23, 2015).[4] Landowners could receive permits from Wisconsin DNR to lethally remove wolves from their property only under specific conditions, such as past attacks on livestock. *Id*. Landowners could lethally remove wolves without a permit if the wolf was in the act of attacking domestic animals on their property. *Id*. These conditions ensured that lethal control was used only when necessary to protect domestic animals.

Use of lethal control helped Wisconsin reduce citizen losses from wolf depredation. After the wolves were delisted, the number of Wisconsin wolf complaints verified by the U.S. Department of Agriculture's Animal and Plant Health Inspection Unit and the number of farms with verified losses decreased. (Aff. of Bradley M. Koele in Support of Wis. Mem. in Opp'n to Pl.'s Mot. for Summ. J., Dist. Ct. Dkt. 29-2, ¶ 8.) In 2012, Wisconsin DNR paid $214,794 to Wisconsin citizens for wolf

---

[4]Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies. *See Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (collecting cases).

depredations that occurred when lethal control was not an option. (Dist. Ct. Dkt. 29-2, ¶ 7.) In 2013, Wisconsin DNR paid $139,174.31 for wolf-related damages when lethal control was an option—a significant decrease that was credited to the use of lethal control. (Dist. Ct. Dkt. 29-2, ¶ 7.)

After the Final Rule went into effect, Wisconsin also implemented a controlled season harvest. (Aff. of David M. Macfarland in Support of Wis. Mem. in Opp'n to Pl.'s Mot. for Summ. J., Dist. Ct. Dkt. 29-4, ¶ 6); *see also* Wisconsin DNR website page on Wolf Hunting and Trapping, *available at* http://dnr.wi.gov/topic/hunt/wolf.html (last visited November 23, 2015). The controlled harvest was carefully tailored to ensure the wolf population would be kept at an optimum level for species survival. Quotas were set for each of six geographical harvest zones. *Id.* Wisconsin DNR consulted with the Van Deelen lab at the University of Wisconsin Department of Forest and Wildlife Ecology to assess the likely impacts of harvest on the wolf population. (Dist. Ct. Dkt. 29-4, ¶ 10.) Through population modeling, Wisconsin DNR worked to ensure that each season's quota did not place the species at risk. (Dist. Ct. Dkt. 29-4, ¶ 10.) Wisconsin DNR can mitigate undesirable

future mortality through regulatory changes and quota adjustments. (Dist. Ct. Dkt. 29-4, ¶ 10.)

Implementation of the lethal aspects of Wisconsin's wolf management program did not cause the wolf population to significantly decrease. Wisconsin's 1999 Wolf Management Plan identified a sustainable population objective of 350 wolves. (Dist. Ct. Dkt. 29-4, ¶ 5.) In April 2012, Wisconsin DNR estimated Wisconsin's wolf population was between 815 and 880 wolves. (Dist. Ct. Dkt. 29-4, ¶ 4.) In April 2013, after the first harvest was implemented, Wisconsin DNR estimated the wolf population to be between 809 and 834. (Dist. Ct. Dkt. 29-4, ¶ 8.) Thus, season harvest and depredation control did not substantially impact the wolf population. It experienced a decrease of only 0.74% from 2012-2013. (Dist. Ct. Dkt. 29-4, ¶ 8.)

### 2. Vacating the Final Rule resulted in regulatory disruption and harm to the state of Wisconsin.

As a result of the Final Rule being vacated, management responsibility for the western Great Lakes DPS shifted to the federal government. When the wolves were relisted, Wisconsin was once again restricted to non-lethal conflict mitigation tools when wolves attack citizens' domestic animals. Wisconsin DNR Wolf Monitoring

Report 15 April Through 14 April 2015, at 5, *available at* http://dnr.wi.gov/topic/Wildlifehabitat/wolf/documents/PostDelistMonito r2015.pdf (last visited November 23, 2015). Landowners are no longer allowed to take action against wolves if they catch wolves in the act of preying on their livestock or pets. Wisconsin citizens are understandably concerned that they will see an increase in domestic animal fatalities and depredation costs in the future.[5] *See generally* Wisconsin DNR Gray wolf depredation reports and maps, http://dnr.wi.gov/topic/wildlifehabitat/wolf/maps.html (last visited November 23, 2015).

The Final Rule should be upheld in its entirety because it was a proper exercise of FWS authority and supported by the evidence in the record. But even if certain deficiencies need to be corrected, the State of Wisconsin should not be penalized when its wolf population is thriving,

---

[5] *See, e.g.*, http://www.channel3000.com/news/Calf-killed-in-first-wolf-attack-of-year-in-Columbia-County/33366900 (last visited November 23, 2015); http://www.wjfw.com/email_story.html?SKU=20150930184737 (last visited November 23, 2015); http://www.waow.com/story/30068044/2015/09/18/farmers-dogs-killed-by-wolves-in-northern-wisconsin (last visited November 23, 2015); http://www.outdoornews.com/October-2015/With-wolf-attacks-officials-hands-tied/ (last visited November 23, 2015).

thanks to its responsible implementation of its wolf management program. The Final Rule should not be vacated.

## CONCLUSION

For these reasons, the Wisconsin Appellants respectfully request that the judgment of the district court be reversed.

Dated this 23rd day of November, 2015.

Respectfully submitted,

BRAD D. SCHIMEL
Attorney General

s/Jennifer L. Vandermeuse
JENNIFER L. VANDERMEUSE
Assistant Attorney General
State Bar #1070979

DANIEL P. LENNINGTON
Assistant Attorney General
State Bar #1088694

THOMAS J. DAWSON
Assistant Attorney General
State Bar #1016134

Attorneys for the Wisconsin Appellants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7741
(608) 267-2223 (Fax)
*vandermeusejl@doj.state.wi.us*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLANT PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5), (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitations of this Court's order of July 29, 2015, which authorized the Wisconsin State Appellants to file a brief not to exceed 7,000 words. The foregoing brief contains 4,922 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

Dated this 23rd day of November, 2015.


s/Jennifer L. Vandermeuse
JENNIFER L. VANDERMEUSE
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on November 23, 2015, I electronically filed the foregoing Opening Brief for the State of Wisconsin and Wisconsin Department of Natural Resources with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 23rd day of November, 2015.


s/Jennifer L. Vandermeuse
JENNIFER L. VANDERMEUSE
Assistant Attorney General