**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 15-5041
(Consolidated with 15-5043, 15-5060, and 15-5061)

───────────────────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
───────────────────────────────

HUMANE SOCIETY OF THE UNITED STATES, *et al.,*
Plaintiffs-Appellees,

v.

S.M.R. JEWELL, *et al.,*
Appellants-Defendants
───────────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
───────────────────────────────

BRIEF FOR APPELLANTS-DEFENDANT-INTERVENORS
HUNTER CONSERVATION COALITION
───────────────────────────────

Hunter Conservation Coalition Appellants-Defendant-Intervenors

James H. Lister (D.C. Bar # 447878)
Melinda L. Meade Meyers (D.C. Bar #1022572)
Birch Horton Bittner and Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
jlister@dc.bhb.com
mmeademeyers@dc.bhb.com
*Attorneys for Appellants-Defendant-Intervenors: Sportsmen's Alliance; Wisconsin Bear Hunters Association; Michigan United Conservation Clubs; Wisconsin Bowhunters Association; Upper Peninsula Bear Houndsmen Association; Michigan Hunting Dog Federation; and Rocky Mountain Elk Foundation*

Anna M. Seidman (D.C. Bar # 417091)
Douglas S. Burdin (D.C. Bar # 434107)
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Attorneys for Appellant-Defendant-Intervenor Safari Club International*

Michael T. Jean (MI Bar No. P76010)
National Rifle Association of America/ILA
11250 Waples Mill Road., 5N
Fairfax, VA 22030
Telephone: (703) 267-1158
Facsimile: (703) 267-1164
mjean@nrahq.org
*Counsel for Appellant-Defendant-Intervenor National Rifle Association of America*

John I. Kittel
U.S.C.A. for D.C. Cir. Bar No. 55798
Mazur & Kittel, PLLC
30665 Northwestern Hwy. Suite. 175
Farmington Hills, MI 48334
Telephone: (248) 432-8000
Facsimile: (248) 432-8010
jkittel@mazur-kittel.com
*Co-Counsel for Appellants-Defendant-Intervenors Michigan Conservation Clubs and Rocky Mountain Elk Foundation*

Dated: December 8, 2015

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellants-Defendant-Intervenors Sportsmen's Alliance, Safari Club International, the National Rifle Association of America, the Wisconsin Bear Hunters Association, the Michigan United Conservation Clubs, the Wisconsin Bowhunters Association, the Upper Peninsula Bear Houndsmen Association, the Michigan Hunting Dog Federation, and the Rocky Mountain Elk Foundation (collectively, "Hunter Conservation Coalition" or "HCC")[1] certify as follows:

A.     <u>Parties and Amici.</u>  All parties, intervenors, and amici appearing before the district court and in this court are listed in the Federal Appellants' Opening Brief dated November 6, 2015.

B.     <u>Rulings Under Review.</u>  References to the rulings at issue appear in the Federal Appellants' Opening Brief dated November 6, 2015.

C.     <u>Related Cases.</u>  The Federal Appellants Opening Brief dated November 6, 2015 accurately explains the extent to which there is a related case.

---

[1] "Hunter Conservation Coalition" is a collective term for the private party appellants-defendant-intervenors who each joined in the Unopposed Motion to Intervene (ECF Doc. 11) granted by the district court in a Minute Order dated May 7, 2013 (ECF Doc. 14).  *See* Unopposed Motion to Intervene at 1 (listing the appellants-defendant-intervenors by name).

**CORPORATE DISCLOSURE STATEMENT OF APPELLANTS-DEFENDANT-INTERVENORS COMPOSING HUNTER CONSERVATION COALITION**

Appellants-Defendant-Intervenors HCC submit the following Corporate Disclosure Statement in accordance with Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Local Rule 26.1:

All of the above organizations are nonprofit advocacy organizations that support and promote hunting, sustainable use, conservation, and wildlife management. Collectively and individually, they work on a variety of hunting conservation issues, including but not limited to those related to their members' ability to hunt wolves (and some, where authorized by state law, with the use of hunting dogs), to participate in sustainable wolf management and conservation, and to use and enjoy other species that are natural prey of wolves.

None of the HCC member organizations have any parent corporations, and no publicly owned corporation owns a ten percent or greater ownership interest in any of the HCC member organizations.


Dated: December 8, 2015

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES .......................................................................................i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY ....................................................................................... vii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES PRESENTED ...........................................1

STATUTES AND REGULATIONS .....................................................1

STATEMENT OF THE CASE .............................................................1

STANDARD OF REVIEW ...................................................................2

SUMMARY OF ARGUMENT .............................................................2

ARGUMENT ........................................................................................5

    I.    Barring Use of a DPS to Delist Any Portion of an ESA-Listed
           Species Will Have Dire Consequences for FWS's Obligations
           under the ESA and Its Practical Wildlife Management. ...........................5

           A. The inability to designate and delist a DPS that is part
              of an ESA-listed species makes it impossible for FWS to
              fulfill its ESA delisting mandate to remove qualified species
              from federal protection in accordance with the best available
              science. .............................................................................................6

B. The district court's prohibition against using DPSs for delisting will impose burdensome obligations on an already overburdened agency and encourage FWS to contradict congressional intent..........................................................7

C. Barring FWS from adjusting conservation statuses by DPS hinders practical resource management tailored to unique regional circumstances. ....................................................15

    1. *Gray Whales* ...............................................15
    2. *Columbian White-Tailed Deer* ...................................15
    3. *Humpback Whales* .....................................16
    4. *Green Sea Turtles* .......................................17
    5. *Grizzly Bears* ...........................................18

D. Barring FWS's ability to designate and delist DPSs within a species listed prior to the addition of the DPS tool renders a nonsensical interpretation of the law. ............................................19

E. Failing to delist recovered DPSs punishes states and communities that practice good wildlife management and hinders state and private cooperation in administering the ESA...20

II. The District Court Decision Severely Diminishes a Citizen's and/or State's Statutory Right Under the ESA to Petition FWS to Consider a DPS's Conservation Status. .............................................22

