[ORAL ARGUMENT NOT YET SCHEDULED]
No. 15-5041
(Consolidated with Nos. 15-5043, 15-5060, and 15-5061)
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

HUMANE SOCIETY OF THE UNITED STATES, et al.,
*Plaintiffs-Appellees*,

v.

SALLY JEWELL, SECRETARY OF THE INTERIOR, et al.;
U.S. SPORTSMEN'S ALLIANCE FOUNDATION, et al., and
STATE OF WISCONSIN, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia
_____

**CENTER FOR BIOLOGICAL DIVERSITY'S *AMICUS CURIAE* BRIEF
IN SUPPORT OF PLAINTIFFS-APPELLEES
THE HUMANE SOCIETY OF THE UNITED STATES
SEEKING TO AFFIRM THE DISTRICT COURT**
_____

Collette L. Adkins
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

Amy R. Atwood
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Telephone: (971) 717-6401
atwood@biologicaldiversity.org

*Counsel for Amicus Curiae Center for
Biological Diversity*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Under D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.     Parties and Amici**. Except for *Amicus Curiae* Center for Biological Diversity, all parties, intervenors, and amici appearing in this court are listed in the Opening Brief for the Federal Appellants (ECF #1582499) ("Fed. Defs.' Br.") and the Brief of *Amici Curiae* for the States of Wyoming, Colorado, Idaho, Kansas, Montana, New Hampshire, North Dakota, and Utah (ECF #1588735).

**B.     Rulings Under Review**. References to the rulings under review appear in the Brief for Plaintiffs-Appellees The Humane Society of the United States, *et al*. (ECF #1598445) ("HSUS Br.").

**C.     Related Cases**. This case has not previously been before this or any other court as defined by D.C. Circuit Rule 28(a)(1)(C). The pending case of *Defenders of Wildlife v. Jewell*, D.C. Cir. No. 14-5300, concerns the government's decision to remove the gray wolf in Wyoming from the endangered species list and involves some of the same parties and some similar issues.

Respectfully submitted this 17th day of February 2016,

/s/      Collette L. Adkins

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

*Counsel for Amicus Curiae Center for
Biological Diversity*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* Center for Biological Diversity certifies that the Center is a non-profit corporation under the laws of California, registered with the Internal Revenue Service as a 501(c)(3) organization. This organization does not have stock, nor does it have parent companies, subsidiaries, or affiliates that have issued shares to the public.

Respectfully submitted this 17th day of February 2016,

/s/  Collette L. Adkins

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

*Counsel for Amicus Curiae Center for Biological Diversity*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ............. ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .................................. iv

TABLE OF CONTENTS .......................................................................... v

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY ............................................................................................ x

INTERESTS OF *AMICUS CURIAE* ...................................................... 1

PERTINENT STATUTES AND REGULATIONS .................................... 2

STATEMENT OF THE CASE ................................................................. 3

SUMMARY OF ARGUMENT ................................................................ 9

ARGUMENT ........................................................................................ 10

I.   The Service Misused The DPS Authority By Simultaneously Designating And Delisting The Western Great Lakes DPS. ............................................................ 10

II.  The Service's Misuse Of The DPS Authority Creates A Non-DPS Remnant That Defeats The Conservation Purpose Of The ESA. .......................................... 18

III.   Although The Service Cannot Simultaneously Designate And Delist A DPS, The Service Can Legally Reclassify A Species-Level Listing Into Multiple DPSs If It Follows The ESA's Requirements. .................................................................. 22

CONCLUSION ..................................................................................... 28

CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS .......... 29

CERTIFICATE OF SERVICE ...................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Defenders of Wildlife v. Hall*,
  565 F. Supp. 2d 1160 (D. Mont. 2008)...............................................................7

*Defenders of Wildlife v. Norton*,
  239 F. Supp. 2d 9 (D.D.C. 2002)............................................................... 11, 20

*Defenders of Wildlife v. Norton*,
  258 F.3d 1136 (9th Cir. 2001) ............................................................................20

*Defenders of Wildlife v. Salazar*,
  729 F. Supp. 2d 1207 (D. Mont. 2010)..............................................................7

\* *Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*,
  354 F. Supp. 2d 1156 (D. Or. 2005) ............................................ 7, 11, 12, 15, 20

*Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*,
  12 F. Supp. 2d 1121 (D. Or. 1997) ............................................................... 15, 23

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014)................................................. 8, 10, 14, 16, 22

\* *Humane Soc'y of U.S. v. Kempthorne*,
  579 F. Supp. 2d 7 (D.D.C. 2008)...................................................... 7, 11, 12, 15

*Nat'l Ass'n of Home Builders v. Norton*,
  340 F.3d 835 (9th Cir. 2003) ............................................................................11

\* *Nat'l Wildlife Fed'n v. Norton*,
  386 F. Supp. 2d 553 (D. Vt. 2005) .................................................... 7, 10, 19, 20

*Pub. Citizen Health Research Grp. v. Brock*,
  823 F.2d 626 (D.C. Cir. 1987).............................................................................8

\*Authorities chiefly relied upon are marked with asterisks

## Statutes

16 U.S.C. § 1531(b) ........................................................................23

16 U.S.C. § 1532(6) ..........................................................................3

16 U.S.C. § 1532(16) ........................................................................3

16 U.S.C. § 1532(20) ........................................................................3

16 U.S.C. § 1533(a)(1) ......................................................................3

16 U.S.C. § 1533(b)(1)(A) ................................................................3

16 U.S.C. § 1533(b)(2) ......................................................................3

16 U.S.C. § 1533(b)(5)(A)(i) ..........................................................24

16 U.S.C. § 1533(c)(1) ....................................................................23

16 U.S.C. § 1533(c)(2) ....................................................................25

16 U.S.C. § 1533(c)(2)(A) ..............................................................22

16 U.S.C. § 1533(f).................................................................... 3, 24

16 U.S.C. § 1533(f)(1) ....................................................................25

16 U.S.C. § 1533(f)(1)(B)(ii) ..........................................................24

16 U.S.C. § 1533(f)(4) ....................................................................25

16 U.S.C. § 1538(a)(1)(B) ................................................................3

Department of Defense and Full-Year Continuing Appropriations Act of 2011,
Pub. L. 112-10, 125 Stat. 38 (2011) ......................................7

## Other Authorities

CENTER FOR BIOLOGICAL DIVERSITY, MAKING ROOM FOR WOLF RECOVERY: THE
CASE FOR MAINTAINING ENDANGERED SPECIES ACT PROTECTIONS FOR
AMERICA'S WOLVES (2014),
https://www.biologicaldiversity.org/campaigns/gray_wolves/pdfs/Making_Room
_for_Recovery_print.pdf ..................................................................16

Courtney Sherwood, *Environmentalists sue Oregon for removing gray wolf from
endangered list*, REUTERS, Dec. 31, 2015, http://www.reuters.com/article/us-
oregon-wolves-idUSKBN0UE1FE20151231 ....................................21

MICHAEL J. ROBINSON, PREDATOR BUREAUCRACY: THE EXTERMINATION OF
WOLVES AND THE TRANSFORMATION OF THE WEST (2005)...................5

Minn. Dep't of Nat. Resources, *Wolf Management* (June 2015),
http://www.dnr.state.mn.us/mammals/wolves/mgmt.html (last visited Feb. 16,
2016) ..............................................................................................17

S. Rep. No. 96-151 (1979), *reprinted in* Cong. Research Serv., 97th Cong., 2d
Sess., A LEGISLATIVE HISTORY OF THE ENDANGERED SPECIES ACT OF 1973
(1982).................................................................................... 11, 12

U.S. Fish and Wildlife Serv., *Western Great Lakes Distinct Population Segment of the Gray Wolf, 2012-2014 Post Delisting Monitoring Annual Report* (2014), *available at* http://www.fws.gov/midwest/wolf/monitoring/pdf/Year1PDMReportSept2014.pdf ..................................................................................................17

## Rules

32 Fed. Reg. 4001 (Mar. 11, 1967) ..........................................................6

43 Fed. Reg. 32,800 (July 28, 1978) ......................................................26

43 Fed. Reg. 9607 (Mar. 9, 1978) ............................................................6

49 Fed. Reg. 7390 (Feb. 29, 1984) ..........................................................4

50 Fed. Reg. 21,784 (May 28, 1985) ......................................................4

55 Fed. Reg. 49,204 (Nov. 26, 1990) ....................................................26

56 Fed. Reg. 19,809 (Apr. 30, 1991) ......................................................4

59 Fed. Reg. 34,270 (July 1, 1994) ........................................................25

59 Fed. Reg. 65,884 (Dec. 21, 1994) ......................................................4

61 Fed. Reg. 4722 (Feb. 7, 1996) ............................................... 4, 13, 24

62 Fed. Reg. 30,772 (June 5, 1997) ......................................................26

68 Fed. Reg. 15,804 (April 1, 2003) .....................................................6, 7

68 Fed. Reg. 43,647 (July 24, 2003) ........................................................5

71 Fed. Reg. 13,027 (Mar. 20, 2007) ......................................................5

72 Fed. Reg. 14,866 (Mar. 29, 2007) ......................................................5

74 Fed. Reg. 15,070 (Apr. 2, 2009) ........................................................7

74 Fed. Reg. 47,483 (Sept. 16, 2009) ....................................................8

76 Fed. Reg. 58,868 (Sept. 22, 2011) ..................................................26

76 Fed. Reg. 81,666 (Dec. 28, 2011) ............................... 6, 8, 16, 25

78 Fed. Reg. 35,664 (June 13, 2013) ....................................................19

78 Fed. Reg. 66,140 (Nov. 4, 2013) ......................................................26

79 Fed. Reg. 39,756 (July 10, 2014) ......................................................26

80 Fed. Reg. 2488 (Jan. 16, 2015) ..........................................................19

Fed. R. App. P. 29(c)(5) ..........................................................................2

## Regulations

50 C.F.R. § 424.11(c) ............................................................... 3, 24, 25

50 C.F.R. § 424.11(d) ..............................................................................19

## GLOSSARY

DPS………………………………………………………Distinct Population Segment

ESA……………………………….Endangered Species Act, 16 U.S.C. §§ 1531-1544

NMFS..................................................................National Marine Fisheries Service

The Center for Biological Diversity ("the Center") is a non-profit organization headquartered in Tucson, Arizona, with offices in Alaska, Arizona, California, Florida, Mexico, Minnesota, New York, Oregon, Vermont, Washington, and Washington, D.C. The Center has more than 990,000 supporters concerned with the increasing rate of extinction and loss of biological diversity in the United States.

For more than 25 years, the Center has advocated for conservation of imperiled wildlife and plants consistent with the requirements of the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"). The Center has developed significant institutional expertise by litigating hundreds of cases under the ESA. Its efforts have made the Center a leader among nonprofits in protecting the nation's endangered species.

The Center has also taken a leading role in gray wolf conservation. The Center was a plaintiff in several lawsuits to overturn efforts by the U.S. Fish and Wildlife Service ("the Service") to prematurely reduce protections for wolves. The Center has worked to ensure the survival and recovery of wolves across the lower 48 States, including the Great Lakes, Northern Rocky Mountains, Northeast, Southwest (Mexican gray wolves), and Southeast (red wolves). The Center has submitted numerous comment letters in response to the Service's calls for

information on the status of wolves, engaged its membership in letter-writing campaigns and similar actions to protect wolves, and defended the ESA from legislative efforts to remove wolf protections.

The Center therefore respectfully submits this *amicus curiae* brief to assist the Court in interpreting the ESA consistent with Congressional intent to promote conservation of wolves and other rare wildlife across the country.

Counsel for the Center authored this brief in whole, and it is filed by leave of Court. No party, party's counsel, or person (other than the *amicus curiae*, its members, or its counsel) contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(c)(5).

## PERTINENT STATUTES AND REGULATIONS

Except for the regulation pasted below, pertinent statutes and regulations appear in the addenda filed by Plaintiffs-Appellees and Federal Appellants.

**50 C.F.R. § 424.11 Factors for listing, delisting, or reclassifying species.**

(c) A species shall be listed or reclassified if the Secretary determines, on the basis of the best scientific and commercial data available after conducting a review of the species' status, that the species is endangered or threatened because of any one or a combination of the following factors . . . .

## STATEMENT OF THE CASE

**Legal Background**

At the most basic level, the ESA's goal of saving endangered species translates into its requirement that the Secretaries of Commerce and the Interior maintain lists of endangered and threatened species. 16 U.S.C. § 1533(c).[1] Listed species enjoy a broad scope of protections, including prohibition on "take," *id*. § 1538(a)(1)(B); designation of critical habitat, *id*. § 1533(b)(2); and development of recovery plans, *id*. § 1533(f).

The Service is required to list, delist, or reclassify a species based on any one or a combination of five factors. *Id*. § 1533(a)(1); 50 C.F.R. § 424.11(c). Listing determinations must be made "solely on the basis of the best scientific and commercial data available," without regard to economic impacts. 16 U.S.C. § 1533(b)(1)(A).

In 1978, Congress amended the ESA's definition of "species" to include "any distinct population segment of any species of vertebrate fish or wildlife . . . ." *Id*. § 1532(16). Recognizing the importance of applying the term "distinct population segment" in a "clear and consistent fashion," in 1996, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service ("NMFS")

---

[1] A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). A "threatened" species is one that "is likely to become an endangered species within the foreseeable future . . . ." 16 U.S.C. § 1532(20).

(collectively, "the Services") developed a "Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act." 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy"). The DPS Policy provides that three elements are considered in deciding whether a population qualifies as a DPS: "discreteness," "significance," and "the population segment's conservation status in relation to the Act's standards for listing . . . ." *Id.* at 4725.

In the years after Congress gave the Services the authority to list DPSs, the Services exercised that authority "relatively rarely." 59 Fed. Reg. 65,884 (Dec. 21, 1994). Specifically, prior to promulgation of the proposed DPS Policy in 1994, of nearly 300 native vertebrate species listed under the Act, only 20 were given separate status as distinct population segments. *See id.* Over this period of time, consistent with Congressional intent, the Services utilized the DPS authority almost exclusively to list imperiled population segments where listing at a higher taxonomic level was not warranted – and not to designate DPSs for the express purpose of delisting them.[2]

Departing from past practice, the U.S. Fish and Wildlife Service now increasingly uses the DPS Policy as a tactic to delist the healthiest populations of

---

[2] *See, e.g.*, 49 Fed. Reg. 7390 (Feb. 29, 1984) (listing "population of woodland caribou . . . found in extreme northeastern Washington, northern Idaho, and southern British Columbia" as endangered); 50 Fed. Reg. 21,784 (May 28, 1985) (listing "interior population" of the least tern as endangered); 56 Fed. Reg. 19,809 (Apr. 30, 1991) (listing "Lower Keys population of the rice rat, or silver rice rat" as endangered).

imperiled species. For example, in addition to its ill-fated attempts to remove protections from wolves, the Service also designated and delisted a grizzly bear DPS in the area of Yellowstone National Park, even though the bear had been previously listed as threatened throughout its range in the lower 48 States. 72 Fed. Reg. 14,866 (Mar. 29, 2007). (Protections to that population of grizzlies were later reinstated in compliance with a court order. 75 Fed. Reg. 14,496 (Mar. 26, 2010)). Moreover, since 1994, the Services designated 63 DPSs in just 22 years – more than doubling the average annual rate of DPS designations from 1978 and 1994.[3]

**The Gray Wolf's Extermination, Listing, and Progress Toward Recovery**

Wolves are habitat generalists, and if they are not persecuted by humans, they can live anyplace with a sufficient population of ungulates. Before the systematic extermination of wolves with poisons and trapping by Federal, State, and local governments, wolves roamed across most of North America. *See generally* MICHAEL J. ROBINSON, PREDATOR BUREAUCRACY: THE EXTERMINATION OF WOLVES AND THE TRANSFORMATION OF THE WEST (2005).

As a result of this extermination campaign, only several hundred wolves remained in northeastern Minnesota and on Isle Royale, Michigan (with possibly a few wolves scattered elsewhere in the United States) by 1973, when the ESA was

---

[3] *See, e.g.*, 71 Fed. Reg. 13,027 (Mar. 20, 2007) (designating and delisting Florida DPS of American crocodile); 68 Fed. Reg. 43,647 (July 24, 2003) (designating and delisting Douglas County DPS of Columbian white-tailed deer).

enacted. 68 Fed. Reg. 15,804, 15,805 (April 1, 2003). A wolf subspecies was one of the first animals to be federally listed. 32 Fed. Reg. 4001 (Mar. 11, 1967) (listing the "timber wolf" (*Canis lupus lycaon*)). In 1978, the Service moved away from protection of wolf subspecies and listed the "entire species" of gray wolf "in Mexico and throughout the 48 conterminous States of the United States" as endangered, except in Minnesota, where it was listed as "threatened." 43 Fed. Reg. 9607 (Mar. 9, 1978) (listing *Canis Lupus* as "Endangered or Threatened to the south of Canada").

Due to the substantive protections of the ESA, gray wolf numbers increased in two core areas of its former range, namely, the northern Rocky Mountains and the western Great Lakes region. 68 Fed. Reg. at 15,805. In Minnesota, the occupied wolf range expanded and wolves dispersed from wilderness areas in northeastern Minnesota into northern Wisconsin and then into the Upper Peninsula of Michigan. 76 Fed. Reg. 81,666, 81,675-78 (Dec. 28, 2011) ("2011 Final Rule").

**The Service's Previous Efforts To Remove Wolf Protections**

In response to this progress toward wolf recovery, the Service has repeatedly attempted to use the DPS Policy to simultaneously designate and delist (or downlist) wolf DPSs. In 2003, the Service created three DPSs – Eastern, Western, and Southwestern – and reclassified the Eastern and Western DPSs as threatened, thereby simultaneously reducing the wolf's status throughout 30 states and

removing protections in several other states where it historically occurred. 68 Fed. Reg. 15,804 (Apr. 1, 2003). Two federal courts struck down the rule for violations of the ESA and the DPS Policy. *Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) (*"Oregon Wolves"*); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) (*"Vermont Wolves"*).

Undeterred, the Service again attempted to use the DPS Policy to reduce gray wolf protections under the ESA, this time entirely removing protections in the western Great Lakes.[4] 72 Fed. Reg. 6052, 6052 (Feb. 8, 2007). Again, a federal court set aside the delisting. *See Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 9 (D.D.C. 2008) (*"2008 Wolves"*).

Six months after the *2008 Wolves* decision, the Service published yet another rule simultaneously establishing and delisting a Western Great Lakes DPS. 74 Fed. Reg. 15,070 (Apr. 2, 2009). Again, environmental groups including the Center challenged the rule on grounds previously raised in *2008 Wolves* and for the Service's failure to provide the public notice and comment on the rule. That case

---

[4] The Service also simultaneously designated and delisted a DPS of northern Rocky Mountain wolves, which a federal court again condemned. 73 Fed. Reg. 10,514 (Feb. 27, 2008); *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1178 (D. Mont. 2008). After another illegal delisting rule and another successful challenge by conservation organizations, *see Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010), Congress removed ESA protections from these wolves through a rider to an appropriations bill. *See* Section 1713 of the Department of Defense and Full-Year Continuing Appropriations Act of 2011, Pub. L. 112-10, 125 Stat. 38 (2011).

settled, and the Service once again was forced to reinstate protections for wolves in the western Great Lakes region. 74 Fed. Reg. 47,483 (Sept. 16, 2009).

The 2011 Final Rule – the Service's fourth attempt to remove wolf protections – "revises" the previous listing of wolves in Minnesota to create a new "Western Great Lakes DPS," which includes wolves in Minnesota, Wisconsin, Michigan and parts of six adjoining states. 76 Fed. Reg. at 81,670. In that rule, the Service also simultaneously delisted that DPS after finding that it did not meet the definitions of endangered or threatened species. *Id.* at 81,723.

In a 110-page opinion, the district court held that the 2011 Final Rule violates the ESA for several independent reasons. The district court admonished that there are times when "a court 'must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough.'" *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 75 (D.D.C. 2014) (Memorandum Opinion, Case No. 13-0186 (D.D.C. Dec. 19, 2014), ECF No. 52, (hereinafter "Op.") at 5) (quoting *Pub. Citizen Health Research Grp. v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987)). Thus, the court ruled for plaintiffs because:

> The FWS's Final Rule challenged in this action is no more valid than the agency's three prior attempts to remove federal protections for a population of gray wolves, which are otherwise members of an endangered species. The challenged Final Rule is predicated on both an untenable reading of the ESA and otherwise flawed findings.

*Id.* at 75-76 (Op. 5). Consequently, wolves in the western Great Lakes region again returned to the status they had under the 1978 rule – *i.e.*, "threatened" in Minnesota and "endangered" in Wisconsin, Michigan, and portions of six adjoining states.

The district court's decision vacating the 2011 Final Rule is the subject of the present appeal.

## SUMMARY OF ARGUMENT

This case presents issues of great importance that go to how the Service implements the ESA, one of the nation's bedrock environmental laws and the world's strongest law for protecting biodiversity. Neither the Act nor its implementing policies contemplate that a DPS could be used to hinder, rather than promote, species recovery. Yet that is precisely what the Service has done in its single-minded drive to delist the gray wolf.

The Service's misuse of the DPS authority – illegally carving out a DPS to delist wolves in the western Great Lakes region – effects a piecemeal delisting of the gray wolf that is patently inconsistent with the ESA's purpose to conserve and recover the nation's most imperiled wildlife. The Service's actions here continue a treacherous trend that threatens conservation and recovery of other federally-listed animals by delisting a species' healthiest population and cutting short recovery elsewhere.

Therefore, the Center – a nonprofit conservation organization that advocates for our nation's endangered wildlife under the ESA – offers this *amicus curiae* brief to assist the Court in understanding what the Service has done in this case, the historical context, and the dangerous precedent that it will set for endangered and threatened animal species if it is allowed to stand.

## ARGUMENT

I.     **The Service Misused The DPS Authority By Simultaneously Designating And Delisting The Western Great Lakes DPS.**

By amending the ESA to provide for the listing of "distinct populations segments," Congress intended that the Service use this authority to protect imperiled populations when listing at the broader species level is not warranted. The district court's analogy to a "one-way ratchet" is appropriate because, as explained below, consistent with the ESA's conservation purposes, Congress intended the DPS authority as a tool to *increase* protections for endangered wildlife. Op. at 67. In the 2011 Final Rule, however, the Service wielded this tool to achieve the opposite effect, misusing the DPS authority to piecemeal delist the gray wolf. As such, the district court correctly set aside the Service's unreasonable interpretation of the ESA, which if allowed to stand, would impede further conservation of imperiled wildlife species with isolated populations that have begun progress toward recovery.

Congress did not define in the ESA the term "distinct population segment," which is not a taxonomic or biological term. *See Vermont Wolves*, 386 F. Supp. 2d at 562. Yet the legislative history shows that Congress envisioned the DPS authority as a tool to proactively list imperiled populations, not remove their protections:

> The committee agrees that there may be instances in which FWS should provide for different levels of protection for populations of the same species. For instance, the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world.

S. Rep. No. 96-151, at 6-7 (1979), *reprinted in* Cong. Research Serv., 97th Cong., 2d Sess., A LEGISLATIVE HISTORY OF THE ENDANGERED SPECIES ACT OF 1973 at 1397 (1982). As several courts have held, this legislative history "suggests that Congress thought of the DPS tool primarily – if not exclusively – as a tool for listing locally vulnerable populations." *2008 Wolves*, 579 F. Supp. 2d at 18 n.12.[5]

The legislative history also shows that some worried that the Service would overuse the DPS authority by listing too many populations. S. Rep. No. 96-151

---

[5] *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) ("The FWS does not have to list an entire species as endangered when only one of its populations faces extinction."); *Oregon Wolves*, 354 F. Supp. 2d at 1169 ("[I]f a distinct and significant population of an unlisted species is struggling while other populations are faring well, FWS may designate the struggling population as a DPS and list it as endangered."); *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 12 (D.D.C. 2002) (internal citation omitted) ("[T]he legislative history of the statute reflects a 'consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a [DPS] of a species protected status.'").

("[The DPS authority] could result in the listing of squirrels in a specific city park, even though there is an abundance of squirrels in other parks in the same city, or elsewhere in the country"). In response, Congress instructed the Secretary "to list populations sparingly and only when the biological evidence indicates that such action is warranted." *Id*. Thus, Congress emphasized that the Service was to use the DPS authority *to list* populations, even if "sparingly."

Congress limited the definition of DPSs to vertebrates (mammals, birds, herpetofauna, and fish), which likely indicates that Congress was not willing to protect DPSs of insect and plant populations but did wish to protect DPSs of charismatic species like the gray wolf. *See 2008 Wolves*, 579 F. Supp. 2d at 17 (discussing Congress's decision to limit DPSs to vertebrates). Given the concern about overuse of the DPS authority, why would Congress make it possible to use DPSs to *remove* protections from core populations of more charismatic vertebrates, while forbidding this "flexibility" for invertebrates? The exclusion of DPSs of non-vertebrates like insects and plants from the definition of "species" makes no sense if the DPS tool could be used, as the Service asserts, for delisting purposes.

That the DPS authority is intended to increase – not remove – protections for vulnerable populations is also evident in the Service's own DPS Policy. The DPS Policy explains that by listing DPSs the Service can "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that

would necessitate listing a species or subspecies throughout its entire range." DPS Policy at 4725; *see, e.g.*, *Oregon Wolves*, 354 F. Supp. 2d at 1160 (explaining that the DPS Policy's purpose is to "allow FWS to *list* a DPS as threatened or endangered, and thereby provide a level of protection that is different from other populations within the same species") (emphasis added).

Consider also that the DPS Policy requires that a population be "significant" to qualify as a DPS. DPS Policy at 4725. Of course, there would be no need to consider a population's significance if a DPS could properly be used for delisting purposes because no harm would come from removing protections from an insignificant population. This reality provides additional evidence that the DPS authority is a listing tool that cannot be used to carve DPSs out of a species-level listing for the sole purpose of delisting.

In applying the DPS Policy to wolves in the western Great Lakes, the Service concluded that precisely because the Great Lakes wolf population is significant, it can be designated as a DPS and all ESA protections removed. Under the Service's logic, if Great Lakes wolves were not "significant" to the species as a whole, the Service would not be permitted to create a DPS for delisting and would

instead be required to maintain the protections of the ESA. This perverse result demonstrates how far the 2011 Final Rule has strayed from congressional intent.[6]

That the DPS Policy requires that a population qualify as endangered or threatened prior to DPS designation provides further evidence that it cannot be properly used as a delisting tool. As the district court held, the Service's "designation of a DPS for the purpose of *not* listing a vertebrate population makes no sense." Op. at 65. The Hunter Conservation Coalition argues that the Service's recognition of "warranted but precluded" DPSs undermines the district court's holding that a population must qualify as endangered or threatened prior to designation as a DPS. Br. for Hunter Conserv. Coal. (ECF #1587537) at 30-31. Yet their argument misses the mark because "warranted but precluded" DPSs (just like proposed DPSs) have been found to satisfy all three criteria for designating a DPS, and most crucially, the agency has applied the ESA's five listing factors and determined that the population qualifies as threatened or endangered (even though the agency has not yet actually designated the population as a DPS through a finalized listing). This is sharply different from what the Service did with the Western Great Lakes DPS, namely, designate a DPS that does not qualify for listing and simultaneously delist it.

---

[6] Moreover, the Great Lakes wolf population is "discrete" only because the wolf has been extirpated from vast swaths of its historic range. Isolation of this population is a threat that helps justify continuing protections, not removing them.

Federal courts have repeatedly rejected the Service's efforts to use the DPS authority to reduce protections for at-risk wildlife. In remanding the Service's decision to create five DPSs of bull trout but list only two of them under the ESA, the U.S. District Court for the District of Oregon held that "[l]isting of population segments is a proactive measure to prevent the need for listing a species over a larger range – not a tactic for subdividing a larger population the USFWS has already determined . . . . warrants listing throughout a larger range." *Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1133 (D. Or. 1997).

To be sure, the prior wolf cases provide abundant authority that the DPS Policy is a listing tool for protecting vulnerable populations and cannot be used to reduce ESA protections. *See 2008 Wolves*, 579 F. Supp. 2d at 17 ("But contrary to FWS' view, Section 1533(c)(2)(B) does not suggest that FWS may simultaneously designate and delist a previously unlisted sub-population of vertebrates within a broader listing. Rather, it quite strongly suggests – consistent with common usage – that the listing of any species (such as the western Great Lakes DPS) is a precondition to the delisting of that species."); *Oregon Wolves*, 354 F. Supp. 2d at 1171 (vacating wolf downlisting rule because "[s]imilar to the bull trout case, the wolf Final Rule created DPSs that decreased the protection afforded to the species, even though the population status of the wolf was not improved outside of the core recovery areas"). But despite being repeatedly rebuffed by the courts, the Service

has once again used the DPS Policy as a tactic for carving out a population of the gray wolf species for the express purpose of delisting it.

The Service's misuse of the DPS authority frustrates the ESA's overall purpose of conserving imperiled species. Endangered species recover when individuals from healthy core populations disperse or migrate to areas where populations have declined or disappeared. This is exactly how gray wolves made progress toward recovery in the western Great Lakes region. But when the Service delists a core population, further recovery of that endangered species becomes more difficult; without ESA protections, fewer individuals disperse to unoccupied habitat beyond the boundaries of the DPS.[7]

To be sure, after the Service delisted the core population of gray wolves in the western Great Lakes, state managers focused on killing wolves responded by authorizing hunting and trapping seasons and aggressive depredation control. *See* Op. at 105-106 (discussing the "unregulated killing zone for wolves" in Minnesota); 2011 Final Rule at 81,700 (describing Wisconsin's plans to reduce the

---

[7] The Center identified 56 long-range wolf dispersal events out of the core populations to adjoining unoccupied habitat. CENTER FOR BIOLOGICAL DIVERSITY, MAKING ROOM FOR WOLF RECOVERY: THE CASE FOR MAINTAINING ENDANGERED SPECIES ACT PROTECTIONS FOR AMERICA'S WOLVES 3-5 (2014), https://www.biologicaldiversity.org/campaigns/gray_wolves/pdfs/Making_Room_f or_Recovery_print.pdf. Dispersal events steadily increased from 2000 to 2011, when wolf populations were under federal protection and have since declined under state management, where aggressive hunting and trapping seasons have led to population declines.

state's wolf population by more than half to the target population of 350 wolves).

In Minnesota, for example, the wolf population declined by almost 25 percent after

the inaugural 2011-2012 hunting and trapping season that followed promulgation

of the 2011 Final Rule.[8] And the Minnesota Department of Natural Resources

reports that hunters, trappers, and others killed 1,650 wolves in the state from

2012-2014, while the 2011 Final Rule was in effect.[9] In short, removal of federal

protections for the Western Great Lakes DPS left fewer wolves to disperse outside

the core occupied area of the DPS. As such, the Service's misuse of the DPS

authority hurts broader species recovery, which is contrary to the ESA's

conservation purpose.

Federal Appellants argue that the district court cannot substitute its policy

judgment for that of the agency, which has "made clear that it places greater

weight" on policy factors such as "the importance of incentivizing state

cooperation." Fed. Defs.' Br. at 58. But that's not what the district court did. The

district court merely ensured – as the judiciary must – that the agency's

---

[8] U.S. Fish and Wildlife Serv., *Western Great Lakes Distinct Population Segment of the Gray Wolf, 2012-2014 Post Delisting Monitoring Annual Report* (2014), *available at* http://www.fws.gov/midwest/wolf/monitoring/pdf/Year1PDMReportSept2014.pdf (documenting wolf declines in Minnesota, Wisconsin, and Michigan following delisting of the Western Great Lakes DPS).

[9] Minn. Dep't of Nat. Resources, *Wolf Management* (June 2015), http://www.dnr.state.mn.us/mammals/wolves/mgmt.html (last visited Feb. 16, 2016) (providing that 734, 401, and 515 of Minnesota's wolves were killed in 2012, 2013, and 2014, respectively).

interpretation does not frustrate *Congress's* policy judgment that is embodied in the ESA. Because Congress, in drafting the ESA, made "it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities," this Court should resist any interpretation of the DPS authority that has the opposite effect. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). The congressional mandate to give species "the highest of priorities" cannot be reconciled with Service's use of the DPS as a delisting tool.

In summary, Congress envisioned the DPS authority as a mechanism to proactively protect populations of a species prior to the point where the entire species needs protection under the Act. There is nothing to suggest that Congress intended the agency to use this authority to do the opposite. The Service's misuse of the DPS authority is inconsistent with Congressional intent and the Service's own DPS Policy. It relegates the persistence of rare wildlife to isolated core populations, impeding broader species conservation and thwarting the ESA's purpose.

## II. The Service's Misuse Of The DPS Authority Creates A Non-DPS Remnant That Defeats The Conservation Purpose Of The ESA.

The Service's simultaneous designation and delisting of the Western Great Lakes DPS from within the gray wolf's lower 48 listing created a "non-DPS remnant" with a tenuous legal status. Although the district court did not focus on the illegality of the Service's creation of this remnant listing, the Service's actions

since its promulgation of the 2011 Final Rule demonstrate an additional reason why its piecemeal delisting of the gray wolf is contrary to the ESA.

The Service has now proposed to delist gray wolves throughout the remainder of the lower 48 States, reasoning that the non-DPS remnant is not a "valid entity" for listing and cannot retain ESA protections.[10] 78 Fed. Reg. 35,664, 35,668 (June 13, 2013) ("Consistent with our 5-year review, we conclude that the current *C. lupus* listed entity is not a valid species under the Act and now propose to remove this entity from the List . . . ."). In that proposed rule, the Service explains that because the non-DPS remnant is not an entire species, sub-species, or DPS, it cannot retain federal protections. *Id*. at 35,673.[11]

It is unreasonable for the agency to defend the legality of the 2011 Final Rule – that created the non-DPS remnant – and then remove wolf protections from that remnant listing because it is not a "valid entity." Such a pernicious tactic simply cannot be allowed to stand. If it does, then any listed species could

---

[10] The district court in *Vermont Wolves* rejected the Service's argument that it could not create a non-DPS remnant. 386 F. Supp. 2d at 565 ("Nowhere in the ESA is the Secretary prevented from creating a 'non-DPS remnant' designation, especially when the remnant area was already listed as endangered."). Yet even if the Service retained endangered species protections for the non-DPS remnant, it remains problematic because these wolves lack designated critical habitat and have no plan to guide their recovery. Existing in a state of regulatory limbo, wolves in the non-DPS remnant have little hope of full recovery.

[11] As the ESA provides for the protection of a subspecies, the Service did finalize protections for Mexican gray wolves as an endangered subspecies. 80 Fed. Reg. 2488 (Jan. 16, 2015).

prematurely lose all protections through this maneuver: (1) designate remaining populations as DPSs and simultaneously delist them as recovered, (2) declare the original listed entity invalid, and (3) delist the non-DPS remnant even though it has not recovered. *Contra* 50 C.F.R. § 424.11(d) (providing that delisting can lawfully occur only if a species is extinct, the original listing was in error, or the species is recovered.).

The Service's proposal to remove federal protections from the non-DPS remnant would mean that numerous "significant portions of the range" of the wolf's lower 48 listing would no longer be protected even though they lack viable wolf populations, such as within the Pacific Northwest or the Northeast. Such an approach to delisting is unlawful. Several courts have made clear that the Service cannot reduce wolf protections in "significant portions of the range" that lack viable wolf populations.[12]

If allowed to stand, the Service's tactics would also sabotage any real chance of further gray wolf recovery. For example, wolves in southwestern Oregon that

---

[12] *Oregon Wolves*, 354 F. Supp. 2d at 1167-72 (rejecting FWS interpretation as "not consistent with the *Defenders* interpretation that 'a species can be extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was'" (citing *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001)); *Vermont Wolves*, 386 F. Supp. 2d at 566 (similar); *see also Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 19-21 (D.D.C. 2002) (setting aside decision to list lynx as threatened instead of endangered given two major geographic regions in which the lynx "is no longer viable but once was").

have just started to establish breeding populations – including wolves that have dispersed into California for the first time in more than 85 years – would face a higher likelihood of persecution in the absence of federal protections. Indeed, the Oregon Department of Fish and Wildlife recently removed protections from the state's wolves, even though only 80 wolves exist in approximately 12 percent of suitable habitat in Oregon.[13]

The Service cannot undercut wolf conservation nationwide just to delist a Western Great Lakes DPS. The Service's simultaneous designation and delisting of the Western Great Lakes DPS creates this problematic non-DPS remnant, which is yet another reason why its misuse of the DPS authority is contrary to the ESA.

The Service's divide and conquer strategy sets a disastrous precedent for any somewhat wide-ranging, federally-protected species that exists in isolated core populations. Species like the red-cockaded woodpecker, spotted owl, Sierra Nevada yellow-legged frog, yellow-billed cuckoo, Indiana bat, black-footed ferret, and more could lose protection under the Service's misguided approach, even though they have not recovered. Indeed, the Service is increasingly eyeing this use of the DPS Policy to remove protections for species such as the grizzly bear where

---

[13] Courtney Sherwood, *Environmentalists sue Oregon for removing gray wolf from endangered list*, REUTERS, Dec. 31, 2015, *available at* http://www.reuters.com/article/us-oregon-wolves-idUSKBN0UE1FE20151231.

"the importance of incentivizing state cooperation" or other such political concerns makes full recovery of a species unpalatable to the agency.

## III. Although The Service Cannot Simultaneously Designate And Delist A DPS, The Service Can Legally Reclassify A Species-Level Listing Into Multiple DPSs If It Follows The ESA's Requirements.

The Hunter Conservation Coalition argues that under the district court's interpretation, "no distinct population, no matter how robust, can be delisted unless the entire original listing unit is delisted." Br. for Hunter Conserv. Coal. 18-19. Although the Service cannot simultaneously designate and delist a DPS, as done in the 2011 Final Rule at issue here, the Service is not "handcuffed" to its initial determination, as the hunters argue. *Id.* at 7. As explained below, the Service can legally use the DPS authority to reclassify a species-level (or subspecies-level) listing into multiple DPSs that encompass the entire the range of the original listing, as long as the Service follows the DPS Policy and the ESA mandates that apply whenever the Service makes a listing decision.

To lawfully reclassify a species-level listing into DPSs, the Service must first review the status of the entire species-level listing. As the district court correctly held, "once an entity is identified and listed, *that entity* is afforded

protection under the ESA, *see* 16 U.S.C. § 1533(c), and the agency's actions must

address that entire listed entity." Op. at 86; *see also* Op. at 87-89.[14]

If, based on the results of the status review of the listed entity, the Service

wants to switch from a species-level listing to DPSs, it must offer a reasonable

basis for doing so. *See Friends of the Wild Swan*, 12 F. Supp. 2d at 1133-34

(holding that the Service failed to provide a reasonable explanation for its decision

to change the nationwide listing of bull trout to five DPSs). In general, a species

should be protected at the highest taxonomic level possible consistent with the

conservation purpose of the ESA. 16 U.S.C. § 1531(b). However, if the Service

"legitimately concludes, after proper and sustainable analysis, that listing of the

entire species" is unnecessary, the agency can "proceed[ ] on a population segment

basis." *See Friends of the Wild Swan*, 12 F. Supp. 2d at 1134.

For example, a good candidate for reclassification would be an animal that is

listed as threatened at the species-level but has a particularly vulnerable population

---

[14] Analysis of the plain language of Section 4(c) shows that the district court is
correct. Section 4(c)(2)(A) directs the Service to review, at least every five years,
"all species included in a list" which is "in effect at the time of such review." 16
U.S.C. § 1533(c)(2)(A). And Section 4(c)(1) provides that the Service "shall from
time to time revise each list published under the authority of this subsection to
reflect recent determinations, designations, and revisions . . . ." *Id.* § 1533(c)(1).
That "list" referenced in Section 4(c)(1) is "a list of all species determined . . . to be
endangered species and a list of all species determined . . . to be threatened
species." *Id*. Because Section 4(c) directs the Services to base its reviews on the
"list," the Service must start by analyzing the status of the listed entity. In other
words, because the DPS does not yet exist, the Service cannot begin its analysis
there, as the Service unlawfully did in the 2011 Final Rule.

that would benefit from uplisting to endangered status. Reclassification of a species-level listing into DPSs could also provide an opportunity to designate critical habitat, which provides an important conservation benefit, especially for species listed prior to 1978 (for which the Service is not otherwise required to designate critical habitat).

Next, each of these new DPSs must comport with the three criteria set forth in the DPS Policy, and namely, they must be discrete, significant, and qualify for protection after applying the ESA's five listing factors. DPS Policy at 4725; 50 C.F.R. § 424.11(c) (providing that a species "shall be listed or reclassified" based on analysis of the five factors). Critically, the Service must also ensure that the new DPSs encompass the entire geographic range of the original listing to prevent the creation of a "non-DPS remnant," as discussed above in Section II. Finally, the Service must engage experts and the public through notice and comment on the proposed reclassification. 16 U.S.C. § 1533(b)(5)(A)(i).

After the Service designates a valid DPS through a final rulemaking, the agency must then develop a recovery plan that sets forth recovery criteria that would need to be met before delisting the DPS. Section 4(f) states that the Services "*shall* develop and implement [recovery] plans … for the conservation and survival of endangered species and threatened species listed pursuant to this section …." *Id.* § 1533(f) (emphasis added). Recovery plans must contain

"objective, measurable criteria which, when met, would result in a determination, in accordance with the [five listing factors], that the species be removed from the list . . . ." *Id*. § 1533(f)(1)(B)(ii). During the development of recovery plans, the Service must "[u]tilize the expertise of and actively solicit independent peer review to obtain all available scientific and commercial information . . . ." 59 Fed. Reg. 34,270 (July 1, 1994) ("Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities."). Draft recovery plans are also subject to public notice and comment prior to their finalization. 16 U.S.C. § 1533(f)(4).[15]

After developing a recovery plan, the Service may then review the status of the DPS (on its own initiative or in response to a citizen petition), and if – after considering the recovery criteria and applying the ESA's five listing factors – the Service determines that the DPS no longer qualifies as endangered or threatened, the Service can propose to delist the DPS. *Id.* § 1533(c)(2); 50 C.F.R. § 424.11(c).

---

[15] By simultaneously designating and delisting the Western Great Lakes DPS, the Service bypassed the ESA's mandatory requirement to develop a recovery plan for that listed entity. As such, it had no relevant recovery criteria to inform the decision about whether to delist. 16 U.S.C. § 1533(f)(1). The Service purports to base its decision to delist the Western Great Lakes DPS on the "Recovery Plan for the Eastern Timber Wolf" (AR000001A). This plan, which was issued in 1978 and revised in 1992, focuses on the "Eastern timber wolf" (*Canis lupus lycaon*), a subspecies that lost legal relevance when the Service listed the gray wolf at the species level in 1978. Moreover, its outdated recovery criteria cannot be reasonably relied upon, especially considering that the target population for Minnesota (1,251 wolves) was almost identical to the wolf population at the time the plan was drafted (1,235 wolves). 2011 Final Rule at 81,676.

Previous listing decisions by NFMS (the federal agency that works to protect endangered marine animals) illustrate appropriate uses of the DPS authority to reclassify a species-level listing into multiple DPSs. For example, in 1990 NMFS listed the Steller sea lion as threatened throughout its range. 55 Fed. Reg. 49,204 (Nov. 26, 1990). In 1997, NMFS reclassified the species into two DPSs, with a Western DPS uplisted as endangered and an Eastern DPS listed as threatened. 62 Fed. Reg. 30,772 (June 5, 1997). This reclassification satisfied a valid conservation objective by providing the Steller sea lion with additional protections in the western portion of the range where it was declining, including the designation of critical habitat. Thereafter, in 2013, following the completion of a recovery plan and a status review that applied the five factors, NMFS delisted the Eastern DPS. 78 Fed. Reg. 66,140 (Nov. 4, 2013).

As another example, the loggerhead sea turtle was originally protected as a threatened species. 43 Fed. Reg. 32,800 (July 28, 1978). In 2011, in response to a petition by *Amicus Curiae* Center for Biological Diversity and its partner, NMFS reclassified the species-level listing into nine DPSs, with four listed as threatened and five uplisted as endangered. 76 Fed. Reg. 58,868 (Sept. 22, 2011). NMFS also designated critical habitat for the Northwest Atlantic Ocean DPS. 79 Fed. Reg. 39,756 (July 10, 2014). If after analyzing the status of these DPSs in the context of

their recovery criteria, the Service determines that any of these DPSs no longer qualify for protection under the ESA, delisting would be appropriate.

These examples show how the DPS authority can be legally utilized to switch from a species-level listing to DPSs, as long as the Service follows the DPS Policy and the ESA's requirements. As such, there is no merit to the argument that the district court's ruling stymies state cooperative efforts by forcing western Great Lakes wolves to "permanently remain on the federal endangered species list." Br. of Defs.-Appellants State of Mich. (ECF #1584892) at 11.[16]

In summary, a major failure of the 2011 Final Rule is that it creates a DPS for the sole purpose of delisting it. This is a misuse of the DPS authority, which (when used lawfully) provides a means to *increase* protection for vulnerable populations. Making matters even worse, the delisting of the Western Great Lakes DPS creates a non-DPS remnant that the Service has now proposed to delist. The Service's misuse of the DPS authority results in an unlawful, piecemeal delisting of the gray wolf across most of the lower 48 States, even though wolves have made progress toward recovery in only two core areas. The 2011 Final Rule establishes a

---

[16] There is absolutely no merit to the argument that "Western Great Lakes wolves would need to recover in Chicago, Milwaukee, Green Bay, and other urban areas where they were historically present before they can be delisted." Opening Br. for the State of Wis. (ECF #1584984) at 12. Urban areas are not "significant portions" of the wolf's historic range so wolves do not need to be recovered there.

dangerous precedent for potentially hundreds of other endangered or threatened species that have begun to recover in isolated populations.

The district court identified numerous additional ways that the 2011 Final Rule violates the ESA. This Court can affirm on any of those bases. Thus, for the reasons explained here and in the Brief for Plaintiffs-Appellees, the Court should affirm the district court decision setting aside the illegal delisting rule.

## CONCLUSION

So that the gray wolf and other species can recover as envisioned by the ESA, the Center respectfully asks that the district court's ruling be affirmed. The Service's misuse of the DPS authority cannot be allowed to stand.

Respectfully submitted on this 17th day of February, 2016,

/s/ Collette L. Adkins
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

/s/ Amy R. Atwood
CENTER FOR BIOLOGICAL DIVERSITY
P.O. BOX 11374
Portland, OR 97211
Telephone: (971) 717-6401
atwood@biologicaldiversity.org

*Counsel for Amicus Curiae Center for Biological Diversity*

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the length limitation of Fed. R. App. P. 29(d) because it contains 6,985 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)), which is less than one-half the maximum length authorized by these rules for a party's principal brief.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2007 in 14-point Times New Roman font.

Respectfully submitted this 17th day of February 2016,

/s/  Collette L. Adkins

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

*Counsel for Amicus Curiae Center for Biological Diversity*

# CERTIFICATE OF SERVICE

The undersigned certifies that the Brief of *Amicus Curiae* Center for Biological Diversity was electronically filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit on February 17, 2016, by utilizing the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 17th day of February 2016,

/s/      Collette L. Adkins

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

*Counsel for Amicus Curiae Center for Biological Diversity*