## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

HUMANE SOCIETY OF THE UNITED STATES, *et al.*,

Plaintiffs-Appellees,

v.

S.M.R. JEWELL, *et al.*,

STATE OF WISCONSIN, *et al.*, and

U.S. SPORTSMEN'S ALLIANCE FOUNDATION, et al.,

Defendants-Appellants

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

## REPLY BRIEF FOR THE FEDERAL APPELLANTS

JOHN C. CRUDEN
   *Assistant Attorney General*

*Of Counsel:*
BENJAMIN C. JESUP
SHARON PUDWILL
   *Office of the Solicitor*
   *U.S. Department of the Interior*
   *Washington, DC 20240*

DAVID C. SHILTON
ANDREA GELATT
MICHAEL R. EITEL
JOAN M. PEPIN
   *Environment and Natural*
   *Resources Div.*
   *U.S. Department of Justice*
   *P.O. Box 7415*
   *Washington, D.C. 20044*
   *(202) 305-4626*
   *joan.pepin@usdoj.gov*

# TABLE OF CONTENTS

Table of Contents ........................................................................ i

Table of Authorities ................................................................. iii

Glossary ..................................................................................... vi

Introduction ............................................................................... 1

Summary of Argument ............................................................... 3

Argument ..................................................................................... 6

I.    The ESA Authorizes FWS to Designate any Discrete
and Significant Vertebrate Wildlife Population as a
DPS, and to List, Delist, or Reclassify it as Appropriate ....... 6

    A.    The plain language of the ESA authorizes FWS's
actions ............................................................................ 6

    B.    In the alternative, FWS's interpretation is
reasonable and entitled to *Chevron* deference. ............. 7

    C.    Delisting a recovered DPS of a species that is
listed at a higher taxonomic level is consistent
with the purposes of the ESA. ....................................... 9

    D.    FWS's interpretation and action are consistent
with the DPS policy ...................................................... 13

    E.    Plaintiffs' opinion that a DPS is not really a
species does not warrant disregarding the ESA's
definition of "species." ................................................. 16

II.    The Minnesota Wolf Population Has Always Been
Listed as a Separate Species, and FWS Has the
Authority to Revise and Update that Listing ....................... 17

III. FWS's Interpretation of the Phrase "Significant Portion of its Range" Is Reasonable and Entitled to *Chevron* Deference ................................................................ 22

    A.    FWS reasonably interprets the ambiguous phrase "significant portion of its range" to refer to a species' current, not historical, range. ......................... 22

    B.    Plaintiffs' contrary interpretation is an attempt to convert the ESA's purpose from the recovery of endangered species to the restoration of recovered species ........................................................... 27

    C.    FWS properly analyzed whether the Western Great Lakes DPS was in danger of extinction in all or a significant portion of its range ......................... 29

IV. FWS's Decision Was Based on the Best Available Science ......................................................................... 29

    A.    There was no improper political influence on FWS's decision to delist the Western Great Lakes wolves ................................................................ 29

    B.    FWS's decision not to change the taxonomic classification of *Canis lupus lycaon* did not require it to abandon the delisting rule ...................... 32

V. FWS's Conclusion that the Western Great Lakes DPS Is Neither Threatened nor Endangered Is Reasonable and Supported by the Record ................................. 36

Conclusion ................................................................ 41

# TABLE OF AUTHORITIES

## CASES:

*Alpharma, Inc. v. Leavitt,*
    460 F.3d 1 (D.C. Cir. 2006) .................................................................. 8

*Am. Wildlands v. Kempthorne,*
    530 F.3d 991 (D.C. Cir. 2008) ........................................................... 13

*Bldg. Indus. Ass'n v. Norton,*
    247 F.3d 1241 (D.C. Cir. 2001) ...................................................... 35

*\*City of Arlington v. FCC,*
    133 S. Ct. 1863 (2013) ............................................................... 8, 23

*Defenders of Wildlife v. Norton,*
    258 F.3d 1136 (9th Cir. 2001) ................................................. 24, 25

*Gibbs v. Babbitt,*
    214 F.3d 483 (4th Cir. 2000) .................................................................. 1

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.,*
    709 F.3d 44 (D.C. Cir. 2013) .............................................................. 40

*Humane Soc'y of the U.S. v. Kempthorne,*
    579 F. Supp. 2d 7 (D.D.C. 2008) .......................................................... 7

*\*In re Polar Bear Endangered Species Act Listing,*
    709 F.3d 1 (D.C. Cir. 2013) ......................................................... 15, 37

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
    734 F.3d 1115 (D.C. Cir. 2013) ........................................................ 27

*\*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................................ 25

*\*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ........................................................ 15

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ........................................................................ 10

*\*Authorities chiefly relied upon*

*Sw. Ctr. for Biological Diversity v. Babbitt,
215 F.3d 58 (D.C. Cir. 2000) ............................................................ 35

Tennessee Valley Auth. v. Hill,
437 U.S. 153 (1978) ........................................................................ 1

Trout Unlimited v. Lohn,
559 F.3d 946 (9th Cir. 2009) ........................................................ 15

United States v. Am. Trucking Assns, Inc.,
310 U.S. 534 (1940) ...................................................................... 11

**STATUTES:**

16 U.S.C. § 1532(5)(A)(ii) ............................................................ 26

*16 U.S.C. § 1532(6) .................................................................. 6, 22

*16 U.S.C. § 1532(20) ................................................................ 22

*16 U.S.C. § 1533(a) ......................................................... 6, 13, 27

*16 U.S.C. § 1533(a)(1) ............................................. 6, 9, 13, 20, 27

16 U.S.C. § 1533(a)(1)(A)-(E) ..................................................... 36

16 U.S.C. § 1533(b) .................................................................... 27

16 U.S.C. § 1533(b)(1)(A) ........................................................... 35

16 U.S.C. § 1533(b)(3)(A) ........................................................... 30

16 U.S.C. § 1533(b)(3)(B) ........................................................... 30

*16 U.S.C. § 1533(c)(1) ....................................................... 6, 11, 20

16 U.S.C. § 1533(c)(2) ............................................................... 12

*Authorities chiefly relied upon

**RULES and REGULATIONS:**

50 C.F.R. § 17.11(g) ............................................................ 18

50 C.F.R. § 402.02 ............................................................. 27

43 Fed. Reg. 9607 (Mar. 9, 1978) .................................... 17

75 Fed. Reg. 55,730 (Sept. 14, 2010) ............................... 29

76 Fed. Reg. 26,086 (May 05, 2011) ................................ 32

76 Fed. Reg. 53,379 (Aug. 26, 2011) .......................... 31, 33

*Policy Regarding the Recognition of Distinct Vertebrate
Population Segments Under the Endangered Species Act,
61 Fed. Reg. 4722 (Feb. 7, 1996) ................................. 7, 13, 14, 15

*Final Policy on Interpretation of the Phrase "Significant Portion
of Its Range" in the Endangered Species Act's Definitions of
"Endangered Species" and "Threatened Species,"
79 Fed. Reg. 37,578, 37,583 (July 1, 2014)............. 23, 24, 25, 26, 27

*Authorities chiefly relied upon

# GLOSSARY

APA .............................................................. Administrative Procedure Act

DPS................................................................ Distinct Population Segment

ESA........................................................................ Endangered Species Act

FWS ............................................................ U.S. Fish and Wildlife Service

JA ..................................................................................... Joint Appendix

NMFS .................................................... National Marine Fisheries Service

## INTRODUCTION

Although the Endangered Species Act (ESA) is "the most
comprehensive legislation for the preservation of endangered species
ever enacted by any nation," *Tennessee Valley Auth. v. Hill*, 437 U.S.
153, 180 (1978), in plaintiffs' view it is not comprehensive enough.  The
ESA "permit[s] the exercise of federal power only to conserve those
species that are 'endangered' or 'threatened.'"  *Gibbs v. Babbitt*, 214
F.3d 483, 504 (4th Cir. 2000).  Once a species (which, by statutory
definition, includes a "distinct population segment" (DPS) of any
species), has "recovered" – that is, once it is no longer in danger of
extinction or likely to become so in the foreseeable future – then the
ESA provides that FWS may, and if petitioned to do so must, remove it
from the list of endangered and threatened species (List).

"The recovery of wolves in the Great Lakes is one of America's
great wildlife success stories."  JA.[1]  First listed as a "species" under the
ESA in 1978, the gray wolf population of the upper Midwest has vastly
exceeded its recovery goals.  From a threatened population of 500-1,000
wolves confined to northern Minnesota, it has grown into a robust and

---

[1] National Wildlife Federation, comment letter on proposed rule, 7/5/11.

healthy population of over 4,000 gray wolves spanning across Minnesota, Wisconsin, and the Upper Peninsula of Michigan. The Fish and Wildlife Service (FWS) recognized that this thriving DPS was recovered, and delisted it in accordance with the language and purpose of the ESA.

Plaintiffs argue, however, that the recovery of the Western Great Lakes DPS is not enough to justify delisting it. They claim that it must remain listed, even if it is no longer imperiled, until the gray wolf has been restored to its full historical range nationwide. The plain language of the ESA, however, does not allow FWS to keep a recovered species on the List for the purpose of making it more widespread or abundant. If the species is no longer endangered or threatened, and if a petition to delist has been filed, the ESA *requires* delisting.

Unable to identify any statutory authority or case law supporting their claim that the Western Great Lakes DPS cannot be delisted until wolves occupy the entire continental United States, plaintiffs rely on bare assertion and invective. The law and the facts, however, support FWS's sound decision that the Western Great Lakes wolf population is recovered and should be delisted.

## SUMMARY OF ARGUMENT

The district court's holding that FWS cannot identify and delist a DPS of a listed species is contrary to both the plain language of the ESA and, alternatively, FWS's interpretation of the ESA, which is entitled to *Chevron* deference. The district court concluded that FWS's power to determine whether "any species" is endangered or threatened is limited when the species at issue is a DPS, but not similarly limited for taxonomic species and subspecies. The plain language of the ESA makes no such distinctions. It defines "species" to include DPSs, and directs FWS to determine whether "any species" is endangered or threatened, and to list, uplist, downlist, or delist it accordingly. FWS's rule and interpretation of the ESA adhere to this plain statutory language.

The district court also erred in rejecting FWS's explanation that the rule in this case did not create a new DPS, but rather revised a preexisting one. The Minnesota wolf population was recognized as a separate species in the 1978 listing rule, and has functioned as a DPS ever since. FWS properly exercised its authority to revise the boundaries of the Minnesota-based species to reflect its territorial

expansion into neighboring states.  Contrary to plaintiffs' suggestion, the boundary revision did not encompass any wolves from any other wolf population; only wolves belonging to the expanded Minnesota population were affected by the rule.

The ESA defines an endangered species as one that "is in danger of extinction throughout all or a significant portion of its range."  FWS has explained, both in the rule and in a formal policy jointly issued with the National Marine Fisheries Service (NMFS), that the phrase "significant portion of its range" refers to the species' current range, not its historical range.  That interpretation is fully consonant with the statutory language, and is entitled to deference.  Plaintiffs disagree, but present no persuasive arguments that FWS's interpretation is contrary to the language, purpose, or structure of the ESA.

Plaintiffs allege political interference with FWS's decision in this case, but there is no evidence that political interest in the decision had any effect on the outcome.  At most, the record suggests that FWS attempted to adhere to a timeline for its decision in order to stave off threatened legislation to "speed-up this process."  There is no evidence, however, that the result was affected in any way by political factors,

and the record also shows that FWS did not allow the timeline to compromise its statutory duty to conduct a robust public process and to base its decision on the best scientific and commercial data available.

The proposed rule, in addition to proposing the revision, renaming, and delisting of the Western Great Lakes DPS, also proposed changing the taxonomic classification of the eastern wolf from *Canis lupus lycaon*, a subspecies of the gray wolf, to *Canis lycaon*, a full species. After two rounds of public comments, FWS rejected the proposed change, explaining that it does not represent the majority opinion in the scientific community. Plaintiffs do not challenge that decision, but argue that having rejected the taxonomic change, FWS had to reject the proposal to revise and delist the Western Great Lakes DPS as well. The revision and delisting of the DPS was independent of the unrelated question of taxonomic classification, and plaintiffs' argument is baseless.

Finally, the record supports FWS's determination that the Western Great Lakes DPS is not threatened or endangered by any of the five factors listed in the ESA. Plaintiffs do not identify a single piece of record evidence that FWS overlooked or misconstrued, basing

their arguments solely on their differing views of the science and policy. That is an insufficient basis to reject FWS's conclusions, especially where those findings depended on FWS's scientific expertise.

## ARGUMENT

### I. THE ESA AUTHORIZES FWS TO DESIGNATE ANY DISCRETE AND SIGNIFICANT VERTEBRATE WILDLIFE POPULATION AS A DPS, AND TO LIST, DELIST, OR RECLASSIFY IT AS APPROPRIATE

#### A. The plain language of the ESA authorizes FWS's actions.

Congress defined "species" in the ESA to include not only taxonomic species and subspecies, but also "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature," or DPS. 16 U.S.C. § 1532(6). Section 4(a) of the ESA directs FWS to "determine whether any species" – which by definition includes DPSs – "is an endangered species or a threatened species" due to any of five listed factors, and to list, delist, or reclassify that species accordingly. 16 U.S.C. § 1533(a)(1); *see* FWS Br. 9-10. FWS must periodically revise the List to "reflect recent determinations" made under Section 4(a). 16 U.S.C. § 1533(c)(1). As explained in FWS's opening brief, 39-42, those statutory provisions give FWS the authority

to determine that a discrete and significant population (that is, a DPS)[2] of a listed species is no longer endangered or threatened, and to delist it. The district court erred in holding that FWS lacked the authority to do so.

## B. In the alternative, FWS's interpretation is reasonable and entitled to *Chevron* deference.

In an earlier challenge to a similar rule, a court found the ESA ambiguous on whether FWS could simultaneously identify and delist a DPS, and remanded to the agency for its interpretation. *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008). In response, the Solicitor of the Department of the Interior explained that the ESA gives FWS the authority to identify a discrete and significant vertebrate wildlife population as a DPS and, if FWS finds that the DPS is neither endangered nor threatened, to delist it. The Solicitor's opinion further explains why its interpretation is consistent with the text, structure, legislative history, and policy goals of the ESA. AR491-509. Plaintiffs deride the Solicitor's opinion as "simply another piece of propaganda in

---

[2] *See Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy"), reproduced in U.S. Statutory & Regulatory Addendum (U.S.Add.) at 27-30.

the war FWS wages on wolves" that is "irrelevant to the Court's analysis," HSUS Br. 39 & n.19, but this Court's precedents teach otherwise. "Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).

Moreover, in the rule under review, FWS clearly stated its interpretation that the ESA authorizes it to designate a DPS within a listed species and, if the facts warrant, to find that DPS not endangered or threatened. FWS also explicitly adopted the "analysis and conclusions set out in the Solicitor's opinion." 76FR81669-70; 81682-83. Where, as here, "Congress has unambiguously vested [the agency] with general authority to administer the [relevant] Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority," then "the preconditions to deference under *Chevron* are satisfied." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013).

The district court nevertheless held that FWS's decision was "entitled to no deference under *Chevron* step two," Op.69, and

substituted its own interpretation.  The district court decided that the ESA applies differently to DPSs than it does to the other types of "species" included in the statutory definition.  Although section 4(a)(1) directs FWS to "determine whether *any species* is an endangered species or a threatened species," 16 U.S.C. § 1533(a)(1) (emphasis added), the district court held that if the species at issue is a DPS, then section 4(a)(1) becomes a "one-way ratchet" that allows FWS to list or uplist, but not to delist or downlist, that species.  Op.67.

Nothing in the text of the ESA supports the district court's extraordinary conclusion that section 4(a)(1)'s directive to determine whether "any species" is endangered or threatened does not apply equally to all "species" defined as such in the ESA.  Plaintiffs tacitly concede that point by failing to make any arguments based on the statutory text in defense of their and the district court's interpretation.

## C. Delisting a recovered DPS of a species that is listed at a higher taxonomic level is consistent with the purposes of the ESA.

Unable to point to any statutory language supporting their interpretation, plaintiffs instead rely on a flawed interpretive principle.  From the agreed premise that a principal purpose of the ESA is to

protect endangered and threatened species, plaintiffs argue that "*all agency action under the ESA*" must be aimed at "expand[ing] the broad protections" that the ESA provides to endangered and threatened species.  HSUS Br. 33 (emphasis in original).[3]  According to plaintiffs, it is "[a]n inarguable caveat" that it "contradicts the purposes of the ESA" for FWS to determine that a distinct population segment of a listed species is recovered, and to delist it.  *Id.*

The conservation of endangered and threatened species is unquestionably one of the ESA's principal purposes, "[b]ut no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987).  *Accord United States v.*

---

[3] If plaintiffs were correct that "*all* agency action" under the ESA must be intended to expand protection for species, and that any action reducing the level of protection afforded a species "contradicts the purposes of the ESA," then no species could ever be delisted or downlisted – a result that, like plaintiffs' interpretation, is contradicted by the plain language of the statute.

*American Trucking Assns., Inc.*, 310 U.S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.")

Congress defined species to include DPSs, and gave FWS the authority to determine whether "any species" is endangered or threatened. To interpret "any species" as including DPSs only when the determination is to list or uplist the DPS might sometimes result in a higher level of protection, by preventing downlisting or delisting of recovered DPSs, but it does so by disregarding the words Congress chose and the limits it set on the means of accomplishing its purposes. Plaintiffs' reading strays far beyond interpretation into the realm of statutory revision.

Moreover, plaintiffs overlook that the ESA's purpose is the recovery of *endangered and threatened* species, not the permanent federal protection of species that have recovered. The ESA expressly requires FWS to periodically revise the List and to remove those species that are no longer endangered or threatened with extinction. *See* 16 U.S.C. § 1533(c)(1) ("The Secretary shall from time to time revise each

list . . . to reflect recent determinations . . . ."); *id.* § 1533(c)(2) (requiring Secretary to review lists at least every five years and to "determine on the basis of such review whether any such species should . . . be removed from such list"). The delisting of recovered species is every bit as consistent with the text and purposes of the ESA as is the listing of endangered species.

After decades of dedicated efforts by FWS, the states of Minnesota, Wisconsin, and Michigan, and private conservation organizations, the wolf population of the Western Great Lakes area has grown in both numbers and territory to the point where the population vastly exceeds its recovery goals and is no longer threatened with extinction. Plaintiffs may disagree, but the peer reviewers,[4] state wildlife managers,[5] and even several major wildlife advocacy groups[6] agreed with FWS's expert wildlife scientists that the Western Great Lakes wolves are recovered and were properly removed from the List. It is absolutely consistent with the purposes of the ESA to delist this

---

[4] 76FR81681; AR11652; AR11709; AR12769

[5] JA (MN DNR); JA (MI DNR); JA (WI DNR).

[6] JA (NWF), JA (DoW), JA (NRDC).

healthy, recovered species and allow FWS to focus its efforts on species that have not yet recovered.

## D. FWS's interpretation and action are consistent with the DPS policy

Plaintiffs represent to this Court that "the DPS Policy expressly states that no DPS can be created absent an express finding that the proposed DPS is endangered or threatened," HSUS Br. 36-37, but they strangely neglect to quote the "express[] state[ment]" that, if it existed, would be so helpful to their case. In truth, the DPS Policy contains no such statement, express or implied. To the contrary, it states that if a population is discrete and significant, then it constitutes a DPS. Only after concluding that the population qualifies as a DPS does FWS apply the five factors of section 4(a)(1) to determine whether or not the DPS is endangered or threatened. "If a population segment is discrete and significant (i.e. it is a distinct population segment) its evaluation for endangered or threatened status will be based on the Act's definitions of those terms and a review of the factors enumerated in section 4(a)." DPS Policy, 61 Fed. Reg. at 4725 (U.S.Add. 30). *Accord Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) ("[i]n determining whether

to list a species as threatened or endangered, the Service must first define the species so the agency can estimate its population").

Moreover, the DPS Policy explicitly states that it governs the identification of DPSs "for the purposes of listing, delisting, and reclassifying under the Act." *Id.* It follows that a DPS can be identified for the purpose of delisting or downlisting it, as well as for listing or uplisting it.[7] The DPS Policy directly contradicts the claim that FWS's authority to recognize a DPS is a "one-way ratchet" that can only be used to list or uplist a population.

The rule and the Solicitor's opinion both clearly explained that under the DPS Policy, a population that is both discrete and significant can be identified as a DPS. Assigning conservation status is not part of the process of identifying a DPS; it is just the next step to take once a DPS has been identified: FWS must then determine whether the DPS should be listed, delisted, or reclassified. *See* Rule, 76FR81669;

---

[7] This aspect of the DPS Policy, which makes clear that a DPS can be recognized to reduce as well as to increase the level of protections provided to a specific wildlife population, is consistent with Congress's intent in defining "species" to include subspecies and smaller populations. *See* FWS Br. 44-47 (legislative history).

Solicitor's opinion, AR492. Other courts have also recognized that a population "qualifies as a DPS if it is both discrete and significant. If a population is deemed to be a DPS, the inquiry then proceeds to whether it is endangered or threatened." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.,* 475 F.3d 1136, 1138 (9th Cir. 2007) (internal citation omitted); *see also Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009) ("after deciding whether a population of fish or wildlife constitutes a 'species' or a 'distinct population segment,' NMFS must decide whether to 'list' the species or distinct population segment").

This Court has held that FWS's interpretation of the DPS Policy "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 11 (D.C. Cir. 2013). As explained in the rule, the Solicitor's opinion, and in FWS's opening brief at 51-55, it is entirely consistent with the DPS Policy and with Congressional intent to identify a discrete and significant population and to then determine that it is neither threatened nor endangered.

### E. Plaintiffs' opinion that a DPS is not really a species does not warrant disregarding the ESA's definition of "species."

Repeatedly throughout their brief, plaintiffs emphasize that a DPS "is not a 'species' in the traditional, scientific sense of the word," as if that justified disregarding the statutory definition. HSUS Br. 36; *see also id.* at 27-28, 41, 84. Plaintiffs depict DPSs as some sort of legal fiction that "does not exist in nature," *id.* at 27, but the term DPS simply means a discrete and significant population of vertebrate fish or wildlife – in other words, a group of animals that does exist in nature, not an abstract concept.

While it is true that the term DPS is "not used in scientific literature," *id.* at 41, that is irrelevant. Congress can, and did, decide that for purposes of the ESA, a DPS is a species. When the word "species" occurs in the ESA, it by definition includes DPSs. Plaintiffs' argument that DPSs aren't "real" species and that the word "species" in the ESA therefore shouldn't always be construed to include DPSs is a clear attempt to rewrite the statutory definition, and must be rejected.

## II. The Minnesota Wolf Population Has Always Been Listed as a Separate Species, and FWS Has the Authority to Revise and Update that Listing

At the time of the original 1978 listing of *Canis lupus*, "the only major population of the gray wolf remaining anywhere in the 48 conterminous States [was] in northern Minnesota." 43 Fed. Reg. 9607, 9610 (Mar. 9, 1978) (U.S.Add.21); *see* FWS Br. 59-65. That Minnesota wolf population was recognized as one "species" and classified as threatened, while any gray wolves existing in the remaining 47 conterminous states or Mexico were lumped together as another "species" and listed as endangered. At that point in 1978, the ESA's definition of "species" had not yet been amended to add the "distinct population segment" language, but the original definition contained similar language defining "species" to include "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Under that predecessor language, FWS recognized the Minnesota population, and the population of the other 47 conterminous states plus Mexico, as distinct "species" under the Act. *Id.*

Thus, as FWS explained in the 2011 rule, the recognition of the Western Great Lakes DPS did not actually recognize a new DPS; it revised and updated the existing listing of the Minnesota wolves, which had been recognized as a separate species under the ESA since 1978, and brought that listing into conformance with the DPS Policy. 76FR81670. Since the Minnesota-based population had expanded over the intervening 33 years to inhabit Wisconsin and Michigan, and to occasionally roam through portions of several adjacent states, it also made sense to change its name to the Western Great Lakes DPS.

Plaintiffs raise a flurry of objections, most of which were also raised by the district court and are refuted in FWS's opening brief pp. 59-65.[8] Plaintiffs also argue that FWS cannot revise the boundaries of

[8] Although plaintiffs allege, HSUS Br. 46, that FWS "[t]ellingly . . . do[es] not even address" the issues discussed in the district court's opinion" at Op. 84-89, they are mistaken. Specifically, the district court's holding at Op. 82-89 that FWS cannot identify a DPS if the species is already listed at a broader taxonomic level is addressed in FWS's brief at pp. 55-59. The district court's holding, Op. 84-86, that contrary to FWS's longstanding regulations, a listed species does not include "all lower taxonomic units" including "all species, subspecies, and populations of that genus," 50 C.F.R. § 17.11(g), is discussed at FWS Br. 42-44 and 56. The district court's presumption, Op. 87-89, that the term "significant portion of its range" refers to the species' maximum historical range is refuted at FWS Br. 67-74.

the Minnesota species because doing so would necessarily alter the boundaries of the "catch-all"[9] grouping listed as a species in the 1978 rule. Plaintiffs assert that FWS cannot do that absent a wholesale reconsideration of the status of all wolves nationwide.

Plaintiffs' argument contains one small kernel of factual truth, from which plaintiffs attempt to draw several incorrect factual and legal conclusions. The kernel of truth is that expanding the boundaries of the Western Great Lakes DPS to reflect the Minnesota wolves' territorial expansion since 1978 necessarily entails contracting the boundaries of the catch-all listing. Plaintiffs are wrong, however, in suggesting that FWS lacks the authority to do that; that it did not properly exercise that authority; or that in so doing, it delisted any wolves other than those that are part of the Minnesota-based species.

FWS clearly stated in the Rule that it was "revis[ing] the existing listing of a species (the gray wolf in Minnesota *and the gray wolf in the*

---

[9] Plaintiffs refer to the other listing as the "lower 48" listing, but that is confusing because it explicitly excluded Minnesota and included Mexico. That listing has since been modified by the delisting of the gray wolf in Montana, Idaho, and parts of four other states. Given the other listing's intent to include gray wolves south of Canada other than the Minnesota population, we refer to it as the "catch-all" listing.

*lower 48 States and Mexico, excluding Minnesota*) to identify a Western

Great Lakes DPS and determine that it is healthy enough that it no

longer needs the Act's protections." 76FR81670 (emphasis added); *see*

*also* 76FR81725 ("revising the entries for "Wolf, gray" and "Wolf, gray

[Northern Rocky Mountain DPS]"). As FWS explained in the rule, FWS

has "authority to make determinations under section 4(a)(1) and to

revise the endangered and threatened species list to reflect those

determinations under section 4(c)(1)." 76FR81670; *see also* pp. 6-9,

*supra*; FWS Br. 36-49.

Plaintiffs allege that the rule affected not only the boundaries of

the catch-all listing but also its wolf population. HSUS Br. 46. That

allegation falsely suggests that wolves *other than members of the*

*expanded Minnesota population* were swept into the expanded

boundaries of the Western Great Lakes DPS and delisted.[10] That is

---

[10] Although there was essentially no wolf population in the rest of the
conterminous United States when the catch-all listing was created, that
has changed. FWS reintroduced wolves in central Idaho and
Yellowstone National Park in the 1990s, and a large and healthy wolf
population now inhabits the Northern Rocky Mountains. Wolves have
been delisted (and thus removed from the catch-all listing) in most of
the Northern Rocky Mountain DPS, including Montana, Idaho, and
parts of Washington, Oregon, and Utah. Wolves also inhabit Wyoming,

simply not the case: "[t]he western boundaries of the [Western Great Lakes] DPS are approximately 400 mi . . . from the nearest known gray wolf packs in Wyoming and Montana" and "[t]here are no known populations of gray wolves to the south or east of the [Western Great Lakes] DPS." 76FR81671. The only wolves occurring within the boundaries of the Western Great Lakes DPS are members of the Minnesota-based listed species, which has simply expanded into neighboring states.

Thus, the rule explicitly did modify the boundaries of both of the pre-existing listings for *Canis lupus* – the Minnesota listing, and the catch-all listing. FWS plainly acknowledged in the rule that it was doing that, and it correctly explained its authority to do so. The only wolf population whose status was affected by the delisting, however, was the Western Great Lakes DPS. Plaintiffs' suggestion that the boundary change delisted wolves from other populations is simply contrary to the record.

---

California, and western Oregon and Washington, where they remain listed under the catch-all listing. There is also a small, endangered population of Mexican gray wolves (*Canis lupus baileyi*) in the Southwest and Mexico.

### III. FWS's INTERPRETATION OF THE PHRASE "SIGNIFICANT PORTION OF ITS RANGE" IS REASONABLE AND ENTITLED TO *CHEVRON* DEFERENCE

Plaintiffs argue that the Western Great Lakes DPS is endangered because it does not occupy all of its historical range. Their argument rests on their insistence that the ambiguous phrase "significant portion of its range" refers to the species' maximum historical range, not its current range. FWS has explained, however, in both the rule and a formal policy, that the word "range" in that phrase refers to the species' current range. FWS's interpretation is consistent with the language and purpose of the ESA, and is entitled to deference.

### A. FWS reasonably interprets the ambiguous phrase "significant portion of its range" to refer to a species' current, not historical, range.

The ESA defines an endangered species as one "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a threatened species as one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Neither the word "range" nor the phrase "significant portion of its range" is defined in the ESA, and the terms have been widely recognized as ambiguous.

FWS explained in the rule that the word "range" in the phrase

"significant portion of its range" refers to a species' current, rather than

historical, range. 76FR81722; *see also* FWS Br. 68-73. FWS, acting

jointly with NMFS, has since published a legally-binding policy

confirming that interpretation. *Final Policy on Interpretation of the*

*Phrase "Significant Portion of Its Range" in the Endangered Species*

*Act's Definitions of "Endangered Species" and "Threatened Species*," 79

Fed. Reg. 37,578, 37,583 (July 1, 2014) (SPR Policy) (U.S.Add. 31). Both

the rule and the SPR Policy interpret an ambiguous term in a statute

the agency administers, and are therefore due deference under *Chevron.*

*City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013).

Despite that compelling proof that FWS interprets "range" to

mean current range, plaintiffs blithely assert that "[b]oth FWS and the

federal courts have consistently recognized that the term 'range' refers

to the species *historical range."* HSUS Br. 48. In support, plaintiffs cite

two listing rules in which FWS noted that the species had been

eliminated from much of their historical ranges. The fact that FWS

considers the loss of historical range, however, hardly shows that FWS

defines "range" to mean "historical range." The use of the modifier

"historical" suggests the opposite. Moreover, even if FWS ever had interpreted "significant portion of its range" to refer to historical range – and there is no evidence that it did – its current interpretation is clear, reasonable, and entitled to deference.

As FWS and NMFS explained in the SPR Policy, the loss of historical range is often relevant in assessing a species' status, because it may reduce population numbers or available habitat. U.S.Add.38. The agencies consider the loss of historical range, among many other factors, in determining whether a species is in danger of extinction throughout all or a significant portion of its range. Determining whether a species "is" in danger of extinction however, requires consideration of its *present* conditions. "[T]o say a species 'is in danger' in an area where it no longer exists – *i.e.* in its historical range where it has been extirpated – is inconsistent with common usage. Thus, 'range' must mean 'current range,' not 'historical range.'" SPR Policy, U.S.Add.37.

Plaintiffs rely on *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001), but "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron*

deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 982-83 (2005). The Ninth Circuit in *Defenders of Wildlife* described the phrase "significant portion of its range" as "inherently ambiguous." 258 F.3d at 1144. That 2001 decision does not, therefore, preclude FWS's interpretations in the 2011 rule and the 2014 SPR Policy.

Plaintiffs also argue that FWS's interpretation of "significant portion of its range" is "identical" to the statutory definition of "critical habitat"; that this renders the phrase "significant portion of its range" redundant; and that FWS's interpretation must therefore be rejected. Plaintiffs' argument amounts to the claim that, because critical habitat by statutory definition does *not* include the entire area that could be occupied by a species, "significant portion of its range" therefore *must* include the entire area that could be occupied by a species, or else the two terms would mean the same thing, which cannot be allowed. HSUS Br. 57.

The two terms are far from identical. Critical habitat, for example, can include areas that are not part of the species' current range, whereas "significant portion of its range" cannot. 16 U.S.C. § 1532(5)(A)(ii). More importantly, the two terms perform different roles in the statutory scheme. The "significant portion of its range" analysis is part of the process for determining if a species warrants listing; FWS analyzes whether a species is in danger of extinction in a "significant portion of its range" to determine whether or not it is endangered or threatened. Critical habitat, by contrast, is one of the protections that the ESA provides to listed species – FWS designates and protects critical habitat to facilitate the species' recovery.

It is not surprising that the two concepts would have some overlap, since they both generally describe areas important to the species' survival, but they have distinct roles in the statutory scheme and do not cover identical ground, legally or physically. The fact that the terms use related concepts provides no basis for rejecting the sound and thorough interpretation set forth in the rule and the SPR Policy.

Even if the two terms were identical, which they are not, that would not be enough to overcome the compelling textual arguments

supporting FWS's interpretation.  *See* SPR Policy, U.S. Add.37-38; FWS

Br. 68-73.  This Court has repeatedly acknowledged that the

"preference for avoiding surplusage constructions is not absolute" and

that "[i]n some cases, redundancy may reflect the broad purpose of a

congressional statute."  *Nat'l Ass'n of Clean Water Agencies v. E.P.A.*,

734 F.3d 1115, 1126 (D.C. Cir. 2013).

> ### B. Plaintiffs' contrary interpretation is an attempt to convert the ESA's purpose from the recovery of endangered species to the restoration of recovered species.

By claiming that a species cannot be deemed "recovered," even if it

is no longer in danger of extinction, until it once again occupies its full

historical range, plaintiffs are attempting to greatly expand the scope of

the ESA.  As written, the ESA has an ambitious but clearly defined

goal: recovering species from the threat of extinction.  Once a species is

no longer "in danger of extinction," or likely to become endangered, by

any of the five factors listed in section 4(a)(1), it is deemed "recovered"

and should be delisted.  16 U.S.C. § 1533(a), (b); 50 C.F.R. § 402.02

(definition of "recovery").

In plaintiffs' view, however, recovery from the threat of extinction

is only the beginning of what the ESA could accomplish, if only this

Court would reject FWS's (and NMFS's) interpretation of "significant portion of its range" and decree that a species remains "endangered" or "threatened," even when it is no longer "in danger of extinction" or likely to become so, until it once again occupies its full historical range.

Plaintiffs argue that "there are numerous areas within the conterminous United States that contain suitable habitat and yet remain devoid of wolves. These areas include the Northeast, parts of Michigan and North Dakota, the Pacific Northwest, and other parts of the West." HSUS Br. 51. That argument has nothing to do with the relevant question in a delisting case: whether the delisted species is in fact endangered or threatened. Rather, it is about whether wolves could become more widespread or abundant in the United States. Plaintiffs are free to advocate for that result, but the ESA does not require maximum abundance or distribution as a condition for delisting. It requires only that the species be not in danger of extinction, and not likely to become so in the foreseeable future.

Moreover, with the exception of "parts of Michigan and North Dakota," the areas in plaintiffs' list of unoccupied suitable habitat are not affected by the delisting of the Western Great Lakes DPS. Nothing

in the rule under review precludes a possible future decision to reintroduce wolves in the Northeast or to facilitate their ongoing expansion into the Pacific Northwest or other areas where they remain listed.

## C. FWS properly analyzed whether the Western Great Lakes DPS was in danger of extinction in all or a significant portion of its range.

Plaintiffs argue, HSUS Br. 52-53, that FWS "ignored significant portions of the range" within the Western Great Lakes DPS, because FWS focused on the species' viability in the core areas of Minnesota, Michigan, and Wisconsin. The reasons why FWS's analysis was correct and sufficient are explained in FWS's opening brief at 73-74.

## IV. FWS'S DECISION WAS BASED ON THE BEST AVAILABLE SCIENCE

### A. There was no improper political influence on FWS's decision to delist the Western Great Lakes wolves

Beginning in March 2010, FWS received a series of citizen petitions to delist the gray wolf in the Western Great Lakes area, which it processed in accordance with the ESA's requirements. FWS issued its required 90-day finding on those petitions in September 2010, concluding that the petitions presented substantial information indicating that delisting may be warranted. 75 Fed. Reg. 55,730 (Sept.

14, 2010); 16 U.S.C. § 1533(b)(3)(A).  That finding required FWS to determine, within 12 months of receiving the petitions, whether delisting is in fact warranted; if so, FWS must "promptly" publish a proposed rule delisting the species.  16 U.S.C. § 1533(b)(3)(B).

In December 2010, three months *after* FWS had released its finding that the delisting petitions may be warranted, Senator Amy Klobuchar of Minnesota wrote to FWS urging it to "expedite the delisting" and informing FWS of her intention to "introduc[e] legislation to help speed-up this process."  AR2732.  FWS responded that it was "working to publish, by April 2011, a proposed rule to delist the wolf. We aim to publish a final determination by the end of 2011."  AR2769. Plaintiffs argue that FWS's response improperly "presumed a delisting outcome," HSUS Br. 65, but that presumption merely reflects FWS's September 2010 finding that delisting may be warranted.  Moreover, the gray wolf population of the Western Great Lakes had vastly exceeded its recovery goals for over a decade, and FWS had long taken the position that it was recovered.  *See* FWS Br. 14-16.  There is simply no evidence that FWS was working on a proposed rule to delist the wolves because of pressure from Sen. Klobuchar, rather than because

the wolves had recovered and meritorious petitions to delist them were pending.

Plaintiffs also allege that, by committing to a timeline, FWS abandoned its duty to base its decisions on the best available science, but the incident plaintiffs cite in support of that allegation actually proves the opposite. Plaintiffs cite an internal FWS document discussing whether FWS should re-open public comment on the proposed rule to allow comment on a new study, published after the proposed rule was issued. AR11749; HSUS Br. 64-65 n.36. The document expressed concern that re-opening public comment could result in "[d]elay[ing] final decision on the [Western Great Lakes] DPS beyond commitment to Sen. Klobuchar." *Id.* What plaintiffs fail to mention, however, is what FWS actually *did*: it re-opened comment for consideration of the new study. 76 Fed. Reg. 53379 (Aug. 26, 2011). FWS's actions speak louder than plaintiffs' words, proving that FWS did not let its timeline compromise its statutory duties to conduct a robust public process and to base its decision on the best scientific and commercial data available.

The cases plaintiffs cite, which reject agency decisions where political interference tainted the outcome, are inapposite because there is no evidence that FWS's decision to delist the wolves was based on anything other than its determination, based on the best available science, that the wolf population is recovered.

### B. FWS's decision not to change the taxonomic classification of *Canis lupus lycaon* did not require it to abandon the delisting rule

FWS proposed two changes in the proposed rule. First, it "propose[d] to identify the Minnesota population" as the Western Great Lakes DPS "and to remove this DPS from the List." 76FR26086. Second, FWS proposed to "recognize recent taxonomic information indicating that the gray wolf subspecies *Canis lupus lycaon* should be elevated to the full species *C. lycaon.*" *Id.*

Public comment revealed significant opposition within the scientific and environmental communities to the proposed recognition of the eastern wolf as a full species rather than as a subspecies of *Canis lupus*. In addition, a new study, published after the proposed rule, reinforced the traditional classification. FWS responded by reopening public comment to solicit comments specifically on the taxonomic issue.

76 Fed. Reg. 53379 (Aug. 26, 2011).  In the same notice, FWS informed the public that the two proposals in the original rule – to delist the Western Great Lakes DPS, and to recognize the eastern wolf as a full species – might be separated into two separate agency actions.  *Id.*[11]

The public- and peer-review processes convinced FWS to reject the proposed change in taxonomy because the proposed change "represents neither a scientific consensus nor the majority opinion of researchers on the taxonomy of wolves."  76FR81669.  FWS explained that

> In light of the ongoing scientific debate, and the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes, we are at this time continuing to recognize *C. lupus* as the only species that occurs in the WGL.  The wolves that occupy the WGL DPS have long been accepted as gray wolves, *C. lupus*, and until greater scientific consensus is reached regarding whether to revise this taxonomic classification, the better conclusion is to continue to recognize them as gray wolves.

*Id.*

Plaintiffs do not challenge FWS's decision not to recognize *Canis lycaon* as a species, but they argue that having rejected the change,

---

[11] Plaintiffs argue that FWS should have re-opened comment, HSUS Br. 58 n.31, apparently forgetting that FWS did.

FWS was constrained to reject the delisting rule as well. Plaintiffs advance two arguments, both meritless, in support of their view.

First, plaintiffs allege that the taxonomic reclassification was "the underlying premise" for recognizing the Western Great Lakes population as a DPS, and without the reclassification, "the support for a separate DPS disappeared." HSUS Br. 58. Plaintiffs cite no record support for their claim that identification of the DPS depended on recognizing *C. lycaon* as a species, and there is none. A DPS is a *distinct* and *significant* population of vertebrate fish and wildlife, and FWS reasonably found that the wolf population of the Western Great Lakes states satisfies that definition. 76FR81671-72. There is simply no connection or dependency between FWS's decision that the Western Great Lakes wolf population is a DPS, and its decision not to recognize that population as part of a new, separate taxonomic species of wolf.

Second, plaintiffs suggest that, absent scientific consensus on the taxonomic classification of wolves in the Western Great Lakes states, FWS cannot act; otherwise, plaintiffs argue, FWS would not know what species it is delisting. HSUS Br. 61. Here again, plaintiffs are attempting to substitute the common meaning of the word "species" for

the ESA's definition.  *See supra* 13-14.  The rule is abundantly clear that the "species" that FWS is delisting is the Western Great Lakes DPS.  Plaintiffs' assertion that FWS cannot delist that DPS unless scientific consensus exists about its taxonomic classification is wholly without support.

The ESA requires FWS to base listing determinations on the "best scientific and commercial data available," not on scientific certainty.  16 U.S.C. § 1533(b)(1)(A).  This Court has repeatedly rejected claims that FWS cannot act on imperfect or incomplete scientific information, if it is the best available.  *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (FWS "must utilize the 'best scientific … data *available*', not the best scientific data *possible*").  In fact, this Court has held that FWS *must* rely on inconclusive scientific information, if it is the best available.  *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).

To show that FWS violated the duty to base its decision on the best scientific data available, plaintiffs must point to "available scientific evidence that is in some way better than the evidence [FWS] relie[d] on."  *Id.*  Plaintiffs do not even attempt to carry that burden,

relying instead on the mere assertion that in the absence of scientific consensus, no conclusion by FWS is scientifically defensible. That assertion is contrary to this Court's precedents and the plain language of the ESA.

## V.   FWS'S CONCLUSION THAT THE WESTERN GREAT LAKES DPS IS NEITHER THREATENED NOR ENDANGERED IS REASONABLE AND SUPPORTED BY THE RECORD

After a thorough review of the evidence, 76FR81688-81723, FWS concluded that the Western Great Lakes DPS is neither threatened nor endangered because of any of the five enumerated factors that statutorily guide its determination, 16 U.S.C. § 1533(a)(1)(A)-(E), a finding with which the peer reviewers unanimously concurred. AR11652; AR11709; AR12769. The district court reversed, holding that the wolves remain threatened by disease, human-caused mortality, and inadequate regulatory mechanisms. Op.100-107. The reasons why those holdings were erroneous are explained in FWS's opening brief at pp. 74-84.

Plaintiffs claim, HSUS Br. 68, that the Western Great Lakes DPS remains endangered by disease and human-caused mortality, but they do not identify any evidence that FWS allegedly overlooked; indeed

they cite to nothing but the rule itself. Plaintiffs quote the rule's discussion of how disease and human-caused mortality affect wolves, and then simply state that "despite these risks," FWS delisted the DPS, as if that somehow showed error in FWS's determination. Plaintiffs appear to believe, like the district court, that if any of the statutory factors *affect* a species, then the species is endangered or threatened by that factor, but that is absurd. Of course wolves, like all species, are *affected* by disease and human-caused mortality, but FWS found, based on the best scientific data available, that the "high reproductive potential of wolves allows wolf populations to withstand relatively high mortality rates," 76FR81700, and that the population was neither threatened nor endangered by disease or human-caused mortality. Plaintiffs identify no contrary evidence, and their mere disagreement with FWS's conclusion does not warrant overturning FWS's sound, record-supported conclusion. *In re Polar Bear*, 709 F.3d at 3.

Plaintiffs also claim that the DPS is threatened by inadequate regulatory mechanisms because "there is little question that, upon delisting, the hunting, and other killing, of wolves will likely increase under state management plans." Without explanation, they assert that

"[t]he Final Rule therefore violates the express terms of the ESA."

HSUS Br. 69. Once again, however, plaintiffs neglect to provide the

"express" language that allegedly proves their point. In truth, nothing

in the ESA prohibits states from authorizing regulated hunting of a

recovered species, as long as it does not cause population levels to fall

below recovery levels.

FWS specifically discussed the impact of hunting in evaluating the

states' regulatory mechanisms. For example, FWS noted that

Minnesota may authorize hunting seasons for wolves, but noted that

Minnesota's management plan requires that population-management

measures, including hunting seasons, "be implemented in such a way to

maintain a statewide late-winter wolf population of at least 1,600

animals, . . . well above the planning goal of 1,251 to 1,400 wolves for

the State in the Revised Recovery Plan." 76FR81703. Similarly, FWS

acknowledged that Wisconsin might authorize hunting, but that

harvest would be limited by the state's commitment to maintaining "a

statewide population of 361 to 385 wolves in late winter" – well above

the recovery level of 100. 76FR81709; 76FR81675. Michigan's wildlife

agency lacked the legal authority to authorize wolf hunting, but FWS

noted that even if it should be granted such authority in the future, "the [Michigan Department of Natural Resources'] history of leadership in wolf recovery and its repeated written commitments to ensure the continued viability of a Michigan wolf population" reinforces the conclusion that Michigan's management "will provide adequate regulatory mechanisms for Michigan's wolves." 76FR81711. Wolf hunting is not authorized in any of the other six peripheral states. 76FR81713; *accord* HSUS Br. 70 (admitting that Illinois and the "other five states do not permit the active hunting of wolves").

The only "evidence" plaintiffs identify in an attempt to undermine FWS's conclusions is an extra-record document, postdating the final rule by three years, showing that Minnesota's wolf population at the end of the first year of state management declined from the previous survey, which was taken in 2007-2008.[12] "[I]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it

_____

[12] The document does not indicate how much, if any, of that decline occurred between 2008 and 2011, when the species was federally listed, and how much, if any, of it occurred during 2012, when it was under state management.

made its decision," and this case does not fall within the "narrow set of exceptions" to that rule. *Hill Dermaceuticals, Inc. v. Food & Drug Admin.,* 709 F.3d 44, 47 (D.C. Cir. 2013) (holding that extra-record evidence "at most . . . may be invoked to challenge gross procedural deficiencies – such as when the administrative record itself is so deficient as to preclude effective review").  If this Court decides to consider plaintiffs' extra-record document, however, then it should be aware that plaintiffs are cherry-picking negative statistics from the report.  The next page of the same document shows that Minnesota's estimated wolf population increased by almost 10% the following year, while still under state management.  More importantly, it shows that even at its lowest point, Minnesota's wolf population was still almost 1,000 wolves over the recovery plan's minimum population goal for Minnesota.  76FR81675.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

JOHN C. CRUDEN
  *Assistant Attorney General*

*Of Counsel:*
BENJAMIN C. JESUP
SHARON PUDWILL
  *Office of the Solicitor*
  *U.S. Department of the Interior*
  *Washington, DC 20240*

DAVID C. SHILTON
ANDREA GELATT
MICHAEL R. EITEL
JOAN M. PEPIN
  *Environment & Nat'l Res. Div.*
  *U.S. Department of Justice*
  *P.O. Box 7415*
  *Washington, D.C. 20044*
  *(202) 305-4626*
  *joan.pepin@usdoj.gov*

APRIL 2016
90-8-6-07449

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitations of this Court's order of July 29, 2015, which authorized the Federal Appellants to file a reply brief not to exceed 8,000 words. The foregoing brief contains 7,998 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

s/ Joan M. Pepin

_____
JOAN M. PEPIN

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2016, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Joan M. Pepin

_____

JOAN M. PEPIN