No. 15-5041
(Consolidated with 15-5043, 15-5060, and 15-5061)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

HUMANE SOCIETY OF THE UNITED STATES, *et al.,*
Plaintiffs-Appellees,

v.

S.M.R. JEWELL, *et al.,*
STATE OF WISCONSIN, *et al.,* and
U.S. SPORTSMEN'S ALLIANCE FOUNDATION, *et al.,*
Appellants-Defendants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

REPLY BRIEF FOR APPELLANTS-DEFENDANT-INTERVENORS
HUNTER CONSERVATION COALITION
_____

Hunter Conservation Coalition Appellants-Defendant-Intervenors

James H. Lister (D.C. Bar # 447878)
Melinda L. Meade Meyers (D.C. Bar #1022572)
Birch Horton Bittner and Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
jlister@dc.bhb.com
mmeademeyers@dc.bhb.com
*Attorneys for Appellants-Defendant-Intervenors: Sportsmen's Alliance; Wisconsin Bear Hunters Association; Michigan United Conservation Clubs; Wisconsin Bowhunters Association; Upper Peninsula Bear Houndsmen Association; Michigan Hunting Dog Federation; and Rocky Mountain Elk Foundation*

Anna M. Seidman (D.C. Bar # 417091)
Douglas S. Burdin (D.C. Bar # 434107)
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Attorneys for Appellant-Defendant-Intervenor*
*Safari Club International*

Michael T. Jean (MI Bar No. P76010)
National Rifle Association of America/ILA
11250 Waples Mill Road., 5N
Fairfax, VA 22030
Telephone: (703) 267-1158
Facsimile: (703) 267-1164
mjean@nrahq.org
*Counsel for Appellant-Defendant-Intervenor National Rifle Association of America*

John I. Kittel
U.S.C.A. for D.C. Cir. Bar No. 55798
Mazur & Kittel, PLLC
30665 Northwestern Hwy. Suite. 175
Farmington Hills, MI 48334
Telephone: (248) 432-8000
Facsimile: (248) 432-8010
jkittel@mazur-kittel.com
*Co-Counsel for Appellants-Defendant-Intervenors Michigan Conservation Clubs and Rocky Mountain Elk Foundation*

Dated: May 11, 2016

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ......................................................................... ii

GLOSSARY..............................................................................................iii

SUMMARY OF ARGUMENT ......................................................................1

ARGUMENT ...........................................................................................2

I.    The District Court's View Makes the Right to Petition for Delisting of a Recovered DPS Meaningless...................................2

II.    The District Court's Interpretation Discourages Conservation ...........6

III.    The District Court's Opinion Undermines Congress's Caution to Use DPSs "Sparingly" .........................................................9

IV.    The Center for Biological Diversity's Proposed Process for Implementing Delisting Reads Non-Existent Procedural
V.    Constraints into the ESA ...................................................................10

    A.    Not every area within a broader listing must be assigned to a DPS for a recovered DPS to be recognized and delisted.......11

    B.    The ESA does not require a waiting period between DPS recognition and delisting. ...................................13

    C.    The ESA has no requirement that the examination and designation of a DPS must be done separately .................13

V.    HSUS's Dispersal Argument is Fact-Based and Was Lawfully Rejected by the Agency. ......................................................13

CONCLUSION ......................................................................................15

# TABLE OF AUTHORITIES

Page

**CASES**

*Am. Wildlands v. Kempthorne*
530 F.3d 991 (D.C. Cir 2008) .........................................................................14

*Chevron USA Inc. v. Natural Res. Def. Council*
467 U.S. 837 (1984) ........................................................................................4

*Friends of Endangered Species v. Jantzen*
596 F. Supp. 518 (N.D. Cal. 1984) ..............................................................7, 8

**STATUTES**

Public Law 97-304, 96 Stat. 1411 (1982) ........................................................ 7

Administrative Procedure Act ("APA")
5 U.S.C. § 553 ................................................................................................13

Endangered Species Act ("ESA")
16 U.S.C. § 1531(a) ..........................................................................................6
16 U.S.C. § 1532(16) ....................................................................................... 4
16 U.S.C. § 1533(b)(1)(A) .................................................................................3
16 U.S.C. § 1533(b)(3)(A) ..............................................................................2, 3
16 U.S.C. § 1537 ...............................................................................................7
16 U.S.C. § 1539(a) ..........................................................................................7

**REGULATIONS**

50 C.F.R. § 17.11(g) ..........................................................................................5
50 C.F.R. § 17.84(n) ........................................................................................11

61 Fed. Reg. 4,722 (Feb. 7, 1996) ......................................................3, 11, 12, 13
75 Fed. Reg. 55,730 (Sept. 14, 2010) ...............................................................5
76 Fed. Reg. 81,666 (Dec. 28, 2011) .........................................................14, 15

**LEGISLATIVE HISTORY**

119 Cong. Rec. S14509, S14515 (July 24, 1973) ...............................................7

# GLOSSARY

APA ............................................................................ Administrative Procedure Act

AR ............................................................................... Administrative Record

CBD .......................................................................... Center for Biological Diversity

DPS ............................................................................ Distinct Population Segment

ESA ............................................................................. Endangered Species Act

FWS ............................................................................ U.S. Fish and Wildlife Service

HCC ........................................................................... Hunter Conservation Coalition

WGL ........................................................................... Western Great Lakes

# SUMMARY OF ARGUMENT

Contrary to congressional intent, the district court's erroneous interpretation of the Endangered Species Act ("ESA") discourages public participation in conserving and recovering species. In their Opposition, Plaintiff-Appellees Humane Society of the United States et al. ("HSUS") offer no reasoned response to the point that the district court's interpretation of the ESA leaves states and private citizenry of the Western Great Lake ("WGL") states with little incentive to contribute to wolf recovery. Under the district court's view that the U.S. Fish and Wildlife Service ("FWS") lacks authority to designate Distinct Population Segments ("DPSs") for the purpose of delisting recovered populations, those who participate in conservation of a federally listed species in their area are not rewarded for their efforts because delisting depends on matters beyond their control – the fortuity of whether other unconnected wolf populations, separated by impassable geographic barriers and unsuitable habitat, also recover. If the district court's ruling is not vacated, those same disincentives will apply to public participation in the conservation of any species composed of multiple unconnected populations. Further, the district court's decision renders useless the statutory right of states and individuals to petition for the delisting of recovered populations, forces FWS to give DPSs second-class treatment compared to species and subspecies, and compels FWS to violate Congress's caution to use DPSs

"sparingly." While Amicus Center for Biological Diversity ("CBD") concedes that FWS may utilize a DPS designation for delisting and suggests a less extreme alternative, it asks this Court to accept non-existent procedural constraints for doing so. Defendant-Intervenor-Appellants Hunter Conservation Coalition ("HCC") address these issues and otherwise respond to the arguments of HSUS and CBD below.

## ARGUMENT

### I. The District Court's View Makes the Right to Petition for Delisting of a Recovered DPS Meaningless.

While the district court's interpretation of the ESA does not deprive citizens the ability to *file* a petition for the delisting of a recovered DPS, it renders any attempt to achieve that statutorily permitted result futile. The district court ruling handcuffs FWS to its past decisions to list at the taxon-level, continental-U.S. level, or another broader level, preventing FWS from recognizing the existence of valid DPSs within that older broader listing and from evaluating the DPS's proper listing status based on the best scientific and commercial data currently available. Consequently, private citizens' statutory right to petition for delisting of a species (a right HCC members exercised successfully in this case) has been eviscerated. *See* 16 U.S.C. § 1533(b)(3)(A).

After determining a petitioned action "may be warranted," FWS must review "the status of the species concerned" based on "best scientific and commercial data available to [it]." *See* 16 U.S.C. § 1533(b)(3)(A), (b)(1)(A). The ESA does not contain any limitation requiring FWS to consider the best present-day science available and then apply that data only to the extent that it conforms to the scope of the agency's past listing decisions. Such a requirement would force FWS to deny petitions for recognition and delisting of a DPS that properly meets modern criteria, even in situations where the population at issue could not have been listed at the DPS level originally.[1]

If the best science available when a citizen petition is submitted demonstrates that a population (a) is discrete from other populations, and thus a "distinct … segment"; and (b) qualifies as "significant" under FWS's DPS Policy, FWS must be free to recognize the existence of the DPS within the older, broader listing. AR000075A-000079A (1996 DPS Policy). HSUS points to no statutory provision mandating that FWS adhere to its prior decisions regarding listing level (taxon-wide, continental U.S. wide, DPS-by-DPS) and disregard the best available

---

[1] This is particularly absurd for species such as *Canis lupus* that FWS listed before Congress created the DPS tool, although HSUS continues to argue that the Minnesota wolf population cannot be a DPS for this reason. *See* HSUS Br. 43-45. FWS would also have to deny petitions for recognizing and delisting a DPS that did not qualify as a DPS at the time of the broader species listing, but presently meets all elements for DPS recognition.

science in favor of blind adherence to older decisions. Such handcuffing would render meaningless a citizen's right to submit a petition and have it decided based on the best scientific data presently available. FWS would have to respond in its denial: "Yes, you have identified a population that qualifies as a DPS under our Policy, but we cannot recognize that DPS because of a decision we made in 1978 to list the species at a broader level, before Congress clarified our authority to recognize and designate DPSs." Nothing in the ESA compels that unreasonable application of statutory authority. The statutory text contains ample flexibility for this Court to affirm FWS's reasonable interpretation of the statute as permitting recognition and delisting of a recovered DPS under a *Chevron* Step One or Step Two analysis. *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-45 (1984).[2]

---

[2] HSUS incorrectly argues that DPSs are artificial constructs rather than biological entities that exist in nature, HSUS Br. 30, 84, confusing the characteristics of the term with the conditions of the entity. Although Congress "invented" the phrase "distinct population segment," and FWS established the criteria necessary for identifying a DPS, those conditions must exist in nature before FWS has the authority to designate and formally recognize a DPS. Consequently, the "artificial" origin of the phrase does not alter the fact that the biological conditions of a DPS naturally exist and are not fabricated by FWS. Upon identifying the biological conditions of a species, subspecies, or DPS, FWS has equal statutory authority to designate each of them and to take any action authorized by the ESA for a species because each qualifies as a "species" under the ESA. 16 U.S.C. §1532(16).

HSUS barely addresses HCC's point that the district court's opinion effectively denies a citizen's right to petition for delisting of any species smaller than the species identified in FWS's original listing. HCC Br. 22-24. Further, HSUS offers a wholly unpersuasive argument rejecting the Solicitor's Opinion statement that requiring a DPS to be listed before it can be delisted would "requir[e the] FWS to reject any petition requesting removal of a recovered DPS from a broader species listing," AR000497A; *see also* HSUS Br. at 39-40. HSUS once again ignores the reality that when FWS makes a species-wide listing, all animals that are part of that species are given a listing status. *See* HSUS Br. 88 n.47 ("The statute simply does not create an opportunity for a citizen to petition to remove a species not already listed."). HSUS's assertion is contrary to the regulations, and to common sense. *See* 50 C.F.R. § 17.11(g) ("The listing of a particular taxon includes all lower taxonomic units.").

Here, in making its "may be warranted" finding, FWS recognized that hunting organizations and others had filed meritorious petitions for DPS recognition and delisting. FWS Reply Br. 29; 75 Fed. Reg. 55,730 (Sept. 14, 2010). After reviewing the petitions and fulfilling its duty to examine a potential delisting under the best scientific evidence available, FWS took the appropriate action – delisting. HSUS asks this Court to ignore the reality that the district court's interpretation of the ESA not only requires FWS to violate its duty to act

according to the best available science, but it guts a citizen's right to petition its government for the delisting of a recovered species, including a DPS. This result is contrary to law.

## II. The District Court's Interpretation Discourages Conservation.

Congress's intent in establishing the ESA was not simply to grant FWS authority to provide federal protection for species in jeopardy. Rather, Congress imbued in the ESA (and its amendments) strategies intended to encourage the public to directly participate in species conservation.[3] Evidence of Congress's intent is found in the ESA's original language, amendments, and legislative history. The ESA's "Findings" state:

> The Congress finds and declares that –
>
> …
>
> (5) *encouraging the States and other interested parties*, *through* Federal financial assistance and *a system of incentives, to develop and maintain conservation programs* which meet national and international standards *is a key to* meeting the Nation's international commitments and *to better safeguarding*, for the benefit of all citizens, the Nation's heritage in *fish, wildlife, and plants*.

16 U.S.C. § 1531(a) (emphasis added).

Similarly, the ESA's legislative history documents the drafters' intent. During discussions leading to the ESA's passage, Senator Tunney stated:

---

[3] *See also* HCC Br. 20-22 (discussing how the district court holding hinders state and private cooperation in administering the ESA).

> Among the greatest contributions that have been made to the
> conservation, restoration, protection, and propagation of endangered
> and threatened species are the contributions made by private citizens.
> Exceptions to the prohibitions could be made by the Secretary
> wherever possible to encourage individual actions which will further
> the purposes of this act.

119 Cong. Rec. S14509, S14515 (July 24, 1973). The ESA incentivizes not only

U.S. citizens but also foreign citizens and states to participate in conservation

efforts. *See* 16 U.S.C. § 1537 (entitled "International cooperation").

Congress's intent to increase private citizens' incentives to participate in

species conservation efforts is evident in other ESA contexts besides delisting. In

1982 Congress amended the ESA and added incidental take permit strategies to

provide additional private conservation incentives. P.L. 97-304 (Oct. 13, 1982); 16

U.S.C. §1539(a). Taking special note of Congress's motivations, the court in

*Friends of Endangered Species v. Jantzen* relied on Congress's plan to encourage

private conservation efforts as its reason for denying a preliminary injunction

motion to stop the incidental take of endangered species:

> In amending the Endangered Species Act to allow this and similar
> projects, Congress indicated its intent to encourage private
> participation in the conservation process, with adequate agency
> supervision to insure results consistent with the spirit of the Act. In
> discussing the Amendment to Section 10(a), the Conference Report
> states:
>
>> To the maximum extent possible, the Secretary should utilize
>> his authority under this provision to encourage creative
>> partnerships between the public and private sectors and among

government agencies in the interest of species and habitat conservation.

596 F. Supp. 518, 527 (N.D. Cal. 1984) (quoting H.R. Rep. No. 97–835, at 7185 (1982)).

Despite ample evidence of Congress's intent to encourage private participation in species conservation, the district court chose a contrary interpretation of the ESA. Under this erroneous view, private citizens who successfully labor to achieve recovery of a DPS with which they interact will lose any ability to seek delisting of that recovered population if other unrelated populations do not or cannot achieve the same recovery. Under this interpretation of the ESA, citizens whose livelihood and/or recreational activities directly and indirectly suffer from the presence of the listed species will have no reason to participate in efforts that increase the numbers and range of discrete populations in their area when the non-recovery of other unconnected population outside of their control blocks delisting. Here, for example, WGL hunters have for decades funded wolf conservation by buying hunting licenses.[4] Under the district court's

---

[4] Hunting license fees are a substantial funding source for state agency conservation work, funding between 65% and 84% of the WGL states' Departments of Natural Resources or Wildlife budgets. *See* Minnesota: http://www.dnr.state.mn.us/ licenserevenue/index.html; Wisconsin: http://dnr.wi.gov/wnrmag/2016/02/ insert%201.pdf; Michigan: http://house.michigan.gov/hfa/PDF/Briefings/Natural_ Resources_Budget_Briefing_fy15-16.pdf. The Court may take judicial notice of

interpretation, despite their efforts and sacrifices, the wolves that hunters and others helped conserve remain listed and will continue to be listed because of the status of unconnected populations outside of their control. Why would hunters, or any group of citizens, participate in conservation of a listed species under such circumstances? That is not what Congress intended.

## III. The District Court's Opinion Undermines Congress's Caution to Use DPSs "Sparingly."

HSUS scoffs at HCC's examples of how the district court's opinion will require FWS to designate multiple DPSs each time it lists a species in order to avoid the crippling effect that the district court's ruling will have on future delisting decisions. HSUS Br. 85; HCC Br. 7-14. HSUS hypocritically complains that such precautionary designations would contradict Congress's recommendation that FWS utilize the DPS tool "sparingly." But it is HSUS's and the district court's strained interpretation of the statute (that FWS is forever precluded from designating and delisting a recovered DPS if it originally listed at a broader level) that is what would force FWS to ignore Congress's caution. It is this illogical view of FWS's DPS designation authority that would force FWS to recognize multiple DPSs the first time a species is listed, solely to preserve flexibility for future delisting decades later. However, if the district court's opinion is reversed, FWS

_____

this publicly available information from state government websites. *See* Fed.R.Evid. 201.

will resume being free to abide by the drafters' caution and to designate DPSs when appropriate for listing *or* delisting actions – either to provide protections as needed or to recognize or reward recovery when merited. This reasonable and congressionally supported approach allows FWS to focus its energies and resources on the species in greatest need.

## IV. The Center for Biological Diversity's Proposed Process for Implementing Delisting Reads Non-Existent Procedural Constraints into the ESA.

In its amicus brief, CBD offers a "Plan B," providing a somewhat less unreasonable variation of HSUS's extreme position that a recovered population within a broader listing can never ever be delisted. Responding to HCC's brief, CBD states that a taxon-wide listing can be converted into a listing of multiple DPSs if, and only if, an agency: (1) divides the entire original listing (such as a taxon-wide listing) into DPSs, with no area left outside of a DPS; (2) waits an undefined length of time during which each DPS retains threatened or endangered status; and (3) begins a separate DPS-specific delisting proceeding with a new separate round of notice and comment. CBD Br. 22-28. CBD's "compromise" must be rejected, just like HSUS's harder-line position, because CBD proposes procedural limitations not found in the ESA.

## A. Not every area within a broader listing must be assigned to a DPS for a recovered DPS to be recognized and delisted.

A DPS is a "population segment," not a geographic area. As such, some geographic areas will have no members of the species present and so could not be part of a "distinct *population* segment." For example, under what is an essentially nationwide listing, FWS might not incorporate wolves in Arkansas into a DPS because there are no wolves in Arkansas and so no "population" to put into a DPS as required by the DPS Policy. *See* AR000075A-000079A. Members of the species not within a particular DPS retain the listing status of the originally listed species. Accordingly, CBD's stated concern that delisting the WGL DPS will create a "non-DPS remnant" misses that point. Under the December 2011 Final Rule, any wolves outside the WGL DPS and the previously delisted Northern Rocky Mountains DPS would remain listed and protected under the ESA.[5]

HSUS and CBD cannot complain if FWS leaves ESA protections in place for wolves not incorporated into a DPS because any wolf that might hypothetically be found there would be protected from "take." The status of any wolf in Arkansas, for example, remains the same whether the Final Rule is restored or not. The fate of those wolves is outside this litigation, and HSUS and CBD can address that issue in another lawsuit.

---

[5] A nonessential experimental population of wolves still exists in Wyoming. 50 C.F.R. § 17.84(n).

CBD also erroneously argues that a DPS cannot be carved out of a broader listing for delisting because a population within a species-wide listing cannot be found to be "significant" (an essential finding for a DPS designation under FWS's 1996 DPS Policy) *and* be eligible for delisting, because removing a "significant" population from ESA protections would necessarily affect that species' recovery. *See* CBD Br. 13.

First, CBD incorrectly distinguishes between a DPS within a species that is entirely divided into DPSs and a DPS within one that is not. If CBD's "significance" theory is true, its "Plan B" that allows for DPS delisting only if the entire species is divided would be prohibited also, because all DPSs would have to meet the significance test.

Second, CBD illogically asserts that FWS cannot create a DPS for the purpose of delisting because that population would necessarily have to be "insignificant" (and therefore not a DPS) for the delisting to cause no harm. *Id.* FWS considers several factors during the "significance" evaluation of a DPS, including "[e]vidence that loss of the discrete population segment would result in a significant gap in the range of a taxon." AR000079A (DPS Policy). FWS is not *required* to consider all of these factors; consequently, no factor is dispositive of "significance." *Id.* In fact, on this issue, FWS has stated:

> The Services … continue to believe that it is not possible to describe
> in advance all the potential attributes that could be considered to a

conclusion that a particular population segment is 'significant' in terms of the policy.

AR000077A.  Moreover, a "significant gap in the range" is not the same as a determination of whether a DPS is "significant."  CBD's claim that finding a population eligible for delisting necessarily leads it to fail the "significance" inquiry is insupportable.

**B.  The ESA does not require a waiting period between DPS recognition and delisting.**

Nothing in the ESA supports CBD's proposition that FWS must observe a "waiting period" after DPS recognition before DPS delisting can occur.  This procedural limitation has no statutory basis.

**C.  The ESA has no requirement that the examination and designation of a DPS must be done separately.**

CBD cites no authority that prohibits FWS from exercising its discretion to propose both DPS recognition and DPS delisting in one proceeding.  The only restriction is that, to comply with Administrative Procedure Act ("APA") rulemaking requirements, both recognition and delisting must be proposed within the notice seeking public comment.  5 U.S.C. § 553.

**V.  HSUS's Dispersal Argument is Fact-Based and Was Lawfully Rejected by the Agency.**

HSUS suggests delisting the WGL DPS prevents WGL wolves from dispersing to establish new wolf populations in presently unoccupied suitable

range.  This fact-intensive argument is predicated on the supposition that there are

significant areas of unoccupied suitable habitat surrounding the core populations in

Minnesota, Wisconsin, and Michigan reachable by dispersers.  Although FWS did

not respond at length to this factual disagreement in its Reply, there is ample

factual evidence to affirm FWS's decision, subject to deferential review.  *See Am.

Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008) (agency action

reviewed under the APA's arbitrary and capricious standard).

While the WGL wolf population has been thriving for years, there has been

no evidence of successful dispersal to form viable satellite populations in the

Dakotas or other neighboring areas (either during periods in which WGL wolves

were listed or the short periods in which they were delisted).  Wolves have not and

will not successfully disperse, regardless of their listing status, because suitable

habitats are far too fragmented, and there are not enough areas of suitable habitat to

sustain a dispersal population.  *See e.g.*, 76 Fed. Reg. 81,666, 81679 (2011)

("Although it is possible for these dispersers to encounter and mate with a mature

wolf outside the primary range, the lack of large expanses of unfragmented habitat

make it unlikely that wolf packs will persist in these peripheral areas; lack of

contiguous habitat is expected to seriously impede further expansion."); *Id.* at

81,674 ("Wolves moving substantial distances outward from the core areas of

Minnesota, Wisconsin, and Michigan will encounter landscape features that are at

least partial barriers to further wolf movement and that may, if crossed, impede attempts of wolves to return toward the WGL core areas. If such partial barriers are in a location that has separate utility in delineating the biological extent of a wolf population, they can and should be used to delineate the DPS boundary."). Areas surrounding the core recovery areas are inhospitable to wolves. Wolves cannot go south into highly populated areas filled with interstate highways. FWS has no jurisdiction to the north (Canada). The Great Lakes are to the east. To the west lie the plains of the Dakotas, an area FWS found would not support a viable wolf population. *Id.* at 81,679.

In an attempt to distract from whether the Final Rule is entitled to deference, CBD relies on extra-record citations: FWS's 2013 proposed action to delist the remaining wolves in the United States not part of the WGL DPS. Not only is this post-delisting action irrelevant to this Court's review of the 2011 WGL wolf delisting decision, but FWS never pursued the proposed 2013 delisting. This is an APA case, which requires the reviewing court to limit its consideration to the administrative record, which excludes a 2013 proposed rule FWS never adopted.

## CONCLUSION

For the foregoing reasons, this Court should affirm FWS's 2011 Final Rule and reverse the district court judgment vacating that Rule.

Dated: May 11, 2016

Respectfully submitted,

Hunter Conservation Coalition Appellants-Defendant-Intervenors

/s/ James H. Lister

James H. Lister (D.C. Bar # 447878)
Melinda L. Meade Meyers (D.C. Bar #1022572)
Birch Horton Bittner and Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile (202) 659-1027
jlister@dc.bhb.com
mmeademeyers@dc.bhb.com
*Attorneys for Appellants-Defendant-Intervenors: U.S. Sportsmen's Alliance Foundation; Wisconsin Bear Hunters Association; Michigan United Conservation Clubs; Wisconsin Bowhunters Association; Upper Peninsula Bear Houndsmen Association; Michigan Hunting Dog Federation; and Rocky Mountain Elk Foundation*

/s/ Anna M. Seidman

Anna M. Seidman (D.C. Bar # 417091)
Douglas S. Burdin (D.C. Bar # 434107)
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
*Attorneys for Appellant-Defendant-Intervenor Safari Club International*

/s/ Michael T. Jean

Michael T. Jean (MI Bar No. P76010)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1158
Facsimile: (703) 267-1164
mjean@nrahq.org
*Counsel for Appellant-Defendant-Intervenor National Rifle Association of America*

/s/ John I. Kittel

John I. Kittel
U.S.C.A. for D.C. Cir. Bar No. 55798
Mazur & Kittel, PLLC
30665 Northwestern Hwy. Suite. 175
Farmington Hills, MI 48334
Telephone: (248) 432-8000
Facsimile: (248) 432-8010
jkittel@mazur-kittel.com
*Co-Counsel for Appellant-Defendant-Intervenor Michigan Conservation Clubs and Rocky Mountain Elk Foundation*

**CERTIFICATE OF COMPLIANCE WITH**
**FEDERAL RULE OF APPELLATE PROCEDURE 32(A)**

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitations of this Court's order of July 29, 2015, which authorized the Private Appellants to file a reply brief not to exceed 3,500 words. The foregoing brief contains 3,487 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

*/s/* James H. Lister
James H. Lister (D.C. Bar # 447878)
Birch Horton Bittner & Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
jlister@dc.bhb.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2016, I electronically filed the foregoing Brief for the Appellants Hunter Conservation Coalition with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/* James H. Lister
James H. Lister (D.C. Bar # 447878)
Birch Horton Bittner & Cherot, PC
1156 15th Street, N.W., Suite 1020
Washington, D.C. 20005
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
jlister@dc.bhb.com