III. FWS Can Recognize a DPS Without Also Finding that the DPS is Endangered or Threatened. ....................................24

IV. If Any Insufficiencies Exist in FWS's Rationale for Delisting the WGL Wolf Species/DPS, Remand Without Vacatur Is the Most Appropriate Remedy. ..............................................32

CONCLUSION ..........................................................34

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) ......................................36

CERTIFICATE OF SERVICE .............................................37

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Wildlands v. Kempthorne*
    530 F.3d 991 (D.C. Cir. 2008) ........................................................31

*Animal Legal Def. Fund v. U.S. Dep't of Agric*.
    789 F.3d 1206 (11th Cir. 2015) .......................................................24

*Chevron U.S.A. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984)......................................................6, 24, 25

*Greater Yellowstone Coal. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011) .........................................................18

*Greater Yellowstone Coal. v. Servheen,*
    672 F. Supp. 2d 1105 (D. Mont. 2009)............................................18

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ......................................................20


## STATUTES
Pub. L. No. 95-632, 92 Stat. 3751 (1978)............................................19

Administrative Procedure Act ("APA")
    5 U.S.C. §553(e) ...........................................................................23

Endangered Species Act ("ESA")
    16 U.S.C. §1531...............................................................................2
    16 U.S.C. §1532(16)..............................................................2, 6, 26
    16 U.S.C. §1533(a)(1)...................................................5, 6, 17, 22
    16 U.S.C. §1533(b)(1) .....................................................................5
    16 U.S.C. §1533(b)(1)(A)......................................................6, 7, 23
    16 U.S.C. §1533(b)(3)(A)..............................................4, 5, 22, 23
    16 U.S.C. §1533(b)(3)(B)(iii)........................................................30
    16 U.S.C. §1533(f)(1)(B)(ii)...........................................................2
    16 U.S.C. §1535..............................................................................22

**REGULATIONS**

50 C.F.R. §17.11(g) ...................................................................31

43 Fed. Reg. 9,607 (Mar. 9, 1978)...........................................19
59 Fed. Reg. 31,094 (June 16, 1994) ........................................15
61 Fed. Reg. 4,722 (Feb. 7, 1996) ............................................25
68 Fed. Reg. 43,647 (July 24, 2003) .........................................16
72 Fed. Reg. 14,866 (Mar. 29, 2007)........................................18
77 Fed. Reg. 55,530 (Sept. 10, 2012) .......................................33
79 Fed. Reg. 72,450 (Dec. 5, 2014) ..........................................30
80 Fed. Reg. 15,272 (Mar. 23, 2015).........................................17
80 Fed. Reg. 22,304 (Apr. 21, 2015) ....................................16, 23
80 Fed. Reg. 60,850 (Oct. 8, 2015)............................................16

**LEGISLATIVE HISTORY**

S. Rep. No. 96-151, (1979) .........................................................9

# GLOSSARY

AR ............................................................................. Administrative Record

CWTD ................................................................. Columbian White-Tailed Deer

DPS ............................................................... Distinct Population Segment

ESA ...................................................................... Endangered Species Act

FWS.......................................................... U.S. Fish and Wildlife Service

HCC ........................................................ Hunter Conservation Coalition

NMFS................................................. National Marine Fisheries Service

WGL......................................................................... Western Great Lakes

## JURISDICTIONAL STATEMENT

HCC agrees with the jurisdictional statement in the Federal Appellants'

Opening Brief dated November 6, 2015.

## STATEMENT OF ISSUES PRESENTED

HCC agrees with the statement of issues presented in the Federal

Appellants' Opening Brief dated November 6, 2015.

## STATUTES AND REGULATIONS

All applicable statutes, etc., not contained in the Addendum to the Federal

Appellants' Opening Brief dated November 6, 2015, and in the Statutes and

Regulations filed with the Opening Brief for Appellants State of Michigan, *et al*.

dated November 23, 2015, are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

HCC agrees with the thorough statement of the case in the Federal

Appellants' Opening Brief dated November 6, 2015.

# STANDARD OF REVIEW

HCC agrees that the standard of review in the Federal Appellants' Opening Brief dated November 6, 2015 is correct and applies to each issue presented.

# SUMMARY OF ARGUMENT

The purpose of the Endangered Species Act ("ESA"), 16 U.S.C. §1531 *et seq.*, is to recover species to the point where they are no longer in danger of extinction and where ESA protections are no longer needed. Once a species, subspecies, or distinct population segment ("DPS") – all of which qualify as "species" under the ESA, 16 U.S.C. §1532(16) – has been restored to the levels in its recovery goals identified by the U.S. Fish and Wildlife Service ("FWS"), the ESA requires FWS to remove that species, subspecies, or DPS from the list of endangered species. *See* 16 U.S.C. §1533(f)(1)(B)(ii).

The DPS designation is an essential tool for species conservation and recovery. If the district court holding that FWS is barred from utilizing the DPS designation to delist healthy, recovered populations is upheld, it will have broad-reaching practical consequences far beyond the Western Great Lakes ("WGL") gray wolves population – it could detrimentally affect wildlife management for virtually all species managed by the federal government under the purview of the ESA.

Federal Appellants did an exemplary job addressing how the district court committed both legal and factual errors in reaching its decision. In particular, Federal Appellants' brief thoroughly discusses how the district court erred in rejecting FWS's authority to utilize the ESA's DPS tool and in evaluating the appropriateness of FWS's actions in light of the record before it. In the arguments below, Appellants-Defendant-Intervenors Hunter Conservation Coalition ("HCC")[2] will focus on the detrimental implications for wildlife management that will result from the district court's erroneous holding. Through several real and hypothetical examples, this brief demonstrates the potential limitations on future FWS efforts to delist and even to list species and DPSs (*e.g.*, the listings of gray whales, Columbian white-tailed deer, humpback whales, green sea turtles, and grizzly bears).

Specifically, this brief will highlight the following: (1) the detrimental impact that the district court's ESA interpretation will have on FWS's ability to comply with statutory obligations to remove species from federal protections when they no longer qualify as endangered or threatened; (2) the onerous, senseless

_____

[2] "HCC" is a collective term for the private party appellants-defendant-intervenors who joined in the Unopposed Motion to Intervene (ECF Doc. 11) granted by the district court on May 7, 2013 (ECF Doc. 14). Coalition members are the Sportsmen's Alliance, Safari Club International, National Rifle Association of America, Wisconsin Bear Hunters Association, Michigan United Conservation Clubs, Wisconsin Bowhunters Association, Upper Peninsula Bear Houndsmen Association, Michigan Hunting Dog Federation, and Rocky Mountain Elk Foundation.

workload the district court's holding would impose on FWS for initially listing species under the ESA while protecting its ability to respond to future population recovery, and the contradictions such approach would have with congressional intent; (3) the limitations the district court's interpretation would impose on FWS's ongoing and successful use of DPSs to address regional disparities in species conservation and recovery; (4) the violation of statutory interpretation principles triggered by the district court's nonsensical interpretation of FWS's DPS designation authority; and (5) the disincentives that the district court's interpretation poses for state and private involvement in species conservation.

This brief will also address the severe diminution of the ESA citizen's petition rights at 16 U.S.C. §1533(b)(3)(A) that will occur if petitioners are foreclosed from using the statutory petition process to address FWS listing decisions that no longer reflect the best available science. In addition, this brief offers arguments that demonstrate that a DPS exists whether or not FWS decides to "designate" it, and that FWS has authority to designate a DPS without also making a separate determination that the members of the DPS qualify as threatened or endangered.

# ARGUMENT

## I. Barring Use of a DPS to Delist Any Portion of an ESA-Listed Species Will Have Dire Consequences for FWS's Obligations under the ESA and Its Practical Wildlife Management.

The starting point in the Court's analysis must be the ESA's definition of the term "species," which allows FWS to define a "species" in three ways: (1) a "species," *i.e.*, a full biological species; (2) a "subspecies," *i.e.*, a biological subspecies; or (3) a "distinct population segment," which is a separate population of a vertebrate species:

> The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

16 U.S.C. §1532(16). Nowhere does the ESA provide that special listing rules apply when the listing unit being utilized by FWS or referenced in a citizen listing/delisting petition is a DPS rather than a full biological species or subspecies. *See* 16 U.S.C. §1533 (the ESA's listing/delisting provision). A citizen may petition for listing or delisting of a "species," and thus may petition for listing or delisting of any of the three available types of species (biological species, biological subspecies, or distinct population segment). *See* 16 U.S.C. §1533(b)(3)(A). FWS may change listings on its own accord as well. 16 U.S.C. §1533(b)(1).

The district court's ruling is inconsistent with this statutory structure because it prohibits any use of the DPS prong of the species definition unless that use is to increase ESA protections (from unprotected to threatened/endangered, or from threatened to endangered). This ruling breaks the parallelism between listing and delisting in accordance with the best available science that 16 U.S.C. §1533 requires.

Because FWS's interpretation and use of the DPS tool is a reasonable interpretation of an ambiguous statute, the agency's judgment is entitled to deference. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). FWS should not be forced to "sacrifice[] regulatory flexibility for protection." Op. 82.

A. **The inability to designate and delist a DPS that is part of an ESA-listed species makes it impossible for FWS to fulfill its ESA delisting mandate to remove qualified species from federal protection in accordance with the best available science.**

Just as FWS has a mandatory responsibility to list species that qualify for threatened or endangered status, the agency bears the obligation to delist species that no longer qualify for protected status. *See* 16 U.S.C. §1533(b)(1)(A). Despite the district court's acknowledgement that the purpose of the DPS tool and the goal of the ESA is to "provide flexibility to the agency in extending federal protection to endangered species *only where necessary… [and that] [s]uch a narrow focus on the threatened or endangered populations presumably better targets federal*

*resources where needed and avoids unnecessary federal preemption of state*

*regulatory authority*," Op. 81 (emphasis added), the opinion erroneously focuses

on the DPS designation's power to *extend* the ESA's protections without

considering the corresponding converse requirement to *remove* species from the

list when science so requires.

The district court's holding prevents FWS from using the DPS classification

tool to fulfill this duty solely because that tool did not exist at the time the species

was listed, or because FWS had no reason to list a biological species at the DPS

level. By handcuffing FWS to its initial determination, the district court's decision

causes absurd management outcomes, such as prohibiting FWS from delisting

recovered (potentially overly abundant) populations that no longer qualify for ESA

protections contrary to FWS's duty to act in accordance with "the best scientific

and commercial data available." 16 U.S.C. §1533(b)(1)(A). The ESA does not

provide discretion to decide whether or not to undertake the listing factor-analysis

only in "appropriate" circumstances, Gov't Br. 40; FWS must delist a DPS if it no

longer meets the requirements for being endangered or threatened.

**B.** **The district court's prohibition against using DPSs for delisting will impose burdensome obligations on an already overburdened agency and encourage FWS to contradict congressional intent.**

The district court's holding forever locks FWS into its initial determination

of classification level, which has serious (sometimes absurd) consequences for

management outcomes. As presented in the Federal Appellants' brief, if FWS decides to make a listing at the species level of taxonomy, it would forever lose the ability to manage smaller subdivisions of the species. Gov't Br. 57. The district court speculates that allowing creation of a DPS for the purpose of delisting would lead FWS to make overly broad initial listings. Op. 81. On the contrary, FWS can only list a species to the extent the facts, science, and listing factors establish that listing is necessary. However, out of concern for the consequences of making an overly broad initial designation and being unable to make subsequent adjustments, the district court decision incentivizes FWS to make piecemeal listings (*i.e.*, designate multiple DPSs even if the conservation status of all DPSs within a biological species is the same) to preserve the flexibility to delist DPSs later, wasting agency resources that would otherwise be conserved by simply listing at the species taxon level.

In effect, when deciding whether a species needs federal protection, the district court holding forces FWS to attempt to anticipate whether certain populations (that would qualify for DPS status) might recover sooner than other portions of the species, and designate those DPSs at the time of listing. This exercise would not only greatly increase FWS's workload to accomplish each individual listing, it would divert resources from more important efforts to conserve species in greatest need, and it would potentially force FWS to designate

far more DPSs than it would ever truly need to create. As demonstrated by FWS and the National Marine Fisheries Service's ("NMFS") recent joint proposed rule to divide the green sea turtle listing into 11 DPSs, agencies must exert tremendous efforts to make the extensive findings in support of listing a species by DPSs. *See* Section I.C.4. *infra*. Further, if FWS must, on a precautionary basis, designate DPSs whenever it anticipates that some portion of the species will be able to qualify for delisting before the rest of the species, FWS will be required to make excessive use of the DPS designation strategy in contradiction of Congress' intent that FWS "list populations sparingly and only when the biological evidence indicates that such action is warranted." S. Rep. No. 96-151, at 1397 (1979). FWS should not be pushed into using the smallest possible population designation in order to preserve the flexibility to delist the same.

The following two hypothetical scenarios illustrate how the district court's interpretation would govern FWS DPS designation. Both present the same problem: FWS determines that an entire biological species of deer, composed of three regional populations, warrants a species-wide endangered listing. FWS has a choice of either listing the deer at the species level or dividing the species into three DPSs and listing each DPS separately. In Scenario 1, to save resources and simplify the listing process, FWS lists the entire biological species with a species-level listing. In Scenario 2, FWS foresees that one regional population may

recover more quickly than the others, so it initially designates three individual

DPSs and lists each one as endangered.



***SCENARIO 1: PRE-RECOVERY – FWS initially lists three regional
populations of the same biological species at the species level.***



***SCENARIO 2: PRE-RECOVERY – FWS initially lists three regional
populations of the same biological species as three regional DPSs.***

Twenty-five years later, only one regional deer population has exceeded its

recovery goals and no longer warrants an ESA listing.  Under Scenario 1, because

FWS initially decided to list at the species level, the agency is barred from recognizing the recovery of that population and is prohibited from delisting it. Despite their fully recovered status, the agency must continue to treat the recovered deer population as an endangered species, redirecting resources from other species in need of protection. *This is the outcome that the district court holding requires.*

Under Scenario 2, FWS foresaw the possibility that one population might recover ahead of the others and designated three separate DPSs at the time of the original listing. This process gives FWS the flexibility to delist that population as a recovered DPS, but it is a much more burdensome process, involving a detailed scientific assessment of discreteness and significance (*see* discussion of green sea turtle in Section I.C.4., *infra*).



**SCENARIO 1: RECOVERY – Twenty-five years post listing – One regional population has recovered, but FWS cannot delist it.**



***SCENARIO 2: RECOVERY – Twenty-five years post listing – FWS delists the one recovered DPS.***

Another 25 years later, the recovered regional population of deer that FWS could not delist under Scenario 1 has increased, and as a result, has reached overpopulated status and has overwhelmed its habitat. However, because the other two regional populations have not yet recovered, FWS still cannot delist the over-recovered population. Under Scenario 2, because FWS could delist the recovered DPS, state wildlife managers have managed this population at a sustainable level absent the ESA's protections, in balance with its habitat, while the other DPSs remain protected by federal law.



***SCENARIO 1: POST-RECOVERY – 50 years post-listing – The recovered population has overrun the region.***



***SCENARIO 2: POST-RECOVERY – 50 years post-listing – The delisted DPS is at a sustainable population level.***

This hypothetical example, and the real ones presented in the next section, demonstrate the need for flexibility. However, the district court decision, as illustrated in Scenario 1, would handcuff FWS to decades-old decisions that may no longer be warranted and could lead FWS to violate the ESA's mandate to act according to the best available science. This outcome is contrary to Congress'

purposes in creating the DPS tool, which was to provide agencies with regulatory flexibility to appropriately manage portions of the same species with different conservation statuses. Even the district court admits, "Congress intended with the ESA and the subsequent inclusion of the DPS designation authority to give the FWS the flexibility to tailor federal protection at the appropriate taxonomic level needed to conserve populations of endangered vertebrates." Op. 88. Under Scenario 2, while FWS had the foresight to list the three DPSs initially, it did so at great expense of resources in determining that the three DPSs existed. The better course than either of these scenarios is how FWS managed the WGL wolves: a range-wide listing followed later, if necessary, by the creation of a scientifically-based DPS for the purpose of delisting the recovered population.

The district court did not contemplate the practical management consequences of its holding, stating that the WGL DPS cannot be delisted because "the agency adopted a listing of the species in 1978 that carries with it consequences under the law." Op. 88. However, the ESA's purpose is not served by telling FWS that it has made its bed and now must lie in it. There is no justification for the district court's assertion that the agency "assumed that burden" when it chose to list at the biological species level. Op. 87. Such an outcome is not only contrary to the ESA's purpose, it is contrary to common sense.

**C. Barring FWS from adjusting conservation statuses by DPS hinders practical resource management tailored to unique regional circumstances.**

Despite the district court's contention, subdivision of already listed species into DPSs is a neutral concept, not one that is fundamentally anti-ESA. In fact, it allows FWS to better meet recovery objectives for a species when plans can be carefully tailored to target recovery efforts. FWS has, on several occasions, used DPSs to acknowledge the recovery of a portion of a larger species, delist that portion, and then focus its conservation resources on only those portions of the larger species that continue to need protection.

### 1. *Gray Whales*

In 1994, FWS and NMFS split the species-wide endangered listing of gray whales (*Eschrichtius robustus*) into two DPSs and simultaneously delisted the eastern North Pacific population due to recovery. 59 Fed. Reg. 31094 (June 16, 1994). The agencies maintained the western North Pacific DPS as endangered because the gray whales were geographically isolated from the recovered population and still qualified for endangered status.

### 2. *Columbian White-Tailed Deer*

In 2003, FWS re-assessed a subspecies of Columbian white-tailed deer (*Odocoileus virginianus leucurus*) ("CWTD") that had been listed as endangered in 1967, divided that subspecies into two DPSs, and delisted one of those DPSs in

that same rulemaking. 68 Fed. Reg. 43647 (July 24, 2003). This proceeding demonstrated the critical role that local cooperation plays in the recovery of endangered populations, Mich. Br. 12-14, as the "Douglas County DPS" of the CWTD recovered in large part due to local ordinances and restrictions designed to protect that population. 68 Fed. Reg. at 43647.

FWS's ability to focus its efforts on the population in greatest need of protection continues to work to the CWTD's benefit. Just recently, FWS proposed to reclassify the remaining DPS from endangered to threatened, 80 Fed. Reg. 60850 (Oct. 8, 2015).

### 3. *Humpback Whales*

NMFS listed Humpback whales (*Megaptera novaeangliae*) as endangered at the species level under the predecessor statute to the ESA. In response to two petitions, NMFS announced that a species status report and assessment of the ESA Section 4(a)(1) factors indicated that the species should be broken into 14 DPSs, two of which should remain on the endangered species list, another two should be downlisted to threatened, and the remaining 10 should be delisted. 80 Fed. Reg. 22304 (Apr. 21, 2015). If the district court's interpretation of the ESA is upheld, NMFS would have to maintain an endangered listing for all 14 DPSs, just because four of the 14 continue to qualify for threatened/endangered status. This result would force NMFS to close its eyes to the best scientific evidence showing the

other 10 separate regional populations have fully recovered and to continue to expend valuable resources to provide ESA protections to populations that no longer require them.

### 4.    *Green Sea Turtles*

FWS and NMFS recently issued a joint proposed rule to divide the green sea turtle (*Chelonia mydas*), previously listed as threatened at the species level in 1978, into 11 DPSs.  80 Fed. Reg. 15272 (Mar. 23, 2015).  In response to a petition, the agencies proposed to split the species into DPSs in order to individually examine the status of each regional population.  The agencies first conducted a detailed analysis, concluding that each population was discrete from other populations and significant and so qualified as a DPS.  Only then did the agencies turn to the next step of determining the proper listing status of each newly-recognized DPS.  While the agencies found each DPS should be classified as threatened or endangered, the agencies noted that ESA Sections 4(a)(1) and (c)(1) (16 U.S.C. §1533) provide authority to recognize DPSs and update the lists of threatened and endangered species to reflect classification decisions.  80 Fed. Reg. at 15275.  The document indicates that the agencies will delist any DPS that recovers in the future, even though that DPS was once part of a broader worldwide threatened listing.  This proposed action demonstrates both the DPS creation/designation process (Section III, *infra*) and the tremendous undertaking

involved in this process (which should only occur if necessary, not proactively, as is necessary under the district court's interpretation and as in Scenario 2 above).

### 5. *Grizzly Bears*

Similar to the WGL wolves, the district court's "one-way ratchet" for use of the DPS tool would affect the impending delisting of the Yellowstone population of grizzly bears. Like the WGL wolves, FWS listed grizzly bears on a species-wide basis in 1975 and did not (and could not) create any DPSs for the species at the time of the listing. 72 Fed. Reg. 14866, 14868-69 (Mar. 29, 2007) (discussing listing history). In March 2007, FWS designated and delisted the Greater Yellowstone DPS of grizzly bears and removed the DPS from the endangered species list. *Id.* at 14866. This delisting was vacated as a result of a legal challenge unrelated to DPS designation for the purpose of delisting. *See Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), *aff'g in part*, 665 F.3d 1015 (9th Cir. 2011). FWS has recommenced delisting efforts. If the district court's interpretation is applied to the new delisting effort, FWS will be unable (1) to acknowledge the recovery of the grizzly bear population that no longer requires a threatened classification, and (2) to restore that population to state management where it belongs.

Under the district court's erroneous interpretation of the ESA, no distinct population, no matter how robust, can be delisted unless the entire original listing

unit is delisted.  The aforementioned examples highlight the benefits of being able

to sub-divide a broadly listed species into DPSs, and then delist, downlist, or uplist

each as appropriate based on the science and facts of each individual

circumstances.  The district court's interpretation of the ESA, if upheld, would

severely undermine FWS's ability to focus its efforts on species that need

conservation efforts.  In contrast, FWS's interpretation finds support in the goals of

the ESA: (1) to devote resources to protect only those populations of species that

require protection; (2) to avoid committing the agency's scarce resources to

populations that do not require them at the expense of species that do; and (3) to

recognize the primacy and role of the states in conserving wildlife.

**D.     Barring FWS's ability to designate and delist DPSs within a
         species listed prior to the addition of the DPS tool renders a
         nonsensical interpretation of the law.**

Several of the examples discussed above highlight an absurdity of the

district court's erroneous interpretation of the ESA – FWS made its initial listing

decision before Congress added the DPS tool to FWS's conservation arsenal.  FWS

listed gray wolves as endangered and threatened in the lower 48 states on March 9,

1978.  43 Fed. Reg. 9607.  Congress amended the ESA's definition of "species" to

include "distinct population segment" on November 10, 1978.  Pub. L. No. 95–

632, 92 Stat. 3751 (1978).  FWS could not anticipate that it would have the ability

to designate a species based on DPS criteria at the time it listed gray wolves

throughout their U.S. range. Nevertheless, the district court determined that, simply because FWS did not have access to the ability to designate DPSs at the time of its initial WGL wolf listing decision, FWS is prohibited from later using the tool. The practical result of this erroneous interpretation is a nonsensical limitation.

When Congress added the DPS classification to the definition of species, it did not include any limitation on FWS using the DPS tool to amend previous listing decisions. In the absence of any such specific restrictions, the district court's interpretation of the ESA is absurd. It penalizes FWS for not using a previously unavailable tool despite the fact that present use of the tool will give FWS greater flexibility to address the conservation needs of species, subspecies, and DPSs. The district court's interpretation violates the general rule of statutory interpretation that the language of a law should not be construed to produce an absurd result. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

**E.** **Failing to delist recovered DPSs punishes states and communities that practice good wildlife management and hinders state and private cooperation in administering the ESA.**

As framed in the Federal Appellants' and Michigan's briefs, FWS should have the ability to delist recovered DPSs to foster state and local cooperation in administering the ESA, Gov't Br. 21-22, as FWS does not have the resources to

implement the ESA on its own. States and local communities facilitate the conservation of listed species. Preventing FWS from delisting DPSs and extracting itself from wildlife management where listing is no longer warranted makes state management even more difficult and undermines private efforts to participate in species conservation. States have a vested interest in recovering endangered species and have devoted significant time and resources to species recovery. Mich. Br. 16-18. States are the "boots on the ground" in managing wildlife, and they must deal with the day-to-day problems when a numerically recovered species cannot be delisted. The public, including HCC's members, who must deal with the listed species also suffer when FWS cannot remove unwarranted federal protections.

States must respond to citizens who lose pets and livestock to the high population of WGL wolves, and states are left dealing with the consequences when wolf numbers rise above the threshold level for social tolerance. *See* Section IV, *infra*. FWS should have the ability to aid states in their recovery efforts by retracting their protective reach once it is no longer needed, as that is what the ESA requires. Prohibiting FWS from re-designating species listings to allow local DPSs to be delisted punishes states for their good management practices. Because state cooperation and the participation of local communities is essential to recovery efforts for remaining endangered species, FWS should be allowed to incentivize

and reward state and private cooperation by delisting recovered populations.  16

U.S.C. §1535.

## II.    The District Court Decision Severely Diminishes a Citizen's and/or State's Statutory Right Under the ESA to Petition FWS to Consider a DPS's Conservation Status.

If the district court's opinion survives, a vital part of the ESA will be

eviscerated, as citizens and states will be deprived of their ESA right to petition for

DPS classification and delisting of distinct populations that recover (often with the

invaluable assistance of the public and the states) where the entire listed entity has

not.  FWS will no longer be able to appropriately respond to citizen petitions

requesting evaluation of the conservation status of a biological DPS within a

designation of a species at a broader population level (as opposed to one within an

unlisted, biological species).  Although FWS has raised this conflict,[3] its brief did

not fully explain the consequences if the district court ruling removes FWS's

power to respond to citizen and/or state petitions.

The ESA grants citizens and/or states the right to petition FWS "to add a

species to, or to remove a species from" the lists of threatened or endangered

species.  16 U.S.C. §1533(b)(3)(A).  The ESA's citizen petition provision allows a

citizen or state to file a petition for delisting at a different level than FWS's initial

designation, *see* 16 U.S.C. §1533, and agencies consider this petition right to

_____

[3] The district court noted that FWS made this argument below.  Op. 64 n.22.

extend to petitions to delist a DPS. 80 Fed. Reg. 22304, 22306 (Apr. 21, 2015) (NMFS states, "Pursuant to the ESA, any interested person may petition to list or delist a species, subspecies, or DPS of a vertebrate species that interbreeds when mature (5 U.S.C. §553(e), 16 U.S.C. §1533(b)(3)(A))"). However, the district court's ruling makes such a petition futile, because the district court interprets the ESA as prohibiting FWS from designating a DPS within a more broadly listed species for the purpose of delisting. Under this interpretation, FWS will have no choice but to deny petitions seeking recognition of a DPS within a more broadly listed species, even if the facts and science conclusively demonstrate that the population making up the proposed DPS is discrete (separate from other populations within the same biological species) and significant and has fully recovered. Not only does such a result frustrate the intent of the ESA listing petition provision and force the commitment of resources to a recovered population, it bars the agency from acting in accordance with the best available science applicable to that requested DPS designation. *See* 16 U.S.C. §1533(b)(1)(A) (FWS shall make listing and delisting decisions "solely on the basis of the best scientific and commercial data available").

The practical result of the district court's ruling is that citizens could never petition for a delisting of any DPS of a more broadly listed species. Citizens will be forced to either (1) file a petition for the delisting of an entire species, or (2)

forego the petition if science does not support delisting the entire listed species.  In tying FWS's hands in responding to citizen petitions regarding designation level decisions made 30-40 years ago, the citizen petition right becomes substantially smaller than it was intended to be.  This is particularly true for petitioners in the instant case – specifically HCC member Sportsmen's Alliance, who filed such a petition for DPS recognition and delisting of the WGL DPS on May 18, 2010, AR 20 at 956A-966A, and HCC members Safari Club International and the National Rifle Association, who filed a joint petition for delisting on June 16, 2010, AR 29 at 1054A-1069A.  If the district court's review of the law is upheld, petitioner rights will forever be circumscribed by FWS's initial decision to make a listing at a broad level, even where, as here, FWS's initial decision to list at a broader level was made before the DPS provision was even added to the ESA.  *Compare Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1224 (11th Cir. 2015) (giving *Chevron* Step 2 deference to agency's interpretation of the Animal Welfare Act in part because the agency's interpretation left regulated parties able to make practical use of their statutory rights while the competing interpretation would "bypass licensees' rights to notice, hearing, and an appeal").

## III. FWS Can Recognize a DPS Without Also Finding that the DPS is Endangered or Threatened.

The district court's unsupported contention that a DPS is only "an affirmative protective tool," Op. 80, is not supported by ESA's text, purpose, or

legislative history, and FWS's permissible interpretation of an ambiguous statute is entitled to *Chevron* deference. 467 U.S. 837, 842-43 (1984). While the district court correctly asserted that the lack of definitions for key terms in the ESA such as "distinct population segment" exacerbates disputes, Op. 8, it erred in holding that FWS improperly filled these gaps with well-thought out legal interpretations based on agency expertise. The district court was incorrect that the ESA's structure, history, and purpose are not consistent with FWS's use of the DPS tool to delist a population of recovered animals. In particular, the ESA allows FWS to designate a DPS without assigning that population "endangered" or "threatened" status under the ESA (some DPSs are neither "endangered" nor "threatened").

FWS considers three factors in deciding the recognition and possible ESA status of a potential DPS: "1. Discreteness of the population segment in relation to the remainder of the species to which it belongs; 2. The significance of the population segment to the species to which it belongs; and 3. The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?)." FWS 1996 DPS Policy, 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996). Troublingly, the district court's discussion reveals a fundamental misunderstanding of FWS's DPS Policy and a general misunderstanding of the biological basis for determining a DPS when it asserts that a "potential" DPS under consideration by

the agency is not given a "DPS status" unless the agency determines that DPS to be threatened or endangered. While it is true that ESA protections do not extend to a DPS unless and until it is listed, it is inaccurate to say that a DPS designation has "no consequences" until a listing is made, Op. 66, and that the "possible" DPS does not come to fruition if a threatened or endangered label is never placed on it, as the district court suggests the DPS Policy states. Op. 68. A DPS exists biologically whether or not it is designated as endangered or threatened.

DPS, subspecies, and species designations are given the same effect by definition under the ESA. The term "species" is statutorily defined to consist of three types of units: (1) full taxonomic species, (2) subspecies, and (3) distinct population segments of vertebrate species that interbreeds when mature. *See* 16 U.S.C. §1532(16). A "species" as used at the macro taxonomic level is deemed to exist even if not classified as threatened or endangered. Similarly, a "subspecies" of a listed species is still a "subspecies" even if it is not separately listed as threatened or endangered. By the same reasoning, the third recognizable listing unit – a DPS – is still a DPS even if not currently listed as endangered or threatened. Thus, the district court completely misses the mark by saying the "authorization at issue" is whether a DPS can be designated for a population that FWS has determined is not eligible for a listing under the ESA. Op. 66. That conclusion would essentially require that a DPS would not exist unless given a

threatened or endangered status.  To carry this analysis out to its illogical end would require that a species does not exist until it is given a threatened or endangered classification.  By the same token, to say that "[q]ualifying for listing status is critical for identification of a DPS," Op. 66, is simply incorrect and does not account for the clear procedures for identifying and designating a DPS set forth in the 1996 DPS Policy.

While Federal Appellants' brief persuasively addresses this issue, it does not detail the full extent of the illogical outcome of the district court's reasoning.  Federal Appellants explain that the DPS inquiry has three factors – (1) discreteness, (2) significance, and (3) conservation status – and that only the first two determine whether the DPS exists in the first place.  The third inquiry only answers the question of what status that DPS has under the ESA – threatened, endangered, or neither (*i.e.*, not listed).  Gov't Br. 51-52.  If a population is discrete from other populations of the same taxon and is significant to the taxon, it is a "distinct population segment" regardless of conservation status.  A simplified explanation and graphic depiction of how the ESA and FWS define and designate a DPS is necessary to grasp the full extent of the management consequences of the district court's interpretation.

## U.S. Fish and Wildlife Service's Decision-Making Process for DPS Recognition



### U.S. District Court's Erroneous Interpretation of the U.S. Fish and Wildlife Service's Decision-Making Process for DPS Recognition



The district court's argument that it would not make sense to create a DPS for the purpose of not listing, Op. 65, creates a false dichotomy – FWS does not need to choose between having a listed DPS and the inability to designate a DPS at all. The district court does not recognize that the first two steps of the DPS inquiry determine whether a particular population is separate and significant enough from other populations to justify considering its listing status independently of other populations. The third step calls for judgments on risks to the population, and the outcome may have little to do with whether the population qualifies as a DPS in the first place. FWS does not waste time and resources by proactively designating DPSs in thriving species that have never been listed and will likely never need to be listed. However, just because all DPS analyses do not end in listing does not support the district court's contention that designating a DPS and then not listing it

would never make sense.  Sometimes the best scientific evidence available mandates such an outcome.

For example, FWS might determine that a population is separate and significant, but then go in any number of directions in evaluating the newly-recognized DPS.  The discussion of gray whales, Columbian white-tailed deer, and humpback whales above illustrate this point, as FWS recognized that a species previously listed at a broader level consisted of several regional DPSs, and then found that one or more of those DPSs had recovered and therefore should not be listed as either endangered or threatened.[4]  Another status for a recognized DPS is "warranted but precluded," which are DPSs (or biological species or subspecies) found to warrant a proposed rule to list as endangered or threatened, but are precluded from listing by higher priorities in light of limited agency resources.  16 U.S.C. § 1533(b)(3)(B)(iii).  These "candidate species" receive no ESA protections, but present another situation in which FWS recognizes the existence of the DPS.  FWS annually lists such species for purposes of reviewing their status. The 2014 Candidate Notice of Review contained 12 DPSs.  79 Fed. Reg. 72450, 72490-95 (Dec. 5, 2014).  These recognitions of non-listed DPSs further disproves

---

[4] It is also clear from the thorough discussion by FWS and NMFS of the green sea turtles in the proposed rule reviewed above that if any of the 11 newly-recognized green sea turtle DPSs recover, the recovered DPS(s) will be delisted.  The analysis of DPS recognition (which turns on discreteness and significance) is clearly separated by FWS and NMFS from the analysis of listing status (which turns on the threat or lack of threats facing the population).

the district court's conclusion that DPSs can only exist if they are listed as threatened or endangered. Thus, the district court's assertion that "[a]n 'unprotected DPS' is, in short, an oxymoron," Op. 69, is completely unfounded.

Furthermore, the district court's interpretation is unfounded for another reason. Because DPSs encompassed within a broader listing necessarily carry the same listing status as the broader species, a DPS can be simultaneously designated then delisted. The district court's erroneous argument that FWS is creating DPSs that have never been classified and then delisting them ignores the reality that all DPSs and subspecies are components of the species in which they are included and are necessarily given a threatened or endangered status when the biological taxon of which they are a part is listed under the ESA. Not only did the *Kempthorne* Court agree, Gov't Br. 42-43, but the regulations clearly state "The listing of a particular taxon *includes all lower taxonomic units*." 50 C.F.R. §17.11(g) (emphasis added). This view is also thoroughly outlined in the 2008 Solicitor's Opinion. *See* Gov't Br. 43-44.

The district court recognized that FWS can modify the classification of an existing DPS, *see* Op. 66, but did not recognize that, when FWS creates a DPS from a listed species and delists it, FWS is revising the status of that DPS (which was the same status as the more broadly listed species). As such, delisting a DPS is simply changing the status of a DPS that already had an ESA status. As in this

case, the designation of gray wolves as endangered and threatened necessarily meant that any population that might be distinct was also listed as endangered or threatened. FWS did not create a DPS out of nothing. Instead, it merely reevaluated the conservation status of the WGL DPS. Gov't Br. 29.[5]

## IV. If Any Insufficiencies Exist in FWS's Rationale for Delisting the WGL Wolf Species/DPS, Remand Without Vacatur Is the Most Appropriate Remedy.

HCC considers the district court's ruling in error in its entirety. This Court should reverse the ruling below and remand this case to the district court with directions to grant summary judgment in favor of Federal Appellants, State Appellants, and private Appellants-Defendant-Intervenors.

However, if this Court reverses the district court's interpretation that the ESA prohibits designation of DPSs for the purpose of delisting or reclassifying a portion of a previously listed species, but upholds the district court's setting aside of the delisting on some other ground, vacatur of the delisting rule is still not the appropriate remedy. Instead, the Court should remand the rule to FWS to better explain the basis for the delisting. Vacatur is unnecessarily extreme.

---

[5] HCC concurs with and will not repeat Federal Appellants' explanation that the WGL delisting did not designate a new species or DPS, but merely revised the 1978 listing of Minnesota's wolves. Gov't Br. 59-65. Even if FWS lacked authority to designate a new DPS for the purpose of delisting, FWS had authority to reclassify the status of the species of Minnesota wolves that it essentially designated as a threatened DPS in 1978.

HCC concurs with and will not repeat Wisconsin's explanation why this case satisfies the criteria for a remand without vacatur (Wis. Br. 18-26), other than to note that the two other states with major WGL wolf populations, Michigan and Minnesota, and the local hunting communities that must deal with the WGL wolf populations, suffered the same types of disruptions addressed by Wisconsin's brief resulting from vacatur. The district court accepted the states' projections that wolf numbers will remain high following delisting even if not quite as high as with continued listing despite recovery. Op. 60-61. This species long ago achieved and far surpassed its recovery goals, and it is managed via regulatory mechanisms adopted by each state with significant wolf populations.

Remand without vacatur could also help preserve the public's willingness to continue to participate in wolf conservation, as public tolerance for predator species plays an important role in their conservation. Prolonging the delisting of a recovered wolf population can damage the population's conservation. In another recent delisting rule for Wyoming wolves, FWS concluded that its failure to delist the DPS for years after it reached established recovery goals had "negatively affected public tolerance" for the wolves. 77 Fed. Reg. 55530, 55569 (Sept. 10, 2012). Wolves that regularly attack livestock, pets, and hunting dogs, and that compete with hunters for wildlife in the field, present ongoing challenges to the daily lives of members of the hunting and farming communities of the WGL states.

Because of these challenges, the social tolerance of impacted communities is the key to the future of the WGL wolves. As noted by wolf biologists in this proceeding, "The long-term survival of wolves . . . ultimately depends on human tolerance." AR 630 at 018868A. Specifically, "[t]he long-term prospects for the wolf's persistence on Great Lakes states landscapes will be tied to the public's tolerance of wolves and to developing a larger segment of the public who value having wolves present." AR 630 at 017755A, 017762A.

In the event that this Court finds any insufficiencies in the explanation offered by FWS for the delisting of the WGL wolves, this Court should reverse and remand the district court's ruling and direct the district court to remand the rule to FWS for further explanation without vacatur of the delisting. In this way, public tolerance for wolves can be preserved and wolf conservation can continue while FWS resolves any of the Court's concerns.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Dated:  December 8, 2015

Respectfully submitted,

Hunter Conservation Coalition Appellants-Defendant-Intervenors

/s/ James H. Lister
James H. Lister (D.C. Bar # 447878)
Melinda L. Meade Meyers (D.C. Bar
#1022572)
Birch Horton Bittner and Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile (202) 659-1027
jlister@dc.bhb.com
mmeademeyers@dc.bhb.com
*Attorneys for Appellants-Defendant-*
*Intervenors: U.S. Sportsmen's Alliance*
*Foundation; Wisconsin Bear Hunters*
*Association; Michigan United*
*Conservation Clubs; Wisconsin*
*Bowhunters Association; Upper Peninsula*
*Bear Houndsmen Association; Michigan*
*Hunting Dog Federation; and Rocky*
*Mountain Elk Foundation*

/s/ Anna M. Seidman
Anna M. Seidman (D.C. Bar # 417091)
Douglas S. Burdin (D.C. Bar # 434107)
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
*Attorneys for Appellant-Defendant-*
*Intervenor*
*Safari Club International*

/s/ Michael T. Jean
Michael T. Jean (MI Bar No. P76010)
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1158
Facsimile: (703) 267-1164
mjean@nrahq.org
*Counsel for Appellant-Defendant-*
*Intervenor National Rifle Association of*
*America*

John I. Kittel
U.S.C.A. for D.C. Cir. Bar No. 55798
Mazur & Kittel, PLLC
30665 Northwestern Hwy. Suite. 175
Farmington Hills, MI 48334
Telephone: (248) 432-8000
Facsimile: (248) 432-8010
jkittel@mazur-kittel.com
*Co-Counsel for Appellant-Defendant-*
*Intervenor Michigan Conservation*
*Clubs and Rocky Mountain Elk*
*Foundation*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 23(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitations of this Court's order of July 29, 2015, which authorized the Private Appellants to file a brief not to exceed 7,500 words. The foregoing brief contains 7403 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word. Words contained within the graphics and their captions are included in this word count.

/s/ James H. Lister
James H. Lister (D.C. Bar # 447878)
Birch Horton Bittner & Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
jlister@dc.bhb.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2015, I electronically filed the foregoing Opening Brief for the Appellants Hunter Conservation Coalition with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ James H. Lister
James H. Lister (D.C. Bar # 447878)
Birch Horton Bittner & Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
jlister@dc.bhb.